DAVID EISENBERG
**DAVID EISENBERG, P.L.C.**
3550 N. Central Avenue, Ste. 1155
Phoenix, Arizona 85012
Arizona State Bar No. 017218
Telephone: (602.237.5076)
Email: david@davideisenbergplc.com

Attorney for Defendant Steven Arthur Martis



UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-21-08043-001-PCT-DJH |
| Plaintiff, | **DEFENDANT'S MEMORANDUM ON SENTENCING** |
| v. | |
| Steven Arthur Martis, | |
| Defendant. | |

The Defendant Steven Arthur Martis ("Martis"), by and through undersigned counsel, respectfully submits the Defendant's sentencing memorandum in which he submits that a sentence of time served is no greater than necessary to fulfill the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). Such a sentence is based on the nature and circumstances of the events underlying the prosecution, the history and characteristics of the Defendant, the harsh impact of the sentencing guideline calculation in his case, the need for programs that will assist him while under supervision, as well as the more general concepts of just punishment, deterrence and protection of the public.

**I.  Nature and Circumstances of the Offense**

Some of the basic background to the events of this case and the single count of conviction are covered by the United States Probation Office ("USPO") in its presentence investigation report ("PSR," Doc. 79.) Other facts that impact sentencing, such as Martis' intent in making telephone calls, are taken from the PSR as well as discovery produced by the government.

**A.      The Calls**

In early 2020, the United States Capitol Police (USCP") referred a matter to the Federal Bureau of Investigation (FBI) concerning voice mail messages left with members of the United States Congress, starting the previous year in January 2019.  The investigation traced the calls to 928-487-3966, a number connected through Voice Over Internet Protocol ("VOIP") to Martis' room to the Hilltop Hotel in Bullhead City, Arizona.  Among the messages left by Martis on the voice mail systems in the Washington, D. C. offices of three members of Congress were the following: on September 4, 2019 to Congresswoman Nancy Pelosi - - "Hello Nancy, hey we're out here in California. We stick by our guns. That's right, you wanna take away our guns, we will take away your life. [Expletive] you, [expletive];" on September 18, 2019 to Congresswoman Pelosi - - "I just killed three of these [expletive] illegals this morning . . . [expletive] you and we coming for you too;" on January 20, 2020, to Congressman Adam Schiff - - "Well hello there Adam, you know what? Your impeachment failed. You're a [expletive] piece of garbage and we're going to wipe the [expletive] streets of [expletive] DC with you. You stupid piece of [expletive]...Hahaha cause we're going to put a bullet in your head. You're dead;" on January 26, 2020, to Congresswoman Pelosi - - "I just killed three of these [expletive] illegals this morning...[expletive] you and we coming for you too;" on March 27, 2020 to Congresswoman Pelosi - - "Nancy, you're a [expletive] [expletive].   We're going to kill you, chop you up into little pieces your [expletive] sack of [expletive];" on March 28, 2020 to Congressman Schiff - - "Hey you [expletive] piece of [expletive] . . . We're going to kill you, you're dead [expletive]. Your career, everything else is dead;" on January 23, 2021 to Senator Charles Schumer  - - "Hi Charles….We are coming to get you too….You're dead, so is Nutty Nancy…"   (Doc. 79, ¶¶ 9-16, 18.)

The count on which the jury convicted the Defendant involved two calls occurring within a minute of each other in the early morning of January 17, 2021 to Congresswoman Pelosi: "I'm coming to kill you, [expletive], Bye" and "You're dead [expletive]." (*Id.*, ¶ 17; discovery [ETM Systems Reports].)  The jury was unable to return a verdict on the two other remaining calls in

1   the superseding indictment, which occurred on January 20, 2020 to Congressman Schiff and on

2   March 27, 2020 to Congresswoman Pelosi.

3       There were, however, scores of other calls placed by Martis to politicians in Washington

4   that, except for being discovered, were not the subject of the USCP/FBI investigation.

5   According to the records produced by YMAX in response to a government subpoena for 928-

6   487-3966 covering the period of January 2019 through February 2021, there were 151 calls to

7   Congresswoman Pelosi's office, 19 calls to Congressman Schiff and 16 calls to Senator

8   Schumer.  Of these 186 calls to the three members of Congress, seven were the subject of the

9   charges in this case.  It appears that the other 179 calls were not reported to the USCP.

10       YMAX records further disclosed that there were also 14 calls to Senator Krysten Sinema,

11   19 calls to Senator Mark Kelly, 18 calls to Congressman Andy Biggs, 17 calls to Congressman

12   Paul Gosar, 21 calls to Senator Martha McSally, 2 calls to Senator Mitch McConnell, 14 calls

13   to Senator Lindsey Graham and 1 call to Congresswoman Maxine Waters.  There were also 154

14   calls to the White House switchboard and 4 calls to the FBI's Washington, D. C. Office.  No

15   recordings of any of these calls have been produced. [1]

16       Presumably, none of these calls contained threats to the intended recipients; otherwise, they

17   would have been reported to the USCP.

18   **B.**       **The FBI Search and Interview**

19       Martis' intent in making the telephone calls - - the most critical issue in this case - - is

20   contained in the FBI interview of him on February 4, 2020.

21       On that day, the FBI executed a search warrant on Room 404 of the Hilltop Hotel, Martis'

22   room.  Among the items it found were two lower receivers for AR-15 rifles.  According to an FBI

23   check with the Bureau of Alcohol, Tobacco, Firearms and Explosives, these are not classified as

24   firearms.  It located no firearms or weapons, but it did find several boxes and rounds of

25

26       [1] These totals are somewhat higher for Congresswoman Pelosi, Congressman Schiff and

27   Senator Schumer than reported by the USPO in its PSR, which covered a shorter, 14 month period from January 18, 2019 through March 18, 2020.  (Doc. 79, ¶ 19.)

28                         3

1  ammunition.  Also found but not seized were several publications, including American Value

2  Survey, National Association For Gun Rights and Judicial Watch. [2/]   Martis clearly subscribed

3  to conservative causes.

4      That day, the FBI also requested that Martis speak with them.  The Defendant agreed, and

5  for 27 minutes he and two agents talked.  Agent Ferreira started the interview by telling Martis

6  he could go at anytime.  Martis did not leave or cut off the interview.  He freely acknowledged

7  making each of the three phone calls the agents played for him.  Each time, he called from his

8  room at the hotel in Bullhead City.  The interview disclosed a man who was clearly upset with

9  Congress and wanted to make his views known. [3/]

10      The agents asked him at the beginning if he knew why they wanted to talk to him.  He did

11  not.   They said they wanted to talk about some calls he made to Congressmen and

12  Congresswomen and asked if he remembered making such calls.  He responded, "Sure do."

13  When the FBI played nine of them, he freely acknowledged it was his voice on the recordings.

14  Martis told the agents why he called: " What[,] getting upset with them and everything over what

15  they're doing to this great president of ours? Ohh hell yes."  But, as the beginning of the interview

16  showed, Martis did not call Congress just about political issues. Among the members he called

17  was Senator Martha McSally to talk about problems with the Veterans Administration.  He was

18  an Air Force veteran.  One of the agents remarked that she was an Air Force colonel and seemed

19  like a pretty decent Senator.  Martis responded: "Who knows."

20      The interview turned to the calls themselves.  Agent Ferreira offered that "when the

21  government gets concerned is obviously when you make certain threats to those individuals."

22  _____

23      [2/]  According to Wikipedia, "Judicial Watch (JW) is an American conservative activist
       group that files Freedom of Information Act (FOIA) lawsuits to investigate claimed misconduct
24     by government officials. Founded in 1994, JW has primarily targeted Democrats . . ."
       According to the Association of Religion Data Archives, the American Values Survey
25     (AVS) is an annual survey on religion, culture and public policy conducted in the fall.

26      [3/]  Excerpts from the interview are taken from the transcript prepared by the defense.  It
       appears as an exhibit to the Defendant's Motion *in Limine* Pertaining to the Admission of His
27     Statement to Law Enforcement.  (Doc. 47-1.)

28                                                    4

Martis replied, " What, that I aint never going to vote for you? (inaudible) that's a threat?"  At this early stage of the interview, the agents had not played any of the calls, and Martis's stated reasoning for calling was to complain about the way the members were conducting their duties.  But, Martis did not recall the specifics of the calls.  When agent Ferreira replied that the calls were specific threats, such as "You threatened to put a bullet in their head," Martis responded "Uh, uh, no way," "Let me hear the conversation then."  "I remember calling a few of the senators, yes, trying to find out what the hell is going on."  At that point, the agents played three voice mails.

The first call played was to Congresswoman Pelosi on January 26, 2019 about "illegals." After listening to the call, Martis said: "ahh I remember that, yeah. Mmhmm. Yeah, I remember (inaudible) the damn border problem and everything, sure, but as far as telling her I'm going to kill her, uhh uhh. Kill her, what ya call it, career maybe, you know. . . "never get her re-elected. Working as much as I can, you know, writing letters and everything to get her out of there." Many times Martis pointedly stated why he made the calls: "Trying to help my country. Yeah." "[Y]es, its insane what the hell their doing."  "Yeah, we're coming for you, and kicking them the hell out of office, hell yeah."  To Martis, his calls were about protecting his country, changing the way things were done and removing representatives he felt were against the country's best interests.

Agent Ferreira addressed the crux of the matter: "And you were in a sound mind when you did that right? You weren't like, you know, you weren't ... it was a situation like, you either . . . were calling to specifically threaten them, or . . ."  Martis interrupted, "No."  The agent continued, "You were calling really to get them to kind of change what they've been doing" to which the Defendant responded, "Change what the hell their doing. Hell yes.  Stick up for this country.  Stop being such idiots."  The agents asked Martis what he meant by  "I just killed three illegals this morning"?  Martis said it was "bull s * * *."  Agent Ferreira asked if he actually killed three illegals.  Martis replied, "No. I would like to but . . . what the hell, you can't do that."

Next, the FBI played the September 4, 2019 call to Congresswoman Pelosi's office about " . . . you want to take away our guns, we will take away your life."     The last call the agents played was the one on September 4, 2019, also to Congresswoman Pelosi, concerning " . . . you want to take away our guns, we will take away your life," followed by an expletive.  The ensuing colloquy sums up Martis' intent in making these calls.

SA Ferreira: So, when you said, . . . "If you want to take· away our guns, we'll take away your life", what did you mean by that?

Martis: Political life. (laughing)

SA Ferreira: Ok. So, so again, you were trying to alter what they were doing, you weren't trying to go over there and necessarily kill her.

Martis: No, no. Hell no.

SA Mills: This, this can go, this can go two different ways, like either you're threatening them like I'm gonna come kill you, or you're making those threats as a way to influence their decision, right. Is it, is it, is it that you're going to go kill them, or . . .

Martis:  No.

SA Mills: Are you trying to change their course of action, change their mind . . .

Martis:  That's it.

SA Mills: [T]o improve the country and do what you want.

Martis: That's right.

SA Mills: So, so it's more the latter, right?

Martis: [Y]es.

SA Mills: So, so when you say, "I kill three illegals", you didn't kill three illegals.

Martis:  No.

SA Mills: [B]ut you' re using that as a way of garnering their attention.

SM: Trying to get her. Get [']em off their butt and do something.

*          *          *

SA Mills: Yeah. What's your whole purpose in calling?

Martis: [T]rying to get them to do something about the doggone problems here. Get their, tell them to do something about the border problems. These people are coming over here. We have legal checkpoints down there for them to come through. They don't want to do that, they'd rather break our laws and trample the fences, f* * king harass our people down there. Uhh uhh, that's wrong man, that's wrong,  and for them to sit up there and say that's right, uhh uhh.. . .

SA Mills: Yeah. I think a good chunk of this country agrees with you, and I think that, I think that, that's what you do. You call your congressman and you try to influence them but are you trying to change what their doing or encourage them in what they're doing?

Martis: [T]rying to get them to do what's right for the country.

SA Mills: [O] k, or is what Nancy Pelosi doing wrong and she needs to change what she's doing?

Martis: I believe so.

SA Mills: Ok. I think a lot of people would agree with you. So, you're calling saying, hey, stop doing this, and do this, right?

Martis: Right, do the right thing. Hell yeah.

6

1   SA Mills: Right. And then that's why you're threatening her and so that you get that
    influence.
2   Martis:  I don't know if I really threatened. (inaudible) life or whatever.
    SA Ferreira: Well when you say, we'll, we'll take away your life, you know that .
3   . .
    SM: Her political life.
4   SA Ferreira: Ok.

5   After playing the January 20, 2020 call to Congressman Schiff, in which Martis said he

6   would put a bullet in his head, the same type of exchange between the agents and the Defendant

7   transpired.  He acknowledged the call.  He also said he could not get to Washington, that he

8   couldn't even make it to Kingman.

9   As he repeatedly stated, Martis had no intention of harming any of the members of Congress.

10  Towards the end of the interview, Martis said that he would not call the politicians anymore.

11  The agents, however, told him that the public was encouraged to call their  representatives, but

12  to threaten a Congressman with a bullet in his head was against the law.  Martis then said, "Now

13  if I talk to them anymore, I'll just tell them that their a piece of crap, and you know. Do what the

14  hell is right, just follow the Constitution, and you know, stop screwing this country. . . . That's

15  all I'll tell them from now on."

16  Essentially, the case agent accurately captured Martis' mindset when he told the USPO that

17  " . . . the defendant did not appear to have the means or intent to carry out his criminal threats."

18  (Doc. 79, ¶ 20.)

19  **C.      Martis' Testimony at Trial**

20  The issue at trial was whether Martis *intended* to threaten the politicians for whom he left

21  messages with physical harm.  As in his interview with the agents, he acknowledged from the

22  stand making the calls. He also testified unequivocally that he did not intend to harm anyone.

23  Just as he said in the interview, he called because he was angry at them; there were doing things

24  that were not right, and they were harming the country.  He testified that he started to get angry

25  with Congresswoman Pelosi and Congressman Schiff in 2018.  At first, he just made calls that

26  were not so much angry with the politicians as they were critical of what they were doing. He had

27  voted for the Bushes and Senator John McCain, and he believed in then President Donald Trump.

28
                                            7

Martis supported the Republican Party, and in his view President Trump got people back to work, managed the border with Mexico and the immigration issues properly and stopped North Korean president Kim Jong-un from firing rockets over Japan.  He became particularly angry over the two impeachments of President Trump, which he saw as orchestrated by Congresswoman Pelosi and Congressman Schiff.  His vexation over the impeachments was why he made at least two of the calls.

His testimony was entirely consistent with his statements to the FBI when they interviewed him in February 2020.

**D.      Intent and Acceptance of Responsibility**

The USPO has denied the Defendant credit for acceptance of responsibility because he was found guilty at trial.  (*Id.*, ¶ 25.)  The Defendant's decision to go to trial does not, by that fact alone, automatically negate acceptance of responsibility.  Here, some consideration should be given to Martis for maintaining his innocence that he did not intend to harm anyone.  Since the focus of this prosecution is the *subjective* intent of the caller at the time the calls were made, the Defendant had the right to testify that he lacked intent to convey a threat.

Although a defendant who chooses to proceed to trial typically does not earn credit for acceptance of responsibility, there are exceptions, including where a defendant does not contest the underlying facts of the case but  challenges the applicability of the charging statute to his conduct.  U.S.S.G. §3E1.1, app. n. 2. [4/]  Here, the Defendant does not argue that he should have

------

[4/]  Section 3E1.1, app. n. provides in its entirety:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a

(continued...)

been given at least a two level reduction for accepting responsibility.  Nonetheless, it is clear that at trial that Martis did not contest the fact that he made the calls and that he uttered the language in them.  Nor was his reason for doing so - - that he was dismayed with how the politicians were handling what he perceived to be critical issues for the country - - any different at trial from what he said during the FBI interview.  Although he was angry, he meant no harm.

Moreover, he continued to maintain that he intended no harm at the interview with the USPO.  The PSR noted that at the presentence interview Martis " . . . indicated he did not intend to harm anyone, and he was angry about how leaders of the United States government were running the nation regarding specific issues."  (*Id.*, ¶ 25.)  Arguably, expressions about the lack of intent are not precisely the same as words of contrition, which is a requirement for the adjustment to apply.  However, Martis' candor at trial and persistent, heartfelt belief that he did not intend to do harm should be viewed as a mitigating factor in considering the nature and circumstances of the crime.

## II.  **History and Characteristics of the Defendant**

### A.  **Background**

Martis is 77 years old.  Upon completing high school in 1962 he went directly into the Air Force, serving four years as a electrician working on B52 bombers, KC135 tankers, and F106, F100 and F101 fighters.  He had temporary duty in Vietnam.  Among the awards he received were the National Defense Service Medal, Air Force Good Conduct Award and Vietnam Service Medal.  When he left active duty with the rank of Airman 1st Class, he served in the reserves for two more years.  He was discharged honorably from both active and reserve duty.  (*Id.*, ¶ 84.)

---

[4/] (...continued)
constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

1    Until approximately 1980, Martis was employed as an aircraft electrician and mechanic and

2  automobile mechanic in private industry in California, including with McDonald Douglas and

3  Western Airlines.  From 1980 until his retirement in 2002, he did general construction labor in

4  Texas, Colorado and Idaho, among other states.

5    Martis was married in 2002 and divorced eight years later.  He has no children.

6    After he retired, Martis moved to Bullhead City.  He lived off social security and Veterans

7  Administration health benefits.  He lived at the Hilltop hotel for about seven years, until his

8  arrest.

9    **B.**      **Age and Health**

10    The USPO has identified Martis' advanced age, poor health and dated criminal history as

11  possible grounds for departure. (*Id.*, ¶102.) However, it rejected these considerations, concluding

12  that " . . . it is believed a sentence at the low-end of the advisory guideline range is needed to

13  impress upon the defendant the seriousness of his actions, while taking into consideration the

14  defendant's specific needs, which can be adequately addressed while he is incarcerated." (Doc.

15  76, p. 21.)  The USPO's reasons for ignoring these grounds for departure, particularly age and

16  health have nothing to do with whether they are actually applicable in this case.

17    Nowhere in the relevant Specific Offender Characteristics does the adequacy of medical

18  treatment in prison overcome considerations of age and physical condition.  These characteristics

19  should be weighed independently of accommodations while incarcerated.

20    Section 5H1.1 of the Sentencing Guidelines provides in relevant part:

21    Age . . . may be relevant in determining whether a departure is warranted, if
      considerations based on age, individually or in combination with other offender
22    characteristics, are present to an unusual degree and distinguish the case from the
      typical cases covered by the guidelines. Age may be a reason to depart downward
23    in a case in which the defendant is elderly and infirm and where a form of
      punishment such as home confinement might be equally efficient as and less costly
24    than incarceration. Physical condition, which may be related to age, is addressed
      at §5H1.4 . . .

25    Accordingly, defendant's age and physical condition are important components in the

26  analysis of 18 U.S.C. §3553(a)(1)'s requirement that the court consider the history and

27

28                                                        10

characteristics of the defendant.  *See, United States v. Whitmore*, 35 Fed.Appx 307, 321-22 (9th Cir. 2002) (the court departed downward where the defendant was 67 years old at sentencing and suffered from HIV, coronary artery disease, and vulnerability to various infections).

By any definition, Martis is elderly.  If the Court accepts the USPO's recommendation of a 27 month sentence, he will be 78½ years old at the time of his release (allowing for time served and a 15% reduction for "good time," his release date would be in the first part of 2023.)

As the PSR provides, Martis has several health concerns that present chronic conditions and preclude his mobility.  In 1992, he had a back injury while working in construction that has not properly heeled.  His back issues compounded in 2017 when he injured his back, left shoulder, and knee from a fall, resulting in three herniated discs in the lower back, torn cartilage and loose ligaments in his left knee.  His back injury is inoperable, and he needs a left knee replacement. It is difficult for him to stand. He takes aspirin and Naproxen for the pain and swelling in his knee.  Martis is confined to a wheelchair.  On November 24, 2020, he had total reverse total shoulder replacement surgery in Kingman at the direction of the Veterans Administration.  In 2013, Martis was diagnosed with glaucoma by medical staff at North Las Vegas VA Medical Center.  He takes prescribed medication to treat this condition. (Doc. 76, ¶¶ 71-74.)

As the guideline notes, home confinement may be a form of punishment that is just as effective as prison.  If the Court sentences Martis to time served, he will go on supervised release. In that case, he can be placed on home detention as a substitute for imprisonment.  U.S.S.G. § 5F1.2 ("Home detention may be imposed as a condition of . . . supervised release . . ., but only as a substitute for imprisonment."); § 5D1.3(e)(2)(Home detention may be imposed as a condition of supervised release, but only as a substitute for imprisonment. See §5F1.2 (Home Detention).

**III. Guideline Calculation & Recommendation**

    **A.       Guideline Calculation**

The Defendant has not submitted objections to the USPO's offense level computation, but as noted above, a downward departure for his age and health is appropriate, and his heartfelt decision to contest the charges as a matter of conscience should also be taken into consideration,

if not as a basis for acceptance of responsibility then in recognition that in exercising his right to trial, he continued to express his opinion about what was happening in the country but that he intended no harm in making the calls.

Nor has the Defendant objected to the criminal history computation.  However, his criminal history should be put into context.  His last conviction was in 2018 for a misdemeanor offense, which accounts for the single subtotal criminal history point.  He was placed on three years unsupervised probation, which results in an additional two points.  (*Id.*, ¶¶ 47, 48.)  His previous conviction was also a misdemeanor, resisting arrest, which occurred ten years earlier in 2008. (*Id.*, ¶ 46.)  His one felony conviction, which was for possession of a controlled substance (marijuana), occurred in 1994.  He has several arrests for which there are no convictions, the last one in 2006.  None of the convictions or arrests contain circumstances comparable to this case.

**B.**      **Recommended Sentence**

As the USPO recognizes, a sentence within the guideline range may be greater than necessary because the defendant is 77 years old, has a dated criminal history, and suffers from medical conditions, which may require surgery.  (*Id.*, ¶ 102.)  Regrettably, the USPO disregards these considerations.  It recommends a low end guideline sentence based on other factors, such as this case presenting a second felony conviction; his "mostly dated but extensive criminal history" over four decades, which includes possession of a controlled substance, aggravated assault, disorderly conduct/resisting arrest, and driving under the influence; his violation of probation for the 2018 offense; he is a risk to re-offend (but does not appear to be a risk to the community). (*Id.*, pp. 20-21.)  These considerations should be put into context.  The last and only other felony occurred in 1994.  The other convictions are for battery on a police officer, drunk driving and driving under the influence, disorderly conduct and resisting arrest, driving with a suspended license, failure to appear and aggravated assault, a misdemeanor which occurred in 1999.  These certainly are numerous, but they are relatively minor.  Most of them are old.  Except for his 2018 conviction for failure to appear, the next most recent conviction took place when Martis was 64 years old, some 13 years ago.

1    Moreover, there is some inconsistency in arguing that Martis is a risk to re-offend, but he is

2  not a danger to the community.  Wheel-chair bound, arthritic and otherwise in poor health, he is

3  not much of a danger to anyone and presents no risk to re-offend.

4        **C.        Needed Medical Treatment and Other Correctional Care**

5        There are other proposed sentencing recommendations to which the defense agrees.  These

6  include a three year term of supervised release, which in Martis' case should be more than

7  adequate to insure compliance with release conditions while affording him the oversight and help

8  he needs.  Participation in proposed mental health treatment and residential reentry placement

9  with substance abuse treatment and anger management counseling would also beneficial.

10  **IV.  Seriousness of the Offense, Adequate Deterrence, Protection of the Public, Respect for**

11       **the Law, Just Punishment**

12       Some consideration should be given to Martis's lack of capacity to carry out his threats.

13  While the defense understands that lack of physical capacity is not a legal defense to an 875( c)

14  charge, it is clear that Martis could never have carried out any of the threats.  Not only was he

15  then (and still is) incapacitated, he had no firearms and there is no indication he was in league

16  with anyone else to do anything he claimed in the calls would happen.  As his financial history

17  shows, his monthly social security check of $820 barely covers his living expenses (*Id.*, ¶ 85);

18  he could not even afford a bus ticket to go to Washington, D. C.

19       The vast majority of his calls went unreported.  If, as the jury heard at trial, Congressional

20  staffers screen caller messages, they either habitually failed in their duties to overhear and report

21  Martis' calls or, more likely, his calls were benign.  This is not to excuse the seriousness of the

22  language to members Pelosi and Schiff as time went on, but it does indicate that Martis' anger

23  rose over the failure of Congressional leaders failing to follow policies he advocated and their

24  continual dismissal of his contacts.

25  **V.  Conclusion**

26       There is little to be gained by keeping the Defendant confined for another year.  Justice is

27  best served in Martis' case by tempering his language with recognizing his dismay over what he

28                                                    13

1  perceived to be the direction the country was headed; addressing his age and physical infirmities;

2  recognizing his service to the country; and allowing the supervised release process to maintain

3  continued oversight over his actions and physical, medical and emotional conditions.

4      Respectfully submitted this 14th day of January, 2022.

5

6

7                              *s/ David Eisenberg*

8                              DAVID EISENBERG
                               Counsel for Defendant Steven Arthur Martis

9

10  I hereby certify that on January 14, 2022, I electronically transmitted the attached document to the Clerk's Office
    using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants,

11  as well as by email to:

12  Kristen Brook, Esq.
    Joseph E. Koehler, Esq.

13  Assistant U. S. Attorney

14

    *s/ David Eisenberg*

15      David Eisenberg

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          14