UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-21-8043-PCT-DJH |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 16, 2021 |
| Steven Arthur Martis, | ) | 8:41 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 1

(Pages 1 through 197, inclusive.)

APPEARANCES:
For the Government:
          U.S. Attorney's Office
          By: KRISTEN BROOK, ESQ.
              JOSEPH EDWARD KOEHLER, ESQ.
          40 North Central Avenue, Suite 1800
          Phoenix, AZ  85004

For the Defendant Martis:
          David Eisenberg, PLC
          By: DAVID S. EISENBERG, ESQ.
          3550 North Central Avenue, Suite 1155
          Phoenix, AZ  85012


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

**INDEX**

2

SUMMARY OF COURT PROCEEDINGS                                    PAGE:

3

Proceedings Outside Presence of Prospective Jury Panel    3
Jury Voir Dire                                           12

4

Proceedings Outside Presence of Prospective Jury Panel   64
Proceedings in Presence of Prospective Jury Panel        71

5

Proceedings Outside the Presence of the Jury             78
Preliminary Jury Instructions                            87

6

Opening Statement
          Government                                     96

7

          Defendant                                     102
Proceedings Outside the Presence of the Jury            195

8

9

**INDEX OF WITNESSES**

10

WITNESSES FOR THE        Direct    Cross    Redirect
GOVERNMENT:

11

BEAL, Owen                 106       122       129

12

CONNELLY, Heather          132       148       154
WILSON, Sean Andrew        155       167

13

LAPOINT, Richard           171       175       176
LAPOINT, Christopher       177       182

14

WHITE, Elliott Michael     185

15

**INDEX OF EXHIBITS**

16

EXHIBIT NO.:          DESCRIPTION:                    RECEIVED:

17

   1      NP voicemail recording 3-27-2020            116
   2      NP voicemail recording 1-17-2021 call 1     116

18

   3      NP voicemail recording 1-17-2021 call 2     116
   4      NP voicemail recording 1-26-2019            114

19

   5      NP voicemail recording 9-4-2019             113
   6      AS voicemail recording 1-20-2020            143

20

   8      E-mail forwarding NP recording 3-27-2020    122
   9      E-mail forwarding NP recording 1-17-2021    121

21

   10     E-mail forwarding NP recording 9-4-2019     112
   11     E-mail forwarding AS recording 1-20-2020    147

22

   30     Envelope with phone numbers                 191
   32     Photograph 02 from search                   188

23

   33     Photograph 03 from search                   190
   34     Photograph Martis Room Front Door           187

24

25

1      (Proceedings outside presence of prospective jury panel:)

2           THE CLERK:  This is case number CR 21-8043,

3    United States of America versus Steven Martis, on for jury

4    trial.

5           MS. BROOK:  Good morning, Your Honor.  Kristen Brook

6    and Joe Koehler on behalf of the United States.  Also present

7    with us is our special agent in this case, Donald Ferreira,

8    from the FBI.

9           THE COURT:  Good morning.

10          MR. EISENBERG:  Good morning, Your Honor.  David

11   Eisenberg on behalf of Steven Martis, and he is to my left.

12          THE COURT:  Good morning, counsel.  This morning I

13   just want to run through very quickly the jury instructions and

14   see if there are any other last-minute matters that we needed

15   to discuss before we bring the panel in.

16          We have provided to you the preliminary instructions

17   as well as end of jury instructions.  Let me just tell you that

18   up to Page 19 I will read as preliminary instructions.

19          The instructions that are on Page 20 through 25 are

20   basically in-course-of-trial instructions.  Now, let me turn

21   your attention to -- We do have and let me just tell you for

22   purposes of completeness at this moment we do have defendant's

23   decision not to testify included in the instruction packet at

24   Page 30 -- I'm sorry -- Page 28.

25          Now, let me ask you about instruction -- on Page 47,

| | |
|---|---|
| 1 | 48, and 49.  Instruction 47 is the stipulated proposed |
| 2 | non-model instruction, and this is presumption of innocence and |
| 3 | summary of charges.  And I'm a little bit confused here.  Is |
| 4 | this to be given as a preliminary instruction? |
| 5 | MR. KOEHLER:  We believe it would be both preliminary |
| 6 | and at the close, Your Honor, yes. |
| 7 | THE COURT:  Okay.  Because, as you can see, Page 48 is |
| 8 | somewhat redundant.  It repeats the elements. |
| 9 | MR. KOEHLER:  I believe that 48 is the initial, and |
| 10 | then 47 is -- No.  It's got to be the other way.  47 is the |
| 11 | preliminary, and then 48 is the post-trial. |
| 12 | THE COURT:  Okay.  So -- |
| 13 | MR. EISENBERG:  I'm sorry, Your Honor. |
| 14 | THE COURT:  Yes. |
| 15 | MR. EISENBERG:  I would agree with that.  And I do |
| 16 | think 47 should be given as a preliminary.  And then at the end |
| 17 | of the case when Your Honor charges again, then what's on 48 |
| 18 | should be given.  The Court may reach it eventually, but I did |
| 19 | have a comment about how the second element is laid out in |
| 20 | here.  Does Your Honor want to hear that now? |
| 21 | THE COURT:  No.  So let me just confirm 47 is to be |
| 22 | read as a preliminary instruction.  And I'll give this right |
| 23 | before I read the indictment. |
| 24 | MR. KOEHLER:  Correct. |
| 25 | THE COURT:  Okay.  So I will -- Let me move this right |

1   now.  And this will -- Okay.  Let me just tell you what I'm

2   inclined to do with the preliminary, just a slight change.

3   Bench conferences and recesses at Page 19 I'm going to read

4   after taking notes, which is Page 17.  Essentially I am going

5   to switch Pages 19 and 18 so that the outline of trial is read

6   before the stipulated proposed non-model instruction on Page

7   47.  And then I will read the indictment.

8           MR. KOEHLER:  Your Honor, we had also proposed the

9   instruction at Page 49 be read as a preliminary instruction.

10          THE COURT:  One moment please.

11          MR. KOEHLER:  That can follow --

12          THE COURT:  Let me get to --

13          Okay.  Now, 48 then will be the instruction that is an

14  end of jury instruction.  And was it this particular

15  instruction, Mr. Eisenberg, that you had a comment on with

16  regard to the second element?

17          MR. EISENBERG:  I did, Your Honor.  And it pertains to

18  one we talked about before, an instruction that we talked about

19  before.  In my trial brief in response to the government's

20  trial brief, I noted that the second element is the defendant

21  transmitted the messages for the purpose of issuing threats.

22  And to me that took the element of intent, which is necessary

23  in this case as it is in almost every case, out of the charge.

24          I propose that intent be replaced for the purpose of.

25  So it would read:  "Second, the defendant transmitted the

1   message with the intent of issuing threats or a threat," not

2   for the purpose of.  It might be a distinction that's just a

3   matter of words, but I don't think so, since the concept of

4   intent is ultimate and certainly is in this case.

5           MR. KOEHLER:  Your Honor, we think it's a distinction

6   without a difference, but we're fine with the word intent.  I

7   would submit that it should be with the "intent to issue"

8   rather than the "intent of issuing".

9           THE COURT:  So I'm going to change this on the

10  preliminary instruction.

11          "Second, the defendant transmitted the message --

12  messages with the intent --"

13          MR. EISENBERG:  Yes, Your Honor.

14          MR. KOEHLER:  "To issue threats."

15          THE COURT:  "-- to issue a -- to issue threats."

16          All right.  Now, you will see that I modified the

17  First Amendment instruction.  And I understand that this is to

18  be read as a preliminary instruction after the substantive

19  instruction on the charge.

20          What I essentially did here, because it seemed to me

21  that I had an agreement between the parties acknowledging that

22  *Virginia versus Black* is the operative case that relates to

23  true threats, I simply lifted the language from the case and

24  inserted it into the instruction.

25          MR. KOEHLER:  We agree with that language, Your Honor.

1          MR. EISENBERG:  Is this the one on Page 49?

2          THE COURT:  49, Page 49.

3          MR. EISENBERG:  Yes.  Right.  I agree too.

4          THE COURT:  All right.  So that is the way that the

5    preliminary First Amendment instruction will read.  And that

6    will go right after then Page 47 and before the reading of the

7    indictment.

8          All right.  Is there anything further to be discussed

9    on the instructions?  And we'll fix those and clean those up

10   and get a copy to counsel.

11         I usually will provide the jurors with their own hard

12   copy and so that they can read along.  And so that's how we

13   will proceed.

14         MR. KOEHLER:  Nothing further from the government on

15   the instructions, Your Honor.

16         THE COURT:  Mr. Eisenberg?

17         MR. EISENBERG:  No, Your Honor.  Thank you.

18         THE COURT:  All right.  The way that we will go

19   forward then, is there anything from the government that I

20   haven't addressed at this juncture?

21         MS. BROOK:  Your Honor, we just have one additional

22   suggestion for voir dire, which came to us over the weekend

23   upon reviewing again the questionnaires.

24         And that relates to the fact there may be evidence

25   that the defendant is a veteran and that our agent also is a

1    veteran.  And so we just ask that perhaps during voir dire we

2    can ask the jury panel to make sure that an individual being a

3    vet, they would still treat them fairly and hold them to the

4    same standards of credibility as well as -- yeah, that's it --

5    as any other person, similarly as we do with somebody who is

6    part of law enforcement or any other specialized group.

7           MR. EISENBERG:  Your Honor, if I may?

8           THE COURT:  Yes.

9           MR. EISENBERG:  I don't think that's necessary.  In

10   fact, the reason it's given with respect to law enforcement is

11   because of the idea that they are in law enforcement.  And so

12   one shouldn't hold them to any different standard than anybody

13   else.  A veteran is not by definition someone in law

14   enforcement who may be testifying by virtue of his position as

15   a veteran.  He just happens to be a veteran.  So I'm not sure

16   what we're trying to get at there.

17          MS. BROOK:  If I may, Your Honor, what we're trying to

18   get at is the fact that we're just on the eve of Veteran's Day.

19   We believe certain people treat veterans differently.  They

20   feel that maybe they're not subject to the same laws, the same

21   standards of credibility by which we gauge other people because

22   of the service that they have provided our country.  So what we

23   want to do is just make sure that the jury we impanel in this

24   case can be fair and treat everybody fairly, not based on any

25   other factor that they may have had in their historical

1    background but just based on, you know, the evidence as it

2    pertains to this particular trial.

3            MR. EISENBERG:  If that were true, Your Honor, then we

4    should have a charge that people who work for the Congress of

5    the United States and who are going to come forward and testify

6    with respect to events that occurred in this case should be

7    given no further credibility than anybody else.  And we have

8    two such persons on the government's witness list.

9            MS. BROOK:  We have no objection to that.

10            MR. EISENBERG:  And I would -- Well, then we should

11   figure out who and for what reason a special person should have

12   special consideration here.  You could -- That could be dozens

13   of people.  Well, I don't know how many witnesses we have.  But

14   why are we making a distinction about people's backgrounds?

15   Law enforcement, yes, I understand that.

16            THE COURT:  I tend to agree with Mr. Eisenberg.  I

17   think that in this day and age, we have so many persons who fit

18   the criteria of being veterans of the military.  And I think

19   it's not necessary, in terms of voir dire, to flesh that out.

20   And certainly you operate at your own peril if you're going to

21   make an issue out of it with regard to your witnesses.  But I

22   don't necessarily think that it provides anything more

23   elucidating in terms of the jury panel.

24            And so I will ask the question regarding law

25   enforcement, and -- but I will not ask the question relating to

1    military service.

2              And so let me just give you -- give you an idea of how

3    voir dire will go.  I only have a couple of relevant past

4    questions.  Of course I'm going to read the witness list, ask

5    if anyone's familiar with any of the witnesses, ask those

6    questions about whether family members are -- have been victims

7    of crimes or serious cases, whether or not family members have

8    been convicted of felonies, and then ask the question about law

9    enforcement, and then ask the standard questions regarding

10   legal knowledge and application of the law.

11             I'm not going to go through -- Oh, and the personal

12   beliefs about whether there's religious or philosophical

13   beliefs sitting in judgment of others.

14             And now let me tell you what I have as expected trial

15   schedule.  Today and tomorrow.  Is there any idea that I should

16   say and if necessary Thursday morning, or do you think that the

17   case will -- When I say the case, I'm talking about jury

18   deliberations as well.  Do you think it will be concluded by

19   tomorrow?

20             MS. BROOK:  Yes, Your Honor.

21             MR. EISENBERG:  Well, I should think certainly the

22   evidence will be in by tomorrow, maybe even tomorrow morning.

23   So jurors --

24             THE COURT:  End of day tomorrow?

25             MR. EISENBERG:  Yes.

1          THE COURT:  Okay.  Anything further?

2          MR. KOEHLER:  Not from the government, Your Honor.

3     Thank you.

4          MR. EISENBERG:  Your Honor, I will have, but I don't

5     know if now is the time.  It has to do with the testimony of

6     two of the witnesses.  We're not there yet.

7          THE COURT:  Well, we can take that up after we get our

8     jury.

9          What we will do is we'll have the jury panel members

10    in and get situated and seated.  We will go through the

11    voir dire process, which I don't think will take very long, I

12    suspect, before -- I'd say two hours maximum.  We might be able

13    to just have a prolonged lunch break, and that is when you can

14    exercise your strikes, and we can then determine who sits on

15    the panel.

16         And then I think the remainder of the day we move to

17    courtroom 604.  And that's how we will proceed.

18         Anything further from the government?

19         MS. BROOK:  No, Your Honor.  Thank you.

20         THE COURT:  Anything from --

21         MR. EISENBERG:  No, Your Honor.

22         THE COURT:  All right.  So we will stand in recess.

23    Carry on.  I just need to get myself situated here and get

24    these jury instructions fixed.

25         (Proceedings recessed from 8:59 a.m. until 9:16 a.m.

1    Proceedings in the presence of the prospective jury panel:)

2              THE CLERK:  This is case number CR 21-8043,

3    United States of America versus Steven Arthur Martis, on for

4    jury trial.

5              MS. BROOK:  Good morning, Your Honor.  Kristen Brook

6    and Joe Koehler on behalf of the United States.  Also present

7    with us is Special Agent Donald Ferreira of the FBI.

8              THE COURT:  Good morning.

9              MR. EISENBERG:  Good morning, Your Honor.  David

10   Eisenberg on behalf of Mr. Steven Martis, who is to my left.

11             THE COURT:  And good morning to you both.

12             Good morning, ladies and gentlemen.  My name is Diane

13   Humetewa, and I am a District Court Judge.  And I welcome you

14   to the District Court for the District of Arizona.  This is a

15   federal court, but it deals with matters that arise throughout

16   the State of Arizona.  And this morning we are choosing a jury

17   for a federal criminal trial.

18             And we do appreciate all of you being here with us

19   this morning.  We do know that jury service is probably an

20   inconvenience for you, taking you away from your jobs and

21   families and disrupting your daily routine.  One of the

22   greatest protections afforded by the United States

23   Constitution, however, is every individual's right to a trial

24   by jury.  And as a United States citizen, one of the most

25   important responsibilities we have is to serve as jurors when

1    summoned to do so.

2            I will talk to you later this morning about the

3    schedule of this trial, and I will give you an opportunity to

4    explain whether that schedule would create undue hardship for

5    you.  Before doing so, however, there are some other matters we

6    must cover.

7            This is the case of United States versus Steven Arthur

8    Martis.  Is the government ready to proceed?

9            MS. BROOK:  Yes, Your Honor.  Thank you.

10            THE COURT:  Is the defense ready to proceed?

11            MR. EISENBERG:  Ready, Your Honor.

12            THE COURT:  Ladies and gentlemen, as you can

13    understand, it is very important that we select jurors who can

14    be fair and impartial to both sides.  If you were a participant

15    in this trial, you certainly would want jurors who would hear

16    and decide the case fairly.

17            To choose a fair and impartial jury, you completed a

18    preliminary questionnaire.  And I'm going to ask you some

19    additional questions this morning.  The lawyers may ask you

20    some follow-up questions after I have finished.  And please

21    understand that the questions are not intended to embarrass you

22    or pry into your personal affairs.

23            Each question is designed to assist the attorneys in

24    selecting a fair jury.  Before asking you these questions, we

25    are going to place all of you under oath to tell the truth.  We

1    do this to make sure that we have completely accurate

2    information when selecting a jury.  Obviously it is very

3    important that you answer each question truthfully.  Please do

4    not withhold information.  Be straightforward and truthful in

5    your answers rather than answering in a way you feel the

6    lawyers or I expect you to answer.

7          When I ask you a question, if your answer to any

8    question is yes, please raise your juror number.  I will then

9    ask you some additional questions.  When you answer a question,

10   please always begin by stating your juror number.  If your

11   answer to a question is no, you need to do nothing.  I will

12   assume by your silence that your answer is no.

13         Now, I know that it may be difficult for some of you

14   to answer questions in a setting such as this.  It is not easy

15   to speak in front of a group of people.  But all of the jurors

16   are in the same situation.  It is important that you answer

17   every question to which you have relevant information.  If you

18   would feel more comfortable answering a question in private,

19   please let me know, and I will allow that at the conclusion.  I

20   will excuse all of the jurors and call you in one by one.

21   Please note, however, that your answers will still remain on

22   the record.

23         Will the entire jury please stand and be sworn for

24   examination on voir dire.

25         (Prospective jury panelists duly sworn on voir dire.)

1          THE COURT:  Now, to refresh your recollection from

2     filling out your preliminary questionnaire, I'm going to read

3     you a brief statement of the case.

4          The government alleges that in 2019 and 2020, the

5     defendant, Steven Arthur Martis, knowingly transmitted a

6     communication with intent to threaten, to harm Congresswoman

7     Nancy Pelosi and Congressman Adam Schiff.  The government

8     alleges that defendant left voice messages on their office

9     telephone answering machines in which he threatened to harm

10    these individuals.  This case does not involve any allegations

11    of physical violence.  Just alleged threatening communications.

12    The defendant denies all allegations and has entered a plea of

13    not guilty to all counts of the superseding indictment.

14         Now, the names of the individuals now having been read

15    to you or revealed to you, is there anything about these

16    circumstances that would cause you to believe that you could

17    not consider the evidence fairly, impartially, and according to

18    the law?

19         Now, I'd like to once again reintroduce myself to you,

20    and I'm going to introduce, although they are not present here,

21    all of them in the courtroom today, my staff.

22         Again, my name is Diane Humetewa, and I am a district

23    judge presiding in a courtroom in this courtroom building.

24         This morning and throughout the trial I am aided by my

25    courtroom reporter Linda Schroeder and my courtroom deputy

1    Liliana Figueroa.

2            I have staff, my law clerks, which include Christine

3    Ritland, Alexander Mallory, and Jonathan Charlton.

4            Do any of you know me or any member of my staff or my

5    courtroom staff?

6            Now, I'm going to once again introduce the Assistant

7    U.S. Attorneys.  They are Kristen Brook and Joseph Koehler.

8    The acting U.S. Attorney is Glenn McCormick.

9            Now, do any of you know either Assistant U.S. Attorney

10   Kristen Brook, Joseph Koehler, or acting U.S. Attorney Glenn

11   McCormick?

12            I'd like you to, Ms. Brook, reintroduce your

13   investigator.

14            MS. BROOK:  Yes, Your Honor.  Thank you.  Please

15   stand.  Ladies and gentlemen, this is Special Agent Donald

16   Ferreira with the FBI.

17            THE COURT:  Are any of you familiar with

18   Agent Ferreira?  All right, sir.  You may be seated.

19            And let me just ask are any of you familiar with any

20   member of the U.S. Attorney's Office?

21            All right.  And, again, that familiarity includes

22   social familiarity or professional familiarity.  And we have

23   juror -- Please hold up your number.

24            And can you briefly explain who in the office or how

25   you are familiar with anyone in the office.  And please just

1    approach the microphone and state your juror number again.

2              PANELIST THIRTY-ONE:  Juror number 31.  Good morning,

3    Your Honor.

4              THE COURT:  Good morning.

5              PANELIST THIRTY-ONE:  I have worked as a prosecutor

6    for many years, for several years, in Indian Country.  And when

7    I was working in a tribe, there were two U.S. attorneys who

8    were assigned to the tribe who I worked with regularly as well

9    as agents and members of the U.S. Attorney who I guess are no

10   longer with the U.S. Attorney's Office.

11             THE COURT:  And with respect to the U.S. attorneys

12   that you worked with, were they here in Arizona or elsewhere?

13             PANELIST THIRTY-ONE:  They were in Arizona, Your

14   Honor.

15             THE COURT:  All right.  And can you give me the

16   approximate year that this would have been?

17             PANELIST THIRTY-ONE:  I was working for a tribe from

18   2012 to 2018.

19             THE COURT:  Now, is there anything about that

20   relationship, your working or being affiliated with members of

21   the U.S. Attorney's Office, that would make it difficult for

22   you to be fair and impartial if selected as a juror in this

23   case?

24             PANELIST THIRTY-ONE:  No, Your Honor.

25             THE COURT:  All right.  Thank you.

1          Is there anyone else who has a yes answer to that

2     question?

3          All right.  And I can barely see that number.

4          PANELIST TWENTY-NINE:  29.

5          THE COURT:  And if you would come to the microphone.

6     Speak clearly into the microphone.  Start with your juror

7     number.

8          PANELIST TWENTY-NINE:  My juror number is 29.

9          THE COURT:  29.  And you are familiar with someone in

10    the U.S. Attorney's Office?

11         PANELIST TWENTY-NINE:  Yes.  Elizabeth Sichi.  I'm not

12    sure if she's within that organization, but she did represent

13    me in the past.

14         THE COURT:  All right.  And was that the

15    U.S. Attorney's Office here in Arizona?

16         PANELIST TWENTY-NINE:  I believe so.

17         THE COURT:  And do you know this individual through

18    basically a professional relationship or a social relationship?

19         PANELIST TWENTY-NINE:  Professional.

20         THE COURT:  Okay.  And is there anything about that

21    relationship that would make it difficult for you to be fair

22    and impartial if selected as a juror in this case?

23         PANELIST TWENTY-NINE:  No, ma'am.

24         THE COURT:  All right.  Thank you, sir.

25         Now, I'd like to once again introduce you to David

| | |
|---|---|
| 1 | Eisenberg, who is the defense attorney in this case.  And are |
| 2 | any of you familiar with Mr. Eisenberg? |
| 3 | All right.  Thank you. |
| 4 | And seated next to Mr. Eisenberg of course is |
| 5 | Mr. Martis.  And I take it that given the recitation of the |
| 6 | summary of the case, let me ask again are any members of the |
| 7 | jury panel familiar with Mr. Martis? |
| 8 | All right. |
| 9 | Now, I asked you to --  I'm sorry.  Was there -- |
| 10 | PANELIST ONE:  Just looking. |
| 11 | THE COURT:  And if you need to, just pop up and take a |
| 12 | look around.  And I'll ask you now to do just that amongst your |
| 13 | fellow jury panel members.  If you would take a moment to gaze |
| 14 | around the room amongst your fellow jury panel members, and |
| 15 | I'll ask did any of you know each other before this morning? |
| 16 | All right.  We have a couple there.  Let's start with |
| 17 | number eight.  And juror number eight, if you could stand and |
| 18 | speak into the microphone.  Start with your juror number.  And |
| 19 | who is it that you are familiar with by jury number, if you can |
| 20 | possibly point them out? |
| 21 | PANELIST EIGHT:  Thank you, Your Honor.  Juror number |
| 22 | eight.  I'm familiar with two of the others in the room, more |
| 23 | by just general acquaintance, people I haven't seen in a very, |
| 24 | very long time.  So it would be juror number 31 I only know by |
| 25 | really name and got acquainted with this morning, and then |

1    juror 28, who I've worked with in the past.

2              THE COURT:  All right.  And is there anything about

3    that familiarity with your fellow juror panel members --

4              Juror number eight, would your acquaintance with your

5    other fellow juror members affect your ability to deliberate

6    and to reach your own independent decision as a juror in this

7    case?

8              PANELIST EIGHT:  No, it would not.

9              THE COURT:  Can you restate the answer into the

10   microphone.

11             PANELIST EIGHT:  No, it would not.

12             THE COURT:  All right.  Thank you.  And there was

13   another juror member, number 39.  I'm sorry.  Let's start with

14   number 11 here in the front row.  We'll try to go numerically.

15             PANELIST ELEVEN:  I'm juror number 11.  And I do have

16   a relative.

17             THE COURT:  And do you know what juror number that

18   relative is?  Okay.

19             PANELIST ELEVEN:  Number 39.

20             THE COURT:  And, again, I'll ask you the question that

21   was just previously asked of number eight.  Given your

22   acquaintance and relationship with juror number 39, would that

23   affect your ability to deliberate and to reach your own

24   independent decision as a juror in this case if the two of you

25   were selected to serve together?

1          PANELIST ELEVEN:  No, it would not, Your Honor.

2          THE COURT:  All right.  Thank you so much, sir.  You

3     may be seated.

4          And let's see if there was anyone else around in this

5     front area of the room.  No.

6          Okay.

7          And let's go to number 39 then.

8          PANELIST THIRTY-NINE:  Juror number 39.  And, yes,

9     obviously juror number 11 is a relative of mine.

10         THE COURT:  All right.  And then again I will ask you

11    the same question.  If the two of you were selected to serve on

12    this jury together, would the relationship that you have with

13    juror number 11 affect your ability to deliberate and to reach

14    your own independent decision in the case?

15         PANELIST THIRTY-NINE:  No, it would not.

16         THE COURT:  All right.  Thank you.

17         And anyone else?  Juror number 31.

18         PANELIST THIRTY-ONE:  Juror number 31, Your Honor.  I

19    am friends with the husband of juror number eight, and I just

20    met her this morning.

21         THE COURT:  All right.  And so given your new

22    relationship or acquaintance with juror number eight, would --

23    if you were selected to serve as co-jurors together in this

24    matter, would that affect your ability to deliberate

25    independently and reach your own independent conclusions?

1            PANELIST THIRTY-ONE:  No, it would not, Your Honor.

2            THE COURT:  All right.  Thank you.  Does anyone

3     else -- Okay.  Number 28.

4            PANELIST TWENTY-EIGHT:  Juror number 28, Your Honor.

5     Yeah.  I just had a working relationship with juror number

6     eight in past.

7            THE COURT:  All right.  And given that relationship,

8     the previous relationship that you had with juror number eight,

9     if you were selected to serve on this jury together, would that

10    affect your ability to deliberate and to reach your own

11    independent decisions in the matter?

12           PANELIST TWENTY-EIGHT:  No, it would not.

13           THE COURT:  All right.  Thank you, sir.

14           Anyone else?

15           All right.  I'm going to read now the names of the

16    witnesses who will be testifying in the trial, and I'll read

17    the list twice.  And so please listen carefully, and I'm going

18    to ask whether or not you're familiar with any of these

19    individuals.

20           Mr. Owen Beal, B-e-a-l; Ms. Heather Connelly,

21    C-o-n-n-e-l-l-y; Special Agent Sean Wilson; Mr. Richard

22    LaPoint; Christopher LaPoint; Special Agent Donald Ferreira;

23    Special Agent Elliott White; Andi Murphy.

24           I will read the list one more time.

25           Owen Beal, Heather Connelly, Sean Wilson, Richard

1    LaPoint, Christopher LaPoint, Donald Ferreira, Elliott White,

2    Andi Murphy.

3              Now, with the upcoming questions, if there are any

4    matters which you would rather discuss privately that may

5    affect your ability to be fair and impartial, please do let me

6    know, and simply hold up your card if you have an answer to the

7    question that you wish to discuss privately, and just simply

8    say I want to discuss it privately with you.  I'll take down

9    your juror number.  And then we will call you in privately if

10   need be.

11             And again do recall that you're all in the same

12   situation, and your answers will always be part of the record.

13             Have you or any member of your family -- and I am

14   including in your family brothers, sisters, parents, or

15   children -- ever been the victims of serious criminal conduct

16   involving serious personal property damage or bodily injury?

17             If you have an answer to that question, I'm going to

18   ask you to explain just generally what the incident was and

19   then what if any police agency investigated the matter and

20   whether anyone was apprehended.

21             All right.  Let's start with juror number one.

22             PANELIST ONE:  I'm juror number one.

23             THE COURT:  Just explain generally the incident.

24             PANELIST ONE:  My youngest son's bank card was taken

25   from me, and it went to court, and she was prosecuted.

1    THE COURT:  Do you remember what the law enforcement

2    agency was that investigated the matter?

3    PANELIST ONE:  It was Mesa.

4    THE COURT:  And generally at what time frame this

5    happened?

6    PANELIST ONE:  2006 or 2007.

7    THE COURT:  And you mentioned that the individual who

8    took the bank card was prosecuted?

9    PANELIST ONE:  Yes.

10   THE COURT:  And do you think that experience would

11   prevent you from being fair and impartial in this case if

12   selected as a juror?

13   PANELIST ONE:  No, Your Honor.

14   THE COURT:  All right.  Thank you.  Number five.

15   PANELIST FIVE:  Juror number five.  Brother-in-law was

16   murdered.  It was investigated by the Palm Springs Police

17   Department.  And years later they apprehended the suspect.

18   THE COURT:  Do you recall generally the time frame

19   that the incident occurred?

20   PANELIST FIVE:  '97, '98.

21   THE COURT:  And when was the individual apprehended,

22   approximately, if you recall.

23   PANELIST FIVE:  2008.

24   THE COURT:  You mentioned the individual was

25   apprehended.  Was he also prosecuted?

1          PANELIST FIVE:  Yes, he was.

2          THE COURT:  And you mentioned this was the Palm

3    Springs Police Department?

4          PANELIST FIVE:  Correct.

5          THE COURT:  And do you think this experience would

6    prevent you from being a fair and impartial juror in this

7    matter?

8          PANELIST FIVE:  No, it would not.

9          THE COURT:  All right.  Thank you.  Number seven.

10         PANELIST SEVEN:  Juror number seven.  My sister was

11   sexually molested by my stepfather, and he spent some time in

12   jail approximately ten years ago.

13         THE COURT:  And do you recall the police department or

14   agency that investigated the matter?

15         PANELIST SEVEN:  This was in Utah.  I'm not sure which

16   city it was in.

17         THE COURT:  Is there anything about that experience

18   that would create a difficulty for you to be fair and impartial

19   if selected as a juror in this case?

20         PANELIST SEVEN:  No, Your Honor.

21         THE COURT:  All right.  Thank you.

22         Anyone else in this front area?  14.

23         PANELIST FOURTEEN:  I'm juror 14.  I was sexually

24   abused by my half brother when I was a child.  I have been

25   stalked.  And I've had to get a restraining order.  And my two

1    cousins were raped by their father.  He went to prison.  He's

2    since died.

3              THE COURT:  In terms of your victimization, do you

4    recall the approximate time frame?

5              PANELIST FOURTEEN:  I was five years old, so it was

6    1979.  My cousins were probably before I was born.  And I was

7    stalked in high school in 1993.

8              THE COURT:  In terms of the stalking incidents that

9    occurred, was there a law enforcement agency that was involved?

10             PANELIST FOURTEEN:  Colorado Springs Police

11   Department.

12             THE COURT:  And was there ever an individual

13   apprehended or prosecuted?

14             PANELIST FOURTEEN:  It was my boyfriend in high

15   school.  I got a restraining order against him.  And then I had

16   it dropped before we graduated.  And I moved a couple thousand

17   miles away.

18             THE COURT:  Now, is there anything about those

19   experiences either individually or collectively that would make

20   it difficult for you to sit as a fair and impartial juror if

21   you were selected to serve as a juror on this case?

22             PANELIST FOURTEEN:  Yes.

23             THE COURT:  All right.  Thank you.  Number 15.

24             PANELIST FIFTEEN:  Good morning, Your Honor.

25             THE COURT:  Good morning.

1          PANELIST FIFTEEN:  I'm juror number 15.  And in 2017

2      when I lived in Mesa, my house was burglarized.  And Mesa

3      Police Department investigated.  And nobody was prosecuted.

4      And I just wanted to let you know previously you had asked if

5      we knew you.  I work for the Maricopa County Attorney's Office,

6      so we do have some cases with you.

7          THE COURT:  Let me start with the question related to

8      the burglary of your home in Mesa.

9          The Mesa Police Department were involved in that

10     investigation?

11         PANELIST FIFTEEN:  Correct, yes.

12         THE COURT:  No one was apprehended or prosecuted?

13         PANELIST FIFTEEN:  They thought they found somebody,

14     but they couldn't prove anything against her.

15         THE COURT:  Is there anything about that experience

16     that would create a difficulty for you if you were selected as

17     a juror in this case?  In other words, would you still be able

18     to be fair and impartial?

19         PANELIST FIFTEEN:  I would be fair and impartial.

20         THE COURT:  And in terms of your relationship with me

21     and working in the Maricopa County Attorney's Office, is that

22     currently the case, or was that previously?  And if you could

23     just generally give me a time frame.

24         PANELIST FIFTEEN:  I'm currently still employed there

25     in the civil services department.

1          THE COURT:  And in terms of bringing cases before the

2    Court, does that refer to attorneys of the Maricopa County

3    Attorney's Office bringing cases in federal court?

4          PANELIST FIFTEEN:  Correct.

5          THE COURT:  All right.  Is there anything about that

6    experience, the professional, I guess, relationship that you

7    would have in terms of bringing matters into the court that

8    randomly get selected -- and sometimes I may be sitting on one

9    of those cases -- that would make it difficult for you to be

10   fair and impartial to either party in this case if selected as

11   a juror?

12         PANELIST FIFTEEN:  No.

13         THE COURT:  All right.  Thank you.

14         PANELIST FIFTEEN:  Thank you.

15         THE COURT:  Number 18.

16         PANELIST EIGHTEEN:  Juror number 18.  My husband was

17   killed in 1996.  My father was assaulted in the same incident.

18   He -- There was someone prosecuted.  He served time for that.

19   Also my home was burglarized in Douglas, Arizona, in 1998.

20   Someone was not prosecuted for that.  It was the Douglas Police

21   Department.  And finally in 2010 I was the victim of a stalking

22   incident in relation to my work as an adult probation officer.

23         THE COURT:  The death of your husband and the assault

24   on your father that occurred in 1996, do you recall what law

25   enforcement agency investigated that?

1          PANELIST EIGHTEEN:  It was in the area of Henderson,

2     Missouri.  I'm not sure what the agency was.

3          THE COURT:  And the burglary in Douglas, that was the

4     Douglas Police Department?

5          PANELIST EIGHTEEN:  Correct.

6          THE COURT:  Is there anything about those incidents as

7     well as the stalking incident that would affect your ability to

8     be fair and impartial if you were selected as a juror in this

9     particular case?

10         PANELIST EIGHTEEN:  No, Your Honor.

11         THE COURT:  All right.  Thank you.

12         Number 25.

13         PANELIST TWENTY-FIVE:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         PANELIST TWENTY-FIVE:  I'm number 25.  In 1993 a close

16    high school friend committed patricide, and he was found

17    guilty.  And this was in San Diego County.

18         THE COURT:  San Diego County?

19         PANELIST TWENTY-FIVE:  Yes.

20         THE COURT:  And this was a close personal friend?

21         PANELIST TWENTY-FIVE:  Yes.

22         THE COURT:  And is there anything about that incident

23    that would make it difficult for you to be fair and impartial

24    to the parties in this case if selected as a juror?

25         PANELIST TWENTY-FIVE:  No.

1          THE COURT:  All right.  Thank you.

2          Anyone else have -- Okay.  Let's see.  Number 33.

3          PANELIST THIRTY-THREE:  Good morning.

4          THE COURT:  Good morning.

5          PANELIST THIRTY-THREE:  I'm juror number 33.  Both of

6     these happened quite a few years ago, but they're pretty

7     significant.  I was five years old, and my grandfather was shot

8     point blank in Long Beach, California.  And it was probably

9     around '69, '70.  And they thought it was Black Panthers or

10    whatever it was at that time.  And nobody was prosecuted for

11    that.

12         And then an uncle of mine several years later, just

13    before Rodney King, probably one or two years before Rodney

14    King, was beaten up on Pasadena Highway pretty close to the

15    damage that Rodney King had done to him.  And I don't know what

16    the outcome of that was.  There was, you know, some money paid

17    out or something.  But, yeah, it was LA County Sheriff's, I

18    believe.

19         THE COURT:  So in terms of the earlier death of your

20    grandfather, that occurred in Long Beach, California, quite

21    some years ago?

22         PANELIST THIRTY-THREE:  No.  I'm sorry.  He did not

23    die.  He was shot, but he lived.

24         THE COURT:  Okay.  And do you recall if anyone was

25    ever apprehended or prosecuted for that?

1        PANELIST THIRTY-THREE:  I don't believe so.

2        THE COURT:  And in terms of your uncle and in being

3    beaten in Pasadena, California, the LA County Sheriff's

4    Department you say investigated that case?

5        PANELIST THIRTY-THREE:  Yeah.  I didn't pay that much

6    attention to it.  My parents paid more attention to it than me.

7    I was in high school and involved in sports and other things.

8    And, you know, I'm not quite sure, but it was, yeah, it was

9    pretty bad.

10        THE COURT:  Now, given those experiences, do you think

11    that they would prevent you from being fair and impartial to

12    the parties in this case if you were selected as a juror?

13        PANELIST THIRTY-THREE:  No, I don't believe so.

14        THE COURT:  Thank you, sir.  Number 21.

15        PANELIST TWENTY-ONE:  Juror number 21.  I was sexually

16    assaulted as a child from the years of 1985 to around 1991-'92.

17    My stepfather was convicted, and he served time in prison.  I

18    don't remember which year he was prosecuted.  It was maybe

19    around '96 or '97.

20        THE COURT:  Do you recall what law enforcement agency

21    investigated the case?

22        PANELIST TWENTY-ONE:  It was covered over two states

23    in San Diego County and Navajo County.

24        THE COURT:  Do you recall the prosecution agency?  Was

25    it Navajo County?

1          PANELIST TWENTY-ONE:  It was Navajo County.

2          THE COURT:  Is there anything about going through

3    those experiences that would make it difficult for you to be

4    fair and impartial to the parties in this case if you were

5    selected as a juror?

6          PANELIST TWENTY-ONE:  I believe so, yes.

7          THE COURT: All right.  Thank you so much.  Does

8    anyone else have an answer to that question?

9          Now, have you or any members of your family -- and,

10   again, when I say your family, I'm talking about your close

11   immediate family, brothers, sisters, parents, or children --

12   ever been convicted of a felony?

13         And if you have an answer to that question, I'm going

14   to ask you just to generally state which family member, what

15   offense, and if you know what the outcome was.

16         Number one.

17         PANELIST ONE:  I am juror number one.  I adopted three

18   boys back in 2005.  Their father was convicted of molestation

19   of his sister in Maricopa County.  And he served time but is

20   now deceased.

21         THE COURT:  And do you think that experience would

22   prevent you from being fair and impartial if selected as a

23   juror in this case?

24         PANELIST ONE:  No, ma'am.

25         THE COURT:  Thank you.

1          Number five.

2          PANELIST FIVE:  Juror number five.  I have one son

3     that was arrested and charged for forgery, and he was

4     convicted, and he did time.

5          THE COURT:  Do you recall approximately when this

6     occurred?

7          PANELIST FIVE:  2005.

8          THE COURT:  And do you think that this experience

9     would make it difficult for you to be fair and impartial if

10    selected as a juror in this case?

11         PANELIST FIVE:  No, I do not.

12         THE COURT:  Thank you.  Anyone else?

13         Number 28.

14         PANELIST TWENTY-EIGHT:  Juror number 28.  My older

15    brother was forging prescriptions, and he ended up serving five

16    years in prison.

17         THE COURT:  Do you recall approximately when this

18    occurred?

19         PANELIST TWENTY-EIGHT:  This was like in the late

20    '90s.

21         THE COURT:  Okay.  And is there anything about that

22    experience that would prevent you from being fair and impartial

23    if selected as a juror in this case?

24         PANELIST TWENTY-EIGHT:  No, there isn't.

25         THE COURT:  Thank you.  Number 40.

1          PANELIST FORTY:  Juror 40.  My mom was convicted of

2     possession of a controlled substance and possession of a

3     firearm.

4          THE COURT:  I'm sorry.  Could you say that last --

5          PANELIST FORTY:  Possession of a firearm with

6     controlled substances in 2013 or 2014.

7          THE COURT:  And you said she was convicted of both of

8     these crimes and of which are felonies.  And do you think that

9     this experience would make it difficult for you to be fair and

10    impartial to both parties if selected as a juror?

11         PANELIST FORTY:  No, Your Honor.

12         THE COURT:  Thank you.

13         Anyone else?  Number 33.

14         PANELIST THIRTY-THREE:  Good morning.  Juror number

15    33.  And my father had a felony about 20 years ago.  They were

16    starting a company in California disposing of chemical waste.

17    And there was a company in Nevada that stuff was being shipped

18    to to be disposed of.  And they did not keep up with their

19    license and their regulations.  And subsequently my father, who

20    was vice president of the company, was charged with a felony.

21    And I believe since it has been lifted, I believe.

22         THE COURT:  Was it -- I guess I'm trying to understand

23    what the particular matter involved.  Was it business related

24    in terms the finances, or was it related to chemical dumping

25    or --

1          PANELIST THIRTY-THREE:  Dumping pretty much, yeah.

2          THE COURT:  And you said this happened when?

3          PANELIST THIRTY-THREE:  I'd say probably 20, 25 years

4    ago, something like that.

5          THE COURT:  Okay.  And, again, do you think that any

6    of those experiences would prevent you from being fair and

7    impartial if selected as a juror in this matter?

8          PANELIST THIRTY-THREE:  No.

9          THE COURT:  Thank you.  Anyone else?  19.

10          PANELIST NINETEEN:  Juror number 19.  My oldest

11    brother is usually involved in drugs of some sort.  I do not

12    have -- I have little to no communication with him, so I do not

13    know if he has any felonies.  But just putting it out there.

14          THE COURT:  All right.  So just generally you're aware

15    of some of his illegal activities and wanted to bring that to

16    the Court's attention?

17          PANELIST NINETEEN:  Correct.

18          THE COURT:  Given that you have infrequent contact

19    with him, is there anything about that circumstance that would

20    make it difficult for you to be fair and impartial to both

21    parties if you were selected to hear this matter?

22          PANELIST NINETEEN:  No, Your Honor.

23          THE COURT:  All right.  Thank you, sir.

24          Anyone else?

25          THE COURT:  Now, somewhat different to the COVID-19

1    questions that you previously answered on the questionnaire, do

2    any of you have any other reason whatsoever, such as having a

3    physical difficulty or a health problem, that might interfere

4    with your service as a fair and impartial juror in this case?

5              I'll give you an example.  If you have a difficulty

6    hearing.  We oftentimes do have jurors that may have difficulty

7    hearing.  And so we do provide hearing assisting devices that

8    are cleansed and given to you individually that you can use at

9    your leisure.

10             Oftentimes I've had people on a jury panel who can't

11   sit for prolonged periods of time.  I myself fit into that

12   category.  And so what I will generally do is encourage jurors

13   to stand when there's breaks or people are coming off and on

14   the witness stand.  I sometimes will do that myself.  I'll

15   stand during portions of the trial.

16             Anything like that?  Does anyone have a physical

17   difficulty or health problem that would make it difficult for

18   you to serve as a juror if selected?

19             All right.  Number 14.

20             PANELIST FOURTEEN:  I'm juror number 14.  I have a

21   question.  I don't have the physical disability.  Is there a

22   question like if I have to go help somebody else?  Is that

23   question coming later?

24             THE COURT:  I'm sorry.  I don't quite -- No.  The

25   question is whether or not you have a physical difficulty that

1 would make it difficult for you to sit as a juror.

2    PANELIST FOURTEEN:  No.  Okay.  Thank you.

3    THE COURT:  Thank you.

4    Number 18.

5    PANELIST EIGHTEEN:  Juror 18.  I do have difficulty

6 sitting for prolonged periods of time, but I think you've

7 already answered that.  If I have the ability to stand or take

8 a break, that would resolve it for me.

9    THE COURT:  Yes.  And we do take periodic breaks.  We

10 have a lunch break.  We have a morning break and an afternoon

11 break.  And then again, as I said, there are opportunities

12 where we will just have a natural break in the progression of

13 the trial, and you can stand, and I'll do the same.  All right.

14 Anything else?  Anyone else?  I'm sorry.  21.

15    PANELIST TWENTY-ONE:  Juror number 21.  I recently had

16 knee surgery, so I do have to, again, I have to stand up and

17 move around from time to time just so it doesn't get so stiff.

18    THE COURT:  What is the maximum amount of time that

19 you think you can sit with your knee surgery?

20    PANELIST TWENTY-ONE:  I find that I can't sit more

21 than two hours long.

22    THE COURT:  Okay.  Thank you.

23    PANELIST TWENTY-ONE:  Thank you.

24    THE COURT:  Anyone else?

25    Number -- I'm sorry -- 32.

1          PANELIST THIRTY-TWO:  Number 32, Your Honor.  I just

2     have problems sometimes.  Make sure it's not a dark room.

3     Otherwise I'll fall asleep.  If I could be accommodated by

4     having me in the back of the juror row, so if I start to feel

5     like I'm falling asleep, that I can go ahead and stand up.  And

6     that way that will keep me from falling asleep.  And if I'm in

7     the back, I won't be disturbing any of the other jurors.

8          THE COURT:  All right.  So do you have difficulty

9     concentrating or just onset of sleep?

10          PANELIST THIRTY-TWO:  I didn't used to have difficulty

11     concentrating, but I do now.  It's just age related.

12          THE COURT:  Okay.  All right.  Thank you, sir.

13          PANELIST THIRTY-TWO:  Thank you.

14          THE COURT:  Anyone else?

15          Are any of you or any members of your family or close

16     friends now serving or have ever served in the capacity of law

17     enforcement officer?  And by law enforcement officer, I'm

18     including not only police officers but also employees of law

19     enforcement agencies, military police, the FBI, Border Patrol,

20     Drug Enforcement Administration, Alcohol Tobacco Firearms, the

21     Department of Justice, the Department of Homeland Security, or

22     other governmental law enforcement or intelligence agencies.

23          All right.  We have quite a few.

24          The question that relates to this:  If so, do you

25     think this relationship would prevent you from being fair and

1    impartial during this case?

2              If you would just state your juror number, state the

3    relationship and the law enforcement agency, and then answer

4    the question.

5              You have a --

6              PANELIST ONE:  Juror number one.  My son's in the air

7    force.  And I don't know exactly what it is he does because

8    he's not allowed to discuss it.

9              THE COURT:  And would the relationship affect your

10   ability to serve as a juror in this matter?

11             PANELIST ONE:  No.  He's currently in Texas.

12             THE COURT:  All right.  Thank you.  Anyone else in the

13   jury box?  Number six.

14             PANELIST SIX:  I am juror number six.  My brother

15   serves in the Coast Guard.

16             THE COURT:  And is there anything about that

17   relationship and his service in the Coast Guard that would make

18   it difficult for you to be fair and impartial if selected as a

19   juror in this matter?

20             PANELIST SIX:  No, it would not.

21             THE COURT:  Thank you.  Anyone else in the jury box?

22             Down here in this section of the room.  Number 15.

23             PANELIST FIFTEEN:  I'm juror number 15.  I work for

24   the Maricopa County Attorney's Office in civil services.

25             THE COURT:  And is there anything about your current

1    employment and what you do in that office that would make it

2    difficult for you to be fair and impartial if selected as a

3    juror in this matter?

4              PANELIST FIFTEEN:  No.

5              THE COURT:  Thank you.  Number 16.

6              PANELIST SIXTEEN:  Juror number 16.  My sister is

7    undercover detective for the Los Angeles Police Department, and

8    my son works in parking enforcement for Santa Monica California

9    Police Department.

10             THE COURT:  And given that you have two family

11   members, very close family members who are working in law

12   enforcement at this time, is there anything about that

13   relationship and what they do for a living that would make it

14   difficult for you to be fair and impartial if selected as a

15   juror in this matter?

16             PANELIST SIXTEEN:  No, Your Honor.

17             THE COURT:  Thank you.  Number 18.  It was flipped

18   around.

19             PANELIST EIGHTEEN:  Sorry.  Juror 18.  I myself was a

20   sworn officer for the Superior Court of Arizona.  I'm now

21   medically retired.

22             THE COURT:  And given your service to the Superior

23   Court, would that affect your ability to be fair and impartial

24   if selected to hear this matter?

25             PANELIST EIGHTEEN:  I don't believe so, Your Honor.

1      THE COURT:  All right.  Thank you.  Number 19.

2      PANELIST NINETEEN:  Juror number 19.  I have a brother

3  in the Border Patrol.  I might have another one, but I don't

4  communicate with him very well.  And, no, this will not

5  infringe on my ability to be impartial in this case.

6      THE COURT:  All right.  Thank you, sir.

7      25.

8      PANELIST TWENTY-FIVE:  Juror number 25.  My godfather

9  has been a detective for the San Diego County Police Department

10  for over 30 years.

11      THE COURT:  And given the relationship that you have

12  with your godfather and the fact that he is currently a

13  detective, is there anything about that that would make it

14  difficult for you to be fair and impartial to both parties in

15  this matter?

16      PANELIST TWENTY-FIVE:  No.

17      THE COURT:  Thank you.  All right.  Let's see if

18  there's anyone on this side of the room?

19      Let's start with number 30.

20      PANELIST THIRTY:  Juror number 30.  My son's a sheriff

21  with the Riverside County Sheriff's in California.  And, no, I

22  would have no problem being impartial.

23      THE COURT:  All right.  That would not make it

24  difficult for you to be fair or impartial?

25      PANELIST THIRTY:  No.

1          THE COURT:  All right.  Thank you.  31.

2          PANELIST THIRTY-ONE:  Juror number 31.  I worked as a

3     prosecutor in the State of New York from 2003 until 2010 and

4     then as a prosecutor for the Yavapai Apache Nation, an Indian

5     tribe in Camp Verde, Arizona, from 2012 until 2018.

6          THE COURT:  And is there anything about your

7     professional relationships and what you do for a living that

8     would make it difficult for you to be fair and impartial if

9     selected as a juror in this case?

10          PANELIST THIRTY-ONE:  No, Your Honor.  I feel a

11     prosecutor has an independent obligation separate from law

12     enforcement to make an independent determination.  I feel I can

13     be fair and impartial this case.

14          THE COURT:  Thank you.

15          Number 40.

16          PANELIST FORTY:  Juror 40.  My uncle has been all over

17     Arizona, like he's been detective, SWAT, a bunch of other

18     departments down in Laveen.

19          THE COURT:  I'm sorry.  Can you get closer to the

20     microphone.  And what was the agency?

21          PANELIST FORTY:  Laveen.

22          THE COURT:  Laveen?

23          PANELIST FORTY:  Yes.

24          THE COURT:  So he has been essentially a kind of a

25     jack-of-all-trades in the Laveen Police Department?

1          PANELIST FORTY:  Yes.

2          THE COURT:  And currently serving still?

3          PANELIST FORTY:  I believe so.

4          THE COURT:  All right.  Is there anything about that

5   relationship that you have with your uncle and his service in

6   the Laveen Police Department that would make it difficult for

7   you to be fair and impartial to both parties in this matter if

8   selected as a juror?

9          PANELIST FORTY:  No.

10         THE COURT:  All right.  Thank you.  Anyone else?

11  Number eight.

12         PANELIST EIGHT:  Juror number eight.  My husband was a

13  prosecutor from 2000 to 2010.

14         THE COURT:  And where was he a prosecutor?

15         PANELIST EIGHT:  Coconino County.

16         THE COURT:  Currently no longer serving there?

17         PANELIST EIGHT:  That's correct.

18         THE COURT:  Is there anything about what your husband

19  previously did for work as a prosecutor that would make it

20  difficult for you to be fair and impartial to both sides if

21  selected as a juror?

22         PANELIST EIGHT:  No, it would not.

23         THE COURT:  Thank you.  Anyone else have an answer to

24  that question?

25         All right.  Now, do you or any of your family members

| | |
|---|---|
| 1 | have any legal training?  And if you have an answer to that |
| 2 | question, I'm going to just ask you to describe the type of |
| 3 | training it is and again if you think that having this legal |
| 4 | training would affect your ability to be fair and impartial in |
| 5 | this case, legal training. |
| 6 | Number eight. |
| 7 | PANELIST EIGHT:  Juror number eight.  My husband is an |
| 8 | attorney currently.  And, no, it would not affect my ability to |
| 9 | be fair and impartial. |
| 10 | THE COURT:  Thank you.  Number 15. |
| 11 | PANELIST FIFTEEN:  Juror number 15.  I work as a |
| 12 | paralegal in civil services at the County Attorney's Office. |
| 13 | THE COURT:  And, again, I think you've answered the |
| 14 | question in a variety of contexts, but in terms of your legal |
| 15 | training, would that affect your ability to be fair and |
| 16 | impartial to the parties in this case if selected to serve? |
| 17 | PANELIST FIFTEEN:  No, it would not. |
| 18 | THE COURT:  Thank you. |
| 19 | Number 18. |
| 20 | PANELIST EIGHTEEN:  Juror number 18.  I had legal |
| 21 | training myself as a probation officer.  My husband is an |
| 22 | attorney currently.  And, no, it would not affect my ability to |
| 23 | be impartial or fair. |
| 24 | THE COURT:  All right.  Thank you.  Number 30 -- |
| 25 | Number 29. |

```
 1              PANELIST TWENTY-NINE:  Juror number 29.  I did take
 2    some courses as part of the master's in business administration
 3    related to law, general law, but I don't think it will affect
 4    my ability to be impartial.
 5              THE COURT:  All right.  Thank you.  31.
 6              PANELIST THIRTY-ONE:  Juror number 31.  I currently am
 7    an attorney.  I practice private -- I'm a family law attorney
 8    in Flagstaff.
 9              THE COURT:  All right.  And, again, do you think that
10    that legal training or even your prior training to be a
11    prosecutor would affect your ability to be fair and impartial
12    if selected to hear this matter?
13              PANELIST THIRTY-ONE:  No, Your Honor.
14              THE COURT:  All right.  Thank you.  35.
15              PANELIST THIRTY-FIVE:  Juror number 35, Your Honor.  I
16    was a litigation assistant with the Attorney General's Office
17    of Arizona for about 32 years.
18              THE COURT:  Retired now from that job?
19              PANELIST THIRTY-FIVE:  Yes.
20              THE COURT:  And is there anything about your previous
21    work as a litigation assistant that would affect your ability
22    to be fair and impartial to the parties if selected as a juror
23    here?
24              PANELIST THIRTY-FIVE:  No, Your Honor.
25              THE COURT:  Thank you.  37.
```

```
 1              PANELIST THIRTY-SEVEN:   37.  My mother is a county
 2    clerk at our county courthouse.
 3              THE COURT:   Where is that?
 4              PANELIST THIRTY-SEVEN:   It's in Apache County.
 5              THE COURT:   Is there anything about what your mother
 6    does for a living working as a county clerk that would make it
 7    difficult for you to be fair and impartial to both parties if
 8    you were selected to hear this matter?
 9              PANELIST THIRTY-SEVEN:   No.
10              Thank you.  Anyone else?
11              Now, I will instruct you on what the law is at the
12    conclusion of the case.  If selected as a juror, you will take
13    an oath to follow the law.  Do you think that you would have
14    trouble following the law even if you may disagree with it?
15              In a civil case, the burden of proof is preponderance
16    of the evidence.  This is a criminal case in which the
17    government must prove guilt beyond a reasonable doubt.  That
18    requires proof that leaves you firmly convinced that the
19    defendant is guilty.
20              Would any of you have any difficulty in holding the
21    government to its burden?
22              PANELIST TWENTY-SIX:   I'm not sure if that's exactly
23    the question you're asking, but --
24              THE COURT:   If you could hold up your juror number.
25              PANELIST TWENTY-SIX:   I'm sorry.  I'm juror 26.
```

1          THE COURT:  Okay.  Do you need me to restate the --

2          PANELIST TWENTY-SIX:  Yeah, because I'm trying to -- I

3     mean, I think I --

4          THE COURT:  Okay.  In a civil case, the burden of

5     proof is preponderance of the evidence.  This is a criminal

6     case in which the government must prove guilt beyond a

7     reasonable doubt.  That requires proof that leaves you firmly

8     convinced that the defendant is guilty.  Would you have any

9     difficulty holding the government to its burden, that is, to

10    prove guilt beyond a reasonable doubt?

11         PANELIST TWENTY-SIX:  No.  I misunderstood your

12    question.

13         THE COURT:  All right.  Thank you.  Now, here are some

14    fundamental principles of law.  The fact that an indictment has

15    been filed raises no presumption whatsoever of the guilt of the

16    defendant.  The United States must satisfy you beyond a

17    reasonable doubt of the guilt of the defendant.

18         The defendant does not have any obligation to testify

19    or to produce any evidence, and you may not draw an adverse

20    inference if the defendant chooses not to testify.

21         The defendant is presumed to be innocent until his

22    guilt is established beyond a reasonable doubt.

23         You must wait until all of the evidence has been

24    presented before making up your minds as to the innocence or

25    guilt of the defendant.

1          Does anyone believe that they will have any difficulty

2     following these principles of the law?

3          Do you have any strong --

4          MR. EISENBERG:  Your Honor --

5          THE COURT:  I'm sorry?

6          MR. EISENBERG:  Number 26.

7          PANELIST TWENTY-SIX:  Juror number 26.  I think I

8     wouldn't fault for that because the situation of the case.  I

9     believe in freedom of speech.  And I really don't think if I

10    was on a jury that I could make that, you know, precise

11    decision on the thing because I believe -- of my beliefs.

12         THE COURT:  All right.  Well, I appreciate you coming

13    forward and answering the question.  And I think there's a

14    question that's somewhat related, and if you would listen

15    closely, I'm going to ask it.  And then if you have a response,

16    we'll start with you.  Okay?

17         PANELIST TWENTY-SIX:  Okay.

18         THE COURT:  Do you have any strong feelings regarding

19    the criminal justice system in this country including but not

20    limited to your feelings about judges and lawyers that would

21    prevent you from giving either the government or the defendant

22    a fair hearing in this matter?

23         Now, do you have a belief, whether religious or

24    philosophical, which makes it difficult for you to sit in

25    judgment of another?

UNITED STATES DISTRICT COURT

1          There will be witnesses called during this trial who

2    are members of law enforcement and who may have been in that

3    profession for a number of years.  Is there anything about the

4    law enforcement profession and/or about the witness having been

5    engaged in such profession for a number of years that would

6    cause you to either give greater or lesser weight or

7    credibility to their testimony solely by virtue of their

8    employment in law enforcement?

9          All right.  I do expect to conduct trial on these

10   particular dates and times.  Today we start in earnest the

11   trial process.  And I am told by the parties that the trial

12   will likely end by the end of the day tomorrow.  In other

13   words, we don't anticipate that the trial will go past

14   Wednesday close of business.

15         Would this schedule create an undue hardship for any

16   of you?

17         And as indicated in the prior questionnaire you filled

18   out, an undue hardship is something more than an inconvenience.

19   It is something that you simply cannot escape because it

20   creates a difficulty for you personally or perhaps an immediate

21   family member.  And I do believe that we have shortened the

22   projected length of trial than was previously told to you.

23         Would the trial schedule create an undue hardship if

24   you had to serve throughout the rest of the day and then

25   possibly to the end of the day tomorrow?

1          Number 13.

2          PANELIST THIRTEEN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          PANELIST THIRTEEN:  I'm juror number 13.  My husband

5   owns a company, and I do dispatching and invoicing for him.  So

6   we have four techs that go out in the field.  They respond to

7   me.  I create an invoice, give it to the customer.  The

8   customer pays on site.  So we're kind of, you know, messing a

9   bit with the business model that we currently have because the

10  customers can't pay because I can't invoice them.  And I'm the

11  sole person at our company that does this.

12         THE COURT:  And so currently what's happening in the

13  company since you are here?

14         PANELIST THIRTEEN:  I contacted the customers for

15  today, 12 of them, and told them I will invoice them tomorrow.

16  And then sometimes we have issues with people not making

17  payment.  That's probably the biggest burden on us.  It's kind

18  of a financial hardship that we have to now go after people

19  after we've provided the service.

20         THE COURT:  And what would happen if you would be

21  absent tomorrow?

22         PANELIST THIRTEEN:  Same thing.  I would have to this

23  evening contact the customers for tomorrow and let them know

24  I'll invoice them on Thursday.

25         THE COURT:  And there is no one at your business that

1  can substitute in your stead?

2       PANELIST THIRTEEN:  No.  I'm the sole person that does

3  this.  Prior to COVID we had an assistant, but we haven't been

4  able to reemploy anybody because we were partially shut down

5  during the COVID time.

6       THE COURT:  All right.  Thank you.  Number 25.

7       PANELIST TWENTY-FIVE:  Juror number 25.  I understand

8  that there's no guarantee about dates of closing for decisions.

9  As long as things don't go past this Friday.  Monday I'm

10 obligated as a parent to travel with, chaperoning high school

11 students to California, and we have reservations.  And I've got

12 eight students depending on me.  So if it goes through

13 Wednesday or Friday, that's fine.  But no further would be

14 possible for my schedule.

15      THE COURT:  And I don't think we will -- I don't think

16 there's any chance in the world it would go even beyond

17 Thursday afternoon.

18      PANELIST TWENTY-FIVE:  Wonderful.  Thank you.

19      THE COURT:  All right.  Thank you.  Anyone else?

20      Does anyone have any other reason whatsoever that they

21 believe will prevent him or her from serving as a fair and

22 impartial juror in this case?

23      Number 14.

24      PANELIST FOURTEEN:  I'm juror 14.  I'm very

25 distracted.  I can't concentrate.  My daughter -- I just found

1    out last night that my ex-husband needs a triple bypass as soon

2    as possible.  He lives in Tennessee.  And I'm trying to get my

3    daughter and I out there so we can take care of him.  He has

4    nobody else.

5             THE COURT:  All right.  Thank you for bringing that to

6    my attention.

7             All right.  Let me just see if the government has any

8    further questions for follow-up.

9             MS. BROOK:  May I have one moment?  I'm sorry.

10            I just have a couple of quick follow-ups, if that's

11   okay.  Let me get to a place where I can see everybody and

12   talk.

13            Good morning.  I just have a couple of follow-ups

14   based on some of the --

15            THE COURT:  Ms. Brook, please speak into the

16   microphone.

17            MS. BROOK:  Sorry about that.  I just have a couple of

18   follow-ups based on the answers provided in court, and I wanted

19   to start.  Number 33 --

20            THE COURT:  And again let me -- Your microphone isn't

21   working right.

22            MS. BROOK:  Maybe I can come over to this one and

23   adjust it downward.  That's much better.

24            Okay.  33, sir, so I just wanted to follow up.  You

25   had mentioned that your grandfather and your uncle had been

1    victims of crimes and that individuals weren't prosecuted in

2    the aftermath of that.

3            Additionally I think you had mentioned a situation

4    with your father as well.

5            Do you have any feelings about how law enforcement

6    handled those situations that maybe make it difficult to, you

7    know, fairly listen to law enforcement in this particular case?

8            PANELIST THIRTY-THREE:  No.  It's just I believe, you

9    know, with my grandfather's case, it was just a sign of the

10   times, and, you know, they didn't know who shot him.  It was

11   outside of a restaurant in Long Beach and dark parking lot.

12   And, yeah, they just never found the guy.

13           And, you know, some of the police officers or

14   sheriff's officers in LA County were -- I believe they were

15   held responsible to a certain extent, so -- but I just never

16   paid much attention to it.

17           MS. BROOK:  And let me just make sure I understand.

18   So did law enforcement have some involvement in the attacks

19   themselves?

20           PANELIST THIRTY-THREE:  Yes.

21           MS. BROOK:  They did?

22           PANELIST THIRTY-THREE:  Yes.

23           MS. BROOK:  And you had mentioned that they were held

24   responsible?

25           PANELIST THIRTY-THREE:  Yes.

1          MS. BROOK:  So in the years past, do you feel like you

2     think about law enforcement differently or maybe see them

3     differently than other people?

4          PANELIST THIRTY-THREE:  No.  Not all police officers

5     are the same, you know.  It just happened to be a bad day for

6     everybody, and it, you know, who knows.  My uncle was a very

7     upstanding contractor in LA County, built, you know, million

8     dollar homes throughout LA County.

9          And, yeah, who knows?

10         Maybe he upset the officers or whatever.  It didn't

11    give them the right to act the way they did.  But, like I said,

12    it happened a year or two before Rodney King, and obviously

13    there was some bad people on the police force there.

14         But all in all, I believe that, you know, most of the

15    time they clean up the mess, so --

16         MS. BROOK:  Thank you, sir.

17         I want to go to 19 for a moment.  It's hard

18    remembering quite where everybody is.

19         Sir, we had a little discussion a couple minutes ago,

20    and 26 discussed, you know, how it would be difficult to have,

21    you know, speech restricted by the law, right, that that may be

22    a difficult law to follow.

23         And I just wanted to follow up on something in your

24    questionnaire.  If the Judge is to instruct you that there are

25    certain types of speech which are illegal, would you have a

1    difficult time following that law as instructed?

2              PANELIST NINETEEN:  No, I would not.

3              MS. BROOK:  Okay.  Thank you.

4              And then I have that same question --

5              Not for you, sir.  Thank you.  You can sit.

6              -- the same question for 38, and I believe 38 is --

7    right there.  Good morning, sir.

8              PANELIST THIRTY-EIGHT:  Good morning.

9              MS. BROOK:  Same question.  If the Judge is to

10   instruct you that there is certain type of speech that's not

11   protected by the First Amendment that's actually illegal, would

12   you have a hard time following that law?

13             PANELIST THIRTY-EIGHT:  No.  I'm in the military.  I

14   follow a lot of rules, so I understand the place.  It's just, I

15   mean, the question was asked about -- particularly about

16   freedom of speech.  But I understand certain things like hate

17   speech, different things like that, how it applies to the law,

18   and it wouldn't -- it doesn't affect my decision on whether or

19   not, you know, I'd be fair or impartial.

20             MS. BROOK:  Okay.  Thank you so much.  A couple more

21   quick questions.  Juror number 29, sir.

22             PANELIST TWENTY-NINE:  Yes, ma'am.

23             MS. BROOK:  We've talked about this morning how a

24   number of jurors have some legal experience in their

25   background.  Would you have a hard time setting aside your own

| | |
|---|---|
| 1 | legal experience and be able to follow the law as the Judge |
| 2 | instructs you on the law? |
| 3 | PANELIST TWENTY-NINE:  No, ma'am. |
| 4 | MS. BROOK:  Okay.  Thank you.  And I have that same |
| 5 | question for juror number eight.  With having some legal |
| 6 | experience, would you have a hard time setting aside the law as |
| 7 | you understand it and following the law as the Judge instructs |
| 8 | you? |
| 9 | PANELIST EIGHT:  No, I would not. |
| 10 | MS. BROOK:  18, same question. |
| 11 | PANELIST EIGHTEEN:  No.  I have -- I have been fair to |
| 12 | a fault, in my experience, my professional experience, so, no, |
| 13 | I would not have a problem following the law. |
| 14 | MS. BROOK:  Thank you.  Lastly, 31.  Same question. |
| 15 | PANELIST THIRTY-ONE:  Thank you.  Juror number 31. |
| 16 | Similar answer.  No, I would not have a hard time being fair |
| 17 | and impartial.  I truly believe the legitimacy of the system |
| 18 | requires all of us to put aside our personal beliefs and listen |
| 19 | to the evidence in this case. |
| 20 | MS. BROOK:  Okay.  Thank you, ladies and gentlemen.  I |
| 21 | appreciate your time this morning. |
| 22 | THE COURT:  Mr. Eisenberg. |
| 23 | MR. EISENBERG:  Thank you, Your Honor.  May I stand |
| 24 | over here? |
| 25 | THE COURT:  Yes.  Just make sure that you have a |

1    microphone that works.

2            MR. EISENBERG:  Thank you.  Excuse me.  Juror number

3    31.

4            THE COURT:  Did you say 31?

5            MR. EISENBERG:  Yes, ma'am.  Make you stand again.

6            In your position -- There, I got it.  Now I'm looking

7    at your juror questionnaire.  And among the things that you

8    stated in your questionnaire was that you had prosecuted

9    crimes, including verbal harassment.  Is that correct?

10           PANELIST THIRTY-ONE:  Yes.

11           MR. EISENBERG:  So in this case where you've heard the

12   nature of the case, you heard Her Honor talk about what the

13   allegations were with respect to my client?

14           PANELIST THIRTY-ONE:  Yes.

15           MR. EISENBERG:  Now, having heard that from the Judge,

16   does that have any impact on or does your experience have

17   any -- Will it have any impact on judging Mr. Martis because

18   it's allegedly the same type of case?

19           PANELIST THIRTY-ONE:  I do not believe so.  My

20   prosecutorial experience was with special victims, so it was

21   specific to domestic violence.  I don't believe that I would

22   have a difficult time being fair and impartial in this case.

23           MR. EISENBERG:  So, in other words, what we ask you to

24   do is to set aside any of your experiences with your work, your

25   previous work, and judge this case the way it's presented to

1    you in court today and tomorrow.  Can you do that?

2              PANELIST THIRTY-ONE:  Yes, I can.

3              MR. EISENBERG:  Okay.  Thank you.  And juror number --

4    Excuse me.

5              Juror number 32.  Good morning, sir.

6              PANELIST THIRTY-TWO:  Good morning.

7              MR. EISENBERG:  I appreciated your answers to the

8    questions about falling asleep.  There's -- I think the Judge

9    described the nature of the day.  It's basically two hours and

10   a break, if I may, Your Honor, followed by another couple of

11   hours, then a larger break.  But whatever it is, over a day's

12   time, you might be in court asking to concentrate maybe five or

13   six hours, maybe more, throughout the day.  And then we go into

14   tomorrow.  Is that going to be a problem for you?

15             PANELIST THIRTY-TWO:  It might be.  I can't say that

16   it won't be.  I noticed that I'm easily distracted by things.

17   So as long as there's not anything else going on, I can

18   probably continue to pay attention.  But I can't guarantee it.

19             MR. EISENBERG:  Is this something you've had for a

20   long time?

21             PANELIST THIRTY-TWO:  No.  This is just standard

22   cognitive decline that comes with age.

23             MR. EISENBERG:  All right.  So if it just goes through

24   tomorrow -- I mean, I guess this is a hypothetical you can't

25   really answer.  Are you going to be able to concentrate as much

1    tomorrow afternoon, let's say, where there might be closing

2    arguments as you are here today listening to all our questions?

3              PANELIST THIRTY-TWO:  I believe so.  So far I have

4    only yawned about three times, so I think I'm probably good.

5              MR. EISENBERG:  And it's hard to tell with a mask.

6              PANELIST THIRTY-TWO:  Correct.  That's why I let you

7    know I've yawned three times.

8              MR. EISENBERG:  Okay.  Thank you.

9              Number 18.

10             PANELIST EIGHTEEN:  I think I heard -- I know I heard

11   your answers to the prosecutor's questions.  I just want to

12   make sure.  You've had a lot of service in law enforcement or

13   working with the courts.

14             PANELIST EIGHTEEN:  Correct.

15             MR. EISENBERG:  So I appreciated your answer about you

16   could still be fair and impartial; any of your prior experience

17   wouldn't impact you here listening to this case.  Is that

18   correct?

19             PANELIST EIGHTEEN:  Correct.

20             MR. EISENBERG:  Okay.  When you were a probation --

21   When you worked as a sworn officer, is that in the security

22   area of the court?

23             PANELIST EIGHTEEN:  No, sir.  I was a senior adult

24   probation officer, which is a sworn officer in Arizona.

25             MR. EISENBERG:  Okay.  So any of those cases that you

1    had that you were a probation officer for, they won't impact

2    you here judging this case today?

3              PANELIST EIGHTEEN:  No, sir.  I was, as I said, fair

4    to a fault, regardless of what side that might have been.

5              MR. EISENBERG:  I appreciate that, ma'am.  Thank you

6    very much.

7              I do have questions for those of you who said that

8    they had legal training or were related to persons who are

9    lawyers or did have legal training.  Excuse me.

10             Number eight, ma'am, your husband is an attorney?

11             PANELIST EIGHT:  Juror number eight.  That's correct.

12             MR. EISENBERG:  And what type of law does he practice?

13             PANELIST EIGHT:  Currently he's criminal defense.

14             MR. EISENBERG:  Okay.  And do you have any discussions

15   with him about his cases?

16             PANELIST EIGHT:  No way.

17             MR. EISENBERG:  No way.  You said that -- That's a

18   curious response.  That's an emphatic you don't.

19             PANELIST EIGHT:  I find his work -- We both -- Neither

20   of us talk very much about our work at all.  We tend to be more

21   into ourselves than our jobs.

22             MR. EISENBERG:  Okay.  Is there anything about his

23   work that would affect you from being fair and impartial to

24   Mr. Martis and listening to the evidence?

25             PANELIST EIGHT:  No.

1          MR. EISENBERG:  Thank you, ma'am.

2          Number 31, I should have asked you this before.  I'm

3     sorry.  You do family law, ma'am?

4          PANELIST THIRTY-ONE:  Yes, sir.

5          MR. EISENBERG:  Okay.

6          PANELIST THIRTY-ONE:  Sorry.  Juror number 31.  Sorry.

7          MR. EISENBERG:  Hello.  You don't do anything that

8     relates to criminal defense, do you?

9          PANELIST THIRTY-ONE:  Not currently.  I have

10    previously.  I have both prosecution and criminal defense

11    experience.

12         MR. EISENBERG:  Right.  But your current work, does it

13    involve any overtones of criminal aspects?  Sometimes divorce

14    or family relationships wind up with -- there may be issues

15    involving criminal activity.

16         PANELIST THIRTY-ONE:  I do not personally handle any

17    criminal cases in Arizona.  Some of the family law cases that I

18    do handle have many elements to them, and I ask other attorneys

19    to handle those.

20         MR. EISENBERG:  All right.  Thank you, ma'am.

21         And number 30 -- I'm sorry.

22         Number 25, good morning, ma'am.

23         PANELIST TWENTY-FIVE:  Good morning.

24         MR. EISENBERG:  Your godfather is a detective for San

25    Diego County?

1          PANELIST TWENTY-FIVE:  Yes, that's correct.

2          MR. EISENBERG:  Do you ever speak with him about his

3     cases?

4          PANELIST TWENTY-FIVE:  No.

5          MR. EISENBERG:  And do you know what types of cases he

6     handles?

7          PANELIST TWENTY-FIVE:  It's violent crime.

8          MR. EISENBERG:  That won't have any impact on your

9     ability to be fair in this case?

10          PANELIST TWENTY-FIVE:  No.

11          MR. EISENBERG:  Thank you, ma'am.  May I have a

12     moment, Your Honor?

13          THE COURT:  Yes.

14          MR. EISENBERG:  Number 21, you talked about when you

15     were a child there was a sexual assault.  Is that right, ma'am?

16          PANELIST TWENTY-ONE:  That is correct.

17          MR. EISENBERG:  At the end of your discussion with the

18     Court, the Judge asked you could you be fair and impartial in

19     this case, and I noticed that you -- I think there was a little

20     hesitation, and you said I believe it would not impact me or

21     your experience wouldn't impact you in order to sit in judgment

22     here today.

23          PANELIST TWENTY-ONE:  Actually meant that I do feel

24     that it will impose my judgment.  I didn't state clearly when I

25     was explaining that when it did go -- it did go to trial in San

| | |
|---|---|
| 1 | Diego County, and I had my experience there on the witness |
| 2 | stand.  It was not very pleasant, and it doesn't, you know, and |
| 3 | it's still there for me very clear on how I was treated by not |
| 4 | the prosecuting attorney but by the defending attorney. |
| 5 | So therefore my experience in having to remember that |
| 6 | and, you know, relive it, it's not, you know, I don't feel that |
| 7 | I would be able to provide an impartial and fair judgment. |
| 8 | MR. EISENBERG:  In other words, as I understand what |
| 9 | you're saying, you felt you were mistreated by the criminal |
| 10 | defense attorney, and that's created an issue for you in terms |
| 11 | of just how things happen in court.  Particularly you would be |
| 12 | biased against the defense.  And I'm not trying to judge at |
| 13 | all.  I'm just trying to get to how you would feel.  Did I say |
| 14 | it right? |
| 15 | PANELIST TWENTY-ONE:  I believe so.  You know, again, |
| 16 | I still strongly feel that, you know, based upon my experience |
| 17 | and the judicial system, that it would impact my judgment. |
| 18 | MR. EISENBERG:  All right.  I appreciate that.  Thank |
| 19 | you. |
| 20 | PANELIST TWENTY-ONE:  Thank you. |
| 21 | MR. EISENBERG:  That's all, Your Honor. |
| 22 | THE COURT:  All right. |
| 23 | All right.  Members of the jury panel, we will take a |
| 24 | recess now.  I would say that we should take -- Let's plan on |
| 25 | being back here in your seats -- |

1          (The Court and clerk confer off the record.)

2              THE COURT:  A lot of logistics to work out, given the

3     need to socially distance still.

4              But what we will do is we will be on about a half an

5     hour break.  We will have you return into the courtroom here,

6     take your places, and be here at 15 after the hour.

7              Before you leave, I admonish you not to discuss

8     anything that we have covered so far this morning amongst

9     yourselves, with your family members, your employers, and so

10    on.  If you need to check in with anyone, just simply let them

11    know that you are still going through the jury selection

12    process and that you were asked by the judge not to discuss

13    anything further.

14             And once you come back into the room, we will then

15    select those who will be on the jury to hear the matter.

16             And so we will now be -- we will now take our half an

17    hour break and, again, return into the courtroom at a quarter

18    after the hour.  Please stand for the jury pool.

19         (The jury exited the courtroom at 10:43 a.m.)

20             THE COURT:  All right.  What I would suggest that we

21    do, I'll give you my sense of who should be excused for

22    hardship.

23             MR. KOEHLER:  Your Honor --

24             THE COURT:  And then I will excuse myself.  You can

25    look amongst yourselves at the remaining list.  And then I will

1   come back at about, I'd say, 11:00, and you can tell me who you

2   think should be removed for cause.  Again, the government has

3   seven strikes, peremptory strikes, and the defendant has 11.

4           MR. KOEHLER:  Your Honor, before we --

5           THE COURT:  I did not ask the biographical 12

6   questions because it's simply in the questionnaire.  All of

7   that information that usually is asked in those 12 numeric

8   questions are all in there, so I did not do that. All right.

9   So --

10           MR. KOEHLER:  Your Honor, before we begin, I

11  apologize.  Juror number 12 has sequence number 1403.  We did

12  not get a questionnaire for that juror.  I double checked the

13  materials we received on the thumb drive as well as the

14  spreadsheet that came with the thumb drive, and there's just no

15  questionnaire.  They're not on the spreadsheet, and there was

16  no questionnaire for them either.  So I wanted to find out if

17  the Court had a questionnaire for juror sequence number 1403.

18  And if not, then we would need to do those questions with that

19  juror individually.

20           And I apologize for the interruption, but I did want

21  to bring that to your attention as soon as possible.

22           THE COURT:  Juror number 12, 1403?

23           MR. KOEHLER:  Correct.

24           MR. EISENBERG:  I noticed the same thing, Your Honor.

25           THE CLERK:  I'm checking with the jury office.

1          THE COURT:  I don't have -- I don't have that sequence

2     either.  I don't have the questionnaire.  I don't have it in

3     the ones that were not turned in either.  So that is a mystery.

4     So we'll find out with the jury admin office.  And it may very

5     well be that we simply then remove the individual because we

6     don't have the required information.

7          And so here is -- here are the individuals I think

8     that should be removed for hardship.

9          Juror number 13, this is the individual who indicated

10    being the bookkeeper for her small business.  And it seems to

11    be both a combined financial hardship as well as a business

12    operations management hardship.

13         Juror number 14, obviously juror number 14 has some

14    family issues.  She seems to be somewhat distraught emotionally

15    and so on.  And so I think 14 should be also removed for

16    hardship.

17         Juror number 21 indicated that she would be -- it

18    would be difficult for her to be fair and impartial, given her

19    vivid memories of having to testify in her own case.

20         Juror number 32, this is the gentleman who has -- it

21    frankly sounds like sleep apnea or something affecting his

22    apparent ability to -- I think he zoned out three times he said

23    here during the questioning.

24         Juror number 26, this is the, if I'm remembering

25    correctly, this is the woman that's seated in the very back

1    against the sidewall here who indicated having difficulty or

2    strong beliefs about the First Amendment.  And I think she --

3    The only difficulty that I have and the only reason I hesitate

4    is that she seemed to be very strong in her beliefs.  She did

5    not answer in a concerning way about following the Court's

6    direction however.

7         I'd be inclined to remove her simply because of her --

8    the force with which she stated her convictions to the First

9    Amendment.

10        MS. BROOK:  Your Honor, the government -- I'm sorry --

11   the government concurs.  There we go.  Now it's working.  I

12   apologize.  I pressed the button.

13        MR. EISENBERG:  I would oppose, Your Honor, because

14   there was at one point I think she understood what you were

15   saying and didn't seem to disagree with it.  Then later on she

16   became more forceful about freedom of speech.  But there wasn't

17   any follow-up as to whether she could be fair and impartial

18   with respect to that.  And without that follow-up, I don't

19   think she should be excused.

20        THE COURT:  Well, I think the concern that I have is

21   the question in which she didn't understand related to holding

22   the government to its burden of proof.  When she -- When she

23   answered the question about her vehement belief in the First

24   Amendment, it was related to the fundamental principles of law

25   and whether she would have any difficulty following those

1    principles of law.  And that is when she stated that she was --

2    she was a firm believer in the First Amendment and that it

3    would challenge her.  So I think for that reason that is

4    sufficient enough of an answer that I will have her removed.

5        I was just informed that the jury administration, they

6    themselves do not have a questionnaire for juror number 12.

7    And so we will remove juror number 12 for that reason.  I guess

8    it's technically a hardship, but it's a hardship for us because

9    we don't have enough information.

10        And so let me just reiterate those who are now

11    removed.  Juror number 12, juror number 13, juror number 14,

12    juror 21, juror 26, juror number 32.  And with that, I will

13    leave you now, and you can exercise your strikes.  I'll be back

14    in about -- How much time do you need?  I told them a quarter

15    after, but now it's about five till.

16        MR. EISENBERG:  Your Honor, I would ask for a half

17    hour, which would put it at --

18        THE COURT:  11:30?

19        MR. EISENBERG:  11:30.

20        THE COURT:  All right.  And that will give you

21    sufficient time to take a break if you need to.  And can we

22    alert jury -- I don't know if they all went down to the jury

23    room -- that they'll come back at 11:30.

24        Now, once we seat this jury and we swear them in, that

25    will likely take about 15 minutes, I would suspect.  We're

1    going to be right at the lunch hour.  Is it your preference

2    that we move immediately to the trial -- the trial courtroom

3    and engage in your opening arguments and maybe take a later

4    lunch at about 12:30, or do you wish me to swear them in, give

5    them the admonishment, put them on their lunch break, and then

6    begin your openings after lunch?

7              MR. EISENBERG:  I would prefer the latter approach,

8    Your Honor.

9              MS. BROOK:  And that's fine.  We can take lunch first.

10             THE COURT:  All right.  So we will impanel the jury.

11   I will swear them in.  I will give them the admonishment.  And

12   then we will release them for about an hour for lunch.  And

13   then we will begin the trial right after lunch.

14             MR. EISENBERG:  And, Your Honor, that would take place

15   in 604?

16             THE COURT:  604, yes.

17             MS. BROOK:  Thank you, Your Honor.

18             THE COURT:  All right.  I will be back just before

19   11:30.

20        (Proceedings recessed from 10:55 a.m. until 11:28 a.m.)

21             THE COURT:  All right.  Are there any challenges by

22   the government?

23             MR. KOEHLER:  No, Your Honor.  Thank you.

24             THE COURT:  Mr. Eisenberg?

25             MR. EISENBERG:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  And are we prepared to have

2     the panel in?

3          MR. KOEHLER:  Yes, Your Honor.

4          MR. EISENBERG:  Yes.

5          THE COURT:  Just to be clear, let me reiterate what

6     we're going to do.  We will have the jury selected.  We will

7     excuse the remaining panel.  We will swear in the jurors.  And

8     I will give them an outline of how we will proceed.  We'll take

9     a lunch break.  Before they do go for lunch, I will give them

10    the admonition not to speak about the case, not to do research

11    and so on and so forth.  And then I will tell them that I will

12    give them preliminary instructions at the very beginning when

13    we come into Courtroom 604.  And then the case will begin in

14    earnest.

15         Are we all on the same page?

16         MS. BROOK:  Yes, Your Honor.

17         THE COURT:  And I would suggest that we would probably

18    end up being back upstairs, I would say, about -- This should

19    not take very long, so I would say at noon we can begin.  Do

20    you need more than that?  12:15?

21         MR. EISENBERG:  For a lunch break, Your Honor?

22         THE COURT:  Yes.

23         MR. EISENBERG:  Up to you guys.

24         THE COURT:  12:30?

25         MR. EISENBERG:  12:30, yes.

1          MR. KOEHLER:  For starting with the trial including

2     lunch?  Because we need to move all our stuff up.

3          THE COURT:  Yes.  And I know you have to have lunch

4     too, okay, so 12:30 we will start.  We'll have the jury in 604.

5          MR. EISENBERG:  And perhaps at that time, Your Honor,

6     I could address the Court on an evidentiary issue that I see

7     arising in this case with the first -- I don't know what the

8     order is that the government is going to call its witnesses.

9     But there are two witnesses that I would like to address the

10    Court on concerning the scope of their testimony.

11         THE COURT:  All right.  We can do that.  Can we have

12    the jury panel in.

13         MR. EISENBERG:  Yes.

14         MR. KOEHLER:  Yes.

15         THE COURT:  All rise for the jury panel.

16      (The jury returned to the courtroom at 11:38 a.m.)

17         THE COURT:  The record may show the presence of the

18    defendant and the presence of the jury panel with roll call

19    waived.

20          Will the clerk please read the numbers of the jurors

21    who are selected to hear this case.  And I would state that as

22    your number is called -- Oh, we do have a couple more coming

23    in.  I'm sorry.

24      (Two more prospective jury panelists entered courtroom.)

25         THE COURT:  All right.  Are we all present then?

1          All right.  Will the clerk please read the numbers of

2     the juror members who are selected to try this case.  And I

3     would just suggest as your number is called, if you would just

4     please stand.

5               THE CLERK:  Juror number 1, you're now juror number 1.

6               Juror number 4, you're now juror number 2.

7               Juror number 5, you're now juror number 3.

8               Juror number 6, you're now juror number 4.

9               Juror number 11, you're now juror number 5.

10              Juror number 15, you're now juror number 6.

11              Juror number 16, you're now juror number 7.

12              Juror number 24, you're now juror number 8.

13              Juror number 25, you're now juror number 9.

14              Juror number 27, you're now juror number 10.

15              Juror number 28, you're now juror number 11.

16              Juror number 36, you're now juror number 12.

17              Juror number 37, you're now juror number 13.

18              THE COURT:  All right.  And to all those who are

19    standing and selected as jurors to serve in this case, before

20    we begin this trial, have any of you thought of anything that

21    might affect your ability to serve as a fair and impartial

22    juror?

23              All right.  Please be seated.

24              Now, to those members of the jury panel who were not

25    selected as trial jurors, I will just convey to you my deep

1    appreciation and gratitude on behalf of not only the court but

2    of the parties and Mr. Martis.  It is imperative that when you

3    receive a jury summons, whether it be from the federal court,

4    the state court, the county court, the city court, that you

5    answer the service as you have today.  We simply could not

6    function as a judicial system without your participation.  And

7    we do know it took time away from your family.  You had to

8    travel here because we don't currently have a big enough

9    courtroom in Flagstaff to facilitate this matter.  So I do want

10   to express my appreciation to you.

11            And you are now excused.  But for the members of the

12   jury who were called, please remain in the courtroom, and let's

13   let the others who were not called to serve exit the courtroom.

14            Please stand.

15            If you were not called, you may leave the courtroom,

16   and you may return to the jury admin service for any further

17   direction.

18       (Excused jury panelists exited the courtroom at 11:40 a.m.)

19            THE COURT:  With the exception of our jury, please be

20   seated, and I'm going to ask now that the courtroom deputy

21   administer the oath to you.

22       (Trial jurors sworn.)

23            THE COURT:  All right.  You may be seated.

24            Now, I'm trying to think about how our afternoon will

25   proceed.  I think the best way to proceed now is I'm going to

| | |
|---|---|
| 1 | give you a brief instruction, and then I'm going to excuse you |
| 2 | for a lunch break.  It will be a bit of a prolonged lunch break |
| 3 | since we are coming upon the noon hour now.  And the way that |
| 4 | we will proceed is we are going to actually physically move to |
| 5 | a different courtroom, Courtroom 604, which is on the sixth |
| 6 | floor.  If you would gather outside of that sixth floor |
| 7 | courtroom, Liliana will meet you after we return from lunch, |
| 8 | and then she will get you situated in the jury rooms that you |
| 9 | will occupy through the trial. |
| 10 | And of course I want to again introduce my courtroom |
| 11 | staff to you and predominantly Liliana, my courtroom deputy. |
| 12 | She will be addressing any of the needs that you may have.  She |
| 13 | will answer any questions that you may have about overnight |
| 14 | stay and so on this evening. |
| 15 | And when we return from lunch, I will then read to you |
| 16 | some preliminary instructions about the case.  We will move to |
| 17 | the parties' opening statements and then with the presentment |
| 18 | of witnesses. |
| 19 | But for now, what I would say to you is because it is |
| 20 | coming to the noon hour, I think what we will do is begin our |
| 21 | trial at 1:00 p.m.  That will give us an ability to move our |
| 22 | equipment up to the Courtroom 604.  It will give the counsel at |
| 23 | least some time to get a lunch.  And you can also get yourself |
| 24 | a lunch downtown.  And once we release you, there are a couple |
| 25 | of restaurants nearby that you may go to.  It's important to |

| 1 | keep your jury number badges on.  That designates to those on |
|---|---|

1    keep your jury number badges on.  That designates to those on

2    the outside of this courtroom as well as outside on the

3    sidewalk that you are serving as jurors.

4              Now, I'm going to, before I excuse you, if --

5    certainly if you have questions about travel and so on,

6    overnight stay and so on, our jury admin office will advise you

7    with that as well.

8              Now, I'm going to say, before I release you, I'm going

9    to say a few words about your conduct as jurors.

10             First, I want you to keep an open mind throughout the

11   trial, and do not decide what the verdict should be until you

12   and your fellow jurors have completed your deliberations at the

13   end of the case.

14             Second, because you must decide this case based solely

15   on the evidence received in the case and on my instructions as

16   to the law that applies, you must not be exposed to any other

17   information about the case or to the issues it involves during

18   the course of your jury duty.

19             Thus, until the end of the case or unless I tell you

20   otherwise, do not communicate with anyone in any way, and do

21   not let anyone else communicate with you in any way about the

22   merits of the case or anything to do with it.

23             This restriction includes discussing the case in

24   person, in writing, by phone, tablet, or computer, or any other

25   means, via e-mail, text messaging, or any Internet chat room,

1   blog, Web site or application, including but not limited to

2   Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat,

3   TikTok, or any other forms of social media.  This restriction

4   also applies to communicating with your fellow jurors until I

5   give you the case for deliberation.

6           And it applies to communicating with everyone else,

7   including your family members, your employer, the media or

8   press, and the people involved in the trial, although you may

9   notify your family and your employer that you have been seated

10  as a juror in the case and how long you expect the trial to

11  last.  But if you are asked or approached in any way about your

12  jury service or anything about this case, you must respond that

13  you have been ordered not to discuss the matter.

14          In addition, you must report the contact to the Court.

15  Because you will receive all of the evidence and legal

16  instruction you properly may consider to return a verdict, do

17  not read, watch, or listen to any news or media accounts or

18  commentary about the case or anything to do with it.

19          Although I have no information that there will be news

20  reports about the case, do not do any research such as

21  consulting dictionaries, searching the Internet, or using other

22  reference materials.  And do not make any investigation or in

23  any other way try to learn about the case on your own.

24          Do not visit or view anyplace discussed in this case,

25  and do not use the Internet or any other resources to search

1    for or view anyplace discussed during the trial.  Also, do not

2    do any research about this case, the law, or the people

3    involved, including the parties, the witnesses, or the lawyers,

4    until you have been excused as jurors.

5         If you happen to read or hear anything touching on

6    this case in the media, turn away and report that to me

7    immediately.

8         These rules protect each party's right to have this

9    case decided only on evidence that has been presented here in

10   court.  Witnesses here in court take an oath to tell the truth,

11   and the accuracy of their testimony is tested through the trial

12   process.

13        If you do any research or investigation outside the

14   courtroom or gain any information through improper

15   communications, then your verdict may be influenced by

16   inaccurate, incomplete, or misleading information that has not

17   been tested by the trial process.

18        Each of the parties is entitled to a fair trial by an

19   impartial jury.  And if you decide the case based on

20   information not presented in court, you will have denied the

21   parties a fair trial.

22        Remember you have now taken an oath to follow the

23   rules, and it's very important that you follow those rules.

24        A jury or -- excuse me -- a juror member who violates

25   these restrictions jeopardizes the fairness of these

| | |
|---|---|
| 1 | proceedings, and a mistrial could result that could require the |
| 2 | entire process to start over. |
| 3 | If any juror is exposed to any outside information, |
| 4 | please notify the Court immediately. |
| 5 | Now, with that I'm going to excuse you for your lunch |
| 6 | hour.  And as I mentioned, you will return to the sixth floor, |
| 7 | Courtroom 604.  And remember the admonishment and just simply |
| 8 | enjoy your lunch hour.  Please all rise for the jury. |
| 9 | (The jury exited the courtroom at 11:50 a.m.) |
| 10 | THE COURT:  You may be seated, and we'll take up |
| 11 | whatever that matter is, Mr. Eisenberg, immediately when we |
| 12 | resume, and we will start with the preliminary instructions and |
| 13 | opening argument. |
| 14 | MR. EISENBERG:  Thank you, Your Honor. |
| 15 | MS. BROOK:  Your Honor, if I may, I have a copy of the |
| 16 | government's opening PowerPoint.  I don't know if you would |
| 17 | like to see them ahead of time. |
| 18 | THE COURT:  Just give that to Liliana.  She'll place |
| 19 | it on the bench for me.  Thank you. |
| 20 | (Proceedings recessed from 11:50 a.m. until 1:01 p.m.) |
| 21 | THE COURT:  The jurors are being gathered.  I know, |
| 22 | Mr. Eisenberg, you wanted to raise something? |
| 23 | MR. EISENBERG:  Yes, Your Honor.  May I speak from |
| 24 | here or would the Court -- |
| 25 | THE COURT:  Whatever your preference is. |

1          MR. EISENBERG:  Your Honor, there are two issues I

2     want to bring up that pertain to the evidence to be presented

3     in the case.  The first issue pertains to what the government

4     intends to do through two witnesses that I think it's going to

5     call.

6          THE COURT:  Move to the microphone please.

7          MR. EISENBERG:  I'm sorry, Your Honor.  Two witnesses

8     that it's going to call who are members of -- Capitol Hill

9     staffers.  And they are going to testify, if it's consistent

10    with the 302s that I received a few days ago, in the following

11    ways:  Both that they worked for either Congresswoman Pelosi or

12    Congressman Schiff.  Their jobs included listening to voice

13    mails.  This is part of the defendant's brief or trial memo

14    that I submitted.  It's number 57, Your Honor, document 57.

15    And it's in response to what the government submitted about two

16    days before mine.

17         They are going to testify that they listened to the

18    voice mails, and in their opinions they constituted a threat to

19    harm.  They referred the messages to the Capitol Police.  Some

20    of the messages were scary.  They were alarming.  They were

21    tough to hear.  And in I think at least one case one of the

22    staffers had to seek counseling because of what she heard.

23         Both opined that the callers were serious.  And in my

24    view, Your Honor, I don't have a problem with them being

25    referred -- the voice mail messages being referred to Capitol

|   |   |
|---|---|
| 1 | Hill Police or Capitol Police, but to give all of this opinion |
| 2 | with respect to the nature of the calls, the reactions of the |
| 3 | listeners to the calls, and the fact that the recipients or the |
| 4 | listeners of the calls had to go out and get counseling is |
| 5 | highly prejudicial and is irrelevant to the issue here. |
| 6 | The issue here is whether there was an intent to |
| 7 | submit threats of bodily harm to members of Congress.  We don't |
| 8 | need an opinion. |
| 9 | THE COURT:  All right.  Let me hear from the |
| 10 | government.  What is the proffer? |
| 11 | MR. KOEHLER:  Your Honor, the government intends to |
| 12 | present testimony from the two staffers about when they heard |
| 13 | the calls, what their impression of those calls was, and how |
| 14 | those calls impact them as staffers. |
| 15 | And importantly the government is not going to |
| 16 | identify the staffers as experts on threats.  It is merely |
| 17 | going to elicit testimony from them about what they heard on |
| 18 | the phone and what they felt about the tone of the messages and |
| 19 | the wording of the messages and its impact on them and their |
| 20 | perception of it as a threat to them or as a threat to their |
| 21 | member. |
| 22 | And I would point out, in addition to the case law |
| 23 | that we cited in our trial memorandum on this issue, the Ninth |
| 24 | Circuit decided a case -- it's an unpublished case from 2020 -- |
| 25 | called Schmidt that your clerk has just handed to you, and it's |

1    on Mr. Eisenberg's table here.  In that case the court held

2    that the District Court did not err in allowing the government

3    to elicit testimony of staffers on the same type of issue

4    without eliciting it as expert testimony and in order to

5    explain why federal agents began investigating and to elicit

6    background information about the threat from the witness.

7         THE COURT:  And indeed in listening to and

8    contemplating this motion, that would indeed be my thought

9    process as well.  But I think given their position as

10   congressional aides, based on the variety of calls they

11   receive, why it was that they took the action they did with

12   respect to referring these particular calls to the Capitol

13   Police is pertinent to the issue.

14        I don't think getting into counseling sessions of

15   either/or both of these aides is relevant to the ultimate issue

16   here.  I think it is prejudicial.  So I'm not going to permit

17   that portion of any testimony to come in.

18        But certainly that they listened to the calls, whether

19   or not they received training about what to do when they

20   receive certain types of calls, why in their opinion based on

21   their experience as congressional aides they did what they did

22   in terms of the action.  So I think that they can testify in

23   that regard.

24        And certainly it also sort of goes to this issue of

25   First Amendment, why it is that they refer certain calls and

1   why it is they don't refer certain calls.

2          And so I think that is relevant as well.  And so that

3   is the manner in which I will restrict the government to bring

4   in that testimony.  Mr. Eisenberg.

5          MR. EISENBERG:  Yes, Your Honor.  Words like they were

6   scary and the calls were serious and scary to the listener, I

7   understand the Court's ruling about how it got referred to the

8   police.  But the fact that they were scary, wouldn't it be

9   sufficient if they simply said based upon that call, I referred

10  it to the Capitol Police as a threat?

11         THE COURT:  Well, they'd have to distinguish why it is

12  that they refer certain calls to the Capitol Police and why

13  they don't refer certain calls.  And there's got to be some way

14  for them to testify in their mind what distinguishes the call.

15  I don't necessarily know if they're going to testify that they

16  got scared or they felt a threat themselves.  But whatever

17  verbiage they use that naturally comes to them I don't think is

18  impermissible.

19         MR. EISENBERG:  Well, my whole basis for this, though,

20  is that invades the province of the jury.  They're perfectly

21  capable of understanding whether a call is a threat or not.

22  And in this case, that's clearly a jury question.  It has

23  nothing to do with that they don't need an opinion by anybody

24  who is either an expert or not an expert.  It's just simply the

25  jurors' call.  It's not a scientific thing.  It's not anything

1    other than what the average human hears and how they perceive

2    it.  That's going to be the job of the jury.  And now we've got

3    these advisory opinions.

4              THE COURT:  Well, I don't necessarily think they're

5    advisory opinions.  They are a form of opinion as to why they

6    treated the call the way they did and what they -- why they

7    involved the Capitol Police.  But I would admonish the

8    government that they're not to get into having the witness

9    overly describe the sensational feelings that they may have

10   felt and so on and so forth.

11             It's certainly not getting into the province of

12   whether or not anyone had to undergo counseling or were

13   emotionally traumatized.  Simply that they received the calls,

14   the way that they treated the call and why they treated the

15   call in the fashion that they did, I think that is a sufficient

16   limiting ruling.  And so let's move forward.  Anything further?

17             MR. EISENBERG:  Yes, Your Honor.  There's a second

18   issue that's also in my trial memorandum.  Excuse me.  This one

19   pertains to my client and, if he testifies, what he can say.

20             THE COURT:  Well, I think I already ruled on this.

21             MR. EISENBERG:  Well, that's how I would take your

22   ruling, Your Honor.  But to extend it to the testimony of the

23   defendant, he should be allowed to get on the witness stand and

24   say whether he intended to convey a threat or he didn't.  And

25   the way I read the government's memo is he couldn't.  He

1    couldn't testify to that effect.  And if I've overdrawn it,

2    then that would be great.  Let the government correct me if I'm

3    wrong.  But he should be able to say that much.  After all,

4    it's his own intent.

5                THE COURT:  Mr. Koehler.

6                MR. KOEHLER:  Your Honor, that was not at all what we

7    were seeking in our memo.  We were seeking to preclude him from

8    testifying that he had the intent to carry out the threat or

9    that he's non-violent or anything along those lines.  That's

10   different from whether he intended to threaten.

11               THE COURT:  That's what my understanding as well.

12               MR. EISENBERG:  That does bring me to a second issue.

13               Whether the speaker, that is, Mr. Martis, had the

14   ability to carry out the threat is something that the

15   government is relying on.  There are cases about prisoners

16   making threats to judges.

17               I see this as a little different.  If a person doesn't

18   have the ability to carry out a threat, then at the time that

19   he makes the threat, that goes to his intent.  His intent is,

20   for example:  I live over here.  You live a thousand, two

21   thousand miles away.  There's no way I can get to you.

22               And that seems to me to be part of the whole intent

23   structure.

24               And to say he doesn't have the ability to do it takes

25   the case away from what he intends -- what his intent is.  I

1    really didn't intend to carry out this threat.  I couldn't
2    have.

3              THE COURT:  Mr. Koehler.

4              MR. KOEHLER:  Your Honor, simple common sense tells us
5    that you can scare someone with words without having any intent
6    at all to follow through on those words, and that is exactly
7    what the case law says about threats.

8              THE COURT:  I think that's *Virginia versus Black* in a
9    nutshell, Mr. Eisenberg, and I made my ruling.

10             And certainly I think that the testimony that he would
11   be limited to or he would not be able to say is that he
12   actually had the means or the ability to carry out the threat.
13   It's the threat itself, the making of the threat itself which
14   is at issue here.

15             And so is there anything further?

16             MR. EISENBERG:  No, Your Honor.

17             THE COURT:  All right.  Let's call in the jury.

18             MS. BROOK:  Your Honor, just briefly, and not on those
19   issues.  I'm sorry.  I just wanted to make sure were we still
20   permitted by Your Honor to take our mask off for oral argument?

21             THE COURT:  Yes.

22             MS. BROOK:  And we had discussed, the three of us,
23   potentially it might help the jury to know if the Court was to
24   inform them that we are all vaccinated.

25             THE COURT:  Yes.  I will do all of that.

1          MS. BROOK:  Great.  Thank you.

2          THE COURT:  Let's not keep the jury waiting.  Let's

3     have them in.

4          MR. KOEHLER:  Your Honor, if I could ask the courtroom

5     deputy once we're done with openings or done with opening

6     instructions to turn the monitor to prosecution table so we can

7     put our PowerPoint on the screen.

8          THE COURT:  Yes.

9          Briefly let me just ask is counsel invoking the rule

10    of exclusion?

11         MR. EISENBERG:  Yes, we are, Your Honor.

12         THE COURT:  All right.  So if there's any member who

13    is a potential witness in the courtroom, then I'm going to ask

14    you to step out.

15         MS. BROOK:  And there are not.

16         THE COURT:  All right.  Thank you.

17         MR. KOEHLER:  Your Honor, just for the record, we have

18    instructed our witnesses, since conducting their pretrial

19    interviews, not to talk to each other about the case.

20         THE COURT:  Thank you.

21       (The jury returned to the courtroom at 1:15 p.m.)

22         THE COURT:  Welcome back, members of the jury.  Let me

23    just go through a couple of house cleaning matters with you.

24         First, I want to just inform you that although we are

25    following socially distanced protocols and mask wearing in the

1    courthouse as directed by our court administrator, I want to

2    let you know that both the counsel as well as the Court are

3    fully vaccinated, and we have in fact had our boosters.

4            I've permitted counsel in their opening arguments or

5    opening statement -- excuse me -- and their closing argument as

6    well as when they are questioning the witness to remove their

7    mask for that purpose.  I have also permitted the testifying

8    witness to remove their mask for purposes that you can see them

9    in their entirety.  They are behind the Plexiglas wall here.

10           You will see that you are of course distanced in the

11   jury box.  Normally we would have you all in there.  And for

12   what we are going to do after we take our afternoon break, our

13   morning break, our noon break, I'm going to permit a rotation

14   of sorts so that each of you will have an opportunity to view

15   the proceedings from the jury box as would normally occur.

16           So after our afternoon break, we will reconfigure you

17   slightly, so some of you will move to the back of the

18   courtroom, and those who are in the back will move into the

19   jury box.

20           And that way everyone will have an opportunity to view

21   the proceedings from all sides.

22           Now I am going to begin by giving you some preliminary

23   instructions.

24           And I do want to, just for the record, state that the

25   record will reflect the presence of the jury, the defendant

1    Mr. Martis, and with roll call waived.

2             Now, to the members of the jury, you are now the jury

3    in this case, and I want to take a few minutes to tell you

4    something about your duties as jurors and to give you some

5    preliminary instructions.  At the end of the trial, I will give

6    you more detailed written instructions that will control your

7    deliberations.

8             When you deliberate, it will be your duty to weigh and

9    to evaluate all the evidence received in the case and in that

10   process to decide the facts.  To the facts as you find them you

11   will apply the law as I give it to you, whether you agree with

12   the law or not.  You must decide the case solely on the

13   evidence and the law before you.

14            Perform these duties fairly and impartially.  You

15   should not be influenced by any person's race, color, religious

16   beliefs, national ancestry, sexual orientation, gender,

17   identity, or economic circumstance.

18            Also, do not allow yourself to be influenced by

19   personal likes or dislikes, sympathy, prejudice, fear, public

20   opinion, or biases, including unconscious biases.  Unconscious

21   biases are stereotypes, attitudes, or preferences that people

22   may consciously reject but may be expressed without conscious

23   awareness, control, or intention.

24            Like conscious bias, unconscious bias can affect how

25   we evaluate information and make decisions.

1          The evidence you are to consider in deciding what the

2    facts are consists of:

3          1.   The sworn testimony of any witness;

4          2.   The exhibits which are received into evidence; and

5          3.   Any facts to which the parties agree.

6          The following things are not evidence, and you must

7    not consider them as evidence in deciding the facts of this

8    case.

9          1.   Statements and arguments of the attorneys.

10         2.   Questions and objections of the attorneys.

11         3.   Testimony that I instruct you to disregard; and

12         4.   Anything you may see or hear when the Court is not

13   in session even if what you see or hear is done or said by one

14   of the parties or by one of the witnesses.

15         Evidence may be direct or circumstantial.  Direct

16   evidence is direct proof of a fact such as testimony by a

17   witness about what that witness personally saw or heard or did.

18         Circumstantial evidence is indirect evidence.  That

19   is, it is proof of one or more facts from which one can find

20   another fact.

21         You are to consider both direct and circumstantial

22   evidence.  Either can be used to prove any fact.  The law makes

23   no distinction between the weight to be given to either direct

24   or circumstantial evidence.  It is for you to decide how much

25   weight to give to any evidence.

1          There are rules of evidence that control what can be

2     received into evidence.

3          When a lawyer asks a question or offers an exhibit in

4     evidence and a lawyer on the other side thinks that it is not

5     permitted by the rules of evidence, that lawyer may object.  If

6     I overrule the objection, the question may be answered or the

7     exhibit received.  If I sustained the objection, the question

8     cannot be answered or the exhibit cannot be received.

9          Whenever I sustain an objection to a question, you

10    must ignore the question and must not guess what the answer

11    would have been.  Sometimes I may order the evidence be

12    stricken from the record and that you disregard or ignore the

13    evidence.

14         That means that when you are deciding the case, you

15    must not consider the evidence that I told you to disregard.

16         In deciding the facts in this case, you may have to

17    decide which testimony to believe and which testimony not to

18    believe.  You may believe everything a witness says or part of

19    it or none of it.  In considering the testimony of any witness,

20    you may take into account:

21         1.  The witness's opportunity and ability to see or

22    hear or know the thing testified to;

23         2.  The witness's memory;

24         3.  The witness's manner while testifying;

25         4.  The witness's interest in the outcome of the case,

if any;

       5.  The witness's bias or prejudice, if any;

       6.  Whether other evidence contradicted the witness's testimony;

       7.  The reasonableness of the witness's testimony in light of all of the evidence; and

       8.  Any other factors that bear on believability.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstance in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

I will now -- Well, let me move to another instruction because I have already given you the admonishment to not research or discuss the case.

Now, at the end of the trial, you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  And I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember the evidence.  If you do take notes, please do keep them to yourselves until you and your fellow jurors go to the jury room

1    to decide the case.

2          Do not let note-taking distract you from being

3    attentive.  When you leave the court for recess, your notes

4    should be left in the courtroom, and no one will read your

5    notes.

6          Whether or not you take notes, you should rely on your

7    own memory of the evidence.  Notes are only to assist your

8    memory.  You should not be overly influenced by your notes or

9    those of your fellow jurors.

10         The next phase of the trial will now begin.

11         First, each side may make an opening statement.  An

12   opening statement is not evidence.  It is simply an outline to

13   help you understand what that party expects the evidence will

14   show.  A party is not required to make an opening statement.

15   The government will then present evidence, and counsel for the

16   defendant may cross-examine.  Then if the defendant chooses to

17   offer evidence, counsel for the government may cross-examine.

18         After all of the evidence has been presented, the

19   attorneys will make closing arguments, and I will instruct you

20   on the law that applies to the case.

21         After that, you will go to the jury room to deliberate

22   on your verdict.

23         Now, this is a criminal case brought by the

24   United States Government.  The government charges the defendant

25   with three counts of making threats through interstate

commerce.  The charges against the defendant are contained in the superseding indictment.  The superseding indictment simply describes the charges the government brings against the defendant.  The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt.

In addition, the defendant has the right to remain silent and never has to prove innocence or to present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements the government must prove to make its case on each count.

First, the defendant knowingly transmitted in interstate commerce a voice message containing a threat to injure Nancy Pelosi and Adam Schiff.

Second, the defendant transmitted the message -- messages with the intent to issue threats.

The government need not prove that the defendant intended to carry out the threat, and the government also need not prove the intended recipient actually received the threat.

The First Amendment protects political speech, including vehement, scathing, and offensive criticism of public officials, including members of the United States Congress.

1          I instruct you, however, that certain statements are

2     not protected by the First Amendment.  The First Amendment does

3     not protect an individual from making what is sometimes called

4     a true threat.  True threats are statements where the speaker

5     means to communicate a serious expression of an intent to

6     commit an act of unlawful violence to a particular individual

7     or group of individuals.

8          The determination of whether any statement made by the

9     defendant in this case constituted such a threat is one that

10    you will be asked to make at the end of the trial after you

11    have heard all of the facts, including the context of such

12    statements, and after I have instructed you all on the relevant

13    law.

14         I will now read to you the superseding indictment.

15         "United States of America versus Steven Arthur Martis.

16         "The grand jury charges:

17         "Count 1.  On or about January 20, 2020, in the

18    District of Arizona, Steven Arthur Martis knowingly transmitted

19    in interstate commerce with intent to threaten a communication,

20    that is, a message left on the Washington District Office voice

21    mail system of Congressman Adam Schiff containing a threat to

22    injure the person of another, to wit, quote, well, hello there,

23    Adam.  You know what?  Your impeachment failed.  We're going to

24    put a bullet in your head.  You're dead, closed quote.

25         "In violation of Title 18 United States Code Sections

1    875(c).

2            "Count 2.  On or about March 27, 2020, in the District

3    of Arizona, Steven Arthur Martis knowingly transmitted in

4    interstate commerce with intent to threaten a communication,

5    that is, a message left on the Washington district office voice

6    mail system of Congresswoman Nancy Pelosi containing a threat

7    to injure the person of another to wit, quote, Nancy, we're

8    going to kill you, chop you up into little pieces, ellipsis end

9    closed quote in violation of Title 18 United States Code

10   Section 875(c).

11           Count 3.  On or about January 17, 2021, in the

12   District of Arizona, Steven Arthur Martis knowingly transmitted

13   in interstate commerce with intent to threaten a communication,

14   that is, messages left on the Washington District Office voice

15   mail system of Congresswoman Nancy Pelosi containing a threat

16   to injure the person of another, to wit, quote, Hi, Nancy.  I'm

17   coming to kill you.  There's a redacted phrase and bye, closed

18   quote.

19           "Martis followed up with another call on the same day

20   in which he said, quote, you're dead.  There's a redacted

21   phrase and closed quote.

22           "In violation of Title 18 United States Code Section

23   875(c).

24           "A true bill."

25           Signed by the foreperson of the grand jury.

1          And the defendant has entered a not guilty plea to

2    each count in the superseding indictment.

3          The government may proceed to its opening statement.

4          MS. BROOK:  Thank you, Your Honor.

5          The defendant intentionally threatened:  We're going

6    to put a bullet in your head.  You're dead.

7          The defendant left this voice mail message on Adam

8    Schiff's message machine in D.C., and then the defendant

9    intentionally threatened again:  We're going to kill you, chop

10   you up into little pieces.

11         The defendant left this, the core part of a

12   threatening message, on Nancy Pelosi's answering machine.

13         And then he did it again.  The defendant intentionally

14   threatened:  I'm coming to kill you.  You're dead.

15         Another voice message that he left on the message

16   machine of Nancy Pelosi.

17         This case is about the defendant intentionally making

18   three separate threatening communications, three separate

19   communications on different days.

20         For that he's charged with three counts of threatening

21   communication:

22         The first count on January 20th of 2020 for the threat

23   he left at Adam Schiff's office "We're going to put a bullet in

24   your head.  You're dead," his intentional threat.

25         Count 2, on March 27th of 2020 for the threat that he

1    left for Nancy Pelosi "We're going to kill you, chop you up

2    into little pieces."

3            And then the third count, on January 17th of 2021, two

4    calls back to back, "I'm coming to kill you.  You're dead."

5            The crime of a threatening communication has two

6    elements that the government will prove to you.  The first is

7    that the defendant knowingly sent a threatening communication

8    in interstate commerce.

9            So what does that mean?

10           It's that the defendant knowingly picked up the phone

11   from Arizona and called Washington, D.C., called somewhere

12   outside of the state, and in that call left a threatening

13   communication.

14           Count -- or the second part of this crime is the

15   second element, which is that the defendant intended the

16   message to be a threat, that is, that the defendant's message

17   was a serious expression of an intent to harm, to kill, to kill

18   in this case Nancy Pelosi or Adam Schiff.

19           So let's take a moment and talk about what a threat

20   is.

21           A threat, as the Court has described for you in the

22   law provided and will do again at the end of the case, a threat

23   is a message that the speaker intends to communicate a serious

24   expression of an intent to kill somebody, an intent to harm

25   somebody.  Put like this, an act of unlawful violence, killing

1    or injuring.

2            This is America, and in the United States of America

3    you have the right to believe whatever you want to believe.

4    And by and large you have the right to say what it is you would

5    like to say.  But you cannot pick up the phone and threaten to

6    kill somebody.  The First Amendment protects all sorts of

7    different types of speech, but there's a limit.  Picking up the

8    phone and in a serious expression threatening to kill somebody,

9    that is not protected.  As the evidence will show and as the

10   law will be instructed from the Court, that is what's called a

11   true threat.

12           So what we're talking about here is not something

13   that's a joke.  We're not talking about political argument.

14   We're talking about specific intent, a threat with your words

15   to kill, to harm, to injure.  It is the threat itself, the

16   words, that are making up the threat that is the crime.  It's

17   not an intention to carry through with the crime.  You'll hear

18   nothing in this case about defendant having a plan or a scheme

19   to kill anybody in Congress or anyone else.

20           It's not even about him having the ability to do that.

21   It is the words that were conveyed in the message.  That's the

22   crime.

23           So let's walk through what happened chronologically.

24           Starting in 2018, the defendant lived in Bullhead

25   City, Arizona.  He lived for a number of years in a long-term

1    stay hotel-motel called the Hiltop.  He resided there in Room

2    404.  And it's from the Hiltop that he called Washington, D.C.

3    You're going to hear about the two calls that he made in 2020

4    and then the back-to-back calls in 2021.

5            Who was he calling?  Well, from the phone number

6    928-487-3966 the defendant -- and that number was the main

7    primary outgoing number for the Hiltop Hotel -- the defendant

8    was calling Nancy Pelosi's office in D.C. and Adam Schiff's.

9            You're going to hear during trial, as you already

10   know, that those two individuals are members of Congress.  In

11   about 2019 Nancy Pelosi became the Speaker of the House, and

12   Adam Schiff is also a representative.  They represent the State

13   of California.

14           In 2020, January, the defendant picked up the phone

15   from his Hiltop Hotel room, and he called Adam Schiff.  He left

16   him a threatening message.  I'm going to read to you the

17   entirety of the message.  We've talked about a specific part,

18   and I'm going to read for you the defendant's words in the

19   message.

20           "Well, hello there, Adam.  You know what?  Your

21   impeachment failed.  And you're a fucking piece of garbage, and

22   we're gonna wipe the fucking streets of fucking D.C. with you,

23   you stupid piece of shit.  Go ahead and go suck George Soros's

24   cock while Obama fucks you in the ass -- hah, hah, hah -- cause

25   we're gonna put a bullet in your head.  You're dead."

1          As the Judge will instruct you on the law and as the

2     evidence will come from the witness stand, the threat is

3     "because we're gonna put a bullet in your head.  You're dead."

4          FBI working with the Capitol Police tracked backwards

5     that phone number that we talked about, the one, the 928

6     number, and they tracked it back to the Hiltop Motel.

7          The staffer that was working inside Adam Schiff's

8     office received this message, and he forwarded it to the

9     Capitol Police.  That helped them track it down.  You'll also

10    hear that there were two other messages from 2019 that linked

11    back to the same phone number.  They used those to go to the

12    Hiltop to talk to the manager and to identify the defendant.

13         On February 4th of 2020, FBI sat down with the

14    defendant in the lobby of the hotel and had a consensual

15    interview.

16         In that interview the defendant said that he

17    remembered making those calls.  He listened to the messages.

18    And he said, yeah, that's my voice.

19         The FBI warned him.  They said when you call and say

20    we're gonna put a bullet in your head, you're dead, that's an

21    actual threat, an active threat.  And they also said you can't

22    pick up the phone and call and threaten to shoot people.  The

23    defendant said yeah, okay.

24         On that day the FBI did not arrest him, and time

25    marched on.

1        Less than two months later, he did it again.  On March

2   27th of 2020, this time the defendant called Speaker Nancy

3   Pelosi.  He picked up the phone again from the Hiltop Hotel,

4   and he left a message.  I will read it to you in its entirety.

5        "Nancy, because you're a fuckin' cunt, we're going to

6   kill you, chop you up into little pieces, you mother fucking

7   sack of shit."

8        As the Judge will instruct you on the law and the

9   evidence will come from the witness stand, you will hear that

10  the threat is "We're going to kill you, chop you up into little

11  pieces."

12       Again, the staffer that received this message

13  forwarded it to the Capitol Police.

14       And again another message, this time on January 17th

15  of 2021, for Nancy Pelosi again.

16       The message in its entirety:  "All right, Nancy.  I'm

17  coming to kill you, cunt.  Bye."

18       Couple seconds later:  "You're dead, cunt."

19       Again, as the Judge will instruct you and the evidence

20  will show, the threat is "I'm coming to kill you.  You're

21  dead."

22       These messages were taken seriously by the people who

23  heard them and received them, the staffers.  You'll hear from

24  them today.  They were concerned for their safety and the

25  safety of their representative.

1          They forwarded the messages on to Capitol Police.

2     They reported them to law enforcement.

3          Ladies and gentlemen, through the presentation of

4     evidence in this case, the evidence will show that the

5     defendant's threats were violent and specific.  He made these

6     threats on purpose.  He picked his words to make sure that the

7     listener felt afraid.  He picked his words to make sure that

8     the listener felt upset.  And the seriousness of the threat was

9     recognized by the people who received them.

10          At the close of evidence that comes from the witness

11     stand, we will ask you to find the defendant guilty as charged.

12     Thank you.

13          THE COURT:  Mr. Eisenberg.

14          MR. EISENBERG:  Thank you, Your Honor.

15          Mr. Martis --

16          MS. BROOK:  Let me grab my mask.

17          MR. EISENBERG:  Mr. Martis, colleagues, Your Honor,

18     jurors:  Much of what the government just told you is exactly

19     what happened.  Those statements were made by Mr. Martis, and

20     we don't deny that.  Those statements were conveyed to

21     Congresswoman Pelosi and Congressman Schiff.

22          Here's the thing to keep in mind about this case,

23     which the government didn't emphasize but I will.  Let me put

24     this into context.

25          You were told about the three calls that were made,

1   one on January 20th, 2020, "Your impeachment failed.  We're

2   going to put a bullet in your head.  You're dead," to

3   Congressman Schiff.

4         My client made that call.  He made the call because

5   your impeachment failed.  He was angry.  He was upset -- and

6   you will hear this -- with respect to what was happening to a

7   person he thought deserved better.  And I don't mean to express

8   a political opinion here.  None of us do.  What we're concerned

9   with here is whether there was a reason to make that call.  The

10   impeachment failed, and he was angry with respect to the people

11   who had brought the impeachment.

12         On March 27th, 2020, a call to Congresswoman Pelosi,

13   "We're going to kill you, chop you into little pieces."  There

14   was a reason for that call as well.  These are not idle, pick

15   up the phone, and let's call somebody and swear at them.

16         The third one, another impeachment -- this is a second

17   impeachment of President Trump -- to Congresswoman Nancy

18   Pelosi, "I'm coming to kill you.  You're dead," because she

19   was, in his mind, involved in the impeachment process.

20         Now, we don't deny the words, nor do we deny the words

21   that were cuss words, swear words, terrible words, ugly words.

22   But that's not the point, because what we dwell on is the

23   intent.  What was his intent to convey those words?

24         And you will hear in this case that his intent was not

25   to put a bullet in Congressman Schiff's head.  It was not to

1   chop Nancy Pelosi into pieces.  And it was not I'm coming to

2   kill you, you're dead, Nancy Pelosi.

3           The relevant jury instructions will bear out what I'm

4   saying.

5           First, yes, the defendant transmitted a voice mail

6   message containing a threat to injure.

7           Secondly -- and this is the important one, at least to

8   a defendant -- did the defendant intend, intend to communicate

9   a threat by virtue of that message?

10          Intent in this case is subjective, not general intent,

11  not how anybody would view the situation.  You have to

12  determine what he meant and whether he intended to kill or

13  bring harm to either of these Congresspersons.  What he

14  intended is therefore paramount.

15          The way to do that, I suggest to you, ladies and

16  gentlemen, is twofold.  Evidence -- and you'll hear this from

17  Her Honor -- is circumstantial or direct.  They are equally

18  appropriate for your consideration.

19          In this case I submit to you the direct evidence of

20  what Mr. Martis will tell you from the stand to you under oath

21  will convey to you why he said what he said; more importantly,

22  what he didn't intend to say or mean or do, that is, to kill

23  anybody, chop anybody up, et cetera, et cetera.

24          So in this case I'm going to ask you to do something,

25  to put aside the things that are very reprehensible.  There's

1      no doubt about it.  Just don't call people names like that.

2      The swear words are awful.  But don't let that overcome your

3      idea -- I'm sorry -- your conclusion.  It's you, the jury, not

4      what anybody else tells.  You, the jury.  Not what the agent

5      told him when he was being interviewed:  You can't do that.

6      It's illegal.

7                That's not the point.  The point is when he picks up

8      the phone, did he intend to convey a threat?  That's what's

9      important here.

10               So that's direct evidence.

11               Ladies and gentlemen, I'm going to ask you -- and I

12     know the Court, I believe, will instruct you, if she hasn't

13     already -- you have to wait until all of the evidence is in.

14     You have to wait until you have heard everything.

15               And if you expect to hear from Mr. Martis, you will.

16     And that will be the true barometer, the true indicator as to

17     whether he intended to convey a threat.  Not whether the words

18     sound like it -- that's the objective approach -- but whether

19     he intended to make the threats.  That's the subjective

20     approach.  And that is what is important here, and that is what

21     you'll be called upon to do.

22               Thank you, Your Honor.  Thank you.

23               THE COURT:  Thank you, Mr. Eisenberg.

24               The government may call its first witness.

25               MS. BROOK:  Thank you, Your Honor.  The government

 1    calls Owen Beal.

 2              THE COURT:  Sir, please come forward and be sworn.

 3                 OWEN BEAL, GOVERNMENT'S WITNESS, SWORN

 4              THE CLERK:  State and spell your last name for the

 5    record.

 6              THE WITNESS:  Beal, B, as in boy, e-a-l.

 7              THE COURT:  Sir, for purposes of your testimony, you

 8    may remove your mask.

 9              THE WITNESS:  Thank you.

10                          DIRECT EXAMINATION

11    BY MS. BROOK:

12    Q.  Good afternoon.

13    A.  Hello.  Good afternoon.

14    Q.  Can you please introduce yourself to the ladies and

15    gentlemen of the jury.

16    A.  Hi.  My name is Owen Beal.

17    Q.  And, sir, what do you do for a living?

18    A.  I work in Speaker Pelosi's office as her legislative aide

19    in Washington, D.C.

20    Q.  How long have you worked there?

21    A.  Two and a half, almost three years now.

22    Q.  And you mentioned that you're her legislative aide.  Which

23    office of Speaker Pelosi's do you work in?

24    A.  The personal office.

25    Q.  Does she have two?

BEAL - DIRECT

1   A.  Yes.  She has the speaker's office or like the leadership

2   office and then the personal office.

3   Q.  And were you working back in that office in 2019 and 2020?

4   A.  Yes.

5   Q.  You had mentioned that you were a staff assistant?

6   A.  Uh-hmm.

7   Q.  Describe for us what a staff assistant does in Nancy

8   Pelosi's office.

9   A.  Sure.  It's the entry level position for any office on the

10  Hill.  You know, you deal with a lot of administrative matters,

11  answering the phone, checking voice mails, you know.  You start

12  to do legislative work, so, you know, writing very minor memos,

13  press -- what do they call it? -- press clippings, that sort of

14  thing.

15  Q.  And before you joined Nancy Pelosi's office and started to

16  work there, did you go to school?

17  A.  Yes.

18  Q.  Where did you go?

19  A.  Hobart and William Smith Colleges.

20  Q.  And what did you major in?

21  A.  Public policy with a minor in psychology.

22  Q.  Where are you from?

23  A.  Born in Boston, grew up in San Diego, went to school in

24  upstate New York, and now I live in D.C.

25  Q.  So let's go back to the assignments and tasks that you

1    would have working there as the staff assistant at Nancy

2    Pelosi's personal office.

3             You had mentioned that you would go through the voice

4    mail?

5    A.  Yes.

6    Q.  What does that mean?

7    A.  So, you know, we get a whole lot of calls.  Whenever you

8    call into the line, you can either, you know, press four to go

9    through to what's called official business and speak to one of

10   the people at the phones like myself, or you can choose to

11   leave a message.  In those cases your message would, you know,

12   get recorded and placed in a voice mailbox.  That was something

13   that me and my other staff assistants would go through and

14   check for, you know, anything of note, be it a threat, or, you

15   know, another -- another VIP trying to reach her or another

16   office trying to schedule some sort of meeting.

17   Q.  You had mentioned that one of the things that you would

18   look for or listen for would be a threat?

19   A.  Yes.

20   Q.  How would you do that?

21   A.  Really just by listening to the message.  You know,

22   whenever they would come in, they would come in with an audio

23   file as well as a description or a transcription of the

24   message.

25   Q.  And would you comb through the file yourself, or would

1    somebody else forward you, somebody within the office, e-mails

2    with attachments, voice messages to review?

3    A.   It was a combination of both.  At the start of the pandemic

4    we had a lot of members on our staff who didn't have a whole

5    lot to do, you know, for the scheduling team and the advanced

6    team who weren't going anywhere, so they were able to help with

7    the massive backlog that we had over on the voice mailbox.  So

8    either I would be going through it, sometimes the interns would

9    help us out if we trained them to do it, or other members of

10   the staff.

11   Q.   So what would you do with the voice messages you listened

12   to?  And specifically if you listened to a message, you said

13   you would determine whether or not it was a threat?

14   A.   Yes.

15   Q.   What would you listen for?

16   A.   We would listen for, I mean, really anything that was

17   threatening or ominous or just gave cause for concern.

18   Q.   And describe for us what something threatening would be.

19   A.   I mean, you know, something as simple as, you know, I hope

20   you die or I'm going to kill you, you know.  Those are things

21   that we're looking for.

22   Q.   So let's take those two statements I hope you die, and I'm

23   going to kill you.  Would you treat those two statements the

24   same?

25   A.   Not exactly the same but certainly similar.

1   Q.  What would be the difference between a I'm going to kill

2   you and I hope you die message?

3   A.  Saying I hope you die, you know, while certainly is

4   threatening and cause for concern doesn't have the same sort of

5   punch and agency that I'm going to kill you does.  You know, if

6   someone says I'm going to kill you, that's really taking a

7   whole 'nother step in, like, adding your own agency and action

8   to it.

9   Q.  So by agency you mean what?  Describe that.

10  A.  The ability to do, you know.  Saying I hope you die, you

11  know, I hope, you know -- To say that you hope something bad

12  happens to someone, that's one thing.  To say that I am

13  actively going to do something to harm you and to meet that

14  goal is a whole 'nother situation.

15  Q.  Okay.  So with that whole other situation when you received

16  a message where somebody said I want you to die, what would

17  you -- or I want to kill you, rather, what would you do with

18  that?

19  A.  We would take that, and we would send it over to Capitol

20  Police.  We would send it to members of the Speaker's detail,

21  you know, her -- the people who were leading her -- her

22  personal body guards.  We call them detail.  We would also send

23  this message to the -- both of our chiefs of staff, a couple

24  different deputy chiefs of staff, and the other staff

25  assistants so they were also aware of this call if we got

1    anything else from them.

2    Q.  And why would you send it to the security detail?

3    A.  So they would be aware.  The security detail also travels

4    with her.  So, you know, these would be either, you know, this

5    is just to make sure that we have all of our bases covered,

6    right, so that way she can be protected both in D.C. and if she

7    does go out and if she travels somewhere else.

8    Q.  I want to take a second.  I want to put on the screen in

9    front of you an exhibit that's already been marked.  It's not

10   yet been admitted.  And I'd like you to look at it.  It's

11   Exhibit 10.  There's a paper one as well.  I'm sorry.  Did you

12   get a chance to look at that?  No, not yet.

13   A.  Yes.

14   Q.  Do you recognize it?

15   A.  Yes.

16   Q.  Does it fairly and accurately represent what it is you

17   recognize?

18   A.  Yes.

19   Q.  And what is that?

20   A.  This would be the initial report of the voice mail.  When a

21   voice mail is made, it's recorded on our, you know, system,

22   right.  It goes into the -- you know, voice mail comes in.  We

23   have a third-party system transcribe the message for us.  And

24   then it will shoot that e-mail of the transcription and the

25   audio file into a separate in-box that me and the other staff

1    assistants would go through.

2    Q.  And is that a voice message from 928-487-3966?

3    A.  Yes.

4    Q.  A message that you received on September 4th of 2019?

5    A.  Yes.

6    Q.  And is that into Nancy Pelosi's D.C. office phone number

7    message machine?

8    A.  Yes.

9         MS. BROOK:  Your Honor, the government moves to admit

10   and publish.

11        MR. EISENBERG:  No objection, Your Honor.

12        THE COURT:  It may be published, and it is admitted.

13   Q.  (BY MS. BROOK)  You mentioned a transcription.  There's a

14   transcription attached?

15   A.  Uh-hmm.

16   Q.  And the system, is the transcription accurate?  Is it

17   something that is a well done transcription or something else?

18   A.  Something else.  It's helpful to have, but it's certainly

19   not the end-all-be-all.

20   Q.  So what did you do with this e-mail?  Did you forward

21   something to someone?

22   A.  Yes.  So we would take this.  First we would, you know --

23   If we had the phone number attached, which in this case we did,

24   we would search through the rest of the voice mailbox to see if

25   that number has called in before.  And then from there we would

1   take that and pass it along to Capitol Police, her detail, the

2   rest of the staff.

3   Q.  Have you had a chance, prior to being on the stand today,

4   to listen to the audio recording of Government's Exhibit No. 5?

5   A.  Yes.

6   Q.  And does that fairly and accurately reflect the phone

7   message that was attached to this e-mail that you forwarded to

8   Capitol Police?

9   A.  Yes.

10          MS. BROOK:  Your Honor, the government moves to admit

11  and to publish Exhibit 5.

12          MR. EISENBERG:  No objection.

13          THE COURT:  Exhibit 5 is admitted and may be

14  published.

15          MS. BROOK:  May we have the audio turned on.  I think

16  it's off.

17          THE CLERK:  It should be on.

18  Q.  (BY MS. BROOK)  So as we figure this out, let's move on,

19  and we'll have the audio catch up with us in a couple minutes.

20          In 2019 did you receive another voice message in the

21  in-box for Nancy Pelosi that you also forwarded to Capitol

22  Police?

23  A.  Yes.

24  Q.  And was that another voice message from 928-487-3966?

25  A.  Yes.

1    Q.  Did you forward that -- You forwarded that as well?

2    A.  Yes.

3    Q.  I already asked that.

4            So prior to being in here today, did you have the

5    chance to listen to Government's Exhibit No. 4?

6    A.  Yes.

7    Q.  And did that Exhibit No. 4 fairly and accurately reflect a

8    voice message that was left on Nancy Pelosi's voice mail system

9    even before the September call?

10           MR. EISENBERG:  Your Honor, excuse me.  This is

11   leading.

12           THE COURT:  Sustained.

13           MS. BROOK:  I'm just trying to lay foundation, but

14   I'll stop.

15   Q.  (BY MS. BROOK)  Another call left on January 26th of 2019?

16   A.  Yes.

17           MS. BROOK:  And, Your Honor, we would move to admit

18   and to publish both Exhibit 5 and 4 as soon as we have the

19   technical difficulties worked out.

20           THE COURT:  5 has already been admitted.

21           Exhibit 4, Mr. Eisenberg?

22           MR. EISENBERG:  No objection, Judge.

23           THE COURT:  And Exhibit 4 may be admitted, and it may

24   be published.

25   Q.  (BY MS. BROOK)  Those two messages, what about them, if

1    anything, concerned you?

2    A.  I mean, the very fact that they were threatening, you know.

3    He was directly threatening her life.  That alone is cause

4    enough for concern.

5    Q.  And we can talk more about the words after we have the

6    audio get caught up.

7            So let's move forward.

8            Did you receive another message in the in-box of Nancy

9    Pelosi's account on March 27th of 2020?

10   A.  Yes.

11   Q.  And was that message again from 928-487-3966?

12   A.  Yes.

13   Q.  What if anything did you make of that message?

14   A.  That's the message that's currently up on the screen,

15   correct?

16   Q.  That's not.  We're going to talk -- That exhibit there I

17   think is Exhibit No. 5.  We're going to move to Exhibit No. 1.

18   So we're just talking about a separate call.

19           Mr. Koehler's hoping that we can turn the monitors off

20   for a moment while he works out the technical difficulties of

21   fixing the system.

22           THE COURT:  I think they are off.

23           MS. BROOK:  And, Your Honor, if I may, I don't think

24   defense is objecting to foundation for any of these particular

25   exhibits, so what we have left are Exhibit 1 and Exhibit 2 and

1    3, those being the calls from January 17th of 2021.

2             THE COURT:  Mr. Eisenberg?

3             MR. EISENBERG:  No, I don't, Your Honor.  I just -- I

4    don't object to their foundation at all.

5             THE COURT:  All right.  So there being no objection,

6    then Exhibits 1, 2, and 3 are admitted.

7             MS. BROOK:  We're going to try with 5, which we've not

8    been able to play yet.  That's the September 4th of 2019 call.

9         (Exhibit 5 played.)

10   Q.  (BY MS. BROOK)  Was that the entirety of the message that

11   was left?

12   A.  Yes.

13   Q.  I had asked you before, but now that you're looking at it,

14   what if anything in that message concerns you?

15   A.  Right away the threat that they say that they want to take

16   away her life.

17   Q.  Let's play Exhibit 4, which is the call from January 26th

18   of 2019.

19        (Exhibit 4 played.)

20   Q.  (BY MS. BROOK)  What did you do with this call?

21   A.  We reported this to Capitol Police as well as gave it to

22   the attention of the detail and the rest of our staff as we

23   typically do for threats like this.

24   Q.  And what of this message was concerning?

25   A.  The fact that he said that he already killed three people

**BEAL - DIRECT**

1  beforehand and that he is going to come for the Speaker as

2  well.

3  Q.  Do you have any way of knowing when you're receiving these

4  messages where the sender or the caller is geographically

5  located?

6  A.  No.

7  Q.  Let's go Exhibit No. 1, which is the March 27th of 2020

8  voice message.

9      (Exhibit 1 played.)

10  Q.  (BY MS. BROOK)  How did you interpret the tone of this

11  caller?

12  A.  Enthusiastic.

13  Q.  What do you mean by that?

14  A.  He certainly seemed excited about committing the act.

15  Q.  What act?

16  A.  Killing her and chopping her up into little pieces.

17  Q.  Was there anything about this message that you interpreted

18  as a joke?

19  A.  No.

20  Q.  And you had mentioned with other messages that you had

21  notified the security detail.  What did you do with this one?

22  A.  The very same.  Reported it to Capitol Police, the detail,

23  as well as the rest of the staff.

24  Q.  Why?

25  A.  Because of the disturbing nature of the threat.

BEAL - DIRECT

 1    Q.  What was disturbing about this message?

 2            MR. EISENBERG:  Objection.  Asked and answered, Your

 3    Honor.

 4            THE COURT:  Sustained.

 5            MS. BROOK:  Let's go to already admitted but not yet

 6    played Exhibit No. 2.

 7        (Exhibit 2 played.)

 8    Q.  (BY MS. BROOK)  Do you recall was this message left close

 9    in time to another message or not?

10    A.  I believe so, yes.

11            MS. BROOK:  Could we play Exhibit No. 3 please.

12        (Exhibit 3 played.)

13    Q.  (BY MS. BROOK)  What do you recall about the timing of

14    these two messages?

15    A.  These were the ones that came in around January of '21,

16    yes.

17    Q.  And did they come in close in time to each other or far

18    apart?

19    A.  I believe they were in close proximity to each other.

20    Q.  Did you listen to these?

21    A.  Yes.

22    Q.  And what did you do after you listened to it?

23    A.  We passed those over to Capitol Police detail as well as

24    the rest of our staff.

25    Q.  Why?

1  A.  Because they were a threat to her.

2  Q.  What did you interpret the tone of the message to be?

3  A.  Deliberate and determined.

4  Q.  And did you interpret it as a joke?

5  A.  No.

6  Q.  Did you view it as a threat?

7  A.  Yes.

8  Q.  What about it was threatening?

9  A.  The direct nature of it to say that they are coming to get

10  her and then to kill her.

11  Q.  When these messages come in, does the representative

12  themself listen to them?

13  A.  No.

14  Q.  Who ends up being the one listening to these messages?

15  A.  The staff assistants, you know, whomever is combing through

16  these voice mails, you know.  Really just the staff, and then

17  the typically chiefs of staff will listen to them if they so

18  choose as well as the detail and Capitol Police.

19  Q.  When you listened back to these messages -- you had

20  mentioned you forwarded them to Capitol Police, to her staff --

21  how did they make you feel?

22      MR. EISENBERG:  Objection, Your Honor.  Irrelevant.

23      THE COURT:  Overruled.

24      THE WITNESS:  Unsettled.

25  Q.  (BY MS. BROOK)  What do you mean?

1    A.  You know, the staff is an extension of the member.  So if

2    someone is making a threat towards your boss, you know, a very

3    easy way to get to them could be to go through the staff.

4    Q.  And did that worry you here?

5    A.  Yes.

6    Q.  Can we provide for the witness Exhibit 9 please.  Do you

7    have that?

8    A.  Yes.

9           MR. EISENBERG:  Your Honor, excuse me.  There's no

10   question posed at this point, so I'm not sure what we're doing

11   here.  Just showing him an exhibit?

12          MS. BROOK:  I just asked him if he had it.

13   Q.  (BY MS. BROOK)  Do you have it in front of you?

14   A.  Yes.

15          THE COURT:  Don't look at the exhibit until you're

16   asked a specific question.

17          THE WITNESS:  Gotcha.

18   Q.  (BY MS. BROOK)  Do you mind opening up the envelope and

19   giving it a look.  And look up after you've had a chance to

20   look at it.

21          MR. EISENBERG:  Again, Your Honor --

22          THE COURT:  Is there a foundational question?

23          MS. BROOK:  Yes.

24   Q.  (BY MS. BROOK)  Do you recognize that?

25   A.  Yes.

1              MR. EISENBERG:  I object, Your Honor.  There's just

2       nothing about this exhibit that has been established.

3              THE COURT:  Lay foundation for the exhibit first

4       before he looks at it.

5       Q.  (BY MS. BROOK)  Did you send these messages that we were

6       talking about also in one group e-mail to the Capitol Police?

7       A.  Yes.

8       Q.  And is the e-mail that you're looking at there as

9       Exhibit No. 9 that e-mail?

10      A.  Yes.

11             MS. BROOK:  Your Honor, we move to admit Exhibit No.

12      9.

13             MR. EISENBERG:  No objection, Your Honor.

14             THE COURT:  It may be admitted.

15             MS. BROOK:  May I have one moment, Your Honor?

16             THE COURT:  Yes.

17      Q.  (BY MS. BROOK)  In front of you there should be another

18      envelope, Exhibit No. 8.  We had talked a moment ago about

19      Exhibit No. 1 that we played, the audio recording of the March

20      27, 2020, message, that you forwarded to the Capitol Police.

21      A.  Yes.

22      Q.  Do you recognize the e-mail with which you forwarded that

23      message to the Capitol Police as Exhibit No. 8?

24      A.  Yes.

25      Q.  Does it fairly and accurately represent the e-mail as it

1    was when you sent it to the Capitol Police?

2    A.  Yes.

3           MS. BROOK:  Your Honor, the government moves to admit

4    Exhibit No. 8.

5           MR. EISENBERG:  No objection.

6           THE COURT:  It may be admitted.

7    Q.  (BY MS. BROOK)  Again, the transcripts that are attached,

8    are they a perfect translation of the voice message?

9    A.  No.

10   Q.  Do you forward to the Capitol Police every message you

11   receive?

12   A.  No, no.  We receive literally thousands of voice mails.

13          MS. BROOK:  I don't have any other questions, Your

14   Honor.

15          THE COURT:  Thank you.  Mr. Eisenberg.

16                          CROSS-EXAMINATION

17   BY MR. EISENBERG:

18   Q.  Good afternoon, Mr. -- is it Beal?

19   A.  Yes, Beal.

20   Q.  I represent the defendant Mr. Martis in this case.

21   Mr. Beal, you've never talked to Mr. Martis, have you?

22   A.  No.

23   Q.  You wouldn't know him from, well, Adam?

24   A.  No.

25   Q.  And the number that was called that you listened to and

1    you've identified how many now messages?  Four?

2    A.  I believe four.

3    Q.  Okay.  Let's say it is four.  I'll be corrected, I'm sure,

4    if it isn't.  Those four messages came to Ms. Pelosi's --

5    Congresswoman's Pelosi commonly known telephone number or one

6    that anybody could find?

7    A.  Yes.

8    Q.  Public number, right?

9    A.  Yes.

10   Q.  So that's area code 202-225-4965?

11   A.  Yes.

12   Q.  So into that number I think you said you get thousands of

13   voice mails?

14   A.  Yes.

15   Q.  Over what period of time would that be?

16   A.  It really depends.  If there's something going on in the

17   news that would be of note, we'll typically get far more calls.

18   But I would say at our height, sometimes we'll get a thousand

19   or two thousand a day.

20   Q.  A day?

21   A.  Yes.

22   Q.  A day.  And some of the calls are generated by events to

23   which Nancy Pelosi is connected, right?

24   A.  Sometimes.  Sometimes not.  People call for all sorts of

25   reasons.

1    Q.  Okay.  And of these calls that you just identified, do you

2    know the number that they came from?

3    A.  Typically we do, yes, unless --

4    Q.  Okay.  Go ahead.

5    A.  Unless they called through the switchboard, and then it's

6    masked.

7    Q.  Now, this number in this particular case, do you know what

8    number it is?  Did you ever learn the number that it came from?

9    A.  I mean, we, yes, we are able to.  Because they called in

10   through their own phone, the number is directly on the, you

11   know -- I don't want to say -- It's on the transcript, yes.  We

12   know the number.

13   Q.  Okay.  And in this case you may not recognize it or

14   remember it, but it's a 928-487-3966 number, right?

15   A.  Yes.

16   Q.  So for all of these calls the number was the same; is that

17   correct?

18   A.  Yes.

19   Q.  Sir, have you ever gone back and attempted to listen to

20   other calls from that telephone number?

21   A.  Personally, no.

22   Q.  And do you know if anybody else has?

23   A.  I wouldn't know.

24   Q.  Did the Capitol Police ask you to do that?

25   A.  No.  No.  When we -- When we send them over to Capitol

1   Police, we send them in bulk.

2   Q.  So you don't know whether there were other numbers -- I'm

3   sorry -- other calls from that number made to Congresswoman

4   Pelosi's office?

5   A.  Not --

6           MS. BROOK:  Objection.  Foundation.

7           THE COURT:  I'm sorry.  What was that?

8           MS. BROOK:  Objection.  Foundation.

9           THE COURT:  Overruled.

10  Q.  (BY MR. EISENBERG)  You don't know?

11  A.  The only way that if they had made other calls using that

12  same number and we didn't send them over, the only reason for

13  that would be if it was in the voice mailbox before I got

14  there.

15  Q.  When did you get there, sir?

16  A.  20 -- February of 2019, I believe.

17  Q.  February of 2019, right?

18  A.  Yes.

19  Q.  And you're still with Congresswoman Pelosi today?

20  A.  Yes.

21  Q.  So you've been there two years?

22  A.  Yes.

23  Q.  And in that course of time does a staffer, perhaps

24  yourself, listen to every phone call that comes in, every

25  message?

```
 1    A.  Not every single one, no.
 2    Q.  Is there a way -- How do you tell what you're going to
 3    listen to and not listen to?
 4    A.  Well, for one you would look at the transcript, you know,
 5    try to see if there's any keywords in there, things like death
 6    or kill.  We would use a list of bad words to help identify
 7    them a little bit easier.
 8    Q.  So, Mr. Beal, let me understand the process then.  When
 9    calls come in, they are transcribed?
10    A.  Yes.
11    Q.  So what you're doing is looking at the transcription first,
12    right?
13    A.  Yes.
14    Q.  And then if it's something that is of concern to you, then
15    you go back and fetch the call?
16    A.  Yes.  We will listen to the -- Typically if there's
17    something of concern, we'll listen to the call just to confirm
18    what the transcription is saying.
19    Q.  Okay.  How long are the calls kept?
20    A.  I don't follow.  How long are the --
21    Q.  Well, let's say on a telephone if a call comes in, it goes
22    into voice mail because nobody picks up on it.  How long does
23    it stay in I'll call it the archive or in the voice mailbox
24    before it's deleted?
25    A.  I don't believe they're deleted at all.  Forever really.
```

1   Q.  Really?  Okay.  There were words played in these messages

2   that you identified as the threats?

3   A.  Yes.

4   Q.  There were other words and phrases played in those messages

5   which I think, would you agree, they're obscene?

6   A.  Yes.

7   Q.  Those are not the threats?

8   A.  Correct.

9   Q.  That's obscenity, correct?

10  A.  Yes.

11  Q.  I think you may have answered this, but -- Oh, well maybe

12  not.

13          Did you -- Were you asked to forward to the Capitol

14  Police any telephone calls from that 928-487-3966 that you

15  could find?

16  A.  No.  No.  At no point did Capitol Police tell us to forward

17  any calls.

18  Q.  Okay.

19  A.  We would, you know, like I said, if we found calls from

20  that number, then we would, you know, use that number to search

21  the rest of the mailbox if they'd called before, and we'd send

22  those over.

23  Q.  I understand.  And it is the Capitol Police that is the

24  principal if perhaps only law enforcement agency that Congress

25  relates to directly?

1    A.  I wouldn't know.  But I believe so.  In this matter they'd

2    probably directly handle it first, yes.

3    Q.  My understanding, if you know, is the Capitol Police has a

4    separate office or function set up just to treat threatening

5    phone calls?

6    A.  Yes.  It's called threat assessment.

7           MR. EISENBERG:  Your Honor, may I have a moment?

8           THE COURT:  Yes.

9    Q.  (BY MR. EISENBERG)  I think, sir, you identified calls that

10   came in in January of this past year, correct?

11   A.  Yes.

12   Q.  And it was right around the time of the impeachment, the

13   second impeachment of the sitting -- of Donald Trump?

14   A.  Yes.

15   Q.  Was that a time that generated a lot of calls?

16   A.  Yes.

17   Q.  Do you remember when the first impeachment of Donald Trump

18   occurred?

19   A.  Yes.

20   Q.  When was that, sir?

21   A.  That was 20 --

22   Q.  I'm not trying to put you on the spot.

23   A.  No.  It feels like it was so long ago.  2019, I believe.

24   Q.  I'm sorry.  Do you remember the month?

25   A.  I do not, no.

```
 1   Q.  All right.  But did that event -- Related to that event,

 2   did your office, Ms. Pelosi's office, receive a lot of calls?

 3   A.  Yes.

 4   Q.  And were some of those threats?

 5   A.  Yes.

 6   Q.  Were they from another number other than this 928 number

 7   that I've been dealing with?

 8   A.  Yes.

 9           MS. BROOK:  Objection.  Relevance.

10           THE COURT:  Sustained.

11           MR. EISENBERG:  Thank you, Your Honor.  I have no

12   other questions.

13           THE COURT:  Thank you.  Ms. Brook.

14           MS. BROOK:  Thank you, Your Honor.

15                          REDIRECT EXAMINATION

16   BY MS. BROOK:

17   Q.  Sir, defense counsel asked you about receiving thousands of

18   messages?

19   A.  Yes.

20   Q.  And you had mentioned that there are times where you do

21   receive thousands of messages?

22   A.  Yes.

23   Q.  Would that be over a week period of time, a day, a month?

24   A.  It depends.  Sometimes we can get thousands of calls a day.

25   Sometimes we only get a couple hundred.
```

BEAL - REDIRECT

1    Q.  When you were testifying earlier, we admitted and talked
2    about five separate messages and exhibits?
3    A.  Yes.
4    Q.  Do these messages blend in with the other messages that
5    you've listened to?
6          MR. EISENBERG:  Objection, Your Honor.  Foundation.
7    Relevance.
8          THE COURT:  Sustained.
9    Q.  (BY MS. BROOK)  Do these messages stick out in your mind?
10   A.  Yes.
11   Q.  What part?
12         MR. EISENBERG:  Objection.  Asked and answered.
13         THE COURT:  Overruled.
14   Q.  (BY MS. BROOK)  Why do they stick out?
15   A.  They were threats, threats to her life.  I mean, we get
16   thousands of calls, like I said, but very often they will be
17   unhappy with their politics or unhappy with the policy.  Most
18   of them are not cause for concern.  People just trying to voice
19   their opinion.
20   Q.  Does obscenity alone constitute something that would be a
21   threat?
22   A.  No.
23   Q.  And I just wanted to clarify.  You spoke about working in
24   her personal office.  Is that her congressional office?
25   A.  Yes.

1  Q.  Okay.  So a congressional office separate from the

2  Speaker's office?

3  A.  Yes, I mean separate, but we still work together.  There's

4  quite a bit of overlap there.  Our primary function, though, is

5  to address the concerns of our constituency.  And, you know, I

6  work for her more in her capacity as a Congresswoman than I do

7  as the Speaker.

8  Q.  You had mentioned, lastly, you had mentioned that you

9  started working for her in February of 2019?

10  A.  Yes.

11  Q.  Although it seems, based upon the e-mails and what you've

12  talked about, that you sent and forwarded to the Capitol Police

13  a message that came in before that point?

14  A.  Yes.

15  Q.  How did that happen?

16  A.  We had a very large backlog when I was brought on board.  I

17  think at worst it was 200,000, you know.  We -- When I say we

18  had all hands on deck to help get rid of those, I really mean

19  we had all hands on deck.

20  Q.  So it was processing through those messages that you found

21  this September of 2019 message?

22  A.  Correct, yes.

23          MS. BROOK:  May I have a moment?

24          THE COURT:  Yes.

25  Q.  (BY MS. BROOK)  I misspoke.  I said September of 2019, but

1   it was January of 2019, the message that you found that

2   predated your employment; is that right?

3   A.  Yes.

4             MS. BROOK:  I don't have any other questions, Your

5   Honor.

6             THE COURT:  All right.  Sir, you may step down.  Thank

7   you.  And may the witness be excused?

8             MS. BROOK:  Yes, Your Honor.

9             THE COURT:  All right.  Thank you, sir.

10            Call your next witness.

11            MR. KOEHLER:  Your Honor, the United States calls

12   Heather Connelly.  If I can have a moment, I need to move the

13   computer up with me.

14            THE COURT:  Ma'am, please come forward and be sworn.

15            HEATHER CONNELLY, GOVERNMENT'S WITNESS, SWORN

16            THE CLERK:  If you would, state your full name and

17   spell your last name for the record.

18            THE WITNESS:  Heather Connelly C-o-n-n-e-l-l-y.

19            THE COURT:  All right.  Ms. Connelly, for purposes of

20   your testimony -- okay -- you can remove your mask.  I was just

21   going to say that.

22            THE WITNESS:  Thank you.

23                         DIRECT EXAMINATION

24   BY MR. KOEHLER:

25   Q.  Good afternoon.  Could you please introduce yourself to the

1    jurors here today and to the Court.

2    A.  Hi.  My name is Heather Connelly.

3    Q.  And, Ms. Connelly, where do you work?

4    A.  I work for the U.S. House of Representatives.

5    Q.  All right.  And did you previously at a point in your

6    career work for the congressional office of Congressman Adam

7    Schiff?

8    A.  I did.

9    Q.  Can you tell us the dates that you worked for Congressman

10   Schiff?

11   A.  Yeah.  So I started with his office in December of 2019 and

12   worked for him until about September, 2021.

13   Q.  So almost two years, correct, and what was your starting

14   position when you were there?

15   A.  I started as the staff assistant.

16   Q.  And how long did you have that position?

17   A.  Until I think I got promoted in June of 2020.

18   Q.  And did you become a staff assistant/legislative aide at

19   that point?

20   A.  I did.

21   Q.  And then did you hold another position above the slash

22   position as we'll call it for now?

23   A.  I did.

24   Q.  What was that?

25   A.  By the end I was just legislative aide.

1    Q.  Very good.

2            THE COURT:  Mr. Koehler, I'm going to ask you just to

3    move closer to the microphone.  Remember that we do have jurors

4    sitting in the back, and we need to make sure that everyone

5    hears.  Thank you.

6    Q.  (BY MR. KOEHLER)  Yes.  Thank you.

7            Can you tell us what you did prior to joining

8    Congressman Schiff's office?

9    A.  Yes.  Before I worked for Congressman Schiff, I did an

10   internship over on the senate side.

11   Q.  All right.  And did you go to college before that?

12   A.  I did.  I graduated in 2018.

13   Q.  All right.  And where did you go to college?

14   A.  I went to Stanford University.

15   Q.  And what were your degrees there or your degree?

16   A.  Double major in theater and political science.

17   Q.  Very good.  And where are you from?

18   A.  Auburn, Alabama.

19   Q.  Can you talk to us about your duties as a staff assistant

20   for Congressman Schiff?

21   A.  Sure.  So the staff assistant role in a congressional

22   office -- Our D.C. office was fairly small, so the staff

23   assistant is kind of the bottom, catchall role, anything that

24   needs to be done.  But there are a couple of things that are

25   sort of my realm of responsibility.  And the first of those is

1    sort of everything in the front office.  So assisting people,

2    visitors when they came to D.C., helping schedule tours, all

3    that kind of stuff, helping people who are there for official

4    visits who want to get connected with legislative staff,

5    assisting the legislative staff with anything that they need,

6    as well as managing the interns and keeping track of any form

7    of constituent correspondence.  So anything from our mail

8    program to if people contacted us on the Web site, managing our

9    phones, all that kind of stuff.

10   Q.  You mentioned managing the phones.  Did your duties also

11   include keeping up with the voice mail that was coming in?

12   A.  Yes.

13   Q.  And can you describe the kind of call volume and voice mail

14   volume you were getting in Congressman Schiff's office back in

15   January to March of 2020?

16   A.  Yeah.  So we were definitely having unusually high volume

17   at that time, so our average was around 2000 voice mails a day.

18   And it varied a little bit, but that was the average.

19   Q.  Can you explain to the jury how a voice mail would arrive

20   to you as a staff assistant.

21   A.  Yeah.  So we had four phone lines in our office that could

22   be ringing at the same time.  And if we had more calls than

23   that or if we were just overwhelmed at the time, it would just

24   go straight to voice mail.  So when we got a new voice mail, it

25   would record like a normal audio voice mail.  But then to make

1    it unlimited, it would automatically put the audio onto the

2    attachment of an e-mail.  And then in the body of the e-mail

3    would be sort of an automated transcription that was mediocre

4    at best.  And then we would receive each e-mail to sort of a

5    shared in-box that I and the interns had access to.

6    Q.  You mentioned that the transcription was mediocre at best.

7    Are you talking about the accuracy of the transcription?

8    A.  Yeah.  So it was like Siri where it's just whatever the

9    computer thinks it's hearing.

10   Q.  And did you have a shared e-mail box for handling those

11   voice mails?

12   A.  We did.

13   Q.  And did you review the transcriptions of the voice mails to

14   help you filter what calls to review, actually listen to the

15   audio, and perhaps take them to the next level so-to-speak?

16   A.  Yeah.  So the way that we were sort of trying to keep on

17   top of our voice mail in realtime was that the interns and I

18   would just go through that e-mail in-box.  And depending on,

19   you know, if I were reviewing them, then I would just make the

20   decision myself.  And then interns would sort of sort things on

21   their own and send some things my direction or put them into we

22   have sort of a response system, so some got put in there.

23        And so we would read through the transcription, and

24   then depending on how much we could tell what it was, we would

25   sometimes listen to the audio as well.

1   Q.  All right.  And were there certain types of messages that

2   perhaps you would choose not to review based just on the

3   transcript itself?

4   A.  Yeah.  I mean, with 2000 messages, you can imagine there

5   are some that were just, you know, junk messages trying to

6   reach us about our car's extended warranty and all that jazz.

7   Q.  So the same calls all of us get on our cell phone telling

8   us our social security number's being cancelled and so forth?

9   A.  Exactly.

10  Q.  And you would ignore those types of messages?

11  A.  Yes.

12  Q.  If they related to policy or a constituent calling and

13  wanting to communicate with a member about a policy position,

14  would you review those?

15  A.  Yeah.  So there were a couple of things that we were sort

16  of looking for when we were reviewing voice mails, a couple

17  things that we would sort of count as official business, you

18  know, if they were trying to reach a legislative staffer or,

19  you know, they had a meeting and were trying to make it to the

20  office or that kind of stuff, scheduling.  And then any policy

21  opinions, whether it was having an opinion about something or

22  asking for more information about something, that's what I

23  mentioned earlier where we have a system to put those in so

24  that then we'll be able to have a legislative staffer then go

25  respond to that person.

1              And then the last thing that we're looking for is any

2       threats against the Congressman or any other people.

3       Q.   So let's talk about that for a minute.  Did you have

4       training in how to recognize threats?

5       A.   Yeah.  So I first learned sort of how to answer

6       congressional calls in general as an intern.  And then when I

7       came into Congressman Schiff's office, I overlapped with the

8       person before me for about a week, and she sort of told me how

9       she had been answering phones and what her standards were.  But

10      then once I took over as staff assistant, it was my

11      responsibility.  And so I created my own sort of official

12      system because I would then be training the interns about what

13      to look for, that kind of stuff.

14              So I wrote out a policy for them.  And then in

15      addition to that, because we were getting so many messages at

16      the time, I wanted to -- or I did -- I reached out to the

17      Capitol Police and asked them to come talk about safety in

18      general both in terms of evaluating messages but then also in

19      terms of the physical safety of the office and that kind of

20      stuff, so they gave me advice.

21      Q.   And did some of that advice revolve around choosing what

22      messages to actually forward to the Capitol Police for review

23      as potential threats?

24      A.   Yeah.  So when we were evaluating what to send out, what we

25      were trying to really look for is what's worth spending time on

1    essentially in that, you know, when someone takes the time to

2    call their representative, it's usually because they feel

3    strongly about something.

4            MR. EISENBERG:  Objection, Your Honor.

5    Non-responsive.

6            THE COURT:  Sustained.

7    Q.  (BY MR. KOEHLER)  Can you talk specifically about the

8    criteria that you learned for forwarding a message to the

9    Capitol Police.

10   A.  Sure.  Yeah.  So when evaluating whether a message met that

11   standard, I sort of wrote out a policy that had two tiers.  And

12   the first tier was if a message had one of these things, it was

13   standalone, something that we would forward.

14   Q.  Can you describe what those things were in that first tier

15   that would cause you to send it just based on the standalone

16   thing inside the message.

17   A.  Yeah.  So those were just if it had a specific direct

18   threat against any elected official.  And the second thing in

19   that category was if they mentioned the Congressman's family.

20   Q.  Okay.  And can you explain what you mean by specific direct

21   threat.

22   A.  Yeah.  So if it specifically said I will insert thing here,

23   that was something -- some particular violent harm against an

24   elected official.

25   Q.  So if it made a specific threat of violence and it was

1    direct to anybody who's in Congress, you would report that?

2              MR. EISENBERG:  Objection, Your Honor.  It's leading

3    at this point.

4              THE COURT:  Sustained.

5    Q.  (BY MR. KOEHLER)  So let's talk about threats to the

6    member's family.  What would qualify -- What would cause you to

7    report a threat to the member's family?

8    A.  Basically just if they included specific information about,

9    you know, the number of children that he had or where he lived

10   or things like that.  And then there were other criteria in the

11   second tier.

12   Q.  Okay.  So now let's talk about that second tier.  Can you

13   tell us about what you were looking for in that second tier in

14   order to forward a message to the Capitol Police.

15   A.  Sure.  So this was what I explained to the interns in terms

16   of how to evaluate whether a message was just upset versus

17   actually something worth forwarding.  And they were sort of a

18   list of red flags where it would include if a message included

19   more than one or a significant amount of these, then we would

20   consider it a threat.

21              So that included things like excessive profanity or

22   indirect threats like, you know, you'll get what's coming to

23   you or things like that, or someone should blank, or things

24   like if they mentioned a specific time or place or method, if

25   they included graphic descriptions, and if they spoke with

1   clarity, consistency, and/or sort of thoughtfulness.  Does that

2   make sense?

3   Q.  So in that second tier, did you have to have just one of

4   those things, or did you have to have more than one of those

5   things in order to qualify?

6   A.  More than one of those things.

7   Q.  Did you occasionally listen to messages that people would

8   say something that sounded threatening but then decide at some

9   point that you weren't going to forward those messages?

10  A.  Not so much me.  Sometimes I would have interns who, you

11  know, were learning to evaluate what to take seriously.  And so

12  that's why I always had them forward those to me, and I would

13  make the final call about what got reported.

14  Q.  Did you sometimes hear calls where somebody was amped up,

15  and then at some point they would calm down during the call?

16  A.  Yeah.  You know, this was what I was getting at in terms

17  of, you know, people do feel strongly on these calls.  And so

18  we talk to people impassioned on all sorts of topics.  And

19  sometimes when people feel strongly about something and want to

20  get it off their chest, you know, they might say something

21  quickly or say something, you know, they might call you a name

22  or something like that.  And then usually they end up calming

23  down, and, you know, that's part of the purpose of these calls

24  is for us to talk through those issues with them and hear them

25  out.  And those usually do not constitute a threat.

1    Q.  Okay.  So if somebody was upset and something slipped, but

2    then calmed down, you would not forward that?

3    A.  That's right.

4    Q.  Once you decided that you were going to report a particular

5    call or message to the Capitol Police, can you describe what

6    steps you would take in order to do that?

7    A.  Sure.  So usually what you would do is call them first, and

8    then they would take down a report of the incident and then ask

9    for any further information.  You would e-mail them whatever

10   message you got or things like that.

11          At the time I was getting enough threats that I sort

12   of did the opposite, and I sort of established that with them

13   that I would prepare all of those reports at once and then give

14   them a call and say, hey, these are how many are coming, these

15   are sort of what to expect from them, and then send the

16   messages.

17   Q.  And did you develop a training guide for the staff that

18   laid out these steps as well as what we talked about earlier

19   with the tiers?

20   A.  I did.

21   Q.  All right.  I'm going to direct your attention now to

22   Exhibit No. 6.  It's a recording.  Did you hear that recording

23   in Exhibit No. 6 before coming to court today?

24   A.  Oh, yes.

25          MR. EISENBERG:  Your Honor, could we lay a little more

1   foundation how she recalls?

2          THE COURT:  Yes.

3   Q.  (BY MR. KOEHLER)  Certainly.  Do you recall receiving a

4   voice mail on or about January 20th of 2020 to the e-mail voice

5   mail system of Congressman Schiff?

6   A.  I do.

7   Q.  And is Exhibit 6 a true and accurate copy of that voice

8   mail?

9   A.  It is.

10         MR. KOEHLER:  Move to admit and publish 6.

11         MR. EISENBERG:  No objection, Your Honor.

12         THE COURT:  It may be admitted, and it may be

13  published.

14         MR. KOEHLER:  Looks like we're having the same audio

15  issue we had earlier, which is odd, because I thought I fixed

16  it.

17         Can we shut the screens off for a moment.

18         THE COURT:  Well, Mr. Koehler, while you are trying to

19  perfect the audio, I think we're at a juncture now that we can

20  take our afternoon break.

21         And, members of the jury, what we will do is we will

22  come back into court I would say just roughly about -- Let me

23  give you about ten after 3:00.  Be prepared to come in.  And we

24  will, again, we're going to situate you differently so that

25  those who are seated in the back of the courtroom will have an

1    opportunity to sit in the front.  Just follow the direction of

2    Liliana.  And we will get that situated.

3              Now, again, you're going to hear me say this a number

4    of times.  Because we are still in the middle of the trial and

5    not all of the evidence or witnesses have been received, I ask

6    you to continue to keep an open mind, not to discuss amongst

7    yourselves or with anyone else any of the matters that have

8    been discussed in the trial so far.  Just continue to keep an

9    open mind and enjoy the break that you have.

10             And, again, we will expect you about ten minutes after

11   3:00 in the courtroom ready to come in.

12             And so with that, please all rise for the jury.

13        (The jury exited the courtroom at 2:45 p.m.)

14             THE COURT:  Those who are in the back of the

15   courtroom, please let the jurors take a few moments if they

16   want to leave and go out into the atrium.  And we will stand in

17   recess.  And let's try to see what is happening with the audio

18   version there.

19             MR. KOEHLER:  I figured it out.  Thank you.

20        (Proceedings recessed from 2:46 p.m. until 3:12 p.m.)

21             THE COURT:  Before we bring the jury in, I'm just

22   going to say to our witness I know that testifying may be a

23   little bit unnerving for you, but I just give you a little bit

24   of notice that just listen to the question that's being asked,

25   and answer that question specifically.  Okay?

CONNELLY - DIRECT

1      THE WITNESS:  Okay.  Thank you.

2      THE COURT:  All right.  Let's bring in the jury.

3      MR. EISENBERG:  Your Honor, may we test this listening

4  device?

5      THE DEFENDANT:  It works.

6      MR. EISENBERG:  It does?  Okay.  Thank you.

7      THE COURT:  Let's bring in the jury.

8      MR. KOEHLER:  Your Honor, just a quick note.  Owen

9  Beal testified earlier, and with Mr. Eisenberg's agreement,

10  Mr. Beal is in the back of the courtroom listening.  He has

11  been instructed not to talk to any other witnesses about

12  anything involving the case.

13      THE COURT:  All right.

14    (The jury returned to the courtroom at 3:13 p.m.)

15      THE COURT:  The record may reflect the presence of

16  counsel, the presence of defendant, the presence of the jury

17  with roll call waived.  And you may continue, Mr. Koehler.

18      MR. KOEHLER:  Thank you, Your Honor.

19  Q.  (BY MR. KOEHLER)  Ms. Connelly, you remain under oath.

20  When we left off, we were trying to play Exhibit No. 6, so

21  let's go ahead and try that now.

22      You've got to be kidding me.  We played it four times

23  during the break, and it worked every single time.

24      THE COURT:  Try it one more time.

25      MR. KOEHLER:  Can we turn the monitors off again.

UNITED STATES DISTRICT COURT

 1     Audio's on.

 2               THE CLERK:  Ready?

 3               MR. KOEHLER:  Yes.

 4         (Exhibit 6 played.)

 5     Q.  (BY MR. KOEHLER)  Ms. Connelly, do you remember reviewing

 6     that message on or around January 20th of 2020?

 7     A.  I do.

 8     Q.  What was your reaction to that message, if any?

 9     A.  It was hard to hear, and I -- excuse me -- and I reported

10     this as a threat.

11     Q.  Did it cause an emotional response at the time?

12     A.  Yeah.  It's just hard to hear a real person say that about

13     a real person, and I was pretty afraid.

14     Q.  Okay.  And you mentioned that you reported that to the

15     Capitol Police, correct?

16     A.  I did.

17     Q.  Did you e-mail it to the Capitol Police?

18     A.  Yes.  I called their office and e-mailed the threat

19     assessment office.

20     Q.  If I can direct your attention to Exhibit 11 on the witness

21     stand in front of you, do you recognize that?

22     A.  I do.

23     Q.  Is that the e-mail that you sent to the Capitol Police with

24     the message attached?

25     A.  It is.

1    Q.  Is that a fair and accurate copy of that e-mail?

2    A.  Yes.

3           MR. KOEHLER:  Move to admit and publish 11.

4           MR. EISENBERG:  No objection, Your Honor.

5           THE COURT:  It may be admitted, and it may be

6    published.

7    Q.  (BY MR. KOEHLER)  When you heard that message, did you have

8    any way of knowing where the caller was at the time that

9    message was left?

10   A.  I did not.

11   Q.  Did you have any way of knowing whether the caller had any

12   intent to carry through?

13   A.  Only what was in front of me.

14          MR. EISENBERG:  I'm sorry, Your Honor.  Foundation.

15   Objection.

16          THE COURT:  Overruled.  You may ask the question.

17          MR. KOEHLER:  If I can rephrase the question?

18          THE COURT:  You may.

19   Q.  (BY MR. KOEHLER)  Beyond the words that were in the

20   message, did you have any way of knowing what the caller's true

21   intent was?

22   A.  No.

23          MR. KOEHLER:  May I have a moment, Your Honor?

24          THE COURT:  You may.

25   Q.  (BY MR. KOEHLER)  Can you tell us what in particular it was

1    about that message that made you feel afraid?

2    A.  Yeah.  So going back to the tiers that I had listed before,

3    this would be in the first tier because it had a direct threat

4    of violence against the Congressman.  And more specifically, it

5    had the threats were direct.  There was more than one.  It had

6    both a place and a method.  And it was the tone of voice was

7    clear.  It was complete sentences.

8    Q.  So the caller did not sound like they were out of it,

9    so-to-speak?

10   A.  No.  It was pretty clear and thoughtful.

11           MR. KOEHLER:  No further questions, Your Honor.

12           THE COURT:  All right.  Mr. Eisenberg.

13                      CROSS-EXAMINATION

14   BY MR. EISENBERG:

15   Q.  Good afternoon, ma'am.

16   A.  Hi.

17   Q.  Hi.  Okay.  The caller, there's a telephone number

18   associated with the caller, right?

19   A.  Yeah.

20   Q.  And that is a 928 number, area code 928?

21   A.  That's right.

22   Q.  And you're able to -- You were able to know that by either

23   the transcript or there's something within the telephone system

24   that you're working with that tells you that?

25   A.  Yeah.  It records it and puts it in the transcript.

1   Q.  Okay.

2           THE COURT:  Let me just ask are the jurors in the back

3   row able to hear her?

4           All right.  Just to make sure.

5           A JUROR:  Just barely.

6           THE COURT:  Speak directly into the microphone.

7           THE WITNESS:  Is this better?

8           A JUROR:  Can she repeat what she said?

9           THE WITNESS:  Is this better?

10          THE COURT:  Can you hear her now?

11          A JUROR:  Yes, now we can.

12          MR. KOEHLER:  One juror asked to repeat the answer.

13          THE WITNESS:  Oh, yes.  They record the phone number

14  in the transcription.

15  Q.  (BY MR. EISENBERG)  Okay.  And you don't -- You never

16  talked to the person who actually made that call?

17  A.  As far as I know.

18  Q.  It's a pretty recognizable voice, would you say?

19  A.  Fairly.

20  Q.  Okay.  But you don't recall ever actually talking face to

21  face or I should say voice to voice with that person; is that

22  correct?

23  A.  Not specifically, no.

24  Q.  Okay.  Now, have you been told to go back and look at --

25  Well, let me back up a moment.

1           There's a repository or a directory of telephone calls

2    that come in, I assume?

3    A.  To a certain extent.  I mean, it's just the e-mail in-box

4    that we get them to.

5    Q.  Okay.  How long are those kept?

6    A.  I think we had it set to a year at the time.

7    Q.  And so when was the first time, if you recall, that you

8    actually started listening?  Was that back in 2019?

9    A.  Me specifically?

10   Q.  Yes.

11   A.  Yes, that's right.

12   Q.  What -- Do you remember the month?

13   A.  In Rep Schiff's office, in December, 2019.

14   Q.  Okay.  So were -- By the time you listened to the call

15   that you've just identified, were there calls that went back to

16   December of 2019 still in your archives?

17   A.  Yes.

18   Q.  Okay.  Now, and can you tell, when you go into the

19   archives, can you look up a voice mail message by the telephone

20   number?

21   A.  Yes.

22   Q.  So, in other words, you could go back and look for

23   928-487-3966 to see if you could find other calls?

24   A.  That's right.

25   Q.  Okay.  Were you asked to do that?

```
 1    A.  I don't remember.

 2    Q.  Well, I will -- If you were asked to do -- I don't want to

 3    do a hypothetical.

 4         Did the Capitol Police ask you to go back and look for

 5    other calls from that number?

 6    A.  Sometimes they do, but I don't remember if they did

 7    specifically in this case.

 8    Q.  Okay.  So is it fair to say if you don't remember, it

 9    didn't happen?

10    A.  I wouldn't say that.  Sometimes it happens, but I don't

11    remember.

12    Q.  You don't remember.  Okay.  Fair enough.

13         Now, with respect to the call that's in Exhibit 6,

14    that's the January 20th, 2020, call?

15    A.  Yes, that's right.

16    Q.  Okay.  Now, ma'am, is there a way to tell when the call

17    came into the office?

18    A.  Yes.  It has in the subject line.

19    Q.  And do you have any information as to when it came into the

20    office?

21    A.  It says 2:39 a.m.

22    Q.  A.m.  So that's in the morning, right?

23    A.  Right.

24    Q.  There's nobody manning the phones in the morning, I take

25    it?
```

1    A.   That's correct.

2    Q.   You can rest assured that therefore -- Well, withdrawn.

3             Now, you went through and identified for Mr. Koehler

4    the parts that were a direct threat.  I think you did.  Well,

5    let me do it.  Okay.

6             Here's the direct threat I think that you're talking

7    about.  "We're going to put a bullet in your head."  Correct?

8    A.   Yes.  There was also the part about wiping the streets with

9    his blood.

10   Q.   Is that how you recall it?

11            I don't think it's with his blood.

12   A.   Yeah.  Sorry.  With you.

13   Q.   And the other parts which are, we'll admit, obscene, those

14   are not the ones that are threats?

15   A.   Not directly.

16   Q.   Well, all right.  Then the part of the call also had right

17   at the beginning "Hello there, Adam.  You know what?  Your

18   impeachment failed."  Do you remember that?

19   A.   Yes.

20   Q.   Do you know what that relates to?

21   A.   I mean, the impeachment that was happening at the time.

22   Q.   Yes.

23   A.   Yeah.

24   Q.   Okay.  So this is a call, as far as you can tell, is a

25   reference to an impeachment that occurred sometime in January

1    or thereabouts in 2020?

2    A.  Yes.

3    Q.  Did you listen to -- I'm going to give you some dates of

4    calls, and if you didn't listen to them, just let me know.

5            January 21st of 2020?

6    A.  Just a call that came in then?

7    Q.  From this telephone number.

8    A.  I wouldn't be able to tell you.

9    Q.  Okay.  And I think -- All right.

10           The same thing for January 22nd, 2020.  You don't

11   recall that?

12   A.  There were too many messages.

13   Q.  And the 23rd of 2020 you don't recall from this telephone

14   number?

15   A.  No, I don't recall.

16   Q.  And 24th of the same month, you don't recall?

17   A.  I don't.

18   Q.  28th of January of 2020, you don't recall?

19   A.  Not specifically.

20   Q.  Okay.  January 31st of that year?

21   A.  Not off the top of my head.

22   Q.  I'm going to give you a few more dates, and then I'll stop.

23   February 3rd and February 26th of that year?

24   A.  I don't remember.

25   Q.  Okay.  And February 27th and March the 5th?

1    A.  Not just based on the dates.  I don't remember.

2    Q.  Okay.  Were any of these calls forwarded to the Congressman

3    himself?

4    A.  Not to my knowledge.

5            MR. EISENBERG:  May I have a moment, Your Honor?

6            THE COURT:  You may.

7            MR. EISENBERG:  That's all I have.  Thank you.

8            THE COURT:  Mr. Koehler.

9                        REDIRECT EXAMINATION

10   BY MR. KOEHLER:

11   Q.  First of all, just to be clear, I'm directing your

12   attention to Exhibit No. 11.

13           THE COURT:  Speak into the microphone.

14   Q.  (BY MR. KOEHLER)  Yes.  Thank you.  The mask.

15           Directing your attention to Exhibit No. 11, what was

16   the phone number from which that message originated?

17   A.  I have it here as 928-487-3966.

18   Q.  And the time stamp on the message, do you know what the

19   time zone is for that time stamp?

20   A.  It would come in as Eastern time, so D.C.

21   Q.  Okay.  And is that the time stamp on the e-mail or the time

22   stamp on the message?

23   A.  It should be both.

24   Q.  And then Mr. Eisenberg asked you about obscenities in the

25   phone calls.  You mentioned those are not threats directly.

1    What do you mean by that?

2    A.  Well, I just mean that I use the whole message to evaluate

3    the context of whatever threats might be included in it.

4    Q.  And does a message containing obscenity standing alone

5    qualify as a threat in your mind?

6    A.  No.

7    Q.  And he also asked you about a number of different call

8    dates and times.  Do messages typically stand out in your mind

9    for a particular reason?

10   A.  Usually if I remember a message, it's because of the

11   content of it.  I don't remember the dates of particular

12   messages.

13   Q.  Okay.  So if you didn't hear content that was memorable to

14   you, would you have any reason to remember that message?

15   A.  No, not necessarily.

16          MR. KOEHLER:  No further questions.

17          THE COURT:  All right.  Thank you.  And you are

18   excused.  You may step down.

19          Is the witness excused?

20          MR. KOEHLER:  She is, Your Honor.  Thank you.

21          THE COURT:  All right.  Please call your next witness.

22          MS. BROOK:  Thank you, Your Honor.  The government

23   calls Special Agent Sean Wilson.

24          THE COURT:  Sir, do please come forward and be sworn.

25          SEAN ANDREW WILSON, GOVERNMENT'S WITNESS, SWORN

1          THE CLERK:  State your full name and spell your last

2    name for the record.

3          THE WITNESS:  Sean Andrew Wilson, W-i-l-s-o-n.

4          MS. BROOK:  Your Honor, may I approach with a sticky

5    note of the list of exhibits?

6          THE COURT:  Yes.

7          MS. BROOK:  Thank you.

8          THE COURT:  Sir, during your testimony, you may remove

9    your mask.

10                        DIRECT EXAMINATION

11   BY MS. BROOK:

12   Q.  Good afternoon, sir.

13   A.  Good afternoon.

14   Q.  Would you please introduce yourself to the ladies and

15   gentlemen of the jury.

16   A.  My name is Sean Wilson.  I'm a special agent with the

17   United States Capitol Police.

18   Q.  And, sir, how long have you been a special agent with the

19   Capitol Police?

20   A.  Since 2016.

21   Q.  Geographically, where are you situated?

22   A.  In Washington, D.C.

23   Q.  And prior to becoming a special agent with the Capitol

24   Police, what did you do for a living?

25   A.  I worked private security for a short time out of college

1    and then was hired by Capitol Police where I did physical

2    security inside the Capitol building, and then progressed to

3    patrol outside, and then progressed to our CERT team, which is

4    like our version of SWAT, and then from there went to threat

5    assessment.

6    Q.  So focusing in on 2019, what was your assignment at that

7    point in time with the Capitol Police?

8    A.  In the threat assessment section.

9    Q.  And what were your duties in the threat assessment center?

10   A.  Our section investigates crimes like threats, harassment,

11   stalking, and impersonation that are directed at members of

12   Congress, their staff, and their families.

13   Q.  Would that include threatening messages left on voice

14   mails?

15   A.  Yes.

16   Q.  So, big picture, the threats that you investigate, are they

17   isolated to one political party?

18   A.  They are not.

19   Q.  And can you describe a little bit about that.

20   A.  Members of both political parties are victims of threats,

21   staff members, family members.  And we do not allow the

22   political parties to determine how we progress with our cases.

23   We just focus on the facts of the case.

24   Q.  So does the Capitol Police distinguish between the

25   political party of the individual threatened in your

1   investigation?

2   A.  We do not.

3   Q.  So on the threat assessment team, how do you prioritize

4   investigating the threats you receive?

5   A.  We have to prioritize as best we can based on the

6   statements that are left in various communications.  We're

7   always looking out for specific methods or precise timing,

8   certain details that will determine what we investigate sooner.

9   Q.  What are the details that direct your investigation?

10  A.  So if an individual uses or if they mention a specific

11  method of committing a threat, if they give an ultimatum or a

12  timeline to commit a threat or to commit an act of violence,

13  depending on how specific or direct they are, those are things

14  we're looking for.

15  Q.  Does it affect your investigation whether it's a direct or

16  an indirect threat?

17  A.  Yes.

18  Q.  How so?

19  A.  Well, indirect threats can sometimes be open for

20  interpretation.  We have to be very careful because everyone

21  has their First Amendment right, and we can't infringe upon

22  that.  So we have to make sure that threats require a specific

23  enough message or, you know, we just have to analyze what is in

24  the message to see what exactly, you know, if there's some sort

25  of intent or if they're going to commit a certain act, and then

1    we base our investigation off that.

2    Q.  So what would be an example of a specific threat that would

3    cause you to initiate a threats investigation?

4    A.  So we do a lot of briefings for staff.  And the example we

5    generally use is if someone says something directly like I'm

6    going to kill you, that's an example that we provide to staff.

7    Q.  Does your investigation distinguish between "I'm going to"

8    and "we're going to"?

9    A.  No.  If an individual were to say "we", they would be

10   including themselves in that action.

11   Q.  At some point in 2019 did you come into contact with a

12   voice message that was left from phone number 928-487-3966?

13   A.  Yes, I did.

14   Q.  And when abouts was that?

15   A.  September 4th, 2019.

16   Q.  How did that happen?

17   A.  The staff for Congresswoman Pelosi reported the voice mail

18   to our office.

19   Q.  And how was it reported to you?

20   A.  It was sent via e-mail.

21          MS. BROOK:  If the witness can be shown what's already

22   been admitted as Exhibit No. 10?

23          THE COURT:  Yes.  I think it may be up there.

24   Q.  (BY MS. BROOK)  I think it might be on your screen as well.

25   Do you recognize that?

1    A.  Yes.

2    Q.  Is that the message that you're referring to?

3    A.  Yes.

4         MS. BROOK:  Your Honor, may we publish for the jury

5    already admitted Exhibit 10?

6         THE COURT:  Yes.

7    Q.  (BY MS. BROOK)  Is this the e-mail message that you were

8    referring to, the one that sent you that message?

9    A.  Yes.

10   Q.  Prior to coming into court today, did you have a chance to

11   listen to marked Exhibit No. 5?

12   A.  Yes.

13   Q.  And did you recognize that --

14         Your Honor, it's already been admitted, so I'm just --

15   can we shortcut.  May we go ahead and play that for the jury.

16        (Exhibit 5 played.)

17   Q.  (BY MS. BROOK)  Do you see it on the screen?

18   A.  Yes.

19   Q.  Do you recognize it?

20   A.  Yes, I do.

21   Q.  Can you read it for us?

22   A.  "Hello, Nancy.  Hey, we're out here in California, and we

23   stick by our guns.  That's right.  You wanna take away our

24   guns?  We will take away our life.  Fuck you, cunt."

25   Q.  You mentioned that you received this message on September

1    4th of 2020?

2    A.  Yes.

3    Q.  I'm sorry.  2019.

4    A.  Yes.

5    Q.  Was there anything in this message that concerns you?

6    A.  Yes.

7    Q.  What?

8    A.  The fact that the individual mentions guns, the phrase we

9    will take away your life.  Those are concerns because it could

10   mean that the individual is intending to use a gun to take away

11   the Congresswoman's life.

12   Q.  After you received this message, did you do anything to

13   follow up with an investigation into this message?

14   A.  Yes.  Our office sent a subpoena to the corporation that

15   owns the phone number.  Through database searches we were able

16   to determine that that was YMAX.

17   Q.  So you subpoenaed the phone number 928-487-3966?

18   A.  Yes, that's correct.

19   Q.  Did you get returns back?

20   A.  Yes, we did.

21   Q.  And what did you do based on the returns that you got?

22   A.  The returns identified that the user, the subscriber for

23   the phone number was Richard LaPoint of Monrovia, California.

24   Q.  What did you do next?

25   A.  We did basic investigation into Mr. LaPoint's background.

1    We notified staff that we had a suspect.  And we notified the

2    Congresswoman's protection detail.

3    Q.  And which Congresswoman was that?

4    A.  Congresswoman Pelosi.

5    Q.  Why was it that you took the step to notify her protection

6    detail?

7    A.  Because there was a reference to guns and a possible

8    reference to using guns against her.

9    Q.  In the course of your investigation at that point did you

10   learn of another message that had been left before in

11   September -- I'm sorry; strike that -- in January of 2019?

12   A.  Yes, we did.

13   Q.  And prior to being here today, did you have an opportunity

14   to listen to Exhibit No. 4?

15   A.  Yes, I did.

16          MS. BROOK:  Your Honor, that one too is already

17   admitted.  May we publish and play?

18          THE COURT:  Yes.

19      (Exhibit 4 played.)

20   Q.  (BY MS. BROOK)  Is there anything of concern in that

21   message?

22   A.  Yes.  The individual mentions that he had already killed

23   people.

24   Q.  And what was concerning about that?

25   A.  Well, we certainly don't want an individual responsible for

1    killing anyone.  But this particular message he made the

2    statement that he had killed random unnamed individuals.  And

3    at that time that wasn't specifically our option to

4    investigate.

5    Q.  So what did you do next in your investigation?

6    A.  We reached out to Monrovia California Police Department,

7    and we asked them to speak with Mr. LaPoint.

8    Q.  What happened next?

9    A.  They did make contact with Mr. LaPoint.  At that time he

10   denied leaving the voice mails.  And he stated he thought it

11   might be his son, Richard LaPoint, Jr., who he doesn't have

12   much communication with.

13   Q.  What happened next?

14   A.  Our office reached out to Mr. LaPoint, Jr., was not able to

15   make contact.  But the voice mail greeting, the voice in the

16   voice mail greeting was obviously not a match for the

17   individual that was leaving the voice mails for Congresswoman

18   Pelosi's office.

19   Q.  And through the course of the investigation and talking

20   with Richard LaPoint, was that voice a match for the messages

21   that were left?

22   A.  At that time, no.

23   Q.  So what happened next?

24   A.  We reached out to the California Highway Patrol's threat

25   assessment section, which we had worked with a lot in the past.

1    We thought that it just needed a more thorough investigation of

2    Mr. LaPoint to try and figure out what exactly was happening.

3    Q.  And at some point did law enforcement interview Richard

4    LaPoint?

5    A.  Yes, they did.

6    Q.  And an what if anything came about from that interview of

7    investigative assistance for you?

8    A.  They spoke to Mr. LaPoint over the phone, and again they

9    stated that his voice did not match the suspect that we were

10   looking for.  And they provided contact information for our

11   office, and Mr. LaPoint agreed to contact us to discuss with

12   our office further.

13   Q.  Did anything about the investigation change in January of

14   2020?

15   A.  Yes, it did.

16   Q.  And what was that?

17   A.  There was an additional voice mail that was reported to us.

18   Q.  Have you had the opportunity to listen to and review

19   Government's Exhibit No. 1.

20   A.  Yes, I have.

21   Q.  Is that that voice mail?

22   A.  There's --

23   Q.  Sorry.  I transposed my numbers.  We actually are referring

24   to Exhibit No. 6.  And it's an audio recording already

25   admitted.  And it's on your screen, I believe.

1    A.  Here we go.

2         I'm sorry.

3    Q.  You can just look at the screen.  In looking at the screen,

4    do you recognize that?

5    A.  Yes, I do.

6    Q.  And what is it?

7    A.  That's the voice mail that was reported to us from

8    Congressman Schiff's office.

9    Q.  The message that we're talking about from January of 2020?

10   A.  That's correct.

11        MS. BROOK:  Your Honor, may we go ahead and play this

12   exhibit one more time so we can talk about it?

13        THE COURT:  Yes.

14    (Exhibit 6 played.)

15   Q.  (BY MS. BROOK)  How did you interpret this message?

16   A.  Our office classified it as a threat.

17   Q.  Why was it so classified?

18   A.  The statement includes in it a portion where it says that

19   the individual is going to do something, and that is to put a

20   bullet in the Congressman's head.

21   Q.  Was that of concern in your investigation?

22   A.  Absolutely.

23   Q.  Why so?

24   A.  This was now the third voice mail that we had from the same

25   phone number.  On top of that, Congressman Schiff did not have

1   a protective detail at that time, which meant he was a softer

2   target than Congresswoman Pelosi.  In addition, the statement

3   itself was an indication that the individual was going to do

4   something, and that was to put a bullet in the Congressman's

5   head.

6   Q.  What happened next in the investigation?

7   A.  At this point our policy is if we are not able to work the

8   investigation ourselves, we refer it to the FBI.  So it was

9   referred to the FBI in California to follow up again with

10  Mr. LaPoint.

11  Q.  And based upon your knowledge of the investigation, where

12  did interviews with Mr. LaPoint lead this investigation?

13  A.  Mr. LaPoint identified the caller as Steve Martis.

14         MR. EISENBERG:  Objection, Your Honor.  It's hearsay.

15  Move to strike.

16         THE COURT:  Sustained.

17  Q.  (BY MS. BROOK)  And let's go at this a different way.

18         So you had talked about using a subpoena to identify

19  the account holder information of the phone number.  At some

20  point was the investigation focused in on a particular hotel,

21  the hotel -- the Hiltop Hotel-Motel in Bullhead City, Arizona?

22  A.  Yes, it was.

23  Q.  And how did that happen?

24  A.  Mr. LaPoint stated that he --

25         MR. EISENBERG:  Objection, Your Honor.  It's about to

1   be hearsay.

2           THE COURT:  Sustained.

3           MS. BROOK:  Your Honor, it's not for the truth of the

4   matter.  It's simply for notice about where the investigation

5   went to.

6           THE COURT:  Rephrase the question.

7   Q.  (BY MS. BROOK)  Did your investigation lead you to the

8   Hiltop Motel?

9   A.  Yes, it did.

10  Q.  You had mentioned at that point that the investigation was

11  handed off to the FBI from the Capitol Police?

12  A.  Yes, that's correct.

13  Q.  Explain to us how that happened.

14  A.  It was submitted to our task force officers who are

15  assigned to a special unit, the violent crimes task force,

16  within the FBI, which just allows us to send requests more

17  directly through them straight to the FBI.

18          MS. BROOK:  Your Honor, I don't have any other

19  questions for this witness.

20          THE COURT:  Mr. Eisenberg.

21                      CROSS-EXAMINATION

22  BY MR. EISENBERG:

23  Q.  Good afternoon, agent.

24  A.  Good afternoon, sir.

25  Q.  As you can tell, I represent the defendant?

1    A.  Yes, sir.

2    Q.  You've never met him, have you?

3              THE COURT:  Bring the microphone closer.

4    Q.  (BY MR. EISENBERG)  I'm sorry.  You've never met him, have

5    you?

6    A.  I have not, sir.

7    Q.  Okay.  You talk about the threat assessment team.  Are you

8    part of that team?

9    A.  Yes, I am, with the U.S. Capitol Police.

10   Q.  And you were a part of that team at the time of these

11   referred voice mail messages; is that correct?

12   A.  Yes, that's correct.

13   Q.  Okay.  And when you got these messages, the ones you've

14   identified are all from the same number, 928-487-3966?

15   A.  Yes, that's correct.

16   Q.  Did you or anyone connected with the threat assessment team

17   go back and ask the referring offices, Congresswoman Pelosi and

18   Congressman Schiff, to see if there were other calls from that

19   telephone number.

20   A.  I did not.

21   Q.  Do you know if anyone within Capitol Police did?

22   A.  I do not.

23   Q.  Do you know whether there were any calls to those two

24   offices from that number?

25   A.  I'm sorry.  Could you repeat?

1   Q.  Okay.  928-487-3966, that's the number we're talking about,

2   right?

3   A.  Yes.

4   Q.  Okay.  And so the question now becomes is do you know

5   whether there were any other calls to Congresswoman Pelosi's

6   office from that number?

7   A.  Other than the ones reported to us?

8   Q.  Yes, sir.

9   A.  I do not.

10  Q.  And I'll ask the same of course with respect to Congressman

11  Schiff.  You don't know whether there were any other calls than

12  the ones that were referred?

13  A.  I do not.

14  Q.  One of the ones that is into evidence is where Mr. Martis

15  admitted or said that he killed people.  Do you remember that

16  one?

17  A.  Yes.

18  Q.  Down on the border, that kind of thing?  Right?

19  A.  Yes.

20  Q.  And I think that the gist of what you were saying is it's

21  not within the purview or authority of the Capitol Police to do

22  any further investigation about murder on the border.  Did I

23  get that right?

24  A.  That's correct.

25  Q.  Was it referred to any relevant agency to investigate

1   whether the caller had murdered anybody?

2   A.   We reached out to Monrovia California Police Department.

3   Q.   Okay.  But I just want to make sure that it was Monrovia

4   that was investigating murders by this caller along the border?

5   A.   The lead that we had at that time was the subscriber for

6   the phone number, so that is who we reached out to to further

7   the investigation.

8   Q.   Do you know where Monrovia is, sir?

9   A.   Other than in California, I do not.

10  Q.   North, south, or whatever?

11  A.   I do not.

12  Q.   Okay.  If you know, did Monrovia ever find whether the

13  caller from 928 murdered people?

14  A.   I don't know.

15  Q.   And when I say 928, it's a shorthand way of referring to

16  this number.  And your answer is you don't know?

17  A.   I don't know.

18          MR. EISENBERG:  Okay.  That's all I have, Your Honor.

19          THE COURT:  Thank you.  Any redirect, Ms. Brook?

20          MS. BROOK:  No further questions, Your Honor.

21          THE COURT:  Thank you.  Thank you, sir.  And you may

22  step down.

23          And may the witness be excused?

24          MS. BROOK:  Yes, Your Honor.  Thank you.

25          THE COURT:  All right.  Please call your next witness.

1        MR. KOEHLER:  The United States calls Richard LaPoint.

2        THE COURT:  Sir, I'm going to ask you to come forward

3    here and be sworn.

4        RICHARD LAPOINT, GOVERNMENT'S WITNESS, SWORN

5        THE CLERK:  If you would state your full name and

6    spell your last name for us.

7        THE WITNESS:  Richard LaPoint, capital L-a capital

8    P-o-i-n-t.

9        Can I take my mask off here?

10        THE COURT:  Sir, I was just going to say you may take

11    your mask off for purposes of your testimony.

12        THE WITNESS:  Thank you.

13                        DIRECT EXAMINATION

14    BY MR. KOEHLER:

15    Q.  Sir, would you please introduce yourself to the Court and

16    to the jury.

17    A.  Hi.  My name is Richard LaPoint.  I live in Bullhead City,

18    Arizona.

19    Q.  What do you do for a living?

20    A.  I manage two hotels.

21    Q.  Is one of those hotels called the Hiltop Motel?

22    A.  Yes, it is.

23    Q.  And that's Hiltop with one L; is that correct?

24    A.  I think so.

25    Q.  Fair enough.  All right.  And how long have you owned that

1  motel?

2  A.  I believe since about 2011.

3  Q.  All right.  Do you manage it yourself?

4  A.  No.

5  Q.  Do you know the tenants there yourself?

6  A.  No, not really, no.

7  Q.  Who manages the motel for you?

8  A.  One of my sons, Christopher.

9  Q.  All right.  And how old is Christopher?

10  A.  How old?  I think he's probably about 34.  I have six kids.

11  So I think he's 34.

12  Q.  All right.  Very good.  And do you know how long he's

13  managed the Hiltop for you?

14  A.  He came soon after I bought it, approximately 2011.

15  Q.  Okay.  So roughly ten years?

16  A.  I'd say so.

17  Q.  Fair enough.  Can you tell us what kind of phone system you

18  use for the Hiltop Motel?

19  A.  Well, we have -- we have a Panasonic distributor, and then

20  we use magicJack's to provide the phone numbers that the

21  Panasonic distributes.

22  Q.  Okay.  And tell us what kind of phone system magicJack is.

23  A.  Well, it's a little device about the size of a pack of

24  cigarettes.  And you connect it to the Internet.  And then you

25  can plug a phone into it or a phone system.  And it allows

1    you to make any call in the continental United States.

2    Q.  Does it cost money to make those calls across the

3    continental United States?

4    A.  MagicJack device costs about $36 a year for any calls, all

5    the calls you ever make.

6    Q.  For one phone number?

7    A.  For one phone number.  That's correct.

8    Q.  And how many phone numbers do you have using the magicJack

9    system?

10   A.  There's three.

11   Q.  Okay.  And is that a savings versus using a traditional

12   phone system?

13   A.  A traditional phone system with three lines is probably

14   about three to five hundred dollars a month through a phone

15   company.

16   Q.  So magicJack costs you less for a year than a regular phone

17   system would cost you for a month?

18   A.  Absolutely, yeah.

19   Q.  All right.  And do you recognize the phone number

20   928-487-3966?

21   A.  Yes.  I believe that's one of the magicJack numbers.

22   Q.  Is it one of the outgoing numbers from the Hiltop Motel?

23   A.  Yes, that's correct.

24   Q.  All right.  And how long have you had that number in

25   service?

1    A.  I would probably say about the same time as I bought the

2    hotel.  MagicJacks are something that I use exclusively, so I

3    buy them as soon as I can get the conventional phone system out

4    and them in place.

5    Q.  Got it.  And are you the registered subscriber for the

6    magicJack account assigned to that phone number?

7    A.  Yes.

8    Q.  I do have something.  In the fall or winter of 2019 to the

9    beginning of January, 2020, did a point come along where the

10   FBI reached out to contact you?

11   A.  Yes, they did.

12   Q.  And was their contact with you in reference to that 3966

13   phone number?

14   A.  It was.

15   Q.  And did you point them in a particular direction at that

16   time?

17   A.  I pointed them to the Hiltop Hotel in Bullhead City,

18   Arizona, and to speak to Christopher, who was the manager.

19   Q.  And why would you ask them to talk to Christopher?

20   A.  I didn't have any knowledge about what could have

21   transpired with that phone number at that time.

22   Q.  All right.  And did they play a recording for you?

23   A.  Well, they actually played it for Christopher.  I was

24   there.  But I think they were playing it for him, not me.

25   Q.  Okay.

1    A.  So I --

2    Q.  When you heard it, did you recognize the voice?

3    A.  I did not.

4         MR. KOEHLER:  No further questions.

5         THE COURT:  Mr. Eisenberg.

6                    CROSS-EXAMINATION

7    BY MR. EISENBERG:

8    Q.  Good afternoon, Mr. LaPoint.

9    A.  Hello.

10   Q.  Mr. LaPoint, the number that Mr. Koehler just gave you --

11   I'll give it to you again -- 928-487-3966, and you recognize

12   that number, right?

13   A.  Yes.

14   Q.  That's a number connected with the magicJack system, as I

15   understand it?

16   A.  One of them.  There's three of them.  That's correct.

17   Q.  Okay.  Do you know whether that number connects to Room

18   404?

19   A.  Well, it's a rotary system, so whenever -- whenever someone

20   calls in on any one of the three magicJacks, and they punch a

21   room number, let's say 404.

22   Q.  Right.

23   A.  Okay.  The Panasonic unit would dial 404 and make the

24   connection between whichever of the three magicJacks they

25   called in on and connect to whatever room you selected.

RICHARD LAPOINT - REDIRECT

1  Q.  So you've just described an incoming call to the Hiltop.

2  So if someone is going to call out from the Hiltop, it's just

3  sort of like the reverse?

4  A.  It would be reversed.  So when he picks up his phone and

5  dials 9, it would select one of the three magicJacks to make

6  the outgoing call.

7  Q.  Okay.  So are you familiar with the room numbers of the

8  Hiltop?

9  A.  Am I familiar with them?

10  Q.  I'll ask it a different way.  Is there a 404, Room 404 at

11  the Hiltop?

12  A.  Yes, there is.

13  Q.  Okay.  So if a caller is in Room 404 and it is connected

14  with magicJack, that call will go out and be connected?

15  A.  Yes.

16        MR. EISENBERG:  Okay.  That's all I have.

17        Thank you, Your Honor.

18        THE COURT:  Is there any redirect?

19                    REDIRECT EXAMINATION

20  BY MR. KOEHLER:

21  Q.  One thing I neglected to ask about.  You mentioned that you

22  had that magicJack account registered to yourself.  Do you

23  recall do you have an address associated to you in Monrovia,

24  California?

25  A.  Yes.  That's where I was first contacted.

1   Q.  And where is the magicJack account registered?  What

2   address is that registered to?

3   A.  436 Grand in Monrovia, California.

4   Q.  Okay.  So when the police reached out, that's where they

5   reached out to?

6   A.  That's where they reached out to.  I had to drive down

7   there to meet with them.  Okay.  And then once they said what

8   phone number, I go, oh, okay, we're, like, 300 miles from where

9   that phone number is.

10              MR. KOEHLER:  Fair enough.  Thank you.

11              THE COURT:  All right.  Sir, thank you for your

12  testimony.  You may step down.  Is the witness excused?

13              MR. KOEHLER:  Yes, Your Honor.

14              THE COURT:  And you are excused.

15              THE WITNESS:  Thank you.

16              THE COURT:  Call your next witness.

17              MS. BROOK:  Thank you, Your Honor.  The government

18  calls Chris LaPoint.

19              THE COURT:  Sir, do come forward and be sworn.

20         CHRISTOPHER LAPOINT, GOVERNMENT'S WITNESS, SWORN

21              THE CLERK:  If you would, state and spell your last

22  name for the record please.

23              THE WITNESS:  Just the last name?

24              THE CLERK:  State your full name and spell the last

25  name.

1          THE WITNESS:  My name is Christopher LaPoint,

2     L-a-p-o-i-n-t.

3          THE COURT:  Sir, for purposes of your testimony, yes,

4     you may remove your mask.  Thank you.

5          MS. BROOK:  Your Honor, may I approach one more time

6     with a Post-it note?

7          THE COURT:  Yes.

8          MS. BROOK:  Thank you.

9                         DIRECT EXAMINATION

10    BY MS. BROOK:

11    Q.  Good afternoon.

12    A.  Hi.

13    Q.  If you can, scootch nice and close to that mic so we make

14    sure everybody in the courtroom can hear you.  Will you please

15    introduce yourself to the jury.

16    A.  Hi.  My name is Chris LaPoint.  I am the manager of the

17    Hiltop Hotel in Bullhead City.  I'm just here to testify just

18    based on what I know about the defendant.

19          THE COURT:  All right.  Thank you.  Ask your next

20    question.

21    Q.  (BY MS. BROOK)  And what we'll do is I'm just going to ask

22    you some bite-size questions and so we can just take care of

23    those one at a time.

24          So, sir, how long have you been the manager of the

25    Hiltop Motel?

1    A.  Ten years.

2    Q.  And as the manager of the hotel, what are your duties?

3    A.  I work every day basically, just oversee operations, the

4    housekeeping, stuff like that.  I can do minor maintenance, but

5    mostly I call my dad and my brother for stuff like that.

6    Q.  For maintenance issues?

7    A.  Yeah.

8    Q.  And are you familiar with the clients, your customers, who

9    stay at the hotel?

10   A.  Yeah.  Because we only rent extended stay, so I'm familiar

11   with all the faces that are there.

12   Q.  Do you live there?

13   A.  Yes, I do.

14   Q.  And have you been living there throughout the ten years

15   you've been a manager?

16   A.  Yes.

17   Q.  You had mentioned that it's a long-term stay motel?

18   A.  Uh-hmm.

19   Q.  What does that mean exactly?

20   A.  Everybody just pays by the month.  There's no contracts or

21   anything.  It's just month-to-month.  Somebody could come in,

22   rent for a month, check out, and then move on.

23   Q.  Your hotel, does it utilize a phone number 928-487-3966?

24   A.  Yes.

25   Q.  And what number is that?  Is that an incoming or an

1   outcoming, if you know?

2   A.  It's actually only an outgoing number.  We have three of

3   those magicJack numbers.  People can call in on those numbers,

4   but it doesn't -- it directs them to the desk when they call

5   in.  But they can call out on those numbers.

6   Q.  As an outgoing number, is it the primary number or the

7   first outgoing phone number that gets utilized?

8   A.  I believe so, yes.

9   Q.  And that particular phone number, has that been

10  in existence and associated with the Hiltop Motel for the ten

11  years that you have been managing it?

12  A.  As far as I know, yes.

13  Q.  In late 2019 do you recall the FBI coming into contact with

14  you to ask you about that phone number?

15  A.  Yes.

16  Q.  And did they have you listen to any messages?

17  A.  Yes.  They had me listen to two recordings.

18  Q.  Before coming in here today, had you had the opportunity to

19  listen to Exhibit No. 6 yesterday?

20  A.  Yes, I did.

21  Q.  Aand did you recognize that as any message you had heard

22  before?

23  A.  Yes.

24  Q.  And what message was that?

25  A.  I don't recall exactly what was said, but it was

1    Mr. Martis's voice calling about either Pelosi or Adam Schiff.

2    I forget which one.  But, yes, I remember the recording.

3           MS. BROOK:  Your Honor, may we go ahead and play

4    Exhibit 6 to ground us in this?

5           THE COURT:  You may.

6       (Exhibit 6 played.)

7    Q.  (BY MS. BROOK)  Do you recognize the speaker in that

8    message?

9    A.  Yes.

10   Q.  And who do you recognize it as?

11   A.  I recognize that voice as being Steve Martis.

12   Q.  Do you here in the courtroom with us today see the Martis

13   that you identify in that message?

14   A.  Yes, I do.

15   Q.  Can you please point to him and identify him by something

16   that he's wearing?

17   A.  He's wearing the mask in the red shirt over there.

18   Q.  How many years --

19          Your Honor, may the record reflect that the witness

20   has identified the defendant?

21          THE COURT:  It may.

22   Q.  (BY MS. BROOK)  How many years total did Mr. Martis, the

23   defendant, live at the Hiltop Motel.

24   A.  I believe it was roughly about three years, maybe three and

25   a half years.

CHRISTOPHER LAPOINT - CROSS

1   Q.  And during those three, three and a half years, did you

2   have occasion to talk to him?

3   A.  Yeah, occasion.

4   Q.  Is that something that happened once a week, once a month?

5   A.  Definitely at least once a month when he would pay his

6   rent, and once, maybe twice more a month if he would collect

7   his mail.

8   Q.  And during those times when you'd talk to him, did you have

9   an opportunity to hear and to understand his voice?

10  A.  Yes, definitely.

11  Q.  Did Mr. -- Did the defendant continue residing at the

12  Hiltop Motel through the beginning of 2021?

13  A.  Yes.

14          MS. BROOK:  May I have one moment?

15          THE COURT:  You may.

16          MS. BROOK:  Your Honor, I don't have any other

17  questions for this witness.

18          THE COURT:  All right.  Thank you.  Mr. Eisenberg.

19                      CROSS-EXAMINATION

20  BY MR. EISENBERG:

21  Q.  Good afternoon, sir.

22  A.  Hi.

23  Q.  I represent Mr. Martis.  Okay?

24          When you listened to Exhibit 6 just now, it's clear

25  that's Mr. Martis's voice, right?

1    A.  Yes.

2    Q.  And when you listened to it when it was played for you by

3    the FBI, there was no doubt in your mind that's Mr. Martis; is

4    that correct?

5    A.  Yes.

6    Q.  And you -- I think you testified that he had been living

7    there at the Hiltop since 2019?

8    A.  Yes.  I believe it may have actually been even mid to late

9    2018, but, yeah, it was roughly three years that he was there.

10   Q.  And during that three-year period of time, he didn't

11   live -- he was there as a continuous tenant?

12   A.  Yes.

13   Q.  So he never moved anywhere?

14   A.  No.

15   Q.  Okay.  And was he resident in a specific room all that

16   time?

17   A.  Yes.

18   Q.  I think it's Room 404?

19   A.  Yeah, that's correct.

20   Q.  And it's 404 can connect through the magicJack system,

21   right?

22   A.  Yes.  All the rooms can.  That way people can call out,

23   call their families and stuff.

24   Q.  Okay.  Was he required to pay for that?

25   A.  No.  The free -- The calls, as long as they're local, are

 1    free.

 2    Q.  When you were interviewed or when you were approached by

 3    the FBI and this call was played for you, were you asked any

 4    other questions about Mr. Martis?

 5    A.  Not that I can recall.

 6    Q.  Okay.  Do you recall whether you were asked about his --

 7    the extent of his residence there?

 8    A.  I believe they asked me about that just if he had been a

 9    long-term tenant.

10    Q.  Right.  And your response to them was the same as it --

11    A.  Yes.  He had been here for a few years.

12    Q.  Okay.  Was Mr. Martis -- You see him now.  Did he look any

13    different back then when he resided with you?

14    A.  No.  About the same.

15    Q.  Same person?

16    A.  Yeah.

17    Q.  Was he confined to a wheelchair?

18    A.  Not a wheelchair.  There was a scooter.  And then

19    occasionally I would see him walk with a cane.

20    Q.  But for the most part, scooter and cane?

21    A.  Scooter and cane, yes.

22    Q.  That's how he got around?

23    A.  Yeah.

24            MR. EISENBERG:  Okay.  Thank you, Your Honor.

25            MS. BROOK:  I don't have any other questions.

```
 1              THE COURT:  I'm sorry?

 2              MS. BROOK:  I don't have any other questions for this

 3      witness.

 4              THE COURT:  All right.  Thank you, sir, for your

 5      testimony, and you may step down.  Is the witness excused?

 6              MS. BROOK:  Yes, Your Honor.  Thank you.

 7              THE COURT:  And you are excused.

 8              All right.  And I'll have the government call its next

 9      witness.

10              MS. BROOK:  Thank you, Your Honor.  The government

11      calls Special Agent Elliott White.

12              THE COURT:  Sir, please come forward and be sworn.

13          ELLIOTT MICHAEL WHITE, GOVERNMENT'S WITNESS, SWORN

14              THE CLERK:  If you would, state your full name and

15      then spell your last name for the record.

16              THE WITNESS:  My name is Elliott Michael White, and

17      the spelling of my last name is W-h-i-t-e.

18              THE COURT:  Sir, for purposes of your testimony, you

19      may remove your mask.

20              THE WITNESS:  Thank you, ma'am.

21              MS. BROOK:  Your Honor, may I approach again with a

22      Post-it?

23              THE COURT:  Yes.

24

25
```

```
1                         DIRECT EXAMINATION

2    BY MS. BROOK:

3    Q.  Good afternoon, sir.

4    A.  Good afternoon.

5    Q.  Would you please introduce yourself to the jury and the

6    Court.

7    A.  Yes.  My name is Elliott White.  I'm a special agent with

8    the FBI.  I work out of Phoenix division in the Lake Havasu

9    City office.

10   Q.  And how long have you been a special agent with the FBI?

11   A.  Since April of 2015.

12   Q.  You had mentioned that you are stationed where exactly?

13   A.  That is in Mohave County at the Lake Havasu City office.

14   Q.  On February 4th of 2020, did you participate in a search

15   warrant that was executed at the Hiltop Motel in Bullhead?

16   A.  Yes.

17   Q.  What room was that search warrant executed in?

18   A.  I'd have to remember.  I don't remember the room number.

19        MS. BROOK:  Your Honor, may we put on the overhead for

20   this witness -- I apologize -- Government's Exhibit marked as

21   34 not yet admitted?

22        THE COURT:  Yes.

23        MR. KOEHLER:  On the computer at counsel table.

24   Q.  (BY MS. BROOK)  Do you see that?

25   A.  It's not up yet.
```

1          MS. BROOK:  Okay.

2          MR. KOEHLER:  It's at counsel table on the computer.

3     The TV monitors are set to the document camera right now.

4          MS. BROOK:  Oh, I think we need to transfer it to your

5     control.

6          THE CLERK:  Correct.  But it will be visible to the

7     jury from counsel table.

8     Q.  (BY MS. BROOK)  Do you have a folder before you that's

9     folder number 34?

10    A.  Are these over here?

11    Q.  Yeah.  Can you open that and tell me if you recognize

12    what's in it?

13    A.  Okay.  Yes, I recognize these.  It's a photo.

14    Q.  And what do you recognize it as?

15    A.  It's the room number of the room that we did a search on.

16    It was Room 404.

17         MS. BROOK:  Your Honor, the government also moves

18    to admit Exhibit No. 34 to publish to the jury.

19         THE COURT:  Yes, it may be -- I'm sorry.  Mr. --

20         MR. EISENBERG:  No objection, Your Honor.

21         THE COURT:  It may be admitted, and it may be

22    published.

23         THE CLERK:  On the document camera.

24         MS. BROOK:  You can do it either way.  Great.

25    Q.  (BY MS. BROOK)  So on February 4th of 2020, did you go into

1    that room?

2    A.  Yes.

3    Q.  And did you do so pursuant to a search warrant that had

4    been signed by a federal magistrate judge?

5    A.  Yes, that's correct.

6    Q.  And did you do a search?

7    A.  I did.

8    Q.  If I can direct your attention to Government's Exhibit No.

9    32, the envelope there, do you recognize that?

10   A.  Yes, I do.  This is a photo that was taken during the

11   search of the interior of the room.

12   Q.  404?

13   A.  Yes, Room 404.

14   Q.  And does that photo fairly and accurately reflect what the

15   room looked like that morning when you went in to search?

16   A.  Yes, it does.

17          MS. BROOK:  Your Honor, the government moves to admit

18   Government Exhibit No. 32.

19          MR. EISENBERG:  No objection, Your Honor.

20          THE COURT:  It may be admitted.

21          MS. BROOK:  May we publish?

22          THE COURT:  It may be published.

23   Q.  (BY MS. BROOK)  While executing this search warrant, did

24   you find anything of significance in your investigation?

25   A.  Yes, I did.

1   Q.  And what was that?

2   A.  I located an envelope with some writing on it on the table

3   that is shown there in that exhibit.

4   Q.  And maybe you can go ahead -- I think it works -- that you

5   can point to where it was located, and maybe put a little X or

6   a circle on the screen for us to know what you're talking

7   about.

8   A.  Yeah.  Here's the circle.  This is the table where it was

9   located.

10  Q.  Okay.  Your Honor, can we clear that?

11           And I'm going to have you look at Exhibit No. 33

12  before you.  Do you recognize that?

13  A.  Yes.  This is the envelope that I mentioned.

14  Q.  Okay.  And is that the envelope that you found inside the

15  room that we've been looking at in 404?

16  A.  Yes, that's correct.

17  Q.  Your Honor, the government --

18           Does it fairly and accurately represent the envelope

19  as you saw it?

20  A.  It does.

21           MS. BROOK:  Your Honor, the government moves to admit

22  Exhibit No. 33.

23           MR. EISENBERG:  Could I see the exhibit on the screen,

24  Your Honor, on our screen?

25           THE COURT:  Not just yet.

1          MS. BROOK:  May I?

2          MR. EISENBERG:  Okay.  No objection, Your Honor.

3    Thank you.

4          THE COURT:  What was that exhibit number again?  33?

5          MR. EISENBERG:  33.

6          THE COURT:  It may be admitted.

7          MS. BROOK:  Thank you.  May we publish?

8          THE COURT:  It may be published.

9    Q.  (BY MS. BROOK)  What was of value in this exhibit?

10   A.  Of value to the investigation was the phone numbers and the

11   names of the representatives on the envelope.

12   Q.  When you were there that morning to execute the search

13   warrant, did you come into contact and see Steven Martis?

14   A.  I did see him when he exited the room.

15   Q.  And where was it that you saw him?

16   A.  We were waiting to do the search until he had left the

17   room, so I saw him when he left the room outside.

18   Q.  And here with us in the courtroom today do you recognize

19   him?

20   A.  Yes, I do.

21   Q.  Can you point to him and identify something that he's

22   wearing?

23   A.  Yes.  He's the gentleman over here, and he's wearing a red

24   shirt.

25          MS. BROOK:  Your Honor, may the record reflect that

WHITE - DIRECT

1    the witness has identified the defendant?

2            THE COURT:  It may.

3            MS. BROOK:  May I have one moment?

4            THE COURT:  Yes.

5    Q.  (BY MS. BROOK)  Your Honor -- Your Honor, just ever so

6    briefly, do you have Exhibit 30 up there?

7    A.  Yes, ma'am.

8    Q.  And can you open it and tell me if you recognize what it

9    is?

10   A.  Yes, I recognize it.

11   Q.  What is it?

12   A.  It's the same letter as we were just referring to.

13   Q.  And is it the original, or is it a picture?

14   A.  It is a picture.

15           MS. BROOK:  Okay.  Your Honor, the government's going

16   to move to admit that exhibit as well.  I think it correlates

17   to an actual piece of paper that we have here that's just a

18   stand-in.  So there's a physical exhibit.  We're going to move

19   to admit that too.

20           THE COURT:  Mr. Eisenberg.

21           MR. EISENBERG:  Excuse me, Your Honor.

22      (Counsel confer off the record.)

23           MR. EISENBERG:  No objection, Your Honor.

24           THE COURT:  Exhibit 30 may be admitted.

25           MS. BROOK:  I have no further questions.

```
 1              THE COURT:  Do you wish to publish?

 2              MS. BROOK:  Yes.

 3              THE COURT:  For clarification, what is the distinction

 4    between the two exhibits?

 5              MS. BROOK:  So one is a close-up picture of this

 6    envelope in the room, and the other, I believe --

 7              MR. KOEHLER:  Is the physical envelope.

 8              MS. BROOK:  It's the physical one.

 9              So the other is the actual physical exhibit, the

10    envelope.  The picture that we have that correlates to 30 that

11    he's looking at is a picture of the physical, and the physical

12    is over here.

13              THE COURT:  All right.

14              MS. BROOK:  Thank you.

15              THE COURT:  Nothing further?

16              MS. BROOK:  Nothing further.

17              THE COURT:  All right.  Mr. Eisenberg.

18              MR. EISENBERG:  Yes, Your Honor.  May the courtroom

19    deputy show the agent or place before the agent Defense

20    Exhibits 101 -- I'm sorry.  I should have reminded you -- 102,

21    103, 104, and 107.

22              MS. BROOK:  Your Honor, we don't have any defense

23    exhibits.

24              MR. EISENBERG:  I delivered them to your office on

25    Friday.
```

1            THE COURT:  Well, let me see counsel very briefly at

2    side bar.

3        (Bench conference on the record as follows:)

4            THE COURT:  You haven't seen these exhibits?

5            MS. BROOK:  We haven't seen them.

6            THE COURT:  Do you know what the exhibits are?

7            MR. EISENBERG:  Yes, I do.  They're items seized

8    during the search.

9            THE COURT:  All right.  And so by my -- by my look, we

10   have only one witness remaining.  Should we take our afternoon

11   break?  They should have an opportunity to look at the

12   exhibits.  And I'm going to have them come in, the jurors

13   report to be promptly here at 9:00.

14           MS. BROOK:  Okay.  Thank you.

15           MR. EISENBERG:  Okay.

16           THE COURT:  Make sure that they --

17       (End of bench conference.)

18           THE COURT:  All right.  Members of the jury, I think

19   we are at a point where it's sort of a natural stopping point

20   because the government does have a right to see what is going

21   to be produced next.  And we will make sure that that happens

22   this evening.

23           What that means is we will conclude the trial for the

24   day.

25           And I would like to have you here present and ready to

| | |
|---|---|
| 1 | go in the jury room so that you can all promptly come in at |
| 2 | 9:00 a.m.  And, again, I'm going to give you an admonishment. |
| 3 | As I indicated before this trial started, you as |
| 4 | jurors will decide this case based solely on the evidence |
| 5 | presented in this courtroom.  And this means that after you |
| 6 | leave here for the night, you must not conduct any independent |
| 7 | research about this case, the matters in the case, the legal |
| 8 | issues in the case, or the individuals or other entities |
| 9 | involved in the case. |
| 10 | This is important for the same reason that jurors have |
| 11 | long been instructed to limit their exposure to traditional |
| 12 | forms of media information such as television and newspapers. |
| 13 | And you also must not communicate with anyone in any way about |
| 14 | this case.  And you must ignore any information about the case |
| 15 | that you might see while browsing the Internet or your social |
| 16 | media feeds. |
| 17 | This, again, includes family members, employers, and |
| 18 | the like.  You can simply just say that you're in the middle of |
| 19 | a trial, and you were told not to discuss anything that you |
| 20 | have heard or seen so far.  And that is so that you continue to |
| 21 | keep an open mind because we are not finished with the |
| 22 | presentment of evidence and witnesses. |
| 23 | And so please adhere to the admonishment and the |
| 24 | seriousness of the admonishment, which, again, if anyone's |
| 25 | exposed to anything overnight, you are to promptly report it to |

1    the Court.

2            And so with that, I ask that you again be ready to go

3    in the jury room so that we can all convene at 9:00 a.m.  And

4    with that I wish you all a very good evening.  Please all rise

5    for the jury.

6        (The jury exited the courtroom at 4:23 p.m.)

7            THE COURT:  Now, again, I'm going to ask that those

8    who are in the courtroom give the jurors ample time to exit the

9    building, get out the elevator, and leave.  And so if you would

10   just stay for a moment.

11           I'm going to confirm -- and I forgot to do this before

12   we left -- I think we are still in this courtroom for the

13   duration of the trial.

14           And as I mentioned, it sounds like or it looks like by

15   what I see on the witness list is that we have only one

16   government witness remaining.

17           MS. BROOK:  That's correct.

18           THE COURT:  And that we have potentially only two

19   witnesses on the defendant's witness list.  Is that correct?

20           MR. EISENBERG:  That's correct.

21           THE COURT:  And so what I'm going to do is ask counsel

22   to be present at a quarter to 9:00.  I'll have for you prepared

23   the final jury instructions on the table.  And so I'm going to

24   ask you to go through those and make sure that they are

25   accurate and they are in the order that you wish them to be

1    read, because I suspect we'll go along quite quickly in the

2    morning.

3              All right.  Is there anything from you, Mr. Eisenberg?

4              MR. EISENBERG:  No, Your Honor.  Thank you.

5              THE COURT:  Anything from the government?

6              MR. KOEHLER:  No, Your Honor.

7              THE COURT:  All right.  And then we will stand in

8    recess.  Go ahead and carry on.  I'm going to gather up my

9    belongings as well.

10             MS. BROOK:  Thank you, Your Honor.

11        (Proceedings recessed at 4:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **C E R T I F I C A T E**

2

3              I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 4th day of May, 2022.

12

13

14                                       s/Linda Schroeder
                                 Linda Schroeder, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25

                       **UNITED STATES DISTRICT COURT**