UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-21-8043-PCT-DJH |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 17, 2021 |
| Steven Arthur Martis, | ) | 8:48 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 2

(Pages 198 through 339, inclusive.)

APPEARANCES:
For the Government:
         U.S. Attorney's Office
         By: KRISTEN BROOK, ESQ.
            JOSEPH EDWARD KOEHLER, ESQ.
         40 North Central Avenue, Suite 1800
         Phoenix, AZ  85004

For the Defendant Martis:
         David Eisenberg, PLC
         By: DAVID S. EISENBERG, ESQ.
         3550 North Central Avenue, Suite 1155
         Phoenix, AZ  85012


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                            INDEX

 2   SUMMARY OF COURT PROCEEDINGS                         PAGE:

 3   Proceedings Outside the Presence of the Jury          268
     Proceedings Outside the Presence of the Jury          308
 4   Final Jury Instructions                               310
     Closing Arguments
 5              Government                                 321
               Defendant                                  328
 6              Government                                 332

 7                     INDEX OF WITNESSES

 8   WITNESSES FOR THE      Direct    Cross    Redirect
     GOVERNMENT:
 9
     WHITE, Elliott Michael           210      217
10   FERREIRA, Donald Avery   218     238      266

11

12   WITNESSES FOR THE      Direct    Cross    Redirect
     DEFENDANT:
13
     MARTIS, Steven           278     298      306
14

15                     INDEX OF EXHIBITS

16   EXHIBIT NO.:       DESCRIPTION:              RECEIVED:

17        7   AS voicemail recording 3-28-2020       302
         12   House Telecom Records NP               229
18       13   House Telecom Records AS               229
         14   YMAX/MagicJack records 01/2019-03/2020 229
19       15   YMAX/MagicJack records 03/2020-02/2021 229
         18   Martis interview recording clip 2      303
20       20   Martis interview recording clip 4      224
         21   Martis interview recording clip 5      225
21       22   Martis interview recording clip 6      226
         23   Martis interview recording clip 7      226
22       24   Martis interview recording clip 8      227
         25   Martis interview recording clip 9      227
23       26   Martis interview recording clip 10     228
         27   Martis interview recording clip 11     228
24

25
```

UNITED STATES DISTRICT COURT

1          (Proceedings outside the presence of the jury:)

2              THE COURT:  Please be seated.

3              I think placed before you -- And let me just say for

4     the record that we have only counsel.  Mr. Martis is not yet in

5     the courtroom.  Do you want to proceed without him?

6              MR. EISENBERG:  Your Honor, he's coming, but if the

7     Court wants to proceed, that's all right.

8              THE COURT:  All right.  So let's just together take a

9     look at these final jury instructions.

10             And let me know if they are in the order in which you

11    want them to be read.  The first is duty of the jury to find

12    facts and follow law.

13             Charge against defendant not evidence.

14             Defendant's decision not to testify, and then there's

15    a defendant's decision to testify.

16             I suspect, Mr. Eisenberg, you're still making that

17    determination?

18             MR. EISENBERG:  No, Your Honor.  I believe he will

19    testify.

20             THE COURT:  Okay.  So I will remove at this time the

21    decision not to testify.

22             Reasonable doubt defined.

23             What is evidence.  What is not evidence.

24             Direct and circumstantial evidence.

25             Credibility of witness.

```
 1              Activities not charged -- we still need this?
 2              MR. KOEHLER:  We believe so, Your Honor, yes.
 3              THE COURT:  All right.  Separate consideration for
 4    multiple counts, single defendant.
 5              On or about defined.
 6              We still have in other crimes, wrongs, or acts of the
 7    defendant.  I'm assuming this relates to upcoming testimony?
 8    We will need this still?  This is the other acts.
 9              MR. KOEHLER:  I'm sorry.  What number are you on or
10    page number?
11              THE COURT:  Page 14, other crimes, wrongs, or acts of
12    defendant.
13              MR. KOEHLER:  Yeah.  So there's a slight difference
14    between 3.10 and 4.3, and we would ask for both.  4.3 would
15    pertain more specifically to the 2019 calls that are not
16    charged, and then the activities not charged is a more general
17    instruction that it doesn't matter whether it's that or other
18    statements inside those calls, those are not part of the
19    charges.
20              THE COURT:  Is that in -- Did you include that in your
21    instructions?  I don't have it here.
22              MR. KOEHLER:  No.  I'm talking about the instruction
23    on Page 11 and Page 14.  There's a slight difference between
24    the two.  So we would ask that both of those be included.
25              THE COURT:  Oh, I see.  Okay.  So -- Right.  They're
```

1    different.

2              MR. KOEHLER:  Yes.

3              THE COURT:  So 11 and 14 will remain.

4              MR. KOEHLER:  Thank you.

5              THE COURT:  I'm sorry.  Page 11 and Page 14, the

6    instruction other crimes, wrongs, or acts will remain.

7              Duty to deliberate.

8              Consideration of evidence.

9              Use of notes.

10             Jury consideration of punishment.

11             Verdict form.

12             Did we -- We have the verdict form printed out and

13   ready, right?

14             Okay.  Communication with Court.

15             And then the substantive 18 U.S.C. 875(c) instruction

16   that refers to Counts 1, 2, and 3.

17             Is everyone satisfied with that?

18             MR. KOEHLER:  Yes, Your Honor.  We think it would be

19   appropriate to give that First Amendment instruction again, the

20   one that was given at the beginning of the trial.

21             THE COURT:  Where would you like that to be given?

22   Before the final --

23             MR. KOEHLER:  Yes, Your Honor, right before the Page

24   22 instruction.

25             THE COURT:  So this will be -- The First Amendment

1    instruction will be Page 22, and the substantive instruction

2    will be Page 23.

3            MR. KOEHLER:  That's perfect.  Thank you.

4            MR. EISENBERG:  I have no objection to that, Your

5    Honor.

6            THE COURT:  All right.  Thank you.

7            MR. KOEHLER:  Mr. Eisenberg made a point that I think

8    might be helpful on the verdict form that it might be

9    confusing, because it just says Count 1 threats, Count 2

10   threats, Count 3 threats.  Perhaps after the threats in

11   interstate commerce put a dash and then the date of the threat

12   for each one to distinguish between the three different counts.

13   Is that what you were talking about, Mr. Eisenberg?

14           MR. EISENBERG:  Yes, Your Honor.  It might be easier

15   for the jury to lock in on this if they had a date with respect

16   to the count.

17           THE COURT:  Did you send over the template for this?

18           MR. KOEHLER:  Yes, we did.

19           THE COURT:  Okay.  Let me make sure we have those

20   particular dates.  Count 1 the date is?

21           MR. KOEHLER:  January 20th, 2020.

22           THE COURT:  Count 2?

23           MR. KOEHLER:  March 27, 2020.

24           THE COURT:  March 27, 2020?

25           MR. KOEHLER:  Correct.

1          THE COURT:  Count 3?

2          MR. KOEHLER:  January 17, 2021.

3          THE COURT:  Okay.  We will make that adjustment in the

4     verdict form.  All right.  And then -- Now, let me just -- Let

5     me ask you about --

6          I still have your in course of trial instructions

7     stipulated facts.  Are we still going to receive those

8     stipulated facts?

9          MR. KOEHLER:  Yes, Your Honor.  In fact, we're going

10    to read the stipulations during Agent Ferreira's testimony

11    today.

12          THE COURT:  Okay.

13          MR. KOEHLER:  I think the operative stipulation that

14    we'll be reading to the jury is the one about the phone

15    numbers.

16          THE COURT:  Okay.

17          MR. KOEHLER:  And I'll probably shortcut the

18    stipulation on the phone records and just note that the parties

19    have stipulated to their admissibility and then move to admit

20    them.

21          THE COURT:  Do you agree with that, Mr. Eisenberg?

22          MR. EISENBERG:  Yes, Your Honor.  There is a list of

23    stipulations that we've filed with the Court.  They're all

24    satisfactory with me.  There are also two exhibits that the

25    government seeks to enter.  They are YMAX records.  And I think

1      the stipulation pertains to those records.  I don't have any

2      objection to those records coming in as well.  They're two -- I

3      think it's Exhibits 13 and 14.

4              So I'll state for the record at this point I don't

5      have any objection.  And, Your Honor, may the record reflect

6      that Mr. Martis is here, and he has been here for the last

7      approximately four to five minutes.

8              THE COURT:  All right.  Okay.  So -- Well, we'll wait

9      for those exhibits to be moved for admission, and then we can

10     simply just put that on the record.

11              All right.  So I have the stipulated facts in course

12     of trial that I can read after those stipulated facts are

13     entered.

14              I have also and I notice that you had proposed the

15     recordings instruction about the recording being the evidence

16     and not the transcript.  We did not use that.  And I don't

17     necessarily think at this juncture it needs to be used.

18              And then the -- you also proposed the possible use of

19     the other acts of defendant in course of jury trial

20     instruction.  Are we going to use that then?

21              MR. KOEHLER:  It may come up during Mr. Martis's

22     cross-examination.

23              THE COURT:  All right.  And so I guess I'll just look

24     for the parties to determine whether or not the Court needs to

25     read the other acts instruction upon his testimony.

1          All right.  Is there anything other than that?  You

2     had also proposed -- And this is the first I had seen, and

3     maybe this is a new modified jury instruction.  There is a

4     proposed instruction 2.1, which is at the beginning of each day

5     of the case basically it states, as I reminded you yesterday

6     and continue to emphasize to you today, it is important that

7     you decide this case based solely on the evidence and the law.

8          So I guess it basically asks to ensure fairness, I

9     will now ask each of you whether you've learned about or shared

10    any information about the case.

11         Do you wish me to read that?

12         MR. KOEHLER:  Ordinarily I wouldn't ask for that, Your

13    Honor.  But this morning on the way in, I happened to be

14    listening to the radio and heard the radio host talking about

15    the FBI being tasked through the counterterrorism division to

16    track parents who are upset with their school boards.  And I

17    don't know what the communication was through the

18    counterterrorism division.  But certainly there are people on

19    the radio talking about it and complaining about it.

20         And so to the extent jurors might have been exposed to

21    something like that either on TV or on the radio, I think it

22    would be appropriate to ask that question of them this morning

23    to make sure that nobody has been tainted by that information.

24         THE COURT:  All right.  We will do that.  Okay.

25         Anything other than that to be discussed?

1        MR. KOEHLER:  No, Your Honor.  Thank you.

2        THE COURT:  And I guess let me just ask you I don't

3    necessarily think it matters if your witness is on the stand

4    when I ask the question unless there's an objection to that.

5        MR. EISENBERG:  Is Your Honor speaking of asking the

6    question of the witness?

7        THE COURT:  No.  When I ask the jurors about whether

8    or not they've heard anything or seen anything that might have

9    affected their determination, if the witness -- because I was

10   going to have the witness come in and be ready to go on the

11   stand, the testifying witness.

12       MR. EISENBERG:  Okay.

13       MR. KOEHLER:  We agree.

14       THE COURT:  I'm sorry?

15       MR. KOEHLER:  We agree.

16       THE COURT:  You agree to what?

17       MR. KOEHLER:  That that's appropriate to do it that

18   way.

19       THE COURT:  Okay.  So he can be on the stand when I

20   ask --

21       MR. EISENBERG:  I don't have any problem with that

22   either, Your Honor.

23       THE COURT:  All right.  Okay.  So are we ready then?

24       MR. EISENBERG:  I would like one moment, Your Honor,

25   to use the restroom.

1          THE COURT:  Yes.  All right.

2          MR. EISENBERG:  Also, Your Honor, Mr. Martis, as you

3     can see, is basically in a wheelchair.  I sent an e-mail to

4     chambers asking if there is a way where if he -- how's he going

5     to get up to the witness stand?  Because I'm not sure there's a

6     ramp in this courtroom.

7          I think I can help him, maybe with the marshals,

8     assist him up the stairs.

9          MR. KOEHLER:  Your Honor, perhaps we could take a very

10    short break to get him on and off the stand before and after?

11         MR. EISENBERG:  Well, it's a question of getting him

12    up there.

13         THE COURT:  We do have the ability to have a ramp.  I

14    don't know how often it's been used.  But we'll see if it's

15    operable, and we'll try to work that out.  If not, what we'll

16    do is we'll take a break for him to come up, be assisted up,

17    and place him in the witness chair.

18         MR. EISENBERG:  I think he can make it with assistance

19    if we just lift him up.  But I have seen that ramp used in

20    another courtroom, and I just can't remember when.  But it was

21    recently.  There was a ramp that was used.

22         THE COURT:  All right.  So I think this is equipped

23    with that ramp, and so we're going to see if we're able to

24    operate it today.

25         MR. EISENBERG:  Okay.

1          THE COURT:  All right.  So you can have about five

2     minutes?

3          MR. EISENBERG:  That's plenty.  Thank you.

4     (Proceedings recessed from 9:02 a.m. until 9:08 a.m.)

5          THE COURT:  Counsel, are we ready?

6          MR. EISENBERG:  Yes, Your Honor.

7     (The jury returned to the courtroom at 9:11 a.m.)

8          THE COURT:  Good morning, members of the jury.  I hope

9     you had a pleasant evening and a pleasant morning so far.  And

10     as I mentioned to you yesterday and I continue to emphasize

11     today and throughout the trial, it is important that you decide

12     this case based solely on the evidence and the law presented

13     here.  So you must not learn about any additional information

14     about this case from sources outside of the courtroom.  To

15     ensure fairness to all parties in this trial, I will now ask

16     each of you whether you have learned about or shared any

17     information about this case outside of this courtroom, even if

18     it was accidental.

19          Now, if you think you might have done so, please do

20     let me know by either raising your hand.  And I see right now

21     that there is no indication of hands raised.  But, in any

22     event, if any -- at any time during the course of the trial you

23     wish to raise something to my attention, please let me know.

24     You can let Liliana know that you wish to talk to me about

25     maybe some information that you might have inadvertently heard

1    or stumbled onto.  It is important.

2            And I also do appreciate you adhering to the

3    admonition that you were given at the beginning of the trial

4    and at the end of the day.

5            So with that, we will continue with the trial.

6            And, sir, I do remind you you are under oath.

7            And, Mr. Eisenberg, you may continue.

8            MR. EISENBERG:  Thank you, Your Honor.

9            Before I do, Liliana, do you have the -- may I

10   approach, Your Honor?

11           THE COURT:  Yes.

12           MR. EISENBERG:  May I proceed, Your Honor?

13           THE COURT:  Yes.

14   ELLIOTT MICHAEL WHITE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

15                       CROSS-EXAMINATION

16   BY MR. EISENBERG:

17   Q.  Good morning, Agent White.

18   A.  Good morning, sir.

19   Q.  Yesterday you were testifying about the search that was

20   conducted at the Hiltop Hotel in Bullhead City.  Do you recall?

21   A.  Yes, sir.

22   Q.  And that was a search that was done in a specific room.  Is

23   that correct?

24   A.  That's correct.

25   Q.  And do you remember the room number?

1   A.  Yes.  It was 404.

2   Q.  And that was a room that you came to learn was inhabited by

3   Mr. Martis; is that correct?

4   A.  That's correct, sir.

5   Q.  Did you see Mr. Martis at the time of the search?

6   A.  Not in the room.  When he exited, sir.

7   Q.  When did you see him?

8   A.  When he exited the room, sir.

9   Q.  Was he asked to leave the room?

10  A.  When we did the search, he was going to the lobby at the

11  time.

12  Q.  I see.  And so he didn't come back while the search was

13  being undertaken?

14  A.  That's correct.

15  Q.  Which means he didn't interfere with the search?

16  A.  Of course.

17  Q.  And he wasn't restrained in any way, was he?

18  A.  No, sir.

19  Q.  Okay.  How many agents were present to do the search?

20  A.  I'd have to -- I can't recall exactly, but there was

21  probably five agents that participated in the search at some

22  point.

23  Q.  And were you in charge of the search?

24  A.  Yes, sir.

25  Q.  Were you in charge of collecting the items for the -- from

WHITE - CROSS

1    the search?

2    A.  With inventorying the items, and then they would have been,

3    at the end of the search, they were turned over to the case

4    agent, Agent Ferreira.

5    Q.  And the search consisted of going into Room 404.  Can you

6    describe the room itself.

7    A.  Yes.  It's a -- 404 consisted of a single room, kind of

8    like a studio with an attached bathroom and closet.

9    Q.  And a closet.  So it's basically one room, a closet, and a

10   bathroom?

11   A.  Yes, sir.

12   Q.  Okay.  And then during the course of the search, you seized

13   some items; is that correct?

14   A.  Yes, sir.

15   Q.  Among the items that were seized was a cell telephone.  Do

16   you recall?

17   A.  Yes, sir.

18   Q.  And was that cell telephone examined for contents?

19   A.  That wasn't part of my role there, so after it was turned

20   over, I don't know exactly what was done with it.

21   Q.  Okay.  So you don't know the results?

22   A.  That's correct.

23   Q.  Normally if there are results, though, or even if there

24   aren't results, they're reported back to whoever is in charge

25   of the case; is that correct?

WHITE - CROSS

1    A.  Right.  The case agent would know that.  But since I was

2    just participating in that search, I wouldn't know.

3    Q.  All right.  I understand.  But there was a cell phone that

4    was found?

5    A.  Yes, sir.

6    Q.  There were other things that were found, documentation, for

7    example?

8    A.  Yes, sir.

9    Q.  You're going to have -- I think you have by now some

10   folders up there or blue backed document -- They're exhibits?

11   A.  Yes, sir, there are.

12   Q.  Okay.  I'm going to ask you whether, if you look through

13   those, were those items among the items that were taken during

14   the search?

15   A.  So these are photographs that were taken during the search

16   of items inside of the Room 404, but they were not items that

17   were collected as physical evidence items.

18   Q.  So, in other words, those are photographs of what was

19   collected?

20   A.  No, sir.  Those are photographs of items that were in the

21   room but were not collected as evidence items.  They were just

22   photographs of items taken in the room.

23   Q.  I see.  Okay.  With respect to each one of them, let's go

24   through them then in order.  Exhibit 101, do you recognize that

25   as being a photograph of something that was in the room?

WHITE - CROSS

1    A.  Yes, sir.

2    Q.  Okay.  And is that a true and accurate representation of

3    the item that was photographed?

4    A.  Yes, sir.

5    Q.  I'm going to ask you the same type of question for the next

6    several documents.  So let's go to 102, same question.  Is that

7    a photograph of an item that was seen during the search?

8    A.  That's correct, yes, sir.

9    Q.  And is it a true and accurate representation?

10   A.  Yes, sir.

11   Q.  Going to 103, same two questions.  Was that -- Excuse me.

12   Is that a photograph of an item that was seen during the

13   search?

14   A.  Yes, sir.

15   Q.  And is it a fair and accurate representation of the item

16   itself?

17   A.  Yes, sir.

18   Q.  With respect to 104, again, same two questions.  Is that a

19   photograph of an item that was seen during the search?

20   A.  Yes, sir.

21   Q.  And is it a fair and accurate representation?

22   A.  It is.

23   Q.  Okay.  You anticipate me, but --

24   A.  Sorry, sir.

25   Q.  No.  That's okay.  And 106, again, the answers would be yes

WHITE - CROSS

1   to both questions?

2   A.  Yes, sir.

3   Q.  All right.  So, in other words, it's a fair and accurate

4   representation of something that was seen during the search?

5   A.  That is correct.

6   Q.  And item 107 is the last item.  Also a fair and accurate

7   representation of what was seen during the search?

8   A.  That is correct.

9   Q.  Agent, do you recall where these items were seen at the

10  time of the search?

11  A.  No.  I wouldn't be able -- Other than just generally in the

12  room, I couldn't tell you the exact location specific --

13  with -- you know, specifically in the room, because unless the

14  item is actually collected, we don't mark where the item was.

15  Q.  Okay.  I understand.  But safe to say they were within the

16  premises of 404?

17  A.  That's correct.

18  Q.  Among the items that you didn't find -- Now, not found,

19  weapons, firearms?  They were not found?  You did not find a

20  firearm, did you?

21  A.  I did not find a full firearm.

22  Q.  You found something called a receiver?

23  A.  So there was two lower receivers that were found inside the

24  place.

25  Q.  And the receivers were determined by ATF not to be

WHITE - CROSS

1    firearms; is that correct?

2    A.  That I don't know.

3    Q.  You didn't find any knives?

4    A.  If there were knives, I don't recall, no, sir.

5    Q.  You didn't find any explosives?

6    A.  No, sir.

7    Q.  And you didn't find any drugs, illegal drugs?

8    A.  Not -- No, sir.

9             MR. EISENBERG:  Thank you.  That's all I have, Your

10   Honor.

11            THE COURT:  Are you moving to admit those exhibits?

12            MR. EISENBERG:  Oh, I'm sorry.  Sorry.  Move to admit

13   Exhibits 101, 102, 103, 104, 105, and 107.  Thank you, Your

14   Honor.

15            THE COURT:  My recollection of the testimony you did

16   not -- you did not show the agent 105.  I only have 104, 106,

17   and 107.

18            MR. EISENBERG:  Yes.  101, 102, 103, 104, 106, and

19   107.

20            THE COURT:  And is there an objection?

21            MS. BROOK:  Yes, Your Honor.  To all except for 106,

22   which is already admitted, the rest the government objects to

23   relevance to these random pieces of paper.

24            MR. EISENBERG:  Well, that would be made relevant,

25   Your Honor, at the time of Mr. Martis's testimony.

WHITE - REDIRECT

1           THE COURT:  You can then, with the exception of 106,

2    do you wish it to be published, 106, to the jury?

3           MR. EISENBERG:  At this time, no, it isn't necessary,

4    Your Honor, but during Mr. Martis's testimony I would do it; I

5    would seek that it be published.

6           THE COURT:  So at this point, Mr. Eisenberg, I'll have

7    you move again for the admission of those Exhibits 101, 102,

8    103, 104, and 107.

9           MR. EISENBERG:  All right, Your Honor.

10           THE COURT:  All right.  Anything further?

11           MR. EISENBERG:  No, Your Honor.

12           THE COURT:  All right.  Redirect.

13           MS. BROOK:  Thank you, Your Honor.

14                        REDIRECT EXAMINATION

15   BY MS. BROOK:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Sir, what is a lower receiver?

19   A.  The lower receiver is the lower portion of a firearm.

20   Usually --

21   Q.  Go ahead.

22   A.  Usually in this case like a rifle firearm.

23   Q.  And by lower portion, can you describe for us what that

24   means.

25   A.  Yes.  It's the portion that would contain the magazine,

FERREIRA - DIRECT

1    where you'd insert the magazine and the trigger assembly.

2    Q.  So it includes the magazine and the trigger assembly, or

3    that's what you put into it?

4    A.  No.  You would insert the magazine into the lower portion,

5    into the lower receiver.

6           MS. BROOK:  One moment please.

7           I don't have any further questions.  Thank you.

8           THE WITNESS:  Thank you.

9           THE COURT:  Thank you.  Sir, thank you.  And is the

10   witness excused?

11          MS. BROOK:  Yes, Your Honor.

12          THE COURT:  All right.  You may step down.  Thank you.

13          THE WITNESS:  Thank you.

14          THE COURT:  Call your next witness.

15          MR. KOEHLER:  The United States calls Donald Ferreira.

16      DONALD AVERY FERREIRA, GOVERNMENT'S WITNESS, SWORN

17          THE CLERK:  If you could, please state your full name

18   and spell your last name for us.

19          THE WITNESS:  Donald Avery Ferreira, F, as in Frank,

20   e-r-r-e-i-r-a.

21          THE COURT:  And again, sir, you may remove your mask

22   for your purposes of testimony.

23          THE WITNESS:  Thank you.

24

25

```
 1                    DIRECT EXAMINATION

 2    BY MR. KOEHLER:

 3    Q.  Good morning, Agent Ferreira.

 4    A.  Good morning.

 5    Q.  Could you please introduce yourself to the Court and the

 6    jury.

 7    A.  Sure.  My name is Donald Ferreira.  I'm a special

 8    agent with the FBI out of the Phoenix division.

 9    Q.  How long have you worked for the FBI?

10    A.  Just over six years.

11    Q.  And to what FBI office are you assigned presently?

12    A.  I'm currently with the Lake Havasu City office.

13    Q.  And just to orient the jury, where is Lake Havasu City

14    located?

15    A.  We are located on the border of California in Arizona.

16    Q.  Is that along the Colorado River?

17    A.  It is.

18    Q.  And is that up river or down river from Bullhead City?

19    A.  It's down river.

20            THE COURT:  And, Mr. Koehler, again I'm going to

21    remind you to speak into the microphone.

22            MR. KOEHLER:  Yes.

23            THE COURT:  Thank you.

24    Q.  (BY MR. KOEHLER)  Can you tell us what you did before

25    joining the FBI in terms of your professional career.
```

FERREIRA - DIRECT

1    A.  Sure.  I was a marine for eight years.  After -- in the

2    Marine Corps infantry.  After getting out of the Marine Corps,

3    I went to college and as well as worked for State Farm.

4            After that I worked as a security contractor for a

5    company called Triple Canopy overseas in Iraq protecting

6    senators and congressmen overseas.  And then I joined the FBI.

7    Q.  Are you the case agent for this case involving Mr. Martis?

8    A.  I am.

9    Q.  When did you get involved in the case?

10   A.  I received a lead in this case.

11   Q.  When was that?

12   A.  My recollection of the date that I received this case --

13   One second.  Let me think about that.

14   Q.  You can be approximate.

15   A.  Approximately January, 2019.

16   Q.  January, 2020?

17   A.  Or 2020.  I apologize.  Yes, 2020.

18   Q.  And when you first came into the case, at what stage was

19   the investigation?

20   A.  What do you mean by that?

21   Q.  Where was the -- Where was the investigation heading at

22   that point?

23   A.  At the time that I received the investigation, we had

24   identified an individual, Mr. Richard LaPoint, through working

25   with the Capitol Police.  And after an interview with him, we

1   identified Mr. Martis.

2   Q.  Okay.  So let's talk about that real quick.  Were you

3   involved in the interview of Mr. LaPoint?

4   A.  I was.

5   Q.  And did you play the recorded phone message that was the

6   subject of the investigation at the time for him?

7   A.  We did not play it for Mr. Richard LaPoint.  We played it

8   for his son, Mr. Christopher LaPoint.

9   Q.  And was it after that that you went and turned the

10  direction of the investigation toward Mr. Martis?

11  A.  That is correct.

12  Q.  Did you at some point execute a search warrant at

13  Mr. Martis's room at the Hiltop Motel?

14  A.  We did.

15  Q.  And when that was going on, did you also conduct an

16  interview with Mr. Martis?

17  A.  We did.

18  Q.  Can you tell us how that interview with Mr. Martis came

19  about?

20  A.  Sure.  So the -- We had gotten a search warrant for his

21  room in 404 at the Hiltop Motel.  And we executed the search

22  warrant the day of.  We contacted the hotel manager,

23  Mr. Christopher LaPoint, originally.  He came up to the lobby.

24  And we asked him to call Mr. Martis from his room and have him

25  come over to the lobby so we could talk with him and also so

1    the agents could search the room.

2    Q.  And did you see Mr. Martis leave his room and come to the

3    lobby?

4    A.  I did.

5    Q.  And describe that please.

6    A.  My recollection of Mr. Martis leaving his room was that he

7    was on a mobility scooter, and then he parked the scooter and

8    walked into the lobby of the Hiltop Motel utilizing a cane.

9    Q.  Was it after he came into the lobby that the search warrant

10   execution began?

11   A.  That is correct.

12   Q.  So nobody was knocking on his door and going into his room

13   while he was still in it, correct?

14   A.  That is correct.

15   Q.  All right.  When Mr. Martis came into the lobby, did he sit

16   down?

17   A.  He did.

18   Q.  And were you also seated?

19   A.  I was.

20   Q.  Did you advise Mr. Martis whether he was in custody or free

21   to leave?

22   A.  Mr. Martis was not in custody.  We did advise him that he

23   was free to go at any time and that he could stop talking to us

24   at any time.

25   Q.  And did you make it clear he didn't have to start talking

```
 1    to you as well?

 2    A.  I did.

 3    Q.  Did he agree to speak to you in spite of that?

 4    A.  He did.

 5    Q.  During the course of the interview, did Mr. Martis

 6    acknowledge having made some heated calls to members of

 7    Congress?

 8    A.  He did.

 9    Q.  And was one of those calls January 20th of 2020, phone call

10    to -- Well, excuse me.  I'm going to walk back a little bit.

11    Was one of those phone calls that he acknowledged making a

12    January 26 of 2019 phone call to Speaker Pelosi's Washington

13    D.C. office?

14    A.  It was.

15    Q.  All right.  Have you reviewed Exhibit 20 before coming to

16    court today?

17    A.  I have.

18    Q.  And is that also true for Exhibits 21 through 27?

19    A.  I have.

20    Q.  And are all of those recordings in Exhibits 20 through 27

21    true and accurate copies of the recordings that or those

22    sections of the interview that you recorded?

23    A.  They are.

24    Q.  And just to be clear, you recorded that interview in audio,

25    correct?
```

1    A.   I did.

2    Q.   I apologize.  I need to get a sticky from the clerk, Your

3    Honor.  May I approach the clerk?

4            THE COURT:  Yes.

5            MR. KOEHLER:  At this time I'd move to admit and play

6    Exhibit 20.

7            MR. EISENBERG:  No objection, Your Honor.

8            THE COURT:  It may be admitted, and it may be

9    published.

10       (Exhibit 20 played.)

11   Q.   (BY MR. KOEHLER)  Now, moving on to Exhibit 21 --

12           THE COURT:  Well, let me just instruct the jury that

13   you have just heard a recording that was received in evidence,

14   and I urge you to listen to it carefully.  I know those of you

15   who are seated in the jury box have the ability to see the

16   transcription, which will help you identify what is being said

17   and to guide you as you listen to the recording.

18           But do bear in mind that the recording is the

19   evidence.  It is not the transcript.  So just play -- pay close

20   attention to the actual recording.

21           Go forward.

22   Q.   (BY MR. KOEHLER)  Moving now to Exhibit 21, did you ask

23   Mr. Martis about his use of illegal drugs and whether he was of

24   a sound mind at the time that he was making these calls?

25   A.   I did.

FERREIRA - DIRECT

1    Q.  And to be clear, was there another agent there with you

2    also asking questions on occasion?

3    A.  There was.

4    Q.  And was that -- What was the name of that agent?

5    A.  It was Special Agent Kemper Mills.

6    Q.  And were his questions also captured on this recording as

7    well as the answers?

8    A.  They were.

9    Q.  Is Exhibit 21 an accurate depiction of that section of the

10   recording?  I'm talking about asking him about drug use and so

11   forth.

12   A.  It is.

13          MR. KOEHLER:  Move to admit and play Exhibit 21.

14          THE COURT:  I think this is one of the agreed-upon

15   admissible exhibits, Mr. Eisenberg?

16          MR. EISENBERG:  Yes, it is, Your Honor.

17          THE COURT:  Yes.  It may be admitted, and it may be

18   published.

19      (Exhibit 21 played.)

20   Q.  (BY MR. KOEHLER)  And so the voice saying you're just a

21   concerned citizen, right, whose voice is that?

22   A.  That's mine.

23   Q.  And the person who said no to the question about illegal

24   drugs and yeah to being a concerned citizen, whose voice was

25   that?

FERREIRA - DIRECT

1    A.   That was Mr. Martis.

2    Q.   All right.  Now moving on to Exhibit No. 22, did you talk

3    to him about a September 24, 2019, call to Congressman Schiff's

4    office?

5    A.   I did.

6              MR. KOEHLER:  Move to admit and play 22.

7              MR. EISENBERG:  No objection, Your Honor.

8              THE COURT:  It may be admitted, and it may be

9    published.

10       (Exhibit 22 played.)

11   Q.   (BY MR. KOEHLER)  All right.  Now moving on to Exhibit 23,

12   did you also play the phone call to Congressman Schiff's office

13   from January 20th of 2020 for Mr. Martis?

14   A.   I did.

15             MR. KOEHLER:  Move to admit 23.  Sorry.

16             MR. EISENBERG:  No objection, Your Honor.

17             THE COURT:  It may be admitted, and it may be

18   published.

19       (Exhibit 23 played.)

20   Q.   (BY MR. KOEHLER)  Did you also ask Mr. Martis questions to

21   verify that he was making those calls from his room at the

22   Hiltop Motel, and that was his voice in the recordings?

23   A.   I did.

24   Q.   And is that contained in Exhibit 24?

25   A.   It is.

FERREIRA - DIRECT

```
 1              MR. KOEHLER:  Move to admit 24 and publish.

 2              MR. EISENBERG:  No objection, Your Honor.

 3              THE COURT:  It may be admitted, and it may be

 4     published.

 5         (Exhibit 24 played.)

 6     Q.  (BY MR. KOEHLER)  And that was Special Agent Mills talking

 7     to Martis in that part of the conversation; is that correct?

 8     A.  That's correct.

 9     Q.  Now moving on to Exhibit 25, did Mr. Martis admit again

10     that he was at the hotel in Arizona when he made those calls?

11     A.  He did.

12              MR. KOEHLER:  Move to admit and play 25.

13              MR. EISENBERG:  No objection, Your Honor.

14              THE COURT:  And it may be admitted and published.

15         (Exhibit 25 played.)

16     Q.  (BY MR. KOEHLER)  Now moving on to 26, did you advise

17     Mr. Martis that these kinds of calls were breaking the law,

18     that making threats was something that was going to draw the

19     FBI's attention because of the threatening nature of the calls?

20              MR. EISENBERG:  Objection.  Misstates the potential

21     evidence.

22              THE COURT:  Overruled.

23              THE WITNESS:  We did warn him.

24              MR. KOEHLER:  All right.  Move to admit and publish

25     26.
```

```
 1              MR. EISENBERG:  No objection, Your Honor.

 2              THE COURT:  It may be admitted and published.

 3         (Exhibit 26 played.)

 4    Q.   (BY MR. KOEHLER)  And did you go on and admonish him

 5    further in Exhibit 27 on the same subject?

 6    A.   I did.

 7              MR. KOEHLER:  Move to admit and publish 27.

 8              MR. EISENBERG:  No objection.

 9              THE COURT:  It may be admitted and published.

10         (Exhibit 27 played.)

11    Q.   (BY MR. KOEHLER)  So after the interview did you leave the

12    lobby and allow Mr. Martis to go about his business?

13    A.   I stayed in the lobby.  Mr. Martis went about his business.

14    Q.   Okay.  And sometime after that did you obtain telephone

15    records for the congressional offices of House Speaker Nancy

16    Pelosi's congressional office and Adam Schiff's congressional

17    office showing the phone calls from the phone number

18    928-487-3966?

19    A.   I did.

20    Q.   We're going to switch over to the document camera at this

21    point.

22              Agent Ferreira, you should have on the witness stand

23    in front of you Exhibits -- we're going to start with 12 and

24    13.

25    A.   I do not have those up here.  Okay.  I have them.
```

1          MR. KOEHLER:  Very good.  And, Your Honor, the parties

2    have stipulated to the admission of 12, 13, 14, and 15.  And so

3    I'll just move for their admission at this time hopefully to

4    speed things up a little bit.

5          MR. EISENBERG:  That's correct.

6          THE COURT:  That was 12, 13, 14, and 15?

7          MR. KOEHLER:  Correct, Your Honor.

8          THE COURT:  And, members of the jury, when the parties

9    have stipulated to certain facts, those facts then are now

10   conclusively established.  You may proceed.

11   Q.  (BY MR. KOEHLER)  Thank you, Your Honor.  So 12 is now in

12   evidence, admitted.  And which phone records are these?

13   A.  These are the House Telecom records.

14   Q.  And what is House Telecom in general terms?

15   A.  In general terms it's a repository that keeps the records

16   for the House of Representatives' individual -- of her

17   individual phone line.

18   Q.  And does House Telecom operate the phone system for the

19   entire House of Representatives?

20   A.  It does.

21   Q.  All right.  And in the records are the phone calls from the

22   3966 number highlighted in there in yellow?

23   A.  They are.

24   Q.  And one of those calls -- So was the January 26, 2019, call

25   captured when you requested the records from House Telecom?

FERREIRA - DIRECT

1    A.   Unfortunately it was not.

2    Q.   And do you know why that was?

3    A.   I do.   The House Telecom system only captures records for

4    two years, and so it was outside the scope of that window.

5    Q.   Okay.   But it did capture the September 20 -- September 4th

6    of 2019 phone call; is that correct?

7    A.   It did.

8    Q.   And then also captured the March 27 of 2020 phone call?

9    A.   It did.

10   Q.   And that reminds me I wanted to circle back on this.

11            So the September 4th of 2019 call, what was the time

12   of day on that?

13            If you look at your screen, it's on your screen.

14   A.   It's 12:04 on September 4, '19.

15   Q.   And is that Eastern Time?

16   A.   That is Eastern Time.

17   Q.   Now, spring forward, fall back with Daylight Savings Time.

18   How far ahead of Arizona is D.C. in September, if you know?

19   A.   In September it's three hours ahead.

20   Q.   So that would have been 9:04 a.m. in Arizona; is that

21   correct?

22   A.   That's correct.

23   Q.   All right.   Now moving to the March 27 of 2020 call, what

24   time does that show?

25   A.   That shows 1:55 on March 27th.

UNITED STATES DISTRICT COURT

1   Q.  And are you able to tell a.m. or p.m. on that one?

2   A.  I don't know.

3   Q.  Okay.  So it was either -- In March that would again be

4   Daylight Savings Time, so it was either 10:55 a.m. or 10:55

5   p.m. --

6   A.  That's correct.

7   Q.  -- in Arizona?

8           Now, moving forward to January 17 of 2020, what time

9   of day were the calls that he made?

10  A.  It indicates 015, so that's just after midnight, 12:15 a.m.

11  Q.  And in January a two-hour time difference; is that correct?

12  A.  That's correct.

13  Q.  So that would have been 10:00 at night locally or 10:15?

14  A.  10:15 at night Arizona time.

15  Q.  Now moving to Exhibit 13, we've moved to admit that

16  already, so that's in evidence.  That phone number on there, do

17  you recognize the phone number on the front?  And again it's on

18  your screen.  I'll make your life easier.

19  A.  I do.

20  Q.  Whose phone number is that?

21  A.  That's office of the Congressman Adam Schiff's number.

22          THE COURT:  Mr. Koehler, continue to use the

23  microphone please.

24          MR. KOEHLER:  Is this better?

25          THE COURT:  Yes.

1    Q.   (BY MR. KOEHLER)   Thank you.

2             All right.   And phone call on January 20th of 2020,

3    what time does that show?

4    A.   That shows 2:39.

5    Q.   And so, again, during January, two hours behind, it's

6    either 12:39 a.m. or 12:39 p.m.?

7    A.   That's correct.

8    Q.   And there was another call on March 28th of 2020; is that

9    correct?

10   A.   That is correct.

11   Q.   And what time does that show?

12   A.   6:13.

13   Q.   And so in March we would be three hours difference?

14   A.   Yes.   March would be three hours difference.

15   Q.   So it's either 3:13 a.m. or 3:13 p.m.?

16   A.   That is correct.

17   Q.   Did you also obtain the records from magicJack systems?

18   A.   I obtained the records from Yana (phonetic), which is the

19   parent company of magicJack.

20   Q.   Is it called YMAX?   Is that the parent company?

21   A.   Or YMAX.   I apologize.   I said Yana.   I misspoke.

22   Q.   And Exhibit 14 we'd moved to admit and is in evidence now.

23   Are all the calls that Mr. Martis made to congressional offices

24   highlighted in that exhibit?

25   A.   They are.

FERREIRA - DIRECT

1   Q.  And are the calls that are referenced in the charges in

2   this case highlighted in blue?

3   A.  They are.

4   Q.  And other calls highlighted in yellow?

5   A.  They are.

6   Q.  Does the exhibit also have highlights of calls made to

7   senate offices?

8   A.  They do.

9   Q.  And also calls to the White House highlighted in yellow?

10  A.  They do.

11  Q.  Did you analyze the records and is that also true of

12  Exhibit 15?

13  A.  That is correct.

14  Q.  And is 15 a continuation of the YMAX records in 14?

15  A.  They are.

16  Q.  Did you analyze those records to count the number of phone

17  calls made from the 3966 phone number to Speaker Pelosi's

18  office?

19  A.  I did.

20  Q.  And approximately how many calls did Mr. Martis make to

21  Speaker Pelosi's office between January, 2019 and January,

22  2021?

23  A.  Mr. Martis made 151 phone calls to Nancy Pelosi's office.

24  Q.  Did you also analyze the number of calls that he made to

25  Congressman Schiff's office during that same time frame?

1    A.  I did.

2    Q.  And how many calls did he make to Congressman Schiff's

3    office during that same time frame?

4    A.  Mr. Martis made 19 phone calls to Adam Schiff's office

5    during that time frame.

6              MR. KOEHLER:  All right.  And another stipulation that

7    we have here for ease of reference for those who are interested

8    in the other congressional phone numbers, the parties have

9    stipulated and agreed that the following Washington, D.C., area

10   telephone numbers correspond to the offices of various members

11   of Congress and senators as well as the White House as set

12   forth below:

13             202-225-2201 is member of Congress Maxine Waters;

14             202-225-2315 is the office of member of Congress Paul

15   Gosar;

16             202-225-2635 is the office of member of Congress Andy

17   Biggs;

18             202-225-4176, which is in Exhibit 13, is the office of

19   member of Congress Adam Schiff;

20             202-225-4965, which is the records in Exhibit 12, are

21   the office of House Speaker Nancy Pelosi's congressional

22   district office;

23             202-224-3121 is the United States Senate's Capitol

24   switchboard;

25             202-224-2235 is the phone number of the office of

FERREIRA - DIRECT

1    Senator Mark Kelly;

2           202-224-2541 is the office of senate minority leader

3    Mitch McConnell;

4           202-224-4521 is the office of Senator Kyrsten Sinema;

5           202-224-5972 is the office of Senator Lindsey Graham;

6           202-224-6542 is the office of Senator Charles Schumer;

7           202-456-1111 is the White House; and

8           202-456-1414 also is the White House.

9           THE COURT:  Is there a question related to the

10   stipulation?

11          MR. KOEHLER:  No.  I was just adding that so that as

12   anyone reviews these records with the yellow highlights and

13   sees a number other than Speaker Pelosi or Congressman Schiff,

14   there's a reference for that number what office it goes to.

15          THE COURT:  All right.  Thank you.

16   Q.  (BY MR. KOEHLER)  So after you left Mr. Martis at the hotel

17   there, did you take steps to keep tabs on Mr. Martis?

18   A.  I wouldn't call it keeping tabs on him.

19   Q.  Okay.

20   A.  I would call it more so that we took steps to help us know

21   if Mr. Martis would be active or moved away or mobile in a way

22   that he would be leaving Bullhead.

23   Q.  Okay.  So you weren't personally tracking him or anything

24   like that.  What did you do exactly?

25   A.  We originally at the hotel at the Hiltop I made contact

UNITED STATES DISTRICT COURT

1   with Christopher LaPoint, the hotel manager, who informed me

2   that, you know, he knew his tenants.  He knew when a tenant

3   would be leaving or moving away or any of that.  So we asked

4   Mr. LaPoint if he would inform us if anything like that took

5   place with Mr. Martis.  And he agreed to do so.

6          So in May of 2020 I contacted Mr. LaPoint, Chris

7   LaPoint, to ensure that nothing like that has happened.  And he

8   advised me that Mr. Martis was still at the Hiltop Hotel in his

9   room.

10  Q.  And on March 27 or shortly thereafter did you become aware

11  of an additional call that Mr. Martis made after you had

12  interviewed and warned him?

13  A.  I did.

14  Q.  And is that in Exhibit 1, which is already in evidence?

15  A.  Yes, it is.

16          MR. KOEHLER:  Your Honor, I'm going to play Exhibit 1

17  please.

18          THE COURT:  Yes.

19      (Exhibit 1 played.)

20  Q.  (BY MR. KOEHLER)  At the time that you became aware of that

21  call, had FBI had essentially a shift in operational stance at

22  that point in time?

23  A.  We did.

24  Q.  What was going on at that time?

25          MR. EISENBERG:  Objection, Your Honor.  Relevance.

FERREIRA - DIRECT

```
 1              THE COURT:  Sustained.
 2   Q.  (BY MR. KOEHLER)  Were you in a position to go visit
 3   Mr. Martis at that point in time?
 4   A.  Not at that time.
 5   Q.  Why not?
 6   A.  Because at the time the FBI received an order.  The global
 7   pandemic was going on --
 8              MR. EISENBERG:  Objection, Your Honor.  Relevance.
 9              THE COURT:  Overruled.
10              THE WITNESS:  The global pandemic was going on, and so
11   we were essentially doing our work but working from home as
12   well.
13   Q.  (BY MR. KOEHLER)  Did you reach out to Mr. LaPoint?
14   A.  I did.
15   Q.  And did Mr. LaPoint -- Did you have any cause for concern
16   at that point after reaching out to Mr. LaPoint in terms of
17   Mr. Martis being gone from the motel?
18   A.  I did not.
19   Q.  And did you later learn of another call in January of 2020
20   or January -- I'm sorry -- January of 2021?
21   A.  Two additional calls, yes.
22   Q.  And were those Exhibits 2 and 3 also already in evidence?
23   A.  They were.
24              MR. KOEHLER:  Play Exhibits 2 and 3, Your Honor.
25              THE COURT:  Yes.
```

1        (Exhibits 2 and 3 played.)

2    Q.  (BY MR. KOEHLER)  After you found out about those two

3    calls, did you move forward with plans to interdict with

4    Mr. Martis?

5    A.  We did.

6    Q.  What did you do?

7    A.  We made a plan to arrest Mr. Martis.  So we went forward

8    with a complaint against Mr. Martis and got a court-ordered

9    arrest warrant.

10   Q.  And did you arrest him on February 3rd of 2021?

11   A.  We did.

12          MR. KOEHLER:  I have no further questions for the

13   witness at this time.

14          THE COURT:  Mr. Eisenberg.

15          MR. EISENBERG:  Yes, Your Honor.

16                     CROSS-EXAMINATION

17   BY MR. EISENBERG:

18   Q.  Good morning, agent.

19   A.  Good morning, sir.

20   Q.  How are you today?

21   A.  I'm good.  How are you?

22   Q.  I'm fine.  Thank you.

23          So there was an interview of Mr. Martis that you

24   conducted in February of 2020, right?

25   A.  That is correct.

1  Q.  And that was February the 4th?

2  A.  That is correct.

3  Q.  Okay.  And it was at the Hiltop Hotel?

4  A.  In the lobby, yes.

5  Q.  And that's in Bullhead City?

6  A.  That is correct.

7  Q.  And it was in the manager's office; is that correct?

8  A.  Correct, at the lobby.

9  Q.  Before you came to the Hiltop that day, you didn't call

10  ahead and tell Mr. Martis you were coming, did you?

11  A.  We did not.

12  Q.  And when you arrived there and -- When was the first time

13  that you came in contact with Mr. Martis?  How did that evolve?

14  Let me ask it that way.

15  A.  As I previously stated, myself and one of the other agents

16  were in the lobby, and Mr. Mar -- we got the hotel manager

17  Mr. LaPoint to call Mr. Martis.

18  Q.  Okay.  And then Mr. Martis came.  Do you know where he came

19  from?

20  A.  From his room.

21  Q.  And did you see him coming down -- Is there a corridor

22  there?

23  A.  It's not.  It's an open parking lot in between his room and

24  where the lobby is.

25  Q.  Now, did -- And when he came into your presence, did you

1    announce who you were?

2    A.  I did.

3    Q.  So is that the first time, as far as you know, he was aware

4    that you were on the premises?

5    A.  I believe so, yes.

6    Q.  All right.  And when you introduced yourself, you said you

7    were with the FBI, correct?

8    A.  I did.

9    Q.  So from that point on, he was in your presence do you

10   recall for how long?

11   A.  The duration of the time that Mr. Martis was with us?

12   Q.  Yes, sir.

13   A.  I do not recall the length of time.

14   Q.  All right.  Well, you know that there was an interview

15   conducted, and it was put on tape.  We've heard portions of it.

16   Correct?

17   A.  That's correct.

18   Q.  And do you know how long that interview took?

19   A.  I don't know the exact time.

20   Q.  If I suggested to you it was 27 minutes and 23 seconds,

21   does that sound correct?

22   A.  If you say so.

23   Q.  All right.  And -- Well, you've listened to it, correct?

24   A.  I have.

25   Q.  And there's a timer on, when you listen to a -- the

1    recording, you'll see there's a timer that shows you how long

2    the interview took place, right?

3    A.  That's correct.

4    Q.  Okay.  So now when you first introduced yourself, that

5    recorder wasn't on, was it?

6    A.  Not at that time.

7    Q.  So you said something to the effect "Hello, Mr. Martis.

8    I'm Special Agent Ferreira with the FBI," something like that?

9    A.  That's correct.

10   Q.  And you were also there with Special Agent Kemper Mills is

11   it?

12   A.  That's correct.

13   Q.  And did he also introduce himself?

14   A.  I don't recall if he introduced himself.  I believe it was

15   a very quick interaction where I introduced myself, and I asked

16   Mr. Martis if he wouldn't mind speaking in the manager's

17   office.

18   Q.  Okay.  So you all went -- Excuse me.  He didn't object to

19   that; is that correct?

20   A.  That's correct.

21   Q.  And so you went into the manager's office; is that right?

22   A.  That's correct.

23   Q.  And during the time that you were with him, agents were

24   searching his room; is that correct?

25   A.  That is correct.

FERREIRA - CROSS

1    Q.  Did he know -- Did you tell him that agents were searching

2    his room?

3    A.  At some point in the interview we did inform Mr. Martis

4    that there was a search warrant being conducted of his room.

5    Q.  And did he object to that?

6    A.  I do not recall.

7    Q.  But if he did, it would be on the recording; is that

8    correct?

9    A.  I would assume so, yes.

10   Q.  Well, there was no time when you shut the recording off?

11   A.  That's correct.

12   Q.  All right.  So at the time that he was with you and your

13   fellow agent, you were interviewing him, Mr. Martis never said

14   stop the interview, did he?

15   A.  He did not.

16   Q.  And he never got up and left; is that correct?

17   A.  He did not.

18   Q.  When you were interviewing him, he wasn't armed, was he?

19   A.  We did --

20   Q.  As far as you know?

21   A.  As far as I know.  We didn't do a patdown of him or

22   anything.

23   Q.  All right.  And so have you done an inventory -- You are

24   the case agent; is that correct?

25   A.  I am.

1   Q.  And have you done an inventory of the items that were

2   either seized or looked at?

3   A.  I have.

4   Q.  Okay.  There was some mention of an item called a receiver.

5   Do you remember that?

6   A.  I do.

7   Q.  And in the course of your being the -- an investigator, you

8   would and you did request that the Bureau of Alcohol, Tobacco,

9   Firearms and Explosives determine whether that was a weapon,

10  correct?

11  A.  We did get -- receive a report from the Bureau of Alcohol,

12  Tobacco, Firearms and Explosives.

13  Q.  And it said that it was not a firearm pursuant to U.S.

14  Code?

15  A.  I would need to look back at the report from ATF.  I don't

16  know if it said that exactly or how it worded it.

17  Q.  Well, as far as you know, it is not a weapon; is that

18  correct?

19  A.  What I know a lower receiver to be is what the witness

20  Agent White spoke in his testimony.

21  Q.  All right.

22          THE COURT:  Sir, can you move a little bit closer to

23  the microphone.

24          THE WITNESS:  Sorry.

25  Q.  (BY MR. EISENBERG)  So there were certain pieces of the

1    recording of Mr. Martis that were played which you have

2    identified, right?

3    A.   That's correct.

4    Q.   Just now, right?

5    A.   During --

6    Q.   During your direct.

7    A.   Yes --

8    Q.   One of them --

9    A.   -- correct.

10   Q.   I'm sorry.  One of them is on Exhibit 20, and it's a

11   recording of a transcript.  I'll read it to you.  Need not

12   replay it.

13           It says, "Hi, nutty Nancy.  Hey, I just killed three

14   of these fucking illegals this morning.  Laughing.  Yeah,

15   buddy, we're gonna take care of this fucking problem down here

16   on the border" and so forth.

17           And then he -- to finish it up, it says, "Fuck you.

18   We're coming for y'all too."  And then according to the

19   recording he was laughing "Yeah, I remember that, yeah."

20           Do you remember -- Do you remember that recording and

21   that response?

22   A.   I do.

23   Q.   So he didn't hesitate when he said I remember it?

24   A.   He did not.

25   Q.   And he didn't deny making the call, did he?

1    A.  He did not.

2    Q.  You asked him about being -- Well, I'll put it this way.

3    You asked him whether he was under the influence.  Let me be

4    more accurate.

5          You said -- This is in Exhibit 21 -- you didn't use

6    any kind of illegal drugs or anything like that, and his

7    response was no.  Do you recall that?

8    A.  I do.

9    Q.  Okay.  When he was in your presence, did he appear to be

10   under the influence of any intoxication or drugs?

11   A.  He did not.

12   Q.  And then I think it was you that said, "You did that under

13   your sound mind.  You were just a concerned citizen, right?"

14          Now, you remember that?

15   A.  I do.

16   Q.  And what you were referring to was, when you said you did

17   that under your sound mind, you're referring to telephone

18   calls?

19   A.  That's correct.

20   Q.  Okay.  And his answer was yeah?

21   A.  That's correct.

22   Q.  And he didn't hesitate when he said that, did he?

23   A.  He did not.

24   Q.  So basically what you're determining here is he's mentally

25   competent, correct?

1    A.   Correct.

2    Q.   As far as you can make that determination?

3    A.   Correct.

4    Q.   All right.  All right.  And that as far as you were

5    concerned, he was a concerned citizen?

6    A.   I did ask him that question, correct.

7    Q.   Yes.  You said you're a concerned citizen, right, and he

8    said yeah?

9    A.   That's correct.

10   Q.   Okay.  Now, there's another recording.  This is Exhibit 22.

11   Let me read it to you and just to refresh your recollection so

12   I can put it in context.  Okay?

13              The recording is "Hello, Nancy.  Hey, we're out here

14   in California.  We stick by our guns.  That's right.  You want

15   to take away our guns.  We'll take away your life.  Fuck you,

16   cunt, laughing or laughter."  Then you said, "You remember

17   making that phone call?"

18              He said, "I don't recall that one, no."

19              Then you said, "No, but that's your voice on the

20   phone?"

21              And he said, "Yeah, sounds like it anyway, sure."

22              Do you remember that one?

23   A.   I do.

24   Q.   Okay.  So he agreed with you he recognized his voice?

25   A.   He did.

1  Q.  And he didn't pause?

2  A.  He did not.

3  Q.  No hesitation there.

4           Okay.  I'm sorry.  I didn't -- Did you answer it?  He

5  didn't hesitate?

6  A.  He did not.

7  Q.  Thank you.  Then Exhibit 23 is another recording --

8           Your Honor, may I just get some water?

9           THE COURT:  Yes.

10 Q.  (BY MR. EISENBERG)  Exhibit 23 is another recording.

11          Excuse me, Agent.

12          It's another recording.  It says, "Well, hello there,

13 Adam.  You know what?  Your impeachment failed.  You're a

14 fucking piece of garbage, and we're going to wipe the fucking

15 streets of fucking D.C. with you, you stupid piece of shit.

16 Yeah, go ahead" and so forth "with Mr. Soros and Mr. Obama,

17 President Obama, hah-hah-hah, because we're going to put a

18 bullet in your head.  You're dead."  And then there's laughter.

19 Correct?

20 A.  That's correct.

21 Q.  And then you said, "Do you remember that call?"  Do you

22 remember that?

23 A.  I do.

24 Q.  And his response was "Hmm."

25 A.  My recollection is his response was "Uh-hmm."

1   Q.  Okay.  So, in other words, he says yes, in effect, he

2   remembers the call?

3   A.  Correct.

4   Q.  No hesitation there?

5   A.  No.

6   Q.  And then you established in Exhibit 24 that it was just him

7   who was making these calls.  Let me read to you Exhibit 24, put

8   it in context.

9           And actually I don't think it was you.  I think it was

10  your partner, Agent Mills, who said this.

11          "And so we know those calls were made from your hotel

12  room and that you've been here a couple of years, and

13  essentially you made those calls.  It's your voice.  There's

14  nothing else in your room -- or there's nobody else in your

15  room making those calls.  Is that correct?"

16          And then the response was "Right."

17          Do you remember that?

18  A.  I do.

19  Q.  So he admitted it's him and only him making those calls,

20  correct?

21  A.  He did.

22  Q.  And there was no hesitation with respect to him saying

23  that, was there?

24  A.  There was not.

25  Q.  And also he's saying that it was from his room where he was

1    making those calls.

2    A.  I believe the agent asked him that or informed him that the

3    phone calls were made from his room, and his response was yes.

4    Q.  Okay.  My point is when these calls were made, as far as

5    what you all could establish from him, is they were made from

6    Room 404?

7    A.  Yes.

8    Q.  Okay.  Then I think it might be the same recording, or

9    maybe it's 25.  This is the one where it's -- there's a

10   discussion with Agent Mills about how Mr. Martis got the

11   telephone numbers to make these calls.  And it's to the effect

12   of Mr. Martis saying "It's all over the place."

13           Then Agent Mills says, "Yeah, it's public record.  But

14   specifically do you look them up on the Internet, or did you

15   call information?  How did you or how do you -- how did you

16   come across --"

17           And then he said, "I usually call information, yeah."

18           So information, how would you interpret what he meant

19   by information?

20   A.  My understanding of what calling information would be would

21   be calling 411, which is a number that you can call to get

22   phone numbers of individuals.

23   Q.  Right.  And you heard Mr. Koehler reciting on a stipulation

24   several telephone numbers of various members of Congress; is

25   that correct?

1    A.   I'm sorry.  Can you repeat the question?

2    Q.   Yes.  There was a stipulation read by Mr. Koehler with

3    respect to telephone numbers?

4    A.   Yes, there was.

5    Q.   Okay.  And it has to do with and I'll just say members of

6    Congress, Pelosi, Schiff, Schumer, Kelly, so forth, correct?

7    A.   I don't know if Mr. Kelly was on there, but, yes, members

8    of Congress.

9    Q.   And those are publicly accessed numbers, correct?

10   A.   They are.

11   Q.   In other words, the number that was read is a number any

12   member of the public could look up, gain access to, and make a

13   call?

14   A.   That is correct.

15   Q.   All right, sir.  Now, you testified about YMAX records for

16   number 928-487-3966.  Am I correct?

17   A.   That's correct.

18   Q.   And that's the number that rings in -- public number that

19   rings into Congresswoman Pelosi's office, right?

20   A.   That's incorrect.  I'm sorry.  What number did you --

21   Q.   I have 487 -- I'm sorry.  No.  That's Mr. Martis's number.

22           The number to Ms. Pelosi was the one that Mr. Koehler

23   read to you.  I don't have it right here in my notes.  But

24   that's an accurate number, correct?

25   A.   That is correct.

1    Q.  And it's from -- All of the calls that you analyzed were

2    from -- this is what I meant to ask -- 928-487-3966?

3    A.  That is correct.

4    Q.  And that's a number that's traceable to Mr. Martis,

5    correct?

6    A.  It's not necessarily traceable to Mr. Martis.  It's traced

7    back to the Hiltop Motel, as you heard previously stated.

8    Q.  Okay.  As far as you know, there is no one else from that

9    hotel who was making calls from those numbers?

10           MR. KOEHLER:  Objection.  Speculation.

11           THE COURT:  Sustained.

12   Q.  (BY MR. EISENBERG)  So in your -- In the course of your

13   investigation, did you determine whether anybody else was

14   making calls to Congresspersons from the Hiltop?

15   A.  That was never a question of our investigation because we

16   were only presented the case from the Capitol Police regarding

17   Mr. Martis.

18   Q.  Well, at first the concern was telephone calls coming from

19   this telephone number, right?

20   A.  That is correct.

21   Q.  That's when the Capitol Police got involved in it, right?

22   A.  That's correct.

23   Q.  And then they talked to the LaPoints, the father and the

24   son, correct?

25   A.  That is correct.

1    Q.  And the LaPoints said it wasn't us that made the calls,

2    right?

3    A.  That is correct.

4    Q.  And that determination -- There was a determination by law

5    enforcement that, no, it wasn't the LaPoints, right?

6    A.  That's correct.

7    Q.  And so you focused on somebody else.  That's Mr. Martis?

8    A.  That's correct.

9    Q.  And in the course of your investigation, you didn't

10   determine whether there was anybody but Mr. Martis who was

11   making these calls?

12   A.  That's correct.

13   Q.  And in fact if there were other suspects, I'm sure you all

14   would have gone out and investigated them, right?

15   A.  Correct.

16   Q.  Okay.  So with respect to the calls that are in Exhibits 14

17   and 15, now, those -- let me just stop you -- stop me.  14 and

18   15 are the results of a subpoena or a series of subpoenas

19   perhaps sent to YMAX/magicJack, correct?

20   A.  Correct.

21   Q.  And what were you subpoenaing when you sent the subpoenas

22   out?

23   A.  We were subpoenaing for subscriber information for the

24   telephone number itself.

25   Q.  That number that we've been talking about, the 928 number?

FERREIRA - CROSS

1    A.   928-487-3966, yes.

2    Q.   And that's the only number that appears in response to the

3    subpoenas, that is, the number 928-487-3966?

4    A.   Correct.   The records included all the call records for

5    that number for those dates.

6    Q.   Do you know how many pages there are in Exhibits 14 and 15?

7    A.   I do not.

8    Q.   Okay.   Well, let me ask it this way.   I know you've done an

9    analysis of the number of telephone calls that were made to

10   various numbers from 928-487-3966, correct?

11   A.   I did an analysis of the calls that were made to the

12   Senators, Congressmen, White House, you know, different numbers

13   in D.C.

14   Q.   Yes.   That's what I mean.   Thank you.

15          So your analysis showed -- and these -- The subpoena

16   response covers what total time period?

17   A.   The subpoena covers from January of -- I believe January --

18   from January --

19   Q.   2019?

20   A.   '19 all the way through when he was arrested, just shy of

21   when he was arrested.

22   Q.   February or so of 2021, or was it a little later?

23   A.   No.   It's through February of 2021.

24   Q.   Yeah.   I think it's actually through February 3rd, 2021.

25   Does that sound right?

FERREIRA - CROSS

1    A.   That's correct, yeah.

2    Q.   Okay.  How many total telephone calls were made from

3    928-487-3966 to Congresswoman Pelosi's telephone number?

4    A.   In total, 151 calls.

5    Q.   Okay.  So this covers that entire -- we'll call it a

6    two-year-plus period of time, correct?

7    A.   Okay.

8    Q.   Okay.  All right.  And how many were made to Congressman

9    Schiff's office?

10   A.   19 total.

11   Q.   19 total calls?

12   A.   Yes.

13   Q.   Okay.  And how many to Senator Schumer's office?

14   A.   I don't recall the total amount to Mr. Schumer's office.  I

15   would have to go back and look at my records.

16   Q.   If I told you there were approximately 16, does that sound

17   right?

18   A.   I don't know the answer to that question.

19   Q.   And how many were there to Congressman Biggs' office?

20   A.   In total?

21   Q.   Yes, sir.

22   A.   Again, I'd have to go back and look at my records.

23   Q.   But you've confirmed there were telephone calls to

24   Congressman Biggs?

25   A.   There were.

1   Q.  And there were telephone calls to Congressman Gosar; is

2   that correct?

3   A.  That's correct.

4   Q.  And there were telephone calls to Martha McSally, Senator?

5   A.  There were.

6   Q.  And to Mitch McConnell?

7   A.  There were.

8   Q.  And to Lindsey Graham?

9   A.  There were.

10  Q.  Mr. Graham, Mr. McConnell, they're also senators; is that

11  correct?

12  A.  Yes, they are.

13          MR. EISENBERG:  May I have a moment, Your Honor?

14          THE COURT:  You may.

15          MR. EISENBERG:  Your Honor -- Sorry.

16  Q.  (BY MR. EISENBERG)  Mr. -- I'm sorry.  Agent, you have made

17  a report, at least a partial report, of the number of calls

18  that were made.  I think that it was a report dated

19  approximately March 23rd of 2020?

20  A.  That's correct.

21  Q.  Okay.  And this is a report with respect to your analysis

22  of the total number of calls at least for most of this period

23  of time; is that correct?

24  A.  At the time we did not have the full set of records.  So

25  that analysis is done off of the first set of records that we

1    received from YMAX.

2    Q.  And the first set of records goes through the period of --

3    get my notes -- approximately January of 2019 through March of

4    2020; is that correct?

5    A.  To my recollection, that's correct, yes.

6            MR. EISENBERG:  Your Honor, may I have this marked

7    solely for purposes of refreshing recollection?

8            And I will mark it as Defense Exhibit 118.

9            THE COURT:  Yes.

10           THE CLERK:  Mr. Eisenberg, the next item is 117.

11           MR. EISENBERG:  You know, I have that marked on

12   something else.

13           May I hand this to your courtroom deputy, Your Honor?

14           THE COURT:  Yes.

15   Q.  (BY MR. EISENBERG)  So, Agent Ferreira, if you just look at

16   that, is that your report?

17   A.  It is.

18   Q.  And would it refresh your recollection with respect to the

19   questions I've been asking which has to do with the number of

20   calls at least during a specific period of time?

21   A.  It would.

22   Q.  Okay.  And the period of time covered is, would you agree

23   with me, from January, 2019, through March of 2020?

24   A.  January 18, 2019, through March 18 of 2020.

25   Q.  Okay.  Thank you, sir.

FERREIRA - CROSS

1          Now, I'm just going to ask you the same questions with

2     respect to -- Let's go with -- let's see -- Senator Schumer.

3     During that period of time, does your report indicate how many

4     times the call -- a call was made from 928-487-3966?

5     A.  It did.  He called 16 times to Mr. Schumer.

6     Q.  Okay.  All right.  And with respect to Congresswoman Maxine

7     Waters?

8     A.  Are you asking me how many times?

9     Q.  Yes, sir.

10    A.  One time.

11    Q.  And with respect to Senator Kyrsten Sinema?

12    A.  11 times.

13    Q.  And with respect to Senator Martha McSally?

14    A.  21 times.

15    Q.  And with respect to Senator Mitch McConnell?

16    A.  Five times.

17    Q.  And with respect to Senator Lindsey Graham?

18    A.  14 times.

19    Q.  And with respect to Congressman Andrew Biggs?

20    A.  18 times.

21    Q.  With respect to Congressman Paul Gosar?

22    A.  17 times.

23    Q.  With respect to the Federal Bureau of Investigation

24    headquarters?

25    A.  Four times.

1    Q.  And with respect to a telephone number associated with the

2    White House switchboard?

3    A.  Five times.

4    Q.  There's another -- This number with respect to the White

5    House switchboard, 202-456-1414, there's another number

6    associated with the switchboard that you found in your analysis

7    of the telephone calls; is that correct?

8    A.  I do not recall that.

9    Q.  So with respect to the -- I'll call it the second batch --

10   this is Exhibit 15 -- there are also calls made to those

11   numbers; is that correct?

12           You know, let me -- I'm sorry, Your Honor.

13           Maybe it would be easier if you took out Exhibit 15.

14   Do you have the -- Do you have it there?

15   A.  I have it in front of me, yes.

16   Q.  I'm sorry?

17   A.  I have it in front of me, yes.

18   Q.  This is Government's Exhibit 15, right?  You've got that?

19   A.  I do.

20   Q.  Okay.  So this exhibit will tell us calls that were made

21   from that same 928 number to other numbers, including, if you

22   look on the second page -- these aren't numbered, at least what

23   I have, the second page -- you see some yellow underlining or

24   highlighting?

25   A.  I do.

1    Q.  Okay.  There's a telephone call to 254-4965, area code 202?

2    A.  That's correct.

3    Q.  And do you recall whose number that is?

4    A.  I do.

5    Q.  Whose number is that?

6    A.  That's the office of Nancy Pelosi's office.

7    Q.  And that's on 3-24-2020, right?

8    A.  That's correct.

9    Q.  If you flip the page, there's another number that you've

10   highlighted, also to Ms. Pelosi's office, correct?

11   A.  That's correct.

12   Q.  3-27-2020, correct.

13   A.  2020, yes.

14   Q.  Okay.  There's another telephone call to 254-4965.  I'm

15   going to drop the area code just for ease.

16        MR. KOEHLER:  Your Honor, I believe the number is

17   225-4965, not 254.

18   Q.  (BY MR. EISENBERG)  Well, what I'm reading says 254.  Do

19   you see where I'm reading?  It's yellow highlighted.

20   A.  The yellow highlighted number I read is 202-225-4965.

21   Q.  I'm sorry.  225-4965.  Do you know whose number that is?

22   A.  That's the office of Nancy Pelosi.

23   Q.  Okay.  Then there's one down below.  And, by the way, what

24   date is that?

25   A.  That was on March 28th, 2020.

1   Q.  And then same day there's a call to another number that's

2   highlighted in blue; is that correct?

3   A.  That's correct.

4   Q.  And whose number is that?

5   A.  That's the office of Congressman Adam Schiff.

6   Q.  Now, if we go -- flip the page, sir.  And if you go down to

7   the point that's highlighted, you did the highlightings, I take

8   it; is that correct?

9   A.  I don't recall if I did the highlighting or not.

10  Q.  But it is highlighted?

11  A.  It is highlighted, yes.

12  Q.  It's highlighted in yellow, right?

13  A.  Correct.

14  Q.  Okay.  And it's highlighted for a reason, and the reason is

15  that it was of significance to the case?

16  A.  Yes.

17  Q.  All right, sir.  So this highlighted number starts with

18  3-31-2020, correct?

19  A.  Are you referring to the 202-456-1111 telephone number?

20  Q.  Correct, yes.

21  A.  Yes, it's highlighted.

22  Q.  That's the White House, isn't it?

23  A.  I do not recall if that's the White House number or not.

24  Q.  If you go to 4-13-2020 on the next page, there's a

25  highlighted number?

1   A.   Correct.

2   Q.   And that's dropping the 202-254-4965?

3   A.   Again it's 225-4965.

4   Q.   I'm sorry 22 -- 225-4965.  All right.  And whose number is

5   that?

6   A.   That is, again, the Congresswoman Nancy Pelosi's office.

7   Q.   Okay.  Give me a moment.

8   A.   Sure thing.

9   Q.   If you go -- I think it's easier to count from the back of

10  the exhibit.

11  A.   Are you referring to the last page of the records?

12  Q.   Yes.  Let's try it this way.

13       Go to a page that starts at the top with 9-23-2020.

14  A.   Okay.

15  Q.   Okay.  And let's make sure we're on the same page.  You see

16  if you go down maybe three or four or five lines, you'll see

17  there's highlighting?

18  A.   Correct.

19  Q.   Okay.  And that is to 225-4965, correct?

20  A.   That's correct.

21  Q.   I read it right this time, didn't I?

22  A.   You did.

23  Q.   Thank you.  And if you go over to the date, it's 9-24-2020?

24  A.   That is correct.

25  Q.   So is it fair to say that if -- And you have every reason

1    to believe this is an accurate document, correct?

2    A.   That is my belief.

3    Q.   The last entry that I can see -- The preceding entry that I

4    can see occurred on 4-13-2020 for that telephone number.

5         You'll have to flip back to a page that starts with

6    4-10-2020.  And if you look down, you'll see a highlighted

7    entry.

8    A.   I see it.

9    Q.   Okay.  Did I -- Is that correct?  The preceding call to

10   Ms. Pelosi's office occurred on April the 13th?

11   A.   Can you be more specific what you mean by preceding call?

12   Q.   The one -- The next call backwards or in time, the next one

13   that appears, preceding call, is on 4-13?

14   A.   I'm sorry.  I don't understand your question.

15   Q.   Okay.  If you go from 4-13-2020 to 9-24-2020, you won't see

16   any other calls to that number?

17   A.   That is correct.

18   Q.   Okay.  And continuing on, am I correct the next call to

19   Ms. Pelosi's number is on 10-22-2020 there's another call?

20   A.   On September 24th there's a call as well to Ms. Pelosi's

21   office, September 24th, 2020.

22   Q.   Okay.  That's the one I thought I was just talking about.

23   Go to the next call.  And I'm suggesting to you, sir, that it's

24   on 10-22-2020.

25   A.   That is correct.

1    Q.  Okay.  Next, if you flip the page -- Excuse me.

2            May I have a moment, Your Honor?

3            THE COURT:  Yes.

4    Q.  (BY MR. EISENBERG)  So I asked you to flip the page, Agent.

5    Are you on a page that starts with 10 -- 12-10-2020?

6    A.  I am.

7    Q.  Okay.  And if you go down to maybe four lines, you'll see

8    that there's highlighted a call to 202-225-2635?

9    A.  That is correct.

10   Q.  And you probably don't recall the number for that, or maybe

11   you do.  So let me ask you do you recall?

12   A.  I believe that's the number to Andrew Biggs' office.

13   Q.  Thank you.  Now, the stipulation that was read by counsel

14   for the government, do you recall that 202-456-1111, the number

15   I asked you about a little bit ago, was read during the

16   stipulation?

17   A.  I don't recall if he read that number in the stipulation.

18   I believe he did.

19   Q.  Okay.  Do you recall that that relates to the White House

20   or not?  If you don't, that's okay.

21   A.  I don't recall that number, if it is or if it is not.

22   Q.  But the point -- Well, excuse me.

23           If you go down a few more lines, you will see

24   highlighted that telephone number that I just mentioned?

25   A.  That's correct.

1    Q.  So if the jury wanted to look through this -- Never mind.

2    I mean, I withdraw.

3            Go to the next page, sir.

4    A.  Okay.

5    Q.  This is in January now of 2011.

6            See at the top there's a line that's highlighted?

7    A.  You mean January, 2021?  You said 2011.

8    Q.  2021, 1/6.

9    A.  Okay.

10   Q.  Okay.  It gives a telephone number 2315, is the number that

11   it ends in.  Whose number is that?

12   A.  That is the Congressman Paul Gosar's telephone number.

13   Q.  And two more lines down on the same day, I'll just give the

14   last four digits, a telephone call to 4521?

15           MR. KOEHLER:  Your Honor, I've let this go on for a

16   while, but I'm not seeing the relevance here.

17           THE COURT:  I was going to -- I was actually going to

18   ask Mr. Eisenberg how much longer you are going to need with

19   the witness, because it's about 10:35, and perhaps at about

20   10:40 we can take our morning break.

21           MR. EISENBERG:  I will be done shortly then, Your

22   Honor.

23           THE COURT:  All right.

24   Q.  (BY MR. EISENBERG)  Actually we were at 2635.

25   A.  Yeah.  We did 2635.  That was Andrew Biggs' telephone

1    number.

2    Q.  And then further down there is, again, 2315.  That's

3    Representative Gosar, correct?

4    A.  That's correct.

5    Q.  So go to the last one I'll ask you about is in January,

6    2021, on January the 14th.  It's a few more pages down in the

7    exhibit.

8    A.  Okay.

9    Q.  And if you look down maybe two-thirds of the way, on that

10   date you'll see a call to 4965; is that correct?

11   A.  That is correct.

12   Q.  And that call was done at -- Withdraw.

13          And finally, Agent, if you go to January 21st of

14   2021 --

15   A.  Okay.

16   Q.  -- you'll see there's a call to 4521?

17   A.  That's correct.

18   Q.  Whose number is that?  It's Senator Sinema's, isn't it?

19   A.  That is correct.

20          MR. EISENBERG:  Okay.  Your Honor, I have no further

21   questions.

22          THE COURT:  All right.  Mr. Koehler, how much time do

23   you anticipate your redirect to be?

24          MR. KOEHLER:  Probably about five minutes, Your Honor.

25          THE COURT:  All right.  I'll permit you to go forward,

FERREIRA - REDIRECT

1    and then we will take our morning recess.

2                    REDIRECT EXAMINATION

3    BY MR. KOEHLER:

4    Q.  So directing you back to Exhibits 2 and 3, the two calls on

5    January 17 of 2021, about how far apart were those two calls,

6    if you remember?

7    A.  They were made simultaneously, I believe, just a few

8    minutes apart.

9    Q.  All right.  During your interview, did Mr. Martis appear to

10   understand the questions you were asking him?

11   A.  He did.

12   Q.  And were his answers responsive to the questions that you

13   asked?

14   A.  He was.

15   Q.  Did he appear to have any difficulty in expressing himself?

16   A.  He did not.

17   Q.  Did he appear to be confusing his words or anything like

18   that?

19   A.  Not at all.

20   Q.  Was he able to speak in complete sentences throughout the

21   interview?

22   A.  He was.

23   Q.  So Mr. Eisenberg went through a number of phone calls with

24   you from those YMAX telephone records as well as I think he

25   might have touched on some of the House Telecom records as

                    UNITED STATES DISTRICT COURT

1    well.

2            Did you have recordings of all of those other calls

3    that were made that are reflected in those records?

4    A.  We did not.

5    Q.  And then let's talk about the calls specifically to the

6    House in the YMAX records.  Those are the ones that start with

7    the 225 as the prefix; is that correct?

8    A.  That's correct.

9    Q.  202-225 is the House prefix?

10   A.  Correct.

11   Q.  With the exception of the calls that are marked as exhibits

12   in this case and that have been played here -- and there's one

13   still marked that hasn't been played -- are you aware of any of

14   those other calls having been reported as a threat?

15   A.  Not to my knowledge.  None of those calls were reported as

16   threats.

17           MR. KOEHLER:  May I have a moment, Your Honor?

18           THE COURT:  Yes.

19   Q.  (BY MR. KOEHLER)  With respect to those calls shown in the

20   YMAX records, with the exception of the calls for which you

21   actually have a recording with a voice on it, do you have any

22   way of knowing who placed that call?

23   A.  I do not.

24           MR. KOEHLER:  No further questions.

25           THE COURT:  All right.  And is the witness excused?

1          MR. KOEHLER:  Yes, Your Honor.

2          THE COURT:  All right, sir.  Thank you for your

3     testimony.  You may step down.

4          And, members of the jury, we are at a good ending

5     point for our morning recess.  And so again I will remind you

6     the admonishment that we continue through the trial, and

7     therefore you're not to discuss any matters amongst yourselves

8     or with anyone else.  Just continue to keep an open mind.  And

9     enjoy your break.

10          We'll ask that you be prepared to come in at -- I'd

11    say let's come in right at the hour.  I'll give you a little

12    bit more.  Be prepared to come in -- Be ready to come in on the

13    hour, and we'll have you in slightly after the hour, about five

14    minutes after.  All right.  Please all rise for the jury.

15        (The jury exited the courtroom at 10:39 a.m.)

16          THE COURT:  All right.  So this is your last witness?

17          MR. KOEHLER:  That is correct, Your Honor.  During the

18    break I'd like to take a moment to visit with the clerk and

19    verify that all of our exhibits that we intended to admit

20    during our case in chief are in fact in evidence.  And once

21    that is done, then we intend to rest.

22          THE COURT:  And we are going to test the system now.

23    I'll come in slightly before the hour and see how we are going

24    to proceed.

25          MR. KOEHLER:  Your Honor, after we rest and before we

1     begin, we do have an issue to raise.  We can raise it now if

2     you'd prefer, or we can wait until that time.

3            THE COURT:  Why don't you raise it now while I'm here.

4            MR. KOEHLER:  Certainly.  So yesterday during his

5     opening statement Mr. Eisenberg made multiple references to

6     whether Mr. Martis intended to put a bullet in Adam Schiff's

7     head or intended to chop Nancy Pelosi into little pieces.

8            And that's in direct contravention of the motion

9     in limine that we filed and the Court's order on that with

10    respect to permissible argument in this case.

11           The arguing about whether he intended to threaten is

12    different from arguing about whether he intended to harm.  And

13    we object to his insinuation that a lack of intent to harm

14    means a lack of intent to threaten.

15           The words themselves are the crime, not action.  And

16    because of that, we would ask that he be limited in his

17    presentation of any evidence with respect to that as well as

18    argument during closing.

19           THE COURT:  Mr. Eisenberg.

20           MR. EISENBERG:  Well, the charge is whether he

21    intended to convey a threat.  And so that's what the element

22    is.  And that's what I will be arguing.  And that's what I will

23    be attempting to elicit from my client.  But -- And I know Your

24    Honor has ruled on this.  As I have said before, one who

25    doesn't intend to harm is one who doesn't intend to convey a

1    threat.  But I think from -- And I understand Your Honor's

2    ruling on this, but that's not the same.  I just want the

3    record to reflect that that is my argument.

4          But in terms of eliciting testimony from my client,

5    I'm going to be limited to whether he intended to convey a

6    threat, because that's the Court's ruling.

7          THE COURT:  That's the ruling that I made, and that is

8    the ruling that will govern.  So do be very careful that you

9    don't get into the other area of whether or not he intended to

10   carry out the threat, but -- There is a fine line.  I

11   understand.  But here the government need not prove that he

12   intended to carry out the threat but that he did in fact

13   transmit a threat.  And so I have previously ruled, and I just

14   admonish counsel not to get into that area.

15         MR. EISENBERG:  I understand, Your Honor.  But I do

16   want to be clear he certainly can give his testimony with

17   respect to whether he intended to convey a threat?

18         THE COURT:  Yes.

19         MR. EISENBERG:  Okay.  Your Honor --

20         THE COURT:  His -- Yes.

21         MR. EISENBERG:  Okay.  I've talked to my client.  I

22   don't want to reveal any privileged material.  But I said to

23   him this is what you can go into and/or the other way around;

24   you can't talk about intention to harm, so --

25         THE COURT:  And, Mr. Martis, I will tell you that when

1      I sustain an objection, you are just to stop talking.

2              THE DEFENDANT:  All right.  Yes, sir -- ma'am.

3              MR. EISENBERG:  Well, I trust, Your Honor -- Well,

4      we'll see how it unfolds.

5              THE COURT:  All right.  Anything further?

6              MR. KOEHLER:  No, Your Honor.  Thank you.

7         (Proceedings recessed from 10:44 a.m. until 11:10 a.m.)

8              THE COURT:  The record will reflect that Mr. Martis is

9      not present.  Neither is the jury.  Counsel are present.

10             And let me just ask counsel how we are proceeding

11     next.  Your last witness has testified?

12             MR. KOEHLER:  That is correct, Your Honor.  We have

13     verified that all of the exhibits that we intended to admit

14     during our case in chief are in fact in evidence.  So when the

15     jury comes back, we intend to rest.

16             THE COURT:  All right.  And I'm assuming,

17     Mr. Eisenberg, you were going to make a motion?

18             MR. EISENBERG:  Yes, Your Honor.  And I won't be long

19     with respect to that motion.  But after the government closes,

20     I will make it.

21             THE COURT:  Well, since we are waiting for

22     Mr. Martis -- I don't know -- would you entertain the idea of

23     having the government rest now for purposes of you making the

24     motion so that we can use that time, or would you like to wait

25     for your client to be present?

1          MR. EISENBERG:  No, I don't think that's necessary,

2     Your Honor.  We can go forward with the motion.  Of course I

3     guess --

4          THE COURT:  And the government certainly -- I can

5     permit the government to close in front of the jury, and then

6     we can proceed.

7          MR. EISENBERG:  And so the motion can be made now.  I

8     don't think there's any problem with that.

9          THE COURT:  All right.

10         MR. KOEHLER:  So for that purpose, the government

11    rests, Your Honor.

12         THE COURT:  All right.

13         MR. EISENBERG:  And, Your Honor, may it please the

14    Court, on the basis of the evidence as submitted by the

15    government up to this point in time, there's no doubt that

16    threats did occur.  The issue as we have discussed at length is

17    whether my client intended to make those threats.

18         And on the surface of the case as it exists now, I

19    concede that threats were made.  So it is necessary for me to

20    go forward with my client's defense.  I'm not going to belabor

21    the obvious.  And in my opinion the government has put on

22    enough of a case such that a motion for a directed verdict is

23    not reasonable.

24         So I am going to put on the record the reasons why I

25    believe it's really not a very appropriate motion for me to

1    make in the first place.  And so that's my position, Your

2    Honor.

3            THE COURT:  I guess the way that I understand it,

4    Mr. Eisenberg, is that you don't feel that you have a basis on

5    which to make a Rule 29 motion.

6            MR. EISENBERG:  That's correct, Your Honor.  I concede

7    that threats were made.  So in the way that threat is defined,

8    it's been made.

9            THE COURT:  All right.  And all that I will comment on

10   then, given that Mr. Eisenberg does make the concession, is

11   that there are other elements that are required to be proved as

12   to Counts 1 -- renumbered Counts 1, 2, and 3 of the superseding

13   indictment, and that is that there is sufficient evidence in

14   the record that Mr. Martis did make telephone calls from the

15   Hiltop location in Arizona to Washington, D.C, the offices of

16   Congressman Schiff and Congresswoman Pelosi, on the dates as

17   alleged, and, as Mr. Eisenberg concedes, that threats were in

18   fact conveyed in those communications, and that there's

19   sufficient evidence in the record as to the dates alleged,

20   respectively January 20th of 2020, March 27th of 2020, and

21   January 17th of 2021.

22            And so there being nothing further, then what we will

23   do is have the jury in.  We will have the government then rest

24   its case.  And then you can call Mr. Martis up.

25            My understanding is our ramp is not operable, and so

| | |
|---|---|
| 1 | we will have someone -- our marshals perhaps help him up. |
| 2 | Should we do that before the jury comes in? |
| 3 | MR. EISENBERG:  Well, we were talking about that at |
| 4 | the break, Your Honor.  I don't think it's appropriate to have |
| 5 | the jury here while the marshals lift him into the -- |
| 6 | THE COURT:  I think we can do that.  Let's have him |
| 7 | come in and take the witness stand before the jury comes in. |
| 8 | And then you can rest.  And then Mr. Eisenberg can move |
| 9 | forward. |
| 10 | I guess, Mr. Eisenberg, let me just see if I can get |
| 11 | from you an estimate of how much time you're going to need with |
| 12 | Mr. Martis on the stand, and then with that, because I think |
| 13 | once we come in, probably what I'm going to suggest is at least |
| 14 | we take testimony until 12:30, if it's going to take that long. |
| 15 | If it's not going to take that long, then I would suggest that |
| 16 | we then go right into closing arguments and then instructing |
| 17 | the jury. |
| 18 | But if it's going to -- For example, Mr. Eisenberg, if |
| 19 | you think you're going to need about a half an hour with your |
| 20 | client on the stand and then the government will need that much |
| 21 | time, then we'll end up having you close your case and then |
| 22 | letting them go to lunch.  We had ordered lunch for them in |
| 23 | anticipating that it would already be to the jury now. |
| 24 | And then we can instruct the jury after lunch and then |
| 25 | permit your closing, and then they can deliberate. |

1          MR. EISENBERG:  Your Honor, under any circumstances I

2    prefer to do closings after lunch.

3          In answer to your question, the direct probably

4    shouldn't take more than 15 or 20 minutes.

5          THE COURT:  Okay.

6          MR. EISENBERG:  But with cross-exam, I don't know.

7    That would carry us up to at least noon, I suspect.  I don't

8    know.

9          THE COURT:  Okay.  Well, so is there an objection then

10   to having just the testimony of Mr. Martis and then breaking

11   for lunch, having them come back?  Mr. Eisenberg -- Well, the

12   government, will you have any rebuttal?

13         MR. KOEHLER:  It's possible, Your Honor.  I may do it

14   through Mr. Martis.  It just depends.  I have a couple of

15   exhibits potentially to offer with him, and it will take a

16   couple minutes to set up and make sure that things are working.

17         THE COURT:  Okay.  So that's how we will proceed.  I

18   will instruct the jury -- Well, you can close, Mr. Eisenberg,

19   after lunch.  And then we can move to instructing the jury and

20   then to your closing arguments.

21         MR. EISENBERG:  Thank you, Your Honor.

22         THE COURT:  All right.

23         MR. EISENBERG:  Let me check, Your Honor.  He may be

24   here.  Do you want --

25         THE COURT:  Yes, please.

```
 1            MR. EISENBERG:  No response, Your Honor.

 2            THE COURT:  Okay.  Here we are.

 3        (The defendant entered the courtroom.)

 4            THE COURT:  We're going to move him into the witness

 5     stand now.  Thank you.

 6            Are the appropriate exhibits, if any, up there,

 7     Mr. Eisenberg?

 8            MR. EISENBERG:  I've given them to Liliana.  It's the

 9     same group.  101 --

10            THE CLERK:  2, 3, 4, 5, 6, and 7?

11            MR. EISENBERG:  There was a skip.  1, 2, 3, 4, 6, and

12     7.

13            THE CLERK:  Not 5?  Okay.

14            THE COURT:  Mr. Martis, the only papers that you're to

15     refer are the exhibits in front of you.  Certainly if you want

16     a writing pad or something of that sort with you, Mr. Eisenberg

17     can provide that to you.  But otherwise you're only to

18     concentrate on the papers that are before you.

19            THE DEFENDANT:  No notes or anything?

20            MR. EISENBERG:  No, no.

21            THE DEFENDANT:  Okay.

22            MR. EISENBERG:  I'm going to give the defendant a pad

23     and one of these pen inserts that the marshals allow and

24     glasses.

25            THE COURT:  Okay.  And you have your headphones.
```

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  All right.

3          MR. EISENBERG:  You're going to have to have those.

4          THE DEFENDANT:  Yes.  I don't know if I'll need that.

5     The pen doesn't work all that well anyway.  I don't know what's

6     wrong with them.  They're frozen, I guess, like everything

7     else.

8          MR. EISENBERG:  We have other pens.  Do you need a

9     pen?  Do you need a pen?

10          THE DEFENDANT:  Do I need a pen?

11          MR. EISENBERG:  Why don't I get you a pen that works.

12          THE DEFENDANT:  Seeing I don't have any of my papers

13    there, what good's a pen?

14          MR. EISENBERG:  You can't have papers, as the Judge

15    has said, but you can try those if you want to write on

16    something.  Don't drop it.

17          THE DEFENDANT:  Be careful.

18          THE COURT:  All right.  Are we ready to have the jury

19    in?

20          MR. EISENBERG:  Ready, Your Honor.

21          THE COURT:  And, Mr. Martis, you may remove your mask.

22          THE DEFENDANT:  All right.  Yes, ma'am.  Sorry about

23    being so scruffy.  They wouldn't let me shave or anything.

24          THE COURT:  That's fine.

25          THE DEFENDANT:  No shave.  No hair cut.  I guess you

```
 1    save two bits, huh?
 2         (The jury returned to the courtroom at 11:24 a.m.)
 3              THE COURT:  Is counsel ready to proceed?
 4              MR. KOEHLER:  Your Honor, at this time the government
 5    rests.
 6              THE COURT:  All right.  Mr. Eisenberg.
 7              MR. EISENBERG:  Yes, Your Honor.  Your Honor, the
 8    defense calls Steven Martis.
 9              THE COURT:  All right.  And, Mr. Martis, I'm going to
10    have my courtroom deputy administer the oath to you.
11              THE DEFENDANT:  Yes, ma'am.
12              STEVEN MARTIS, DEFENDANT'S WITNESS, SWORN
13              MR. EISENBERG:  May I proceed, Your Honor?
14              THE COURT:  You may.
15                          DIRECT EXAMINATION
16    BY MR. EISENBERG:
17    Q.  Mr. Martis, I'm going to ask you a series of questions, but
18    I want you to understand that you're to respond to the
19    questions.  Okay?
20    A.  Yes, sir.
21    Q.  Okay.  So -- And if you can't hear, let me know.  And I
22    want you to speak into that microphone so the jury can hear
23    you.
24    A.  Yes.
25    Q.  Okay?  All right.  Is that working?
```

UNITED STATES DISTRICT COURT

1    A.  Yes, it is, sir.

2    Q.  All right.  Sir, well, please state your name.

3    A.  Steven Martis.

4    Q.  Mr. Martis, how old are you?

5    A.  77.

6    Q.  Where were you born?

7    A.  Pittsburgh, Pennsylvania.

8    Q.  Have you gone to high school?

9    A.  Yes.

10   Q.  Did you graduate?

11   A.  Yes.

12   Q.  And once you graduated, what did you do next after

13   graduating from high school?

14   A.  I -- I just knew that we were going to get involved over

15   there in Vietnam, so I went down and enlisted in the Air Force

16   right after graduation.

17   Q.  How long were you in the Air Force?

18   A.  Four years.

19   Q.  While you were in the Air Force, what was your job?

20   A.  I was an aircraft electrician.

21   Q.  An aircraft electrician?

22   A.  Yes, sir.

23   Q.  What did you do as an aircraft electrician?

24   A.  Took care of every system on the KC-135, B-52s, F-106s,

25   F-101s, and F-100s, anything that had a wire going to it.

1   Q.  Where did you serve physically?

2   A.  Physically -- let's see -- Lackland Air Force Base in

3   Texas, Chanute Air Force Base in Illinois, and transferred to

4   Castle Air Force Base in Northern California, went TDY to

5   Hawaii, Vietnam, and Alaska.

6   Q.  Did you -- And when you were discharged, were you

7   discharged honorably?

8   A.  Yes, sir.

9   Q.  Did you get any awards or decorations?

10  A.  Yes, I did.

11  Q.  What did you get?

12  A.  We have the -- Oh, boy.  Let's see.  The good conduct

13  medal, the Vietnam ribbon, the -- what was that? -- national

14  defense ribbon, and the nuclear combat preparedness ribbon.

15  Q.  When you left active duty, what was your rank?

16  A.  E4.

17  Q.  What is that equivalent to in --

18  A.  Now it's called a senior airman.

19  Q.  After you left active duty, did you serve in the reserves?

20  A.  Yes, I did.

21  Q.  For how many years?

22  A.  Four and a half years.

23  Q.  From the time you left up until the time -- Well, let's do

24  it this way.  I'm going to ask you about where you were

25  employed, just briefly.  Tell us, if you can, where you started

1   your employment and for how long you worked there and then what

2   you did.

3   A.   It was a long time ago.  Let's see.  Right after I left

4   service, I got employed with McDonnell Douglas in Long Beach, I

5   think it was, California, and out at the airport with Western

6   Airlines at LAX, and then over to AiResearch when the fuel

7   crisis hit and everybody shut down air travel.

8   Q.   Let me stop you there.  What sort of jobs did you do for

9   McDonnell Douglas and Western?

10  A.   I trouble shot the electrical systems, made sure every --

11  had to check every wire in the aircraft after it was being

12  built, before the final components were installed.

13  Q.   And for AiResearch, sir, what was your job there?

14  A.   Customizing the Gulfstreams III jets, Citations.

15  Customize the -- what -- the corporate jets they are called.

16  Q.   And time goes on.  Did you become an auto mechanic?

17  A.   Yes, sir.

18  Q.   And how long were you an auto mechanic?

19  A.   Jeez, eight years till my toes got ripped off.

20  Q.   Then after that did you go into construction?

21  A.   Yes, sir.

22  Q.   How long were you in construction?

23  A.   I'd say at least 14 years, 15.

24  Q.   All right.  Sorry.  I don't mean to interrupt you.

25  A.   Quite all right.

```
1    Q.  What job or jobs did you have while you were in

2    construction?

3    A.  General construction laborer, whatever needed to be done,

4    dig ditches for culverts, pulled wire, carry lumber, shingles,

5    roofing tiles, whatever needed to be done.

6    Q.  And when you were in construction physically, where did you

7    do that work?

8    A.  Just about all over the place.  Took a job in Illinois,

9    North Carolina, Virginia, I think -- No, it wasn't Virginia.

10           Oh, here in Arizona up in Flagstaff, and -- Boy, come

11   on, come on, brain.

12   Q.  Well, that's okay.  It's all right.

13   A.  Yeah.  It runs together.

14   Q.  Okay.  Did there come a time when you retired?

15   A.  Yes.

16   Q.  When did you retire?

17   A.  Approximately ten years ago.

18   Q.  And are you -- Do you have an income while you're retired?

19   A.  Social security.

20   Q.  All right.  And are you -- Do you get benefits from the

21   Veterans Administration?

22   A.  No.

23   Q.  How about medical attention?

24   A.  Yes, through the VA.

25   Q.  Did there come a time when you were married?
```

1    A.   Yes.

2    Q.   When was that?

3    A.   As I was a construction worker up there in Flagstaff and

4    then Oregon.

5    Q.   Well, when did you get married, sir?

6    A.   Oh, boy.  It was a failed marriage.  What can I say?

7    Q.   All right.  That's good enough.

8    A.   I don't recall.

9    Q.   Okay.  And do you have any children?

10   A.   No.

11   Q.   Did there come a time, Mr. Martis, when you moved to

12   Bullhead City?

13   A.   Yes, sir.

14   Q.   When was that?

15   A.   Approximately 20 years ago.

16   Q.   And did there come a time while you lived in Bullhead City

17   that you rented from -- a room from the Hiltop Hotel?

18   A.   Yes, sir.

19   Q.   And how long had you lived there before this case arose?

20   A.   About three and a half years.

21   Q.   You've heard testimony -- You've been in the courtroom

22   yesterday and today, correct?

23   A.   Yes, sir.

24   Q.   You heard testimony about a search being conducted?

25   A.   Yes, sir.

1  Q.  And that search was at the Hiltop, correct?

2  A.  Correct.

3  Q.  With respect to the search, sir, did you know it was going

4  to happen ahead of time?

5  A.  No, sir.

6  Q.  When you -- When -- Let me ask it this way.  Did there come

7  a time when you interviewed with agents?

8  A.  Yes.  I was called up to the office there, and that's when

9  I met the FBI agents.

10  Q.  And do you recall how many of them there were?

11  A.  Just two at the interview.

12  Q.  During the interview, Mr. Martis, did you interview

13  voluntarily with them.

14  A.  Yes.

15  Q.  And did you answer their questions to the best of your

16  ability?

17  A.  Yes, I did.

18  Q.  Did there come a time when you wanted to leave but couldn't

19  or didn't?

20  A.  Yeah.  I felt like I couldn't leave, you know.

21  Q.  Why is that?

22  A.  These -- They made me feel intimidated, like, you know, if

23  you leave, we're going to probably jump on me or something, you

24  know.  I didn't know.

25  Q.  All right.  And there came a time when the interview was

1   completed, right?

2   A.  Correct.

3   Q.  I'm going to ask you some questions now about what you

4   believe in.  I don't want you to be offended.  Okay?

5   A.  All right.

6   Q.  All right.  These questions are, you might say,

7   politically -- political in nature.

8            Now, did you vote in the last election previous to the

9   one -- the recent one?  Did you vote during the election for

10  President Trump?

11  A.  Yes, I did, 2016.

12  Q.  Okay.  Are you a supporter of him?

13  A.  Oh, for sure.

14  Q.  Why are -- Why do you support him?

15  A.  Oh, he was the most patriotic president I think this

16  country has seen in decades.

17  Q.  Is there or are there -- I'm sorry.  Were there policies

18  that you appreciated?

19  A.  Oh, yes.  The way he got the unemployment taken care of,

20  his dealings with North Korea, got them to stop firing missiles

21  over the top of Japan, who felt threatened by them, and his

22  handling of the mid-east.

23  Q.  And what about the border?

24  A.  Oh, boy.  That's a bad one right there.  Everything he

25  tried to do to secure our southern border, Nancy Pelosi would

1    not have anything to do with it.

2    Q.  I'm sorry.  Go ahead.

3    A.  She -- He tried to get money for more border agents.  No,

4    can't do that.  Tried to build a wall.  No, you can't do that.

5    Everything he tried.  He finally even started -- continued

6    Obama's deal of separating families, putting kids in cages they

7    were called.

8    Q.  So when -- You've heard about telephone calls that were

9    being made during the trial?

10   A.  Yes.

11   Q.  Okay.  So the telephone calls were made by you?

12   A.  Correct.

13   Q.  And you don't deny making them; is that correct?

14   A.  No, no, sir.

15   Q.  So I'm going to ask you first a general question.  Why were

16   you making these telephone calls?

17   A.  Mainly to get these representatives to get up off the

18   dollar and to start working for the country instead of doing

19   everything they could to destroy President Trump.

20   Q.  When you made the calls -- How did you find out where the

21   telephone number was for any particular congressperson you

22   wanted to call?

23   A.  Dialed 411, information.

24   Q.  It was publicly known?

25   A.  Yes.

MARTIS - DIRECT

1    Q.  Now, with respect to the reason, you've described a little

2    bit just now.  You've heard some calls that were played,

3    correct?

4    A.  Yes, sir.

5    Q.  Would you describe your tone of voice as -- How would you

6    describe it?

7    A.  Well, at first I was just calling them up and say, hey, why

8    don't you work with this president.  He's doing everything that

9    he can.  And then after awhile, nothing -- nothing was done.

10    It was like talking to a brick wall.  So then I figured, well,

11    just do like I did in construction.  Just get on their ass and

12    just ream 'em.

13    Q.  Now, let's go back then in time.  When did you start making

14    calls?  We're going to limit this.  Okay.  When did you start

15    making calls to Congresswoman Pelosi and Congressman Schiff?

16    A.  Probably around 2017.

17    Q.  2017?

18    A.  Yes.

19    Q.  Now, you recall that the calls that were played go back to

20    2019?

21    A.  Yes.  That's when I started getting tough with them, you

22    know.

23    Q.  So what you're saying is you were making your calls before

24    the ones that were recorded and are being played?

25    A.  Yes, sir.

1    Q.  Okay.  Can you estimate, if at all, how many calls you made

2    in 2017 and 2018 to Ms. Pelosi?

3    A.  15 maybe.  I don't -- don't really recall.

4    Q.  Now I'm going to ask you the same question about

5    Congressman Schiff.  How many calls before 2019, if you can

6    recall, did you make?

7    A.  Probably zero.

8    Q.  So with respect to him, it started during this period of

9    time from 2019 on; is that correct?

10   A.  Correct.

11   Q.  Now, I'm going to ask you about -- I'm going to read the

12   call to you rather than play it.

13   A.  Yes, sir.

14   Q.  Okay.  These are calls, if you'll bear with me, that were

15   played here.  There's a call on January 20th, 2020.  This is to

16   Congressman Schiff.  Okay?

17   A.  Yes, sir.

18   Q.  "We're going to wipe the fucking streets with you.  We'll

19   put a bullet in your head."  Do you remember that call?

20   A.  Yes, I do.

21   Q.  Do you -- Why did you make that call?

22   A.  Well, I think that was right around the time of the

23   impeachments that were going on.  And after they impeached him

24   once, I believe it was, that Adam -- or, no -- it was Mitch

25   McConnell that said, well, we're going to deal with Adam Schiff

1    very severely and take him to task, try to remove him from his

2    seat on the investigate --

3    Q.  There's a committee?  Is that what you're trying to think

4    of?

5    A.  Yes, his committee, Intelligence Committee.  And then I

6    thought, well, maybe keep him on there because he needs more

7    intelligence.

8    Q.  Now, you used some words.  If you'll pardon my language,

9    I'm going to have to repeat them.

10          "Wipe the fucking streets with you."  Why did you use

11   those words?

12   A.  Just was angry, upset with what the heck was going on.  As

13   I said before, I figured do like we did in construction.  Just

14   ream everybody that we can, you know.  Just you're not doing

15   your job right now, doggone it.  You get down there, and you

16   get that done.  We need it fixed, you know.

17   Q.  There's another part to this message that I want you to

18   concentrate on that.  We'll put, quote, we'll put a bullet in

19   your head, end quote.

20   A.  Yeah.  That's referring to what Mitch McConnell was saying.

21   And I thought, well, they're going to do all that, you know,

22   take him to task and deal with him very severely.  It's like

23   putting a bullet in his head, you know, get him off the

24   committee.

25   Q.  Now --

1    A.  He doesn't like --

2    Q.  I'm sorry.  Okay.  You used the term "we" as in we'll put a

3    bullet?

4    A.  Yes.

5    Q.  Who is "we"?

6    A.  No one else but me.  I thought that would lead more weight

7    to the situation.

8    Q.  All right.  When you made that call, sir, did you intend to

9    make a threat to do bodily injury?

10   A.  No, sir.

11   Q.  That's not -- What did you intend?

12   A.  I intended to get him up off his butt to start working with

13   the President instead of against him.

14   Q.  There's another call I'm going to go to, March 27th, 2020.

15   This is to Ms. Pelosi.

16        And I'll read this call to you, if you can give me a

17   moment.

18        This call says, quote, we're going to kill you; cut

19   you into little pieces, unquote.  Do you remember that call,

20   sir?

21   A.  Yes, after reading the transcript, but -- I don't know.  To

22   me -- It was my voice.  I didn't really recall making the

23   statement, but I guess I did, you know.  It was my voice.

24   Q.  So you don't deny that you made the statement?

25   A.  No.

MARTIS - DIRECT

1   Q.  You listened to it, and you heard your voice?

2   A.  Correct.

3   Q.  And it was you?

4   A.  I believe so.

5   Q.  Did you intend to convey a threat to do bodily injury to

6   Ms. Pelosi during that call?

7   A.  No, sir.

8   Q.  The call says we're going to kill you.  Who's the "we"?

9   A.  Again, myself.

10  Q.  Did you consult with anybody before you made these calls

11  that you're going to make them?

12  A.  No, sir.

13  Q.  You did it on your own?

14  A.  Correct.

15  Q.  I meant to ask you before, sir:  What news media do you

16  follow that -- Withdraw please.

17          Back in this period of time, did you follow news

18  media?

19  A.  Yes, I did.

20  Q.  What news media did you follow?

21  A.  I tried to keep an open mind.  I listened to ABC, CBS, and

22  Fox News, which I finally decided that was the most truthful.

23  Q.  And how did you come to that conclusion?

24  A.  Just by listening to speeches that President Donald Trump

25  made and their reaction to it, and that's it.

```
 1   Q.  The third call -- A third call that's been played is on
 2   January 17th, 2021.  This is also to Ms. Pelosi.  And it goes
 3   like this:  Hi, and -- Perhaps.  I'm sorry.
 4           "Hi, nutty Nancy."
 5           I may have that wrong, but here's the important part:
 6           "I'm coming to kill you, cunt.  You're dead, cunt."
 7           There are two calls.  Do you recall that?
 8   A.  I recall the recording, yes.
 9   Q.  You made those calls, didn't you?
10   A.  Yes.
11   Q.  Your voice?
12   A.  Evidently, yes, sir.
13   Q.  Now, this was in January of 2021.  Was it due to the
14   impeachment, the second impeachment?
15   A.  Yes, I believe it would be, yes.
16   Q.  And why did you make that call?
17   A.  Same reason.  I was just upset and worried for our terrific
18   president, just was really concerned what was going on.
19   Q.  Did you intend to make a threat to Ms. Pelosi in that call?
20   A.  No, I never intended to threaten anyone.  Even in
21   construction, when we start yelling and screaming at each
22   other, you know, it's just part of the job.
23   Q.  So why did you say those words?
24   A.  Trying to get her to do something.
25   Q.  Now, there were lots -- Sorry.
```

MARTIS - DIRECT

1          How many, if you can estimate, over this two-year

2    period of time, how many times did you call Congresswoman

3    Pelosi's office?

4    A.  I have really no idea.

5    Q.  Was it a lot?

6    A.  Oh, I'd say more than just a couple of times, yes.  More

7    than 25.  Less than 2,000.

8    Q.  Somewhere in there?

9    A.  Oh, yes.

10   Q.  So are you a member of the American Legion?

11   A.  Yes, I am.

12   Q.  Are you a member of the Veterans of Foreign Wars?

13   A.  Yes, I am.

14   Q.  Did you, at the time of the search, have any documentation

15   pertaining to those two organizations?

16   A.  Yes, sir.

17   Q.  In your room?

18   A.  Yes, sir.

19   Q.  I think it's up there.  Could you take a look.  They're

20   these blue covered sheets.

21   A.  Yes.

22   Q.  And if you look down at where it says number 101, would you

23   look at that.

24   A.  Yes, Exhibit 101.

25   Q.  And what is that, sir?

1          MR. KOEHLER:  I'm going to object on grounds of

2    relevance, Your Honor.

3          MR. EISENBERG:  Well, Your Honor --

4          THE COURT:  I don't have a copy of that in front of

5    me.

6          MR. EISENBERG:  There is a notebook, black covered

7    notebook.

8          THE COURT:  Do you have a copy?

9          MR. EISENBERG:  I do.

10          THE COURT:  Can I take a look?

11          MR. EISENBERG:  Oh, sure.

12          THE COURT:  You're going to have to lay some

13    foundation.

14          MR. EISENBERG:  Well, he stated that he recognizes it,

15    Your Honor.  I think the objection is to relevance.

16          THE COURT:  I'm going to sustain the objection, that

17    is, to 101.

18    Q.  (BY MR. EISENBERG)  Well, Mr. Martis, are you connected

19    with an organization called the National Association for Gun

20    Rights?

21    A.  Yes, sir.

22    Q.  What is that?

23    A.  It's a group based in Littleton, Colorado, I believe.  And

24    they're mainly a group that stands up for the gun rights.  It's

25    a very good organization.  And I feel the Second Amendment is

1    our Constitution's insurance policy.

2            MR. KOEHLER:  I'm going to object to further questions

3    about that.  This is not about gun rights in this case.

4            THE COURT:  Sustained.

5            MR. EISENBERG:  Your Honor, if I may, can I have a

6    side bar?

7            THE COURT:  Yes.

8        (Bench conference on the record as follows:)

9            MR. EISENBERG:  Your Honor, I know that the Court

10   doesn't like side bars, but I feel like this is important

11   enough for my client to be able to talk about what he believes

12   in.  And that's part of his nature, his personality.  And

13   that's where some of this anger comes from.

14           So I think it's appropriate that he be able to

15   identify the organizations that he's connected with and --

16           THE COURT:  I think he's already sufficiently

17   testified to his support for the President, the work that he

18   thinks is important that he has done.  I think that's

19   sufficient.  I'm not entirely sure what the document's

20   relevance is.

21           MR. EISENBERG:  It shows his intent to carry through

22   those policies, which he feels the President or that President

23   at the time supported.

24           THE COURT:  How does it relate to the telephone calls

25   that he made?

1          MR. EISENBERG:  That's the whole idea, the background,

2     in terms of what he -- what his nature is.  He's already

3     explained that he, number one, believes in these policies.  The

4     border was a problem.  The gun rights are a problem.  The

5     connections to the impeachment were a problem.  And some of

6     these organizations are organizations that he supports, so it

7     gives him credibility.

8          THE COURT:  Mr. Koehler.

9          MR. KOEHLER:  Your Honor, he's testified about his

10    reasons for making phone calls and his objections to their

11    policies.  He's testified that he favors gun rights.  We're not

12    disputing that.  But admitting documents from these third-party

13    organizations that have nothing to do with the calls

14    themselves, and we don't know when he received these documents

15    or when he referred to them prior to making the calls.  We

16    don't know if these documents came into his possession after

17    the phone calls.  We just don't know anything about that.

18          So in light of that, we're going to maintain our

19    objection on relevance grounds.

20          THE COURT:  I'm going to sustain the objection because

21    I don't find that they're relevant to the particular counts in

22    the indictment.  I don't know how they -- how those documents

23    came to be.  It's going to confuse the jury, frankly, when they

24    look at the content of those documents.  I don't know what the

25    relevance is to Count 1, 2, and 3 as we've discussed them.

1              MR. EISENBERG:  Well, respectfully, Your Honor, I

2    disagree.

3         (End of bench conference.)

4    Q.  (BY MR. EISENBERG)  So -- Excuse me.  Mr. Martis, are you

5    ready?

6    A.  Yes.

7    Q.  Okay.  So, Mr. Martis, at the end of the day, on any of

8    these calls, did you intend to threaten Nancy Pelosi?

9    A.  No, sir.

10   Q.  Did you intend to threaten Adam Schiff?

11   A.  No, sir.

12   Q.  There were calls to Senator Schumer?

13   A.  Yes.  I made calls to Congressman Schumer, Senator Schum --

14   Senator Charles Schumer.

15   Q.  Right.  And did you intend to convey a threat in that call?

16   A.  No, sir.  I just parroted his words right back to him.

17   Q.  All right.  So as far as you are concerned, Mr. Martis, you

18   didn't intend to threaten any of these people?

19   A.  That is correct.

20            MR. EISENBERG:  Thank you, Your Honor.

21            THE COURT:  Let me see counsel at side bar briefly.

22        (Bench conference on the record as follows:)

23            THE COURT:  In looking at your exhibits, I noticed

24   Exhibit I think it's 105, the same exhibit that the government

25   introduced.  So I just wanted to give you an opportunity if you

1    wanted to ask him about that exhibit in this set of exhibits.

2              MR. EISENBERG:  No.

3              THE COURT:  All right.

4         (End of bench conference.)

5              THE COURT:  All right.  Thank you, Mr. Eisenberg.

6              Who with the government is going to examine?

7              MR. KOEHLER:  I am, Your Honor.  I will need a minute

8    to set up, if that's okay.

9                              CROSS-EXAMINATION

10   BY MR. KOEHLER:

11   Q.  I guess we're one minute before noon, so I'll say good

12   morning, Mr. Martis.  How are you today?

13   A.  Fairly well.  How are you doing today?

14   Q.  I'm doing well.  You have not spoken to me before; is that

15   correct?

16   A.  That is correct.

17   Q.  And in this trial is the first time we've met?

18   A.  Yes, sir.

19   Q.  Sir, you talked for a bit about your feelings making these

20   phone calls to various members of Congress over time; is that

21   correct?

22   A.  Yes, sir.

23   Q.  Is it fair to say that you had a growing sense of

24   frustration?

25   A.  Yes.

1    Q.  In fact, you said you felt like you were running into a

2    brick wall; is that right?

3    A.  That is correct.

4    Q.  And that's because nobody was getting back to you about

5    your complaints about the treatments of former President Trump;

6    is that right?

7    A.  That, and no one actually seemed to change what they were

8    doing in order to help this country.

9    Q.  So you weren't having an effect with the calls that you

10   were making?  Fair to say?

11   A.  That's safe to say, yes.

12   Q.  And so you decided to get tough on them, right?

13   A.  Correct.

14   Q.  And so you amped up the language?

15   A.  Yes, sir.

16   Q.  Sometimes you used curse words, right?

17   A.  Oh, most definitely.

18   Q.  And you'll agree with me that you're not on trial here for

19   those curse words, right?

20   A.  I hope not.

21   Q.  None of the other calls that you made in which you might

22   have used curse words are charged here; is that correct?

23   A.  That's correct.

24   Q.  Okay.  In each of these calls that are charged here, you

25   made reference to killing; is that right?

1    A.  Yes.

2    Q.  Now, you said that when you worked in construction,

3    sometimes you get mad at your co-workers?

4    A.  That's correct.

5    Q.  You'd yell and scream at them, right?

6    A.  Yes.

7    Q.  Did you threaten to kill them?

8    A.  Oh, hell, yeah.

9    Q.  You would threaten to kill them for not doing their jobs?

10   A.  Yes.  But we all knew that that was just talk.

11   Q.  And those people knew you, right?

12   A.  Correct.

13   Q.  But you didn't know anybody in Adam Schiff's office, did

14   you?

15   A.  No.

16   Q.  You didn't know anybody in Congresswoman Pelosi's office,

17   did you?

18   A.  No.

19   Q.  And those people didn't know you, right?

20   A.  As far as I know.

21   Q.  Okay.  So you say these words in these calls.  Let's start

22   with the first one:  "I'm gonna put a bullet in your head.

23   You're dead."

24           Is that right?

25   A.  No, it's incorrect.

1   Q.   I'm sorry.   "We are gonna put a bullet in your head.

2   You're dead."

3   A.   That's correct.

4   Q.   But you said earlier that when you said we, you were really

5   referring to yourself; is that right?

6   A.   As I had no other people connected with me, correct.

7   Q.   You wanted to scare somebody into taking further action; is

8   that right?

9   A.   To urge them to take more action.

10  Q.   So you wanted to get tough on them by saying I'm gonna put

11  a bullet in your head; we're gonna put a bullet in your head?

12  A.   Yes.   That was to Senator Schumer, and that was -- No.

13  Excuse me.   I believe that was to Adam Schiff, because Mitch

14  McConnell told him that he was going to treat him very

15  seriously and take him to task and possibly get him off the

16  Intelligence Committee.

17  Q.   And so taking him off the Intelligence Committee is the

18  same thing as putting a bullet in his head?

19  A.   Politically, yes.

20  Q.   Did you mention politics there?

21  A.   Maybe not in that one phone call.

22  Q.   You did mention it in another call though; is that right?

23  A.   Yes, I believe so.

24           MR. KOEHLER:   So I'm going to move to admit Exhibit 7

25  pursuant to the stipulation, Your Honor.

```
1              MR. EISENBERG:  Exhibit 7?

2              No objection.

3              THE COURT:  What number in the stipulation is it?

4              MR. KOEHLER:  If I may have a moment?  I believe it's

5     number four, but I'm not sure.

6              Number five.

7              THE COURT:  Yes, it may be admitted, and you've

8     already stipulated to it.  The parties have agreed it's

9     admitted, and it may be published:

10    Q.  (BY MR. KOEHLER)  So just to preface this particular

11    exhibit, you made a phone call to Adam Schiff's office on March

12    28th of 2020; is that right?

13    A.  I don't have the documents in front of me, but I imagine it

14    would be okay.

15             MR. KOEHLER:  Are we on the system?

16             THE CLERK:  This is Exhibit 7?

17             MR. KOEHLER:  Yes.

18        (Exhibit 7 played.)

19    Q.  (BY MR. KOEHLER)  That's your voice, correct?

20    A.  Correct.

21    Q.  And you made that call?

22    A.  Yes, sir.

23    Q.  Would you agree with me that was on March 28th of 2020?

24    A.  If you say so.

25    Q.  During your interview with the FBI, Mr. Ferreira told you
```

```
 1    that you were free to leave, didn't he?

 2    A.  I don't recall.

 3    Q.  I'm going to play you what's marked for identification as

 4    Exhibit No. 18.

 5    A.  I read in the report here that, yes, he said that.

 6    Q.  Have you listened to the audio recording of your interview?

 7    A.  Yes.

 8            MR. KOEHLER:  And I'm going to play for you Exhibit

 9    No. 18.  That's a segment of your interview.

10            Move to admit Exhibit No. 18.

11            MR. EISENBERG:  No objection.

12            THE COURT:  It may be admitted.

13       (Exhibit 18 played.)

14    Q.  (BY MR. KOEHLER)  So you heard him tell you that you were

15    free to leave at any time, right?

16    A.  Yes.

17    Q.  And that you didn't have to talk to him, correct?

18    A.  Correct.

19    Q.  Throughout the entire interview, his tone of voice was

20    consistent with what we just heard in that recording, wasn't

21    it?

22    A.  As far as I can recall, yes, sir.

23    Q.  He was calm with you, correct?

24    A.  Yes.

25    Q.  He did not yell at you?
```

```
 1    A.   No.

 2    Q.   He did not threaten you?

 3    A.   No.

 4    Q.   So everything you said during that interview was voluntary,

 5    correct?

 6    A.   Yes.

 7              MR. KOEHLER:  May I have a moment, Your Honor?

 8              THE COURT:  Yes.

 9    Q.   (BY MR. KOEHLER)  So most of your calls were directed at

10    Nancy Pelosi, the Speaker of the House of Representatives; is

11    that correct?

12    A.   The ones that are charged here with, yes.

13    Q.   And just in general, the calls that you made over time, you

14    mentioned that you made a series of phone calls to her over

15    time.  Would you agree that most of the calls that you made to

16    members of Congress were directed to her?

17    A.   Possibly, yes.

18    Q.   Why is it that you had her on your mind so strongly?

19    A.   She's ring leader of what was going down in the House of

20    Representatives.  She was always on Donald Trump's back trying

21    to, oh, you can't do this; oh, you can't do that, you know,

22    just refusing to cooperate in any way at all with him.

23    Q.   So you had very strong feelings toward her; is that right?

24    A.   No.  I had very strong feelings for our great President

25    Trump.
```

MARTIS - CROSS

1  Q.  But you were angry at her for trying to block what then

2  President Trump was doing, correct?

3  A.  I was upset with her, yes.

4  Q.  And over time, that level of upset built; is that correct?

5  A.  I just kept being upset with her.

6  Q.  More so to the point where you decided that you were going

7  to use the words you used in those calls, correct?

8  A.  No.  No.  What happened was being nice to her and asking

9  her politely and everything just had no effect, so, you know,

10  you have to ramp it up to try to get through to her.

11  Q.  Would you agree with me that there's a difference between

12  being impolite and even vulgar and being threatening?

13  A.  Repeat that.

14  Q.  Is there a difference between being polite and being

15  impolite?

16  A.  Yes.

17  Q.  And is there a difference between being impolite and

18  threatening?

19  A.  It depends.

20  Q.  What do you mean by "it depends"?

21  A.  Well, it depends upon how impolite you are, I guess, and

22  who's making the determination.

23  Q.  So at some point being impolite crosses into the realm of

24  threatening?  Is that what you're saying?

25  A.  It could be, but I never meant to threaten anyone.

1    Q.  Would you agree that at some point words speak for
2    themselves?
3            MR. EISENBERG:  Objection, Your Honor.  It misstates
4    the burden of proof, misstates intent.
5            THE COURT:  Overruled.
6            THE WITNESS:  Repeat the question.
7    Q.  (BY MR. KOEHLER)  Would you agree that sometimes words
8    simply speak for themselves?
9    A.  Sometimes, correct.
10           MR. KOEHLER:  No further questions.
11           THE COURT:  Mr. Eisenberg.
12                   REDIRECT EXAMINATION
13   BY MR. EISENBERG:
14   Q.  Mr. Martis, you were just asked if words speak for
15   themselves.  Do you remember that?
16   A.  Yes, sir.
17   Q.  Your words, did they speak for your intent to commit bodily
18   harm or not?
19           MR. KOEHLER:  Objection.
20           THE WITNESS:  No, sir.
21           MR. KOEHLER:  Leading and outside -- in violation of
22   the instruction.
23           THE COURT:  Sustained.
24   Q.  (BY MR. EISENBERG)  Did you intend to commit -- I'm sorry.
25   Did you intend to convey a threat by your words?

1    A.   No, sir.

2    Q.   In any of these telephone calls?

3    A.   None whatsoever.

4              MR. EISENBERG:  No further questions, Your Honor.

5              THE COURT:  Thank you.

6              Mr. Eisenberg, any other witness?

7              MR. EISENBERG:  No, Your Honor.  So the defense rests.

8              THE COURT:  All right.  Members of the jury, given

9    that it is a quarter after noon and we are upon the lunch hour,

10   just into it, I'm going to -- we have ordered lunch for you.

11   And so lunch will be brought in for you.  You will have a full

12   hour for lunch.

13             Now, please remember, even though the government and

14   the defense counsel have rested their case, that the actual

15   case has not been handed over to you yet to deliberate upon.

16             So you are to adhere to the admonishment not to

17   discuss the case, not to contact any other outside sources

18   about the case.  Simply just enjoy the lunch hour.

19             When you return, what I think will happen is the Court

20   will instruct you again on some legal principles and how you

21   are to go about your deliberations.  And the parties will give

22   you final summations of the case.

23             And so we will be in recess.  Let's have you back in

24   ready to come in at quarter after 1:00.

25             With that, please all rise for the jury.

1          (The jury exited the courtroom at 12:13 p.m.)

2               THE COURT:  Is there going to be any rebuttal?

3               MR. KOEHLER:  No rebuttal, Your Honor.  Thank you.

4               THE COURT:  All right.  So let's have Mr. Martis down

5     from the witness stand, and we will stand in lunch recess.

6               Remind me again, counsel, did you wish me to provide

7     the jury instructions first, or would you like to close first?

8               MR. EISENBERG:  I think we decided that you would give

9     them before.

10              MR. KOEHLER:  I believe that's correct, Your Honor.

11              THE COURT:  All right.  We will proceed in that way.

12    And so I will see you here at a quarter after the hour.

13              One last question before you leave.

14              You filed your joint stipulations.  How are you going

15    to present that to the jury?  Is there a separate form that you

16    intend to give them?  I have those stipulations 1 through --

17    The document you filed, Doc 51, they number 1 through 6.  That

18    includes the list of those telephone numbers?

19              MR. KOEHLER:  Correct.  We have no objection to simply

20    giving the stipulations to the jury, a copy of the stipulations

21    to go with the exhibits.  But if the Court prefers another

22    method, we're happy to make it happen.

23              THE COURT:  What we will do is we will run a copy of

24    document 51 and just simply include that.  Maybe we should

25    include it as whatever the final exhibit number would be.

1          MR. KOEHLER:  I believe 34 was our final exhibit

2     number.  Maybe it was 35.

3          THE COURT:  We can label it as Exhibit 35.

4          MR. KOEHLER:  No objection to that.

5          THE COURT:  All right.  And so we will see you at

6     quarter after the hour.

7          MS. BROOK:  Thank you, Your Honor.

8       (Proceedings recessed from 12:16 p.m. until 1:18 p.m.)

9          THE COURT:  The record will reflect the presence of

10    counsel, the presence of Mr. Martis.  The jury is not present.

11         Counsel, I just want to make sure that when you leave,

12    you leave with all of your work materials, because the jury

13    will assemble in this courtroom for purposes of deliberation.

14    And so do make sure that you take everything with you.

15         Have we distributed the copies of the jury

16    instructions?

17         Do you have the instructions in front of you?

18         MR. KOEHLER:  We do, Your Honor.

19         THE COURT:  All right.  Mr. Eisenberg?

20         MR. EISENBERG:  Yes, I do, Your Honor.

21         THE COURT:  Are we ready to have the jury in?

22         MR. EISENBERG:  I'm ready, Your Honor.

23         THE COURT:  Are we ready?

24         MR. KOEHLER:  Yes, we are, Your Honor.  And just to be

25    clear, I will be delivering the closing, and then Ms. Brook

1    will be delivering rebuttal for the government.

2           THE COURT:  After I instruct the jury?

3           MR. KOEHLER:  Correct.

4           THE COURT:  All right.  Let's have the jury in.

5       (The jury returned to the courtroom at 1:21 p.m.)

6           THE COURT:  Well, welcome back, members of the jury.

7    We thought we were doing something good by ordering lunch in,

8    but apparently the -- of all of the selections that we chose,

9    the restaurant apparently went through a power surge or

10   something, so I apologize for the delay in receiving your

11   lunches.

12          And before we took our lunch break, Mr. Eisenberg, on

13   behalf of his client, rested his case.  The government has

14   rested theirs.

15          And so now, members of the jury, now that you have

16   heard all of the evidence, it is my duty to instruct you on the

17   law that applies to this case.  A copy of these instructions

18   will be available in the jury room for you to consult.  And in

19   fact there are copies of these jury instructions on your chairs

20   if you wish to follow along.

21          It is your duty to weigh and to evaluate all the

22   evidence received in the case and in that process to decide the

23   facts.  It is also your duty to apply the law as I give it to

24   you to the facts as you find them, whether you agree with the

25   law or not.  You must decide the case solely on the evidence

1    and the law.  Do not allow personal likes or dislikes,

2    sympathy, prejudice, fear, or public opinion to influence you.

3    You should also not be influenced by any person's race, color,

4    religious beliefs, national ancestry, sexual orientation,

5    gender identity, gender or economic circumstances.  Also, do

6    not allow yourself to be influenced by personal likes or

7    dislikes, sympathy, prejudice, fear, public opinion, or biases,

8    including unconscious bias.  Unconscious biases are

9    stereotypes, attitudes or preferences that people may

10   conscientiously reject but may be expressed without conscious

11   awareness, control, or intention.  You will recall that you

12   took an oath promising to do so at the beginning of this case.

13          You must follow all these instructions and not single

14   out some and ignore others.  They are all important.  Please do

15   not read into these instructions or into anything I have said

16   or done any suggestion as to what verdict you should return.

17   This is a matter entirely up to you.

18          The indictment is not evidence.  The defendant has

19   pleaded not guilty to the charges.  The defendant is presumed

20   to be innocent unless and until the government proves the

21   defendant guilty beyond a reasonable doubt.  In addition, the

22   defendant does not have to testify or present any evidence.

23   The defendant does not have to prove innocence.  The government

24   has the burden of proving every element of the charges beyond a

25   reasonable doubt.

1        The defendant has testified.  You should treat this
2    testimony just as you would the testimony of any other witness.
3        Proof beyond a reasonable doubt is proof that leaves
4    you firmly convinced the defendant is guilty.  It is not
5    required that the government prove guilt beyond all possible
6    doubt.  A reasonable doubt is a doubt based upon reason and
7    common sense, and it is not based purely on speculation.
8        It may arise from a careful and impartial
9    consideration of all the evidence or from lack of evidence.  If
10   after a careful and impartial consideration of all of the
11   evidence you are not convinced beyond a reasonable doubt that
12   the defendant is guilty, it is your duty to find the defendant
13   not guilty.
14       On the other hand, if after a careful and impartial
15   consideration of all the evidence you are convinced beyond a
16   reasonable doubt that the defendant is guilty, it is your duty
17   to find the defendant guilty.
18       The evidence you are to consider in deciding what the
19   facts are consists of:
20       1.  The sworn testimony of any witness;
21       2.  The exhibits which are received into evidence; and
22       3.  Any facts to which the parties agree.
23       In reaching your verdict, you may consider only the
24   testimony and exhibits received in evidence.  The following
25   things are not evidence, and you may not consider them in

1    deciding what the facts are:

2         1.   Questions, statements, objections, and arguments

3    by the lawyers are not evidence.  The lawyers are not

4    witnesses.  Although you must consider a lawyer's question to

5    understand the answers of a witness, the lawyer's questions are

6    not evidence.  Similarly, what the lawyers will say in their

7    closing argument and at other times is intended to help you

8    interpret the evidence, but it is not evidence.  If the facts

9    as you remember them differ from the way the lawyers state

10   them, your memory of them controls.

11        Any testimony that I have excluded, stricken, or

12   instructed you to disregard is not evidence.

13        Anything you may have seen or heard when the Court was

14   not in session is not evidence.  You are to decide the case

15   solely on the evidence received at the trial.

16        Evidence may be direct or circumstantial.  Direct

17   evidence is direct proof of a fact such as testimony by a

18   witness about what that witness personally saw or heard or did.

19   Circumstantial evidence is indirect evidence.  That is, it is

20   proof of one or more facts from which you can find another

21   fact.

22        You are to consider both direct and circumstantial

23   evidence.  Either can be used to prove any fact.  The law makes

24   no distinction between the weight to be given to either direct

25   or circumstantial evidence.  It is for you to decide how much

1    weight to give to any evidence.

2            In deciding the facts in this case, you may have to

3    decide which testimony to believe and which testimony not to

4    believe.  You may believe everything a witness says or part of

5    it or none of it.

6            In considering the testimony of any witness, you may

7    take into account:

8            1.   The opportunity and ability of the witness to see

9    or hear or know the things testified to;

10           2.   The witness's memory;

11           3.   The witness's manner while testifying;

12           4.   The witness's interest in the outcome of the case,

13   if any;

14           5.   The witness's bias or prejudice, if any;

15           6.   Whether other evidence contradicted the witness's

16   testimony;

17           7.   The reasonableness of the witness's testimony in

18   light of all the evidence; and

19           8.   Any other factors that bear on believability.

20           Sometimes a witness may say something that is not

21   consistent with something else he or she said.  Sometimes

22   different witnesses will give different versions of what

23   happened.  People often forget things or make mistakes in what

24   they remember.  Also, two people may see the same event but

25   remember it differently.

1          You may consider these differences, but do not decide
2   that testimony is untrue just because it differs from other
3   testimony.
4          However, if you decide that a witness has deliberately
5   testified untruthfully about something important, you may
6   choose not to believe anything that witness said.
7          On the other hand, if you think the witness testified
8   untruthfully about some things but told the truth about others,
9   you may accept the part you think is true and ignore the rest.
10          The weight of the evidence as to a fact does not
11   necessarily depend on the number of witnesses who testify.
12   What is important is how believable the witnesses were and how
13   much weight you think their testimony deserves.
14          You are here only to determine whether the defendant
15   is guilty or not guilty of the charges in the indictment.  The
16   defendant is not on trial for any conduct or offense not
17   charged in the indictment.
18          A separate charge -- Excuse me.  A separate crime is
19   charged against the defendant in each count.  You must decide
20   each count separately.  Your verdict on one count should not
21   control your verdict on another count.
22          The indictment charges that the offenses alleged in
23   Counts 1, 2, and 3 were committed on or about a certain date.
24          Although it is necessary for the government to prove
25   beyond a reasonable doubt that the offense was committed on a

1    date reasonably near the date alleged in Counts 1, 2, and 3 of

2    the indictment, it is not necessary for the government to prove

3    that the offense was committed precisely on that date charged.

4          You have heard evidence that the defendant committed

5    other acts not charged here.  You may consider this evidence

6    only for its bearing, if any, on the question of the

7    defendant's intent, motive, preparation, or plan, identity or

8    absence of mistake or accident, and for no other purpose.

9          When you begin your deliberations, elect one member of

10   the jury as your foreperson who will preside over the

11   deliberations and speak for you here in court.

12         You will then discuss the case with your fellow jurors

13   to reach agreement if you can do so.  Your verdict, whether

14   guilty or not guilty, must be unanimous.

15         Each of you must decide the case for yourself, but you

16   should do so only after you have considered all the evidence,

17   discussed it fully with the other jurors, and listened to the

18   views of your fellow jurors.

19         Do not be afraid to change your opinion if the

20   discussion persuades you that you should, but do not come to a

21   decision simply because other jurors think it is right.

22         It is important that you attempt to reach a unanimous

23   verdict but of course only if each of you can do so after

24   having made your own conscientious decision.  Do not change an

25   honest belief about the weight and effect of the evidence

1    simply to reach a verdict.

2            Perform these duties fairly and impartially.  Do not

3    allow personal likes or dislikes, sympathy, prejudice, fear, or

4    public opinion to influence you.  You should also not be

5    influenced by any person's race, color, religious belief,

6    national ancestry, sexual orientation, gender identity, gender

7    or economic circumstances.  Also, do not allow yourself to be

8    influenced by personal likes or dislikes, sympathy, prejudice,

9    fear, public opinion, or biases, including unconscious biases.

10   Unconscious biases are stereotypes, attitudes, or preferences

11   that people may consciously reject but may be expressed without

12   conscious awareness, control, or intention.

13           It is your duty as jurors to consult with one another

14   and to deliberate with one another with a view towards reaching

15   an agreement if you can do so.  During your deliberations, you

16   should not hesitate to reexamine your own views and change your

17   opinion if you become persuaded that it is wrong.

18           Because you must base your verdict only on the

19   evidence received in the case and on these instructions, I

20   remind you that you must not be exposed to any other

21   information about the case or to the issues it involves.

22   Except for discussing the case with your fellow jurors during

23   your deliberation, do not communicate with anyone in any way,

24   and do not let anyone else communicate with you in any way

25   about the merits of the case or anything to do with it.

1          This restriction includes discussing the case in

2     person, in writing, by phone, tablet, computer, or any other

3     means, via e-mail, text messaging, or any Internet chat room,

4     blog, Web site, or any other form of social media.

5          This restriction applies to communicating with your

6     family members, your employer, the media or press, and the

7     people involved in the trial.

8          If you are asked or approached in any way about your

9     jury service or anything about this case, you must respond that

10    you have been ordered not to discuss the matter and to report

11    the contact to the Court.

12         Do not read, watch, or listen to any news or media

13    accounts or commentary about the case or anything to do with

14    it.

15         Do not do any research such as consulting

16    dictionaries, searching the Internet, or using other reference

17    materials.

18         Do not make any investigation or in any other way try

19    to learn about the case on your own.

20         The law requires these restrictions to ensure the

21    parties have a fair trial based on the same evidence that each

22    party has had an opportunity -- an opportunity to address.

23         A juror who violates these restrictions jeopardizes

24    the fairness of these proceedings, and a mistrial could result

25    that would require the entire process to start over.

1          And if any juror is exposed to any outside

2     information, please notify the Court immediately.

3          Some of you have taken notes during the trial.

4     Whether or not you took notes, you should rely on your own

5     memory of what was said.

6          Notes are only to assist your memory.  You should not

7     be overly influenced by your notes or those of your fellow

8     jurors.

9          The punishment provided by law for this crime is for

10    the Court to decide.  You may not consider punishment in

11    deciding whether the government has proved its case against the

12    defendant beyond a reasonable doubt.

13         A verdict form has been prepared for you.  After you

14    have reached unanimous agreement on a verdict, your foreperson

15    should complete the verdict form according to your

16    deliberations, sign and date it, and advise the clerk that you

17    are ready to return to the courtroom.

18         If it becomes necessary during your deliberations to

19    communicate with me, you may send a note through the courtroom

20    deputy, Liliana, signed by any one or more of you.

21         No member of the jury should ever attempt to

22    communicate with me except by a signed writing.  And I will

23    respond to the jury concerning the case only in writing or here

24    in open court.

25         If you send out a question, I will consult with the

1    lawyers before answering it, which may take some time.  You may

2    continue your deliberations while waiting for the answer to any

3    question.  Remember that you are not to tell anyone, including

4    me, how the jury stands, numerically or otherwise, on any

5    question submitted to you, including the question of the guilt

6    of the defendant, until after you have reached a unanimous

7    verdict or have been discharged.

8            The First Amendment protects political speech,

9    including vehement, scathing, and offensive criticism of public

10   officials, including members of the United States Congress.  I

11   instruct you, however, that certain statements are not

12   protected by the First Amendment.

13           The First Amendment does not protect an individual

14   from making what is sometimes called a true threat.

15           True threats are statements where the speaker means to

16   communicate a serious expression of an intent to commit an act

17   of unlawful violence to a particular individual or group of

18   individuals.

19           The determination of whether any statement made by the

20   defendant in this case constituted such a threat is one that

21   you will be asked to make at the end of the trial after you

22   have heard all of the facts, including the contexts of such

23   statements and after I have instructed you on all of the

24   relevant law.

25           The defendant is charged in Counts 1, 2, and 3 of the

1    superseding indictment with transmitting in interstate commerce

2    a threatening communication to a person in violation of Section

3    875(c) of Title 18 of the United States Code.

4              In order for the defendant to be found guilty of that

5    charge, the government must prove each of the following

6    elements beyond a reasonable doubt:

7              First, the defendant knowingly transmitted in

8    interstate commerce a voice message -- voice messages

9    containing a threat to injure Nancy Pelosi and/or Adam Schiff;

10             Second, the defendant transmitted the messages with

11   the intent to issue threats.

12             The government need not prove that the defendant

13   intended to carry out the threat.  And the government also need

14   not prove the intended recipient actually received the threat.

15             Is the government ready to make its closing statement?

16             MR. KOEHLER:  Yes, Your Honor.

17             THE COURT:  You may proceed to do so.

18             MR. KOEHLER:  Good afternoon, everyone.  I would like

19   to start off simply by thanking all of you for serving as

20   jurors.  You all drove from distances all across the northern

21   half of the state to come here and took a few days out of your

22   lives to hear this case.  And for that I simply want to thank

23   you.

24             At the beginning of this trial, Ms. Brook promised to

25   you that we would prove the three threat charges that are set

1       forth in the indictment:

2               Count 1.  "We're gonna put a bullet in your head.

3       You're dead."  We've proven that.

4               Count 2.  "We're going to kill you, chop you up into

5       little pieces."  Again, we've proven that.

6               Count 3.  "I'm coming to kill you.  You're dead."

7       We've proven that.

8               Not only have we proven that Steven Martis made those

9       calls, that he made those calls in interstate commerce by

10      making telephone calls from Bullhead City, Arizona, to

11      Washington, D.C., but you heard Mr. Martis take the witness

12      stand in this trial and admit having made those calls and

13      uttered those words.  That was his voice in those recordings.

14              These were in fact criminal threats.  These were

15      messages in which Mr. Martis meant to communicate a serious

16      expression of an intent to commit an unlawful act of violence

17      on a person, that is, a threat to kill Adam Schiff on January

18      20th of 2020, a threat to kill and chop up into little pieces

19      Nancy Pelosi on March 27 of 2020, and a threat to kill Nancy

20      Pelosi again on January 17th of 2021.

21              Again, the elements here, that he knowingly sent a

22      threatening communication in interstate commerce.  You heard

23      him admit from the stand he knowingly made those phone calls to

24      his Congresspeople.

25              And, again, the proof that he intended that to be a

1      threat.  And we'll talk about that at length here.

2             Remember it is the threat itself, the words spoken

3      over the phone, that constitute the violation.  It's not

4      whether he intended to actually do the things that he said on

5      the phone.

6             It's the fact that he said those words with the intent

7      to do what?  To strike fear in the heart of the listener.

8             This case is not, again, about a plan to carry it out

9      or his having the ability to carry out the threat.  It's also

10     not about Speaker Pelosi or Congressman Schiff actually

11     receiving those.  Again, as the Judge just instructed you,

12     those are not necessary elements of this case.

13            It's also not about Mr. Martis's political beliefs or

14     Adam Schiff's and Nancy Pelosi's political stances.  All of

15     their beliefs could be reversed.  Nancy Pelosi and Adam Schiff

16     could be Republicans, and he could be a Democrat.  It wouldn't

17     matter.  The only thing that matters:  What did he say on that

18     phone call, and what was his intent in saying it?

19            So let's talk first about the threat call to Adam

20     Schiff on January 20.

21        (Exhibit 6 played.)

22            In what world does somebody say, "We're gonna put a

23     bullet in your head.  You're dead," without intending to strike

24     fear in the heart of the listener of that message?

25            That was Mr. Martis's first bite at the apple.

1          After that, the FBI came and paid him a visit.  And

2     they warned him these kinds of messages are unlawful.  They're

3     concerning.  Because now you're talking about an active threat

4     to somebody.  And you heard from Agent Wilson the fact that the

5     Capitol Police ramped up protection for Congressman Schiff

6     after this, that they notified people on his staff so that

7     everybody was aware that this threat was out there.  These

8     things have real world consequences for the people who receive

9     them.

10          And they warned him.  And he said okay.  He understood

11     that warning that when you make a call like this, now you're

12     causing people to be concerned because there's an active

13     threat.  And they warned him more.  We're not here to tell you

14     how to vote.  We're not here to tell you how to live your life,

15     who to talk to.  It changes when you call in and say, hey, you

16     know, Adam, I'm gonna put a bullet in your head like you did on

17     the 20th.

18          That's one of the situations where it becomes now

19     you're breaking the law.  That's what Agent Ferreira said to

20     Mr. Martis and asked him does that make sense to you, and

21     Mr. Martis said yeah, okay.  So he understands.  Even if

22     somehow he was unclear about those words being threatening when

23     he uttered them on January 20th of 2020 -- and I would submit

24     to you those words speak for themselves and speak for his

25     intent -- but at this point on February 4th when the FBI pays

1    him a visit, there's no doubt at all.  A call like this is

2    breaking the law.

3         Yet what does he do about five weeks later?

4    (Exhibit 1 played.)

5         Okay.  Again, in what world does somebody say we're

6    gonna kill you, chop you up into little pieces, and not have an

7    intent to cause fear of harm to the person on the other end of

8    that line?

9         The words themselves reflect his intent.  But when you

10   consider it especially in the context of the fact that he was

11   warned by the FBI, he knows exactly what he's doing, and he

12   knows it's wrong.

13        But he doesn't stop there.  He does it again in

14   January of 2021.  It's January 17th.  That slide is wrong.

15   It's January 17 of 2021.

16   (Exhibits 2 and 3 played.)

17        I don't know why the audio starts to play again when I

18   advance to the next slide.  I apologize for that.

19        Again, it's a threatened I'm coming to kill you.

20   Those are his words.  He's not saying, you know, I'm mad at you

21   about your politics, nor did he say anything about politics in

22   the message on March 27 of 2020 to Speaker Pelosi.  Both of

23   those, there's no discussion about the issues of the day.  It's

24   blunt.  It is simple.  "I'm coming to kill you.  You're dead."

25   And then on the previous call, "We are gonna kill you, chop you

1    up into little pieces."  Those are blunt and forceful messages

2    intended to strike fear.

3         Think for a minute about what else you heard in this

4    trial about Mr. Martis's calls.  You heard that he made

5    hundreds of calls, approximately 151 to Speaker Pelosi's office

6    and approximately 19 to Adam Schiff's office, plus you'll see

7    in the exhibits, the YMAX Exhibits 12 and 13 -- or no -- it's

8    14 and 15, hundred and hundreds of calls to congressional phone

9    numbers in that two-year span.

10        He knows how to choose his words.  You heard there

11   were no other reported threats.

12        He knows how to vent his anger.  He knows how to get

13   tough on Congresspeople without threatening to kill them.

14        These aren't his buddies from construction work who

15   know him.  These are strangers, people he's never met before in

16   his life, people all the way across the country.

17        He knows his words are going to have a different

18   impact on that kind of person than it is on somebody that he

19   works construction with, even assuming he's telling the truth

20   about that.

21        It's easy to come up with a post hoc explanation for

22   something you said almost a year ago and over a year ago on the

23   telephone when you're here in front of you in the jury.  But

24   when you look at the words themselves and you listen to the

25   tone of voice that he used, when he said those words on the

1    phone, his intent was plain at the time he made the call.  The

2    calls themselves are the best evidence of what his intent was

3    at the time that he made them.

4            The threats were violent and specific.  Again, he knew

5    what he was doing.  He did it on purpose.  He told you himself

6    he admitted I wanted to get tough on them.  Why?  He's

7    frustrated.  He's not getting his way.  It's understandable

8    people would get frustrated when they're not getting their way

9    when calling their Congressman or even talking to a family

10   member that disagrees with them, and they're not getting

11   anywhere in the argument.

12           But it's one thing to get mad, get angry, curse, call

13   people names, all of that.  It's a completely different world

14   when you threaten to kill them.  That's crossing the line.

15   That's where we have no longer order in society.  That is

16   something that the First Amendment does not sanction, and it's

17   something that the law prohibits, and it's something that

18   should be prohibited here.

19           Again, in the jury instructions, in the

20   next-to-the-last instruction you got, Judge Humetewa instructed

21   you to consider the context in which the statements are made in

22   order to understand them.

23           Again, these are calls being made to complete

24   strangers, and they're specific and violent threatening to

25   kill.

1          These are the threats:  "We're gonna put a bullet in

2    your head.  You're dead".  We're going to kill you and chop you

3    up into little pieces".  I'm coming to kill you.  You're dead."

4          We have proven all of those beyond a reasonable doubt.

5    The words speak for themselves.  They convey violence.  They

6    convey fear and intent to instill that fear.

7          Members of the jury, we have proven the charges in

8    this case beyond a reasonable doubt.  We ask you to find the

9    defendant guilty.  Thank you.

10          THE COURT:  Thank you, Mr. Koehler.

11          Mr. Eisenberg.

12          MR. EISENBERG:  Mr. Martis, colleagues, Your Honor,

13    jurors:

14          What is important in this case, paramount, the most

15    important thing, is the element of intent.  The government is

16    required to prove that Mr. Martis intended to convey a threat.

17    You must be firmly convinced that that is exactly what he

18    intended to do.  That's part of the charge that Her Honor just

19    gave earlier.

20          Part of the evidence in this case is direct evidence.

21    That's his testimony.  So let's keep that in mind.

22          And, finally, before I go into the evidence, this is a

23    case calling for proof of subjective intent.  That is to say,

24    in a roundabout way, what did he intend, he, intend when he

25    picked up the phone and made those messages?

1          It is not about the content of the threat just.  And

2   that's what the government emphasizes.  They will go from the

3   words and say there was the intent.

4          How conveniently they skip over the second and I would

5   say the one element in this case that is the most important:

6   What did he intend to do when he made those communications?

7   Did he intend to convey a threat?

8          Well, what better proof of that is when the man gets

9   on the witness stand and testifies that he did not intend to

10  convey the threat.  What form of cross-examination, what

11  content, what was said, what was asked of Mr. Martis to

12  disprove that?

13         Under oath he gets up there, and he says what he

14  intended to do or not do.

15         What he intended to do was to make people wake up and

16  pay him some attention.

17         Now, the words might be horrific, but it's not the

18  words just.  It's what he intended to do.

19         Was there, as a matter of analysis, on your behalves,

20  was there anything about what he said, the way he said it, how

21  well he said it that gives you pause that he was lying?

22         That's your call, because part of the jury charges

23  here in this case and any other case has to do with the witness

24  and the witness's credibility and whether you take the witness

25  at their words in part or not.  That's up to you.

1              But I submit to you, ladies and gentlemen, there was

2      nothing asked of him, there was no content in what he said,

3      there was no way in which he said it that says he was wrong or

4      he was lying when he was on the stand.  The man was very

5      forthcoming.

6              The reasons -- The reasons for making those calls is

7      he does want politicians to pay attention, pay attention to the

8      issues that he sees.

9              Now, I agree with the government that as we sit here

10     today, politics should not be how we feel about something, you

11     individuals, myself, anybody in this courtroom.

12             What is important is what he feels about politics,

13     because it was the motivating factor for him to do what he did.

14     Whether you are pro one side or the other isn't the issue.  The

15     issue is for him he was pro Trump, and Pelosi -- Congresswoman

16     Pelosi was not.  And Congresswoman Pelosi and Congressman

17     Schiff were not doing what he thought should be done.  Bottom

18     line for him was they were undermining the President, at the

19     time, the President of the United States.  And that's where he

20     felt impelled to get somebody's attention.  You don't like the

21     words.  I can understand that.  I can understand that.  But

22     swear words do not convey his intent.

23             The intent to cause a harm -- a threat, rather, a

24     threat, is what is involved in this case.

25             So when he has issues with the border, immigration,

1    impeachment, and other issues that he conveyed to you while on

2    the witness stand, that is the reason why he called.

3             Now, he did say he called several times before that

4    2019 through 2011 two-year period of time.  None of those calls

5    apparently caused anybody any consternation.

6             Now, I will be straightforward with you and say none

7    of them were brought before you.  We don't know whether anybody

8    listened to those calls.  But we sure know that in this period

9    of time that I'm talking about, those two years, there were

10   over 150 calls made from that telephone number to Ms. Pelosi's

11   office.  Only a few of them are brought here.

12            Now, what can you make that?

13            Well, you could say that according to the staffers who

14   listen to these things, they must have heard calls that didn't

15   strike them as being a problem.

16            If he made that many calls just to Ms. Pelosi and

17   several more were made to Congressman Schumer, and we got no

18   response -- I'm sorry.  Not Congressman Schumer.  Congressman

19   Schiff.  18 calls to the Congressman, and only one is here

20   before you.  And there are calls that are made throughout this

21   entire period of time.  What to make of that?

22            Well, it could be a graduated sense of frustration.

23            Now, you and I might agree that we don't do this in

24   order to carry out our frustration.  But we're not on trial

25   here, and that's not the issue.

1          The issue is was he frustrated, and do you believe it
2    or not.  That's really the job here, and that's the only job
3    that you all have.  As far as he is concerned, it is whether he
4    intended to convey a threat.

5          So are you going to believe the words, or are you
6    going to believe the man?  I submit you believe the man.  He
7    testified here under oath.  He was unequivocal.  He could not
8    be shaken.  And that is my client.

9          That's all that need be said.

10         Thank you, Your Honor.

11         THE COURT:  Thank you.  Government.  Ms. Brook.

12         MS. BROOK:  That's right.  So the defendant was
13   frustrated.  He was angry.  And he picked up the phone, and he
14   engaged in a criminal threat not once, not twice, but on three
15   separate occasions.

16         Let me start with what defense counsel ended with.
17   All those calls, there was testimony about how hundreds of
18   calls were coming from the Hiltop Motel and going to different
19   congressional offices.  That's right.

20         We're not quite sure if all of those were the
21   defendant, which ones were, which ones weren't.  Defendant said
22   he made quite a few.

23         What we do know, based upon the evidence that came
24   from the witness stand, is that when the defendant wanted to
25   call and talk about politics, he knew exactly how to do it.  He

1    talked about careers.  He talked about other things.  But when

2    he hit his point, when he hit his limit, when he hit his mark

3    of frustration, he knew exactly how to get people to pay

4    attention to him.  You scare the bejesus out of them.  You pick

5    up the phone and you tell them you're gonna kill them, chop

6    them up into little pieces.  You pick up the phone and you say

7    we're gonna put a bullet in your head; you're dead.  That is

8    the mark of intention, intention to commit the crime.

9           Defense counsel stood before you and suggested that

10   you can't find him guilty because when the defendant took the

11   stand today, he didn't confess; he didn't admit to it.

12          Ladies and gentlemen, let's make no mistake about it.

13   The government and the government alone bears the burden of

14   proof.  It is our job to prove to you beyond a reasonable doubt

15   every element of these crimes.  Defendant has no obligation to

16   testify.  But when he does, when he gets on the stand, it is

17   your judge to gauge his credibility just like you would anybody

18   else's.

19          The Judge instructed you on some ways to do that.

20   What is their motive?  What is their opportunity or interest in

21   not telling the truth?  Have they said other things that are

22   inconsistent?

23          These are some of the ways you gauge whether or not to

24   believe what the defendant said when he testified.  It's just

25   one form of evidence, what he said when he was up there.  And

1      we're going to come back to that in a minute.

2              But what the defense does not want you to focus on,

3      what they're distracting you from is the fact that you have the

4      evidence of the crime.  This isn't a case where a witness comes

5      in and sits down and repeats words that were heard that weren't

6      recorded.  We have the recordings.  You have the direct

7      evidence of the threats.

8              And it is through listening to those threats, the

9      direct evidence of them, the recording, that you can tell,

10     based upon the evidence that's come from the witness stand, the

11     words, were the words threatening?  I'm gonna put a bullet

12     in your head.  I'm going to chop you up into little pieces.

13             The context of those statements is also important.

14             Context how?  What else was said in the messages.

15             You will see especially with Counts 2 and Counts 3,

16     the messages to Nancy Pelosi, there's nothing in there about

17     politics.  It's all about death.  It's all about threats.

18             His tone, the tone with which he delivered that

19     message, and how deliberately he did it.  Let's talk about tone

20     for a second.  The defendant testified here today, and you

21     heard him talk.  He was calm.  He was articulate.  He was able

22     to speak in a way that he could communicate his thoughts in a

23     calm and rational way.  But what did he do on the phone?

24             Well, let's talk about the Nancy Pelosi threats.

25             The defendant intended to threaten.  How do we know

1    that?

2          He testified that he picked her.  She was the ring

3    leader, always on Donald Trump's back, he said, refusing to

4    cooperate.

5          So he picked the target.  He was deliberate about his

6    words.  And what did he say about that?

7          Well, being nice to her had no effect, so I had to

8    ramp it up; I had to get it through to her.  I had to have them

9    pay attention to me.  I intended the effect that the message

10   had on the listener, which was to scare, to be noticed.

11         There has been some talk about politics in this case,

12   and as it seems clear to everybody, politics plays no part in

13   this.

14         It also plays no part in whether the victims in this

15   case, whether the individuals who the messages were driven to,

16   targeted to, should, because of their position, just be

17   receiving these threats.

18         Defendant talked about how he had built up this anger,

19   these feelings.  Even though we have built up anger and

20   feelings, politicians, who are elected, who are in place in

21   political positions don't deserve to be threatened with death.

22   They don't deserve to be treated any different than anybody

23   else.  And the law so instructs they aren't to be treated any

24   different than anybody else.

25         Just because, as the defendant said, he was frustrated

1   because of politics?

2          It explains his intent perhaps for him.  It explains

3   why he wanted to scare, to frighten the listener, because he

4   was upset.  He was angry.  He wasn't being noticed.  He wasn't

5   paying attention.  He had been warned that this is criminal,

6   and he did it anyway.  He did it again, and he did it again.

7          Ladies and gentlemen, the evidence in this case has

8   come from the witness stand.  The defendant issued violent, as

9   the witness testified, scary threats, threats that were serious

10  expressions of an intent to commit a violent act, each of the

11  three, to kill.

12         He did so because he wanted the listener to feel

13  afraid.  He wanted the listener to feel upset.

14         And as the evidence has shown that came from that

15  witness stand, he intended his message to be just that, a true

16  threat.

17         We ask you to hold the defendant accountable and find

18  him guilty on all three counts.

19         Thank you.

20         THE COURT:  All right.  Members of the jury, as you

21  know, there are 13 of you that were selected to hear this case,

22  but the law only requires that 12 of you deliberate.

23         And so by random draw we are going to select the

24  alternate juror.  If you are selected as the alternate,

25  however, that does not necessarily mean that you are relieved

1    of your responsibilities.  That is because during the course of

2    deliberations from time to time we have a juror called away on

3    an emergency or something like that.  That juror will then be

4    called back to resume that position and continue deliberations.

5            And so I will have the courtroom deputy draw by random

6    lot the alternate juror.

7            THE CLERK:  There are 13 numbers in this hat.

8            Alternate is number ten.

9            THE COURT:  Seven?  Ten.  I'm sorry.  Number ten.

10   Which juror is number ten?

11           All right.  Sir, when we let you leave the courtroom,

12   you can gather your things and leave the building.  But I do

13   believe we have your contact information.  And make sure, if we

14   don't, we have a good cell phone number for you, if you would

15   give that to Liliana before you leave.

16           Now, at this juncture what I'm going to tell you is

17   for a momentary basis we're going to have you exit the

18   courtroom.

19           We are then going to vacate this courtroom.  It will

20   give all of us an opportunity to gather our belongings and

21   leave.  You're going to begin your deliberations in this

22   courtroom for social distancing and so on.  So you will

23   actually deliberate in the courtroom.

24           So don't begin your deliberations until you come back

25   into the courtroom.  And Liliana will bring you back in.

1           All right.  Let me administer the oath to the

2     courtroom deputy.

3        (Courtroom deputy sworn.)

4           THE COURT:  All right.  Now the courtroom deputy will

5     escort you out.  And, again, ladies and gentlemen, if you do

6     have any reason to communicate, please only do so by a writing.

7           If you do so, please indicate the time and date of

8     that writing.  And if a juror number wishes to sign it by their

9     number or any number of you wish to do so, only do so by juror

10    number.

11          All right.  And all rise for the jury.

12        (The jury exited the courtroom at 2:11 p.m.)

13          THE COURT:  Please make sure that Liliana has a way to

14    contact you in case there are questions.  All right.  Thank

15    you, counsel.

16          MS. BROOK:  Thank you.

17        (Proceedings recessed at 2:12 p.m.)

18

19

20

21

22

23

24

25

1            <u>C E R T I F I C A T E</u>

2

3            I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 6th day of May, 2022.

12

13

14                                    s/Linda Schroeder
                               Linda Schroeder, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT