**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **3:21-CR-08043-DJH** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 8, 2021 |
| **Steven Martis,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**FINAL PRETRIAL CONFERENCE**

Official Court Reporter:
Hilda E. Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                         **A P P E A R A N C E S**

3

   For the Plaintiff:
4      United States Attorney's Office
       By:  **Kristen Brooks**, Esq.
5           **Joseph Koehler, Esq.**
       40 North Central Avenue, Suite 1200
6      Phoenix, AZ 85004

7  For the Defendant:
       David Eisenberg, P.L.C.
8      By:  **David Eisenberg**, Esq.
       3550 N. Central Ave
9      Suite 1155
       Phoenix, Arizona 85012-2120
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **P R O C E E D I N G S**

3

4         THE COURT:  All right.  Please be seated.

5         COURTROOM DEPUTY:  Case number CR 21-8043, United

6    States of America vs. Steven Arthur Martis, on for final

7    pretrial.

8         MS. BROOK:  Good afternoon, Your Honor, Kristen Brook

9    and Joe Koehler on behalf of the United States.

10        THE COURT:  Good afternoon.

11        MR. EISENBERG:  Good afternoon.  David Eisenberg on

12   behalf of Mr. Martis, who is seated to my left of the -- he's

13   in a wheelchair.  May he remain seated?

14        THE COURT:  Yes.  And good afternoon to you,

15   Mr. Eisenberg.  Good afternoon to you, Mr. Martis.

16        THE DEFENDANT:  Good afternoon, Judge.

17        Now, we are set to proceed to trial next Tuesday.

18   Have the parties discussed any other resolution to the case

19   short of trial?

20        MS. BROOK:  No, Your Honor, I don't believe there's

21   been any interest from the defendant's part.

22        MR. EISENBERG:  That is correct, Your Honor.

23        THE COURT:  All right.  And so we will proceed to

24   trial then with the selection of the jury.  And before we

25   conclude the Final Pretrial Conference, we will go through the

1    selected removals for hardship and so on, but let me take care

2    of some of the final pretrial matters first.

3            The schedule for the court is to begin jury selection

4    Tuesday morning at 9:00 a.m., and what my goal is is that we

5    screen the juror questionnaires so that we get to a maximum of

6    24.  My assumption is that typically for the duration of this

7    kind of trial, there will only be one alternate.  Am I correct

8    in that assumption?

9            MS. BROOK:  Yes, Your Honor.

10           THE COURT:  So we will seat 13.

11           MR. EISENBERG:  I agree, Your Honor.

12           THE COURT:  All right.  I think, I am not sure, I know

13   Mr. Eisenberg has been before me in trial before, but I voir

14   dire the entire panel.  I conduct the voir dire.  And usually

15   because of the way that we've already submitted the jury

16   questions in advance, many of those questions duplicate parts

17   of the voir dire.  It will streamline the selection process and

18   so we should be able to seat a jury well before the lunch hour.

19           I do not include a strike and replace system.  I voir

20   dire the entire panel and then everyone is excused at the same

21   time.  Usually there will be a break before we select the juror

22   members so that you may exercise, if there are additional

23   strikes that you wish to exercise.  And if there has to be a

24   decision on any sort of a motion, a Batson challenge or

25   something thereabouts.

1        We will continue to follow the COVID-19 protocols in

2   that the jurors will be spaced, and that means that we will

3   have to take up the first section of the public viewing area to

4   accommodate all 13.

5        I think what I intend to do is let the jurors rotate

6   into the jury box.  So for example, I would suggest that we do

7   it at the lunch hour and then at the beginning of the morning

8   so that everyone has an opportunity to be seated in the jury

9   box.

10       And I think I received, and I want to discuss it with

11  the counsel, I received a communication with respect to

12  additional voir dire questions, and I will have to review

13  those.  I didn't have an opportunity to look through them, and

14  I will review those and I will let you know what I agree to

15  include or omit.  It wasn't brought in the form of a filing.

16  But in any event, I'll look through them and determine if there

17  needs to be additions made to the voir dire questions.

18       We will -- since we are seating 13, we will pick the

19  alternate at the end before deliberations begin.  I generally

20  instruct the jury before closing arguments.  Is that the

21  parties' preference?

22       MR. EISENBERG:  It is for me, Your Honor.

23       MS. BROOK:  Yes, Your Honor.

24       THE COURT:  I don't allow the jury to ask questions.

25  Is there an objection?

1          MR. EISENBERG:  None for me, Your Honor.

2          MS. BROOK:  No, Your Honor, that's fine.

3          THE COURT:  I will permit them, however, to take

4     notes.

5          Now, let me stay on the topic of jury selection.  Let

6     me look through the communication regarding your proposed

7     additional voir dire questions.

8          Alexander, I thought I had printed -- you had printed

9     that out for me.  Can you run a get a copy of that?  Thank you.

10          As he does that, let me go ahead and go through your

11     joint proposed jury instructions.  The -- there seems to be an

12     agreement on the standard instructions, and I have reviewed

13     your stipulated proposed nonmodel instruction on the

14     substantive charge.  I guess one question that I had, and this

15     is something that had caused me pause in sending out the jury

16     questions in advance, throughout the questionnaire, and as well

17     in your proposed jury questions, you continue to refer to the

18     individual senators and congresspersons by their initials.  I

19     think at this point we need to revise that because it is, as

20     you know, public record.  Although there's a redacted

21     indictment, at some point the names become public, and of

22     course, they are going to become public upon the very beginning

23     of the case.

24          MS. BROOK:  And by that, Your Honor, do you mean that

25     obviously in court we're going to be talking about those

1    individuals by their real name, not initials; correct?

2              THE COURT:  Yes.

3              MS. BROOK:  The government agrees.  The reason why we

4    have been keeping as initials in filings is just because they

5    are openly accessible, and so as victims we have protected

6    their names.  And understandably there's kind of a catch,

7    right, when we are doing jury questionnaires, et cetera,

8    because we want the jury to fully understand the individuals

9    that we're dealing with.  That's correct.

10             Mr. Koehler was just pointing out that it's our policy

11   in our office that whenever we do public filings we need to

12   redact their names, but here in court we do believe that we

13   should be referring to them by their true names.

14             THE COURT:  All right.  So what we will do is I

15   will -- when the summary of the case, at the very beginning of

16   the start of voir dire we will insert the names and throughout

17   the remainder of the case the names will be spoken.  Obviously,

18   that means the jury instructions are going to be changed to

19   include their full names.

20             MS. BROOK:  That's correct.

21             THE COURT:  Now, there seems to be an agreement with

22   respect to your stipulated proposed nonmodel jury instructions

23   A and B.  There is, however, a submission by the government

24   that a nonmodel instruction related to the First Amendment

25   protections and, quote, true threats, unquote, be provided to

1    the jury.  It's an interesting -- it's an interesting question

2    because obviously there has been recent case law development

3    that calls into question the model instruction that we are

4    using, and in some of the case decisions they do talk about the

5    intent that has to be proven, and this -- this idea that the

6    individual make the communication intending it to be a true

7    threat.

8           And so there is some discussion about not only in the

9    case law that you've discussed, but I myself have come upon

10   other cases that discussed some of the nuances in these

11   statutes, and so I'm going to reserve judgement on that

12   particular question as to number one, whether or not there

13   should be any instruction related to the true threat, or quite

14   possibly I might just lift the first part of the government's

15   proposed instruction regarding the First Amendment.

16          And I guess I could ask Mr. Eisenberg if he would have

17   an objection to that.  And what I would submit to you is taking

18   out everything after, on line 20, the sentence ends with "a

19   true threat," and then taking out everything beyond that.  Or

20   even including subsections 1 and 2 and omitting everything

21   after "interpret as a threat of injury."  And I think that's

22   probably your biggest objection is including number 2; is that

23   correct?

24          MR. EISENBERG:  That's correct, Your Honor.  The

25   Court's proposal is acceptable to me.  And the reason why I

1    think it's parallel to the current status of the 875(c)

2    elements is that it would comply with Bachmeier.  And the

3    second part what the government proposes does not.  It throws

4    it back into the perception of a third-party nonspeaker.

5    That's the problem Bachmeier tries to get the situation away

6    from that.  So when Your Honor says from line 20 Arabic number

7    1, "a true threat is a statement that the defendant intends to

8    make as a threat, with the context of the communication." I'm a

9    little bit puzzled by the language there, but it says, "with

10   the context of the communication would interpret as a threat of

11   injury."  I'm not sure what the government is getting at there,

12   but my point is the first part is correct.  I have no objection

13   to that.

14        THE COURT:  When you say the first part, let me

15   make -- let me make sure that I understand.  So the part that

16   you do not object to is:  The First Amendment protects

17   political speech, including vehement, scathing and offensive

18   criticisms of public officials, including members of the United

19   States Congress.  I instruct you, however, that certain

20   statements are not protected by the First Amendment.  The First

21   Amendment does not protect an individual from making what is

22   sometimes called a true threat.

23        The only problem that I see is that I can see that a

24   jury question would come back:  What is the definition of a

25   true threat?  And so I feel like it should include some

1    explanation, which includes the next sentence:  A true threat

2    is a statement that the defendant intends to be made as a

3    threat.

4           MR. EISENBERG:  And I agree with that, Your Honor.

5           THE COURT:  All right.  So I will operate under that

6    idea that you have no objection to that first part.

7           I'll examine the case law a little closer to determine

8    whether or not I will permit the government to go any further

9    than that.

10          MR. KOEHLER:  Just listening to you read that

11   statement it occurred to me that the words "from making" should

12   probably be replaced with "who makes."  Writing it sounds one

13   way and hearing it sounds different, and I think hearing it it

14   would make more sense to protect a person who makes.

15          THE COURT:  "Does not protect an individual who makes

16   what is sometimes called a true threat."

17          MR. KOEHLER:  Correct.

18          THE COURT:  All right.  I'll take a look at that

19   closer and let you know my decision when we meet again next

20   Tuesday morning.

21          MR. KOEHLER:  Thank you, Your Honor.  We're working on

22   a trial memorandum that we hope to have filed this afternoon

23   that will elaborate a little bit further on the true threat

24   case law.

25          THE COURT:  All right.  Thank you.  The communication

1    that you made to the Court, and I think you both joined in on

2    this, at least Mr. Koehler did as did, I am not sure,

3    Mr. Eisenberg, if you were part of this discussion, but it

4    looks like, oh, in fact, it says Mr. Eisenberg objects.  So the

5    government is asking that I ask in voir dire whether the

6    prospective jurors have strong views either for or against the

7    persons upon which the threats were made.  And if so, if that

8    would any way affect their ability to be fair and impartial.

9    And I think this is the question that I had when we submitted

10   the questionnaire in the first instance using the initials of

11   the individuals even though they are public officials.  It

12   seems in some might create a reaction and it may not in others,

13   or going one way or the other.  And so to me it seems to be a

14   very legitimate question to be asked.  And so once the names of

15   the individuals are revealed, then it seems to me to be the

16   next obvious questions given that information:  Do you have a

17   strong feeling that, or a strong reaction to any of those

18   individuals such that it would make it difficult for you to sit

19   as a fair and impartial juror?  What is the objection to that,

20   Mr. Eisenberg?

21            MR. EISENBERG:  Yes, Your Honor, I did follow through

22   on that, and my objection in my e-mail was that, first of all,

23   the jury questionnaire as it currently exists has three

24   questions in it that I think get out the issue that the Court

25   is raising.  That's questions one, two and 18.  One and two are

1    more general, but it says:

2           Have you read or heard anything about this case?  And

3    some people did.  They had heard about it, not very many.

4           But the second question I think is more on point:

5    Given this brief recitation of facts, and that's the statement

6    of the case, is there anything about these circumstances that

7    would cause you to believe you could not consider the evidence

8    fairly and impartially according to the law?  And I think now

9    that we are going to include the given names of the two

10   congresspersons, that certainly is going to get out the essence

11   of what the Court is concerned with.

12          And then question 18, yes:  Do you have any strong

13   feelings about laws that make communicating verbal threats over

14   the phone illegal, that might make it difficult for you to sit

15   as a juror and so forth.  Some people did answer that as

16   opposed to no.  Some people wrote a few things about it.  I

17   think that also is going to bring out the issue without getting

18   into the politics of one person or one party, one political

19   police spectrum, one effort at whatever has happened in this

20   country in the past two years, and pretty soon if that does

21   happen we are going to have a jury panel that's going to be

22   voicing an awful lot of political dissent or one way or

23   another.  And then I think the remaining jurors, even though

24   they say I'm not going to be swayed by that, are now thinking

25   about the politics of the situation, and I am more concerned

1    that we are here as the charge, the threat by Mr. Martis.  That

2    should really be the central focus of the jury.

3         So if the jury concludes that, yes, he intended to

4    make threats of injuring, injury to another person, that's the

5    issue.  Of course, he is going to be talking about, if he

6    testifies, and that's a whole other issue before the Court, but

7    if he testifies and he says:  I didn't intend to make any

8    threat at all, then the fact that Nancy Pelosi or Adam Schiff

9    are involved in the receiving of the calls becomes irrelevant.

10   So I am trying to get the jury's reaction that this is good,

11   these politics are good or these politics are not so good.

12   Stay as much away from the case as possible.

13        And that is why, and I know Your Honor will get to

14   this, but my motion under Rule 106 then comes into play.  So

15   that's my position.  I think that's enough in the voir dire

16   that will get that out.

17        THE COURT:  Well, I completely agree with you.  I

18   understand what your concern is, Mr. Eisenberg.  I completely

19   agree that politics and the debate on politics and what

20   people's beliefs are about that and about these particular

21   individuals is not wholly relevant to the matter, but it is

22   going to be relevant in terms of sitting on the jury.  So what

23   I think I'm inclined to do is once the individuals have been

24   fully named, then reiterate question two.

25        Is there an objection to that?

1          MR. EISENBERG:  No.  No.

2          THE COURT:  I think that would be then, that would get

3     out, if there are people that have strong feelings one way or

4     the other.  And I will ask them, and I will admonish them not

5     to state what those feelings are, but if they have such a

6     feeling that it would affect their ability to be fair and

7     impartial.

8          MR. KOEHLER:  We agree wholeheartedly, and to the

9     extent there needs to be followed up, that can happen at

10    sidebar in order to avoid swaying anybody else on the panel,

11    but you hit the crux of the question, which is, this is the

12    reality, and we have to know if somebody has such a strong

13    opinion about either person that they can't be fair and

14    impartial.  Thank you.

15         THE COURT:  And so that's how we will proceed.  And

16    beyond that, there really weren't any other, I don't think any

17    other recommended voir dire questions; is that correct?

18         MR. KOEHLER:  That's correct.

19         THE COURT:  Okay.  All right.  And your form of

20    verdict looks fine to me.  The -- let me move to your

21    stipulations.  You have -- you have six stipulations, and how

22    is it that you are intending to present these to the jury?  In

23    other words, do you wish me to read these at the outset of the

24    case along with the instruction on stipulated evidence, or do

25    you wish to have me, or are you going to read the stipulation

1    when you have a relevant witness testify, how do you envision

2    this happening?

3            MR. KOEHLER:  Your Honor, from our perspective we

4    intended to relay the stipulations at the time that they become

5    relevant with the given witness for that particular exhibit.

6            THE COURT:  Are you proposing for the Court to read

7    the stipulation with the stipulation instruction, or are you

8    going to read it?

9            MR. KOEHLER:  We would read the stipulation, Your

10   Honor, and respectfully request the Court give the jury

11   instruction at that time, or you could give the instruction at

12   the end of the case.  I don't think it will make a huge

13   difference here.

14           THE COURT:  All right.  You can read in the

15   stipulation and then I will use the stipulation instruction at

16   the end of the case.

17           Any objection, Mr. Eisenberg?

18           MR. EISENBERG:  No, Your Honor.

19           THE COURT:  Okay.

20           MR. KOEHLER:  The stipulation at the end about the

21   phone numbers, we'll talk to Mr. Eisenberg about when the best

22   time would be to read that stipulation.  He requested that

23   particular one, and so we'll work with him to weave that into

24   either our presentation or allow him to present it himself as

25   he thinks is appropriate.

1          THE COURT:  Now that you raised that issue, I mean,

2   with regard to stipulation number six, I was curious as to the

3   relevancy of that because obviously there are individuals that

4   are not named anywhere in the indictment on this stipulation

5   and I want to understand what the relevancy then is.

6          MR. KOEHLER:  That's correct, Your Honor.  Our

7   intention is not to get into any of Mr. Martis' phone calls to

8   those other offices that are not listed in the indictment, but

9   Mr. Eisenberg has informed us informally that he wants to get

10  into evidence of other phone calls Mr. Martis may have made to

11  those offices that are reflected in the phone records that we

12  have marked as an exhibit, and that will be on, on our exhibit

13  list forthcoming.  There is two sets of spreadsheets containing

14  call detail records for the phone number at the Hilltop Motel

15  where Mr. Martis resided, and some of those outgoing phone

16  calls were in addition to Speaker Pelosi and Congressman

17  Schiff's office, also other senators and other congress people

18  as well as to the White House.  We agree to stipulate that

19  those are in fact their phone numbers to avoid having

20  Mr. Eisenberg have to present foundational evidence for that,

21  but in terms of the relevance of those phone numbers, that's a

22  different question.

23         THE COURT:  So as I understand it, then you may still

24  make an objection based on relevancy.

25         MR. KOEHLER:  Correct.

1          THE COURT:  All right.  Did you wish to say something

2   on that point, Mr. Eisenberg?

3          MR. EISENBERG:  Well, I don't want to precede the

4   issue when it arises, but this -- this seems to dovetail.  If

5   the government is going to make an objection based on

6   relevance, it seems to dovetail with the government's view that

7   politics will come into the case, but an answer by Mr. Martis

8   or a reaction by Mr. Martis to political questions may not be.

9   There are 130 some odd -- 139 calls that were made to

10  Ms. Pelosi's office in the first part of 2019 through

11  approximately the beginning of 2020.  Yet, the government is --

12  I am not sure what the government is going to play at this

13  point, but apparently only one or two are actually relevant,

14  including those that are in 404(b), and I have objected to the

15  government playing those.  But if they are going to play those,

16  I think it's relevant for the jury to understand how many calls

17  were actually made.

18          And Your Honor, excuse me, I think the same is true

19  for calls to Mr. Congressman Schiff, and at the time when I was

20  going through this as well to Senator Schumer, who is, a call

21  to him is no longer part of the case.  So in any event, we do

22  have the stipulation.  So we don't have to bring people in to

23  identify these telephone numbers, but that is going to be part

24  of my presentation to the jury.

25          And I might add, Your Honor, that for all of these

1    other calls, just speaking now that first period of time, the

2    government hasn't produced recorded conversations, or actually

3    they are voicemails, and perhaps the reason for that is,

4    although I've asked, they haven't been able to come up with

5    them.  And I respect that.  The way I view, what happens at

6    Congress is the likelihood of telephone voice messages being

7    retained does not appear to be very great.  There is no policy

8    or protocol with respect to that.  So I don't know exactly

9    where that leaves calls that are going to be played or not

10   played, but there sure is an absence of anything that anybody

11   felt was important enough in Congress to report to the capitol

12   police.  And that leaves perhaps the argument that what just is

13   in Mr. Martis' mind when he did make the calls that he made?

14          And I will add, Your Honor, I haven't seen the recent

15   production by the government.  I think they did send that to me

16   for the second period of calls.  That's the more, later period,

17   the ones in, I think they run from around March of 2020 through

18   the very beginning of this year.

19          In any event, I don't know the breakdown in terms of

20   the numbers called.  I have discussed this with Mr. Koehler,

21   but I don't have my notes here with respect to those.

22          I don't really think the argument at this point in

23   time as to -- well, we'll get to that, Your Honor, respectfully

24   when the Court allows me to argue on Rule 106, because I think

25   that's going to bring out some more of what I'm trying to say

1    with respect to this stipulation.

2              THE COURT:  Well, as it stands now, you stipulated on

3    foundation, but there's no stipulation as to the relevancy as

4    to each of the individual calls that are listed here.

5              MR. EISENBERG:  No, I just heard the government to say

6    that they may oppose that.

7              THE COURT:  Yes, and so I think what I'm going to have

8    to do is wait to see what the relevancy of each of those

9    associated phone numbers to those individuals are.

10             MR. EISENBERG:  Very well, Your Honor, that's

11   typically what does happen with respect to some of the offers

12   of proof, but that's where I intend to go with it, and I am

13   sure there will be opportunities before I actually get into

14   that that counsel will be alerted.  That's where I am headed.

15             THE COURT:  Well, in any event, I have gone through

16   the other stipulations and everything seems to be in order, and

17   my understanding now is the government will intend to read the

18   stipulation and only at the end of the case, then I will read

19   the stipulation instruction.  And so we will see what happens

20   with regard to the stipulated exhibits at number six.

21             MR. EISENBERG:  Very well, Your Honor.  Thank you.

22             THE COURT:  Anything -- does either party have any

23   question with regard to what we have up to this point covered?

24             MR. KOEHLER:  Not from the government, Your Honor.

25             MR. EISENBERG:  Your Honor, I do have some questions

1  that you're probably going to cover, but I will raise them now.

2  How many strikes will you allow the parties?

3       THE COURT:  I have seven for the government and 11 for

4  the defendant, and you will be able to make those strikes

5  simultaneously and in private.

6       MR. EISENBERG:  Another question, Your Honor, is the

7  wearing of masks.  When counsel interrogates a witness, will we

8  be required to wear a mask up at the podium?

9       THE COURT:  Well, I think, as you can see, I'm not

10 wearing a mask simply because I have my Plexiglass shield up,

11 and I think for purposes of trial we are still under the

12 General Order for masking.  And to the extent that we're going

13 to require that the jurors wear masks, I would suggest that we

14 all wear masks.  Now, I understand that we do have Plexiglass

15 in front of the witness box, so they are shielded from the jury

16 pool in any event, and I know that some jurors in the past have

17 had difficulty understanding people who speak through the mask.

18 We'll have to cross that bridge when we get there.  But is

19 there a particular issue that you have, Mr. Eisenberg?

20       MR. EISENBERG:  Yes, Your Honor, in a trial that I was

21 recently a part of, the Court there allowed interrogating

22 counsel to remove the mask, but that was in a larger courtroom

23 where there was much more dispersion, and I am assuming this

24 trial will be held in a courtroom much like this, if not in

25 fact Your Honor's courtroom.  So perhaps the issue of juror

1    distance, social distancing here is a little bit more intense

2    than it was in the larger courtroom.  But nonetheless, I think

3    it's just an easier way to communicate without wearing masks

4    for counsel.  Not here to object, but there to interrogate.

5          THE COURT:  To question the witnesses.  Let me think

6    on that, Mr. Eisenberg, a little bit, and let me see.  I'll

7    have to consult with our chief judge, but I don't know what

8    courtroom where we are going to be in.

9          Liliana, do you know?

10         We will be in 604, next door, same configuration.

11         What is the government's position?

12         MS. BROOK:  We don't object if we were to determine

13   that the questioning occur at the podium without the mask.  I

14   think certainly my sense would be for the witnesses it would be

15   best if they weren't masked if they were behind the Plexiglass

16   just so there is no confusion or misinterpretation about what

17   they are saying, the jurors can follow along and see their

18   lips.  And yeah --

19         THE COURT:  And I actually, you know, and I have

20   debated this internally, I also believe it's important for the

21   full demeanor of the witness.

22         MS. BROOK:  I know it's come up in other courtrooms

23   with which I am in trial within the next couple of months that

24   the judge has asked are we vaccinated.  We are both vaccinated,

25   Mr. Koehler and myself, as well as a booster.

1          THE COURT:  Well, I think it is, it is appropriate.

2    Then I will reconsider having the witnesses who testify behind

3    the Plexiglass, and I think every courtroom is outfitted with a

4    Plexiglass now, to remove the mask for purposes of answering

5    questions.  To the extent that there is enough distance at the

6    podium, then I will permit the individual who is asking the

7    questions to remove their mask during the examination of the

8    witness with the understanding that otherwise everyone is to be

9    masked.

10          MR. EISENBERG:  Thank you, Your Honor, and I too am

11   fully vaccinated, and I have gotten a recent booster shot.

12   It's a little difficult to ask jurors.  In fact, I think there

13   are very few courts that will do this, and ask them whether

14   they have received vaccination, and I think in some respects

15   that might be too intrusive.

16          THE COURT:  I don't intend to do that.

17          MR. EISENBERG:  If we observe social distancing it

18   shouldn't be a problem.  And you have to be -- jurors have to

19   wear a mask anyway to even get in the courthouse.

20          THE COURT:  Right.  I understand.  All right.  So

21   that's how we will proceed.  Did you have any other questions,

22   Mr. Eisenberg?

23          MR. EISENBERG:  The only other one that I can think of

24   right now is that there are some witnesses that are going to be

25   presented through video, and --

1          MS. BROOK:  May I --

2          MR. EISENBERG:  I am not sure who that is.  And the

3     extent to which the questioning through video will take place,

4     I'm not in favor of doing any witness through video, but I

5     understand the logistics of trials, particularly in this day

6     and age, so I haven't objected to it, and I think that has been

7     done recently since the time of COVID.

8          MS. BROOK:  All of our witnesses are live.

9          MR. EISENBERG:  There are no --

10         MS. BROOK:  Nobody is going to be testifying over

11    video.

12         MR. EISENBERG:  Thank you.  I understood there would

13    be two.

14         MS. BROOK:  We talked about it hypothetically two

15    weeks ago.

16         MR. EISENBERG:  I withdraw my request.

17         THE COURT:  All right.  Okay.  So very good.  While

18    we're on presentation of witnesses, let me -- obviously counsel

19    is to use the podium at all times.  The only objecting counsel,

20    because we have two counsel, will be the counsel who has

21    control of the witness.  I have a practice of not permitting

22    sidebars.  I'm going to do the same here.  What I have done in

23    the past is if you have an objection, I don't permit speaking

24    objections.  You may cite the rule or hearsay, form of the

25    question, things of that nature.  If you wish to make a further

1    record or to be heard on an objection, I will hear you at the

2    break, at the end of the day, or before we have the jury in.

3    It simply eats time away from the jury hearing of the evidence,

4    and so that is why I do not permit sidebars, but I give you a

5    full opportunity to make your record at other times in the

6    proceeding.

7          Of course, work with Liliana, my courtroom deputy,

8    about how to handle the exhibits.  I prefer that you have the

9    exhibits as to the next testifying witness available to her

10   before the witness is called.

11         Please do keep in mind -- Mr. Koehler.

12         MR. KOEHLER:  We're going to do our best to present

13   everything from the laptop, Your Honor, so hopefully we'll

14   avoid that issue all together.

15         THE COURT:  All right.  And please do make sure that

16   you're aware that your microphones are at all times on and keep

17   that in mind when you're conferring with your client or with

18   co-counsel.  We have often had conversations going on which the

19   jury can hear, and obviously because there will be some seated

20   behind you then that is also a problem.

21         I do not permit texting at the counsel table.

22   Certainly keep your cell phones on silent mode or in your

23   briefcases.

24         We have no witnesses -- do we have any witnesses that

25   are requiring translators?

1          MS. BROOK:  No.

2          THE COURT:  And we have no witnesses by video.  Okay.

3     Well, that will make it easier.

4          Anything with regard to the conduct of the trial?

5          MS. BROOK:  No, Your Honor, somewhat tangential,

6     though, as we are here before trial, we are going to trial on

7     Counts 3, 4 and 6, and it's the government's position that

8     perhaps it would be best to renumber them on the record so that

9     we refer to them as 1, 2 and 3.  The concern is that the jury

10    is left with the impression that he was previously convicted of

11    whatever was 1, 2, and the other dismissed counts, or for them

12    to interpret whatever they may because the numbers are

13    nonconsecutive.

14         THE COURT:  I would agree with that.  I had a little

15    bit of a difficulty reading through the statement of the case

16    for that reason.  I thought it would be odd to have missing

17    numbers.  And so for purposes, although he is -- the indictment

18    as it exists charges him only with Counts 3, 4 and 6.  For

19    purposes of trial presentation, 3 will be 1, 4 will be 2, and 6

20    will be 3.  And so we will renumber in the statement of the

21    case and otherwise we will refer to it as 1, 2 and 3.

22         MS. BROOK:  And in keeping with that, Your Honor, the

23    parties have agreed to, I believe there is one up on Your

24    Honor's desk, an amended joint statement of the case, it will

25    be filed when we get back to the office.  What it did was took

1    out the senator who is no longer relevant and reframes the time

2    period.

3              THE COURT:  And what you should do before you file it

4    is insert the full names of the individuals.

5              MS. BROOK:  The only concern is under policy, the

6    U.S. -- we're not allowed to put their full names into any

7    document that we put on the public docket, so if we could still

8    retain the initials and then Your Honor reads to the jury the

9    full names, that would be best.

10             MR. EISENBERG:  Your Honor, I am not familiar with

11   that policy.  I know there is a policy on naming

12   co-conspirators who are not indicted and alleged victims, but

13   this doesn't seem to fall within that latter part because the,

14   to my knowledge none of these calls ever actually got through

15   to either of the two political persons that are involved.

16             Moreover, I am not sure in what way they would

17   otherwise can be, to be a victim unless just making a statement

18   creates the status of a victim, but to say that people in the

19   political sphere are by policy not to be named in documents

20   that get filed with the court, I don't understand that and I

21   don't see the -- I don't see the relevance of it.

22             THE COURT:  I tend to agree with Mr. Eisenberg's

23   argument.  I also think that here you have political officials,

24   public officials, and I can see the Department of Justice's

25   policy if you have, you know, a Jane Doe sexual assault victim,

1    but obviously I think here because of the public persona of

2    these individuals the privacy interests aren't as great, and so

3    obviously for reasons of not only the jury instructions which

4    are going to be on the public record, but as part of the trial

5    record you should have some indication of a document with their

6    names other than the redacted sealed indictment.  And so I

7    think I'm just going to have to have you buck the DOJ policy on

8    this particular matter.

9           So when you file the amended joint statement of the

10   case, I'm going to ask that you include the full names of the

11   individuals as to Counts now 1, 2 and 3.

12          MS. BROOK:  And we will do as ordered, Your Honor.

13   Thank you.

14          THE COURT:  All right.  And so let me now move to the

15   government's Notice of Admissions.  The government did file

16   early on a notice that it seeks to introduce certain recorded

17   statements by the defendant to law enforcement.  And as I

18   understand the briefing, it is for the following intended

19   purpose:  The government states it intends to use the

20   statements because it indicates that the defendant states that

21   he made the calls to show that he was in Arizona at the time

22   that the calls were made; to show that he made the statements

23   voluntarily and that he was not in a custodial setting when he

24   made the statement; that he was lucid and of sound mind at the

25   time that he made the call; and that he had prior knowledge

1      that making such calls were in contravention of the law.

2           And the government also noticed that it fell in line

3      with the prior bad acts case law essentially evincing that Mr.

4      Martis had knowledge and lack of mistake and so on.

5           In response, Mr. Eisenberg did file his Motion in

6      Limine, and that is at Document 47, and Mr. Eisenberg in

7      essence says that if the government introduces these statements

8      that any other part of the statement, in fairness, ought to be

9      considered, and there he relies on federal rules of evidence

10     106, otherwise known as the rule of completeness, but Rule 106

11     does not permit the admission of inadmissible hearsay even if

12     it may complete the admission by defendant.

13          I did have an opportunity to review the Ortega case

14     that the government cited in its response.  And in looking at

15     Ortega, although it is a different set of facts, the Court

16     there found that the defendant's self-inculpatory statements as

17     offered by the government in that case are admissions by a

18     party opponent and are therefore not hearsay, but it was the

19     nonself-inculpatory statements portions that they held were

20     inadmissible hearsay, and that's the equivalent of, I think of

21     what Mr. Eisenberg wants to introduce.

22          And here, like Ortega, even though I think the way I

23     understand things to unfold, Ortega, the statements, the

24     exculpatory statements that were made were made some days after

25     the arrest.  In fact, I think they were made at the initial

1     appearance of the defendant some days later.  But here the --

2     Mr. Martis essentially would be -- he would be able to place

3     his exculpatory statements before the jury without subjecting

4     himself to cross-examination, which is really what the hearsay

5     rule protects against, and I think the concern is that, as I

6     understand it, at least the way I read the pleadings, the

7     explanations that were given by Mr. Martis to law enforcement

8     was given at the time of their investigation, and this, of

9     course, was an out-of-court statement.

10            And I think that the statements appear to have been

11    made then days or even months after the actual threat was

12    communicated, let's say the alleged threat, so that has some

13    concern there.  So in that regard, it sort of has this

14    questionable guarantee of trustworthiness.  Number one, he was

15    questioned after completing the actual statement, communicating

16    the statement to these alleged victims.  And when confronted

17    with allegations of illegal conduct, generally persons will

18    say:  Oh, I really didn't mean to do or say that which I am

19    accused of doing or saying.  And so that's what I mean when I

20    say there's a question about the guarantees of trustworthiness

21    of the statement.

22            And so for those reasons I'm going to deny

23    Mr. Eisenberg's motion to permit the -- well, I will permit the

24    government to get the statement out, but I'm not going to

25    permit Mr. Eisenberg to get into what was said after all of

1    those statements that were bolded and italicized in the

2    pleading.

3            MR. EISENBERG:  Your Honor, if I may, I would like to

4    complete the record.  I understand the Court's ruling.

5            THE COURT:  Yes.

6            MR. EISENBERG:  Thank you, Your Honor.  The government

7    says that there are two issues here that bother me about how

8    this is going to evolve.  One is the government says it only

9    wanted to show that Mr. Martis acknowledged making the calls,

10   that's one part of what they are saying, yet in what they want

11   to play, it's as if there's a foregone conclusion that those

12   calls contained threats, and this is in what they want to play.

13   Page 13, it's hard to see the lines on this, Your Honor, but

14   somewhere around midparagraph we have Special Agent Ferreira

15   saying:  I think it just comes down to, you know, one of those

16   situations that everybody has the right to voice their opinion,

17   but when you make pointed threats that you did, that you did,

18   hey, we're going to put a bullet in your head like you did to

19   Adam Schiff, that's when it becomes a little bit more

20   concerning obviously from the government's side.  'Cause now we

21   have somebody that's having an active threat.  Do you see what

22   I'm saying there?  And Mr. Martis' response is:  Yeah.  So now

23   we have on the tape the agent saying:  You made an active

24   threat, a pointed threat.  And Mr. Martis seemingly says:

25   Yeah, okay.  So now we have what appears to be an accusation

1    and Mr. Martis being faced with what he's going to say with

2    respect to admitting or denying it.

3           And that goes later on, or I think a little bit

4    earlier in a transcription, this is one to Mr. Schiff:  You

5    know what, your impeachment failed, and so on and so forth, ha

6    ha ha, we're going to put a bullet in your head.  You're dead.

7    That's the recorded transcript.  Mr. Martis laughs or goes:

8    Uh-huh.  Then he is asked, and this is what the government is

9    going to play:  Do you remember that phone call?  And he says:

10   Uh-huh.  So he acknowledges making the phone call.  Under the

11   government's theory, the next thing is the other agent, which

12   is Mill:  So did you have a gun that you're going to put a

13   bullet in his head?  And he says:  No, is that your intent?

14   And Mr. Martis says, a few lines down, the question is

15   repeated:  Is that you're going to actually kill them?  And Mr.

16   Martis says:  No.

17          So that's in the context of how the government would

18   bring out the fact that these recorded transcripts, sorry,

19   recorded telephone calls are made.  And then they will put in

20   his "uh-huh," but then in the next breath he's saying, "I

21   didn't mean to make a threat."  So if you're going to leave

22   that dangling with the impression that the jury is going to get

23   that he made what I am going to call a conscious or a knowing

24   threat to impede -- sorry -- to injure.  That's one concern I

25   have with how the government has done this.

1          And another one is on page 14.  This is, again, Agent

2    Ferreira, he's saying:  The thing that when a -- when it

3    changes is when you call in and say:  Hey, hey, you know, Adam,

4    I am going to put a bullet in your head.  So that's one of

5    those situations then all of a sudden becomes, you know, now

6    you're breaking the law.

7          So now we have an advisory statement made by a federal

8    agent on the record saying that you, Mr. Martis, broke the law.

9    And that's what the jury is going to hear.  They are going to

10   get an advisory opinion now from the government agent.  Here's

11   what he says in response to that:  M-M-M.  Then agent Ferreira

12   says:  Does that make sense to you?  And he says:  Yeah.  Okay.

13   But later on there is an explanation for what, or earlier

14   actually, for what he was saying with respect to making those

15   telephone calls.

16         So we're kind of left with the idea that if somebody

17   is confronted and their responses are, M-M-M, that doesn't

18   really do anything other than say, I am not even sure if it

19   says he acknowledges having made the call.  I am not fighting

20   that, though, but the problem is, is that if he makes an

21   agreement, yeah, I made that call and it's a threat, and that's

22   not what he's saying consistent throughout this entire

23   interview about a half an hour.

24         So the other thing, Your Honor, is the agents are

25   saying things such as it's a violation of the law.  And the

1    jury is going to hear that.  And I think if they are going to

2    hear that, you know, the context of the interrogator is always

3    important to these statements that are made in terms of being

4    confronted.  But nonetheless, that's the way it works.  It's

5    whatever the responses are that concerns the defendant.  Is the

6    jury actually going to get the full idea of the extent of the

7    response, and in this case the denial, and they are not.

8              So anyway, Your Honor, thank you.  That's my position.

9              THE COURT:  All right.  Well, I'm not persuaded

10   otherwise, Mr. Eisenberg.  I think the rule of completeness is

11   an important rule, but I think there are also other carveout

12   rules that inform the Court's decision.  And again here, the

13   totality of the guarantee of trustworthiness of the statements

14   well after the fact of the calls in my mind is an important

15   question that I have.

16             And I do think that to the extent that any recording

17   is played in which an officer is advising Mr. Martis that what

18   he is saying or doing is prohibited under the law, I think

19   pertains to the prior bad acts evidence or statement and it

20   goes to his knowledge of making those later statements that the

21   government intends to introduce.  And so in any event, you've

22   made the record very clear, Mr. Eisenberg.

23             All right.  And so there are no remaining outstanding

24   Motions in Limine; is that correct?

25             MR. EISENBERG:  Yes, Your Honor.

1          MR. KOEHLER:  That's correct, Your Honor.  If the

2     record could reflect that you're granting our Cross Motion in

3     Limine on the same topic.

4          THE COURT:  Yes, I will grant that.

5          And so let's move now to the jury question.  And you

6     have all submitted your joint hardship for COVID, and I am

7     going to try to do this as quickly and as concisely as I can.

8     I'm going to go first to those by number that the parties and

9     the Court agree should be let go for hardship reasons related

10    to COVID, and then I'm going to go through those that I think

11    Mr. Eisenberg and the government have a dispute about.  I want

12    to also point out other questionnaires that I thought fit into

13    the bailiwick of hardship, whether that be for COVID or for

14    financial reasons.

15         So if you have your list, those that are going to be

16    released for hardship include:  214, 234, 294, 332, 355, 399,

17    432, 445, 600, 611, 664, 680, 693, 922, 933, 957, 1019, 1023,

18    1024, 1035, 1050, 1067, 1072, 1137, 1171, 1187, 1229, 1240,

19    1261, 1265, 1269, 1298, 1347, 1357 and 1400.

20         There are additional disputes.  Let me first go to

21    105.  So here 105 answers yes to question 22:  Do you have

22    concerns about COVID-19?  And then talks about it's unavoidable

23    to come into conflict with those who believe COVID is a hoax

24    and so on.  And then they also state that they have a

25    grandmother who is 80 years old and who would be at risk.  So

1    105, I believe, does meet the criteria for a COVID hardship.

2    Is there an objection?

3            MS. BROOK:  Did this individual state that they live

4    with the grandmother, or was that not in there?

5            THE COURT:  It does not state that.

6            MS. BROOK:  I think the only qualifier would be from

7    our perspective that the jury at present doesn't fully

8    understand the procedure by which we keep everyone separate

9    and, therefore, you know, comply with social distancing

10   regulations.  With that said, if Your Honor feels this person

11   should be struck, the government doesn't object.

12           MR. EISENBERG:  I do, Your Honor, because the issue

13   that he or she raises has to do with coming into the presence

14   of people who may potentially have COVID, but if everybody is

15   masked in here according to the protocols of the CDC, that's a

16   protective device, so is social distancing.  So whatever issue

17   this person has is answered by how we operate here in federal

18   court.  And if anything, they ought to be at least brought

19   here.  And if they continue to evince an inability or

20   unwillingness to deliberate, then I concede that they should be

21   excused.  This person doesn't say he is so upset about this

22   that he doesn't even want to come to court.

23           The other concern is expression about his grandmother,

24   but I am not sure how that --

25           THE COURT:  Well, the question preceding that is:  Are

UNITED STATES DISTRICT COURT

1    you or anyone in your household at risk for complications?  If

2    yes, do you believe it might affect your duties as a juror?

3    And the answer is:  Yes.  And if you answer yes, please

4    explain:  My grandmother is 80.

5            So I guess I read into it the assumption that the

6    grandmother lives in the household because the question is:

7    Are you or anyone in your household at high risk for

8    complications?

9            MR. EISENBERG:  That assumes that this potential juror

10   would turn around and infect the grandmother, and I suppose --

11           THE COURT:  And that's the concern.  That's the

12   concern that you get at.

13           MR. EISENBERG:  Well, I think this has to be cleared

14   up because I think the question isn't vague.  I understand Your

15   Honor's connection to "in your household," but I hadn't keyed

16   in on that frankly, so I am not sure.

17           THE COURT:  That's the sole reason for the question.

18   We don't want to have people sitting on a jury and then leaving

19   here, going home and feeling like they are going to put others

20   at risk.  That's the whole reason for the question.

21           MR. EISENBERG:  Yes, I understand the question, Your

22   Honor, but if it prevents them from deliberating, then I think

23   they should be excused.  We just don't -- I am not sure we have

24   enough here, but anyway, I made my point.

25           THE COURT:  And the government does or does not object

UNITED STATES DISTRICT COURT

1    to removing number 105?

2         MS. BROOK:  We do not object to removing.

3         THE COURT:  I think there is enough in there that I

4    can say that the person should be removed for hardship reasons

5    due to COVID.

6         The next is 197, and I think this is one where the

7    parties disagree, but here too the -- I point out the answer to

8    question 25:  All individuals in the courthouse are required to

9    wear a mask.  Would wearing a mask create a problem for you?

10   And the answer is:  Yes.  I had my shots for the virus.  I

11   don't think I should wear a mask.

12        And so I think the statement is pretty clear.  And I

13   don't want to seat anyone who starts rebelling against wearing

14   a mask in the course of the voir dire or in a jury trial.  Is

15   there an objection to removing 197 for that reason?

16        MS. BROOK:  Not from the government.

17        MR. EISENBERG:  I was the one who objected to it, Your

18   Honor.  It just seems like you don't know enough about this

19   person's position.  The rest of this -- the rest of the answers

20   here are vague, not very responsive.  And he doesn't say:  I

21   won't wear a mask.  He just says:  I don't think I should wear

22   a mask.  Not sure where that puts him in the spectrum of not

23   following Your Honor's orders or not following the Court's

24   instructions, but just on that basis I think he or she should

25   be brought in and asked about it.

1              THE COURT:  All right.  We'll keep 197 in.

2              952, this is another one I just wanted to point out

3      that although they answer the mask question:  No, it would not

4      create a problem for them.  Again, they state:  I don't like

5      it.  I've been vaccinated.  And I guess on the basis of the

6      last number 197, we'll keep that individual in as well.

7              The next is 1023.  This is an individual who indicates

8      caring for a spouse.  And this is a tentative answer, but I

9      flag it for the parties just for their consideration because

10     the duration of the trial basically they state will cause a

11     hardship because the answer being:  If the care I found for my

12     husband fails, I would have a problem serving.  Otherwise the

13     answers related to COVID are no.

14             MR. KOEHLER:  We flagged that one as well, Your Honor,

15     but we anticipate this trial lasting two days; in other words,

16     the Tuesday and at some point into Wednesday, but perhaps not

17     even reaching the afternoon of Wednesday.  And so we felt like

18     that would be a short enough time where that risk would be

19     minimized.

20             THE COURT:  Mr. Eisenberg.

21             MR. EISENBERG:  I feel the same way.  If the juror had

22     said:  I cannot find care.  In fact, it seems like there is

23     care for the husband, but the juror is saying if it fails.

24     That's -- it's a bit of a problem, and I can understand why she

25     is of concern, but I have to agree with the government it's two

1    or three days at the most, trial.

2            MR. KOEHLER:  And Your Honor, I think we could

3    probably ask that juror at the outset during voir dire:  Have

4    you found care, or is the care in place and stable?  And if

5    they answer yes to that question, then I think we're fine.

6            THE COURT:  We will keep that juror in.  Oh, yes.  I

7    think the parties had submitted 1023.

8            MS. BROOK:  Yes.

9            THE COURT:  So 1023 is out.

10           MR. KOEHLER:  That's correct.  Never mind.

11           THE COURT:  Okay.  So I also identified -- well, let's

12   move on.

13           1059, this too here is an answer yes to:  Are you or

14   anyone in your household at high risk?  And this person says

15   they're 78 years olds.  And according to the CDC site

16   reference, my age puts me at a high risk.

17           MS. BROOK:  Again, with this individual, Your Honor,

18   it's the government's position that they may not fully

19   understand the social distancing mechanisms that we put in

20   place to help protect them in this particular environment, and

21   so without that information they may not necessarily understand

22   fully how protected they are in keeping with CDC guidelines.

23           MR. EISENBERG:  I guess I felt differently about it

24   because of her age and she feels that she is at a high risk as

25   opposed to the situation involving the grandmother.  That's a

1   person who is somewhat distant, not the same as the juror, so I

2   thought that this person ought to be struck.  I think there is

3   enough in here that she showed apprehension simply that she has

4   an, excuse me, a comorbidity, which is age.

5           THE COURT:  And I agree, and so we will remove 1059.

6           I flagged 1129 not necessarily, not related to COVID,

7   but the answer to question 21:  Would the length of trial

8   create an undue hardship?  This person says, yes, and basically

9   states:  I am the only school social worker for two public

10  schools in the Flagstaff area.  I am regularly involved in

11  suicidal and mental health emergencies for middle school-aged

12  children.  And so I would consider removing this individual for

13  that reason.  Is there an objection?

14          MS. BROOK:  Your Honor, we do object, and we discussed

15  this with defense counsel extensively on the phone, just that

16  issue.  Our perspective is that this case is very short.  It's

17  about as short as they come, first, but second, that this

18  individual likely is somebody who has, you know, at some time

19  taken a sick day or gone on a vacation, leave, there has to be

20  some sort of policy or procedure in place to have a backup for

21  this individual for a 24, 36, 48-hour time out of the district.

22  So with that, we felt it best to not strike this individual.

23          THE COURT:  Mr. Eisenberg.

24          MR. EISENBERG:  I did think that this individual

25  should be struck.  I would hate to think that anything would

1    happen in those school districts while she is away, and we're

2    going to be banking on the fact that there's a substitute

3    around, that's a bit too hazardous, Your Honor, so I think that

4    she should be.  I think it's, well, whoever it is should be

5    stricken.

6         THE COURT:  Yeah, I actually thought it's sort of a,

7    we assume that they have enough of the faculty available, but I

8    just saw a big story about how we don't have enough bus drivers

9    and they are doing triple duties and getting raises because we

10   don't have enough, so I am going to go ahead and remove 1129

11   for hardship reasons.

12        1200, this individual answered that the length of the

13   trial, that the trial itself would create an undue hardship

14   because of the joint custody and the time that the parent will

15   miss with the child, and also answered yes to concerns about

16   COVID, and then yes to the daughter not having been vaccinated.

17   So I thought there were multiple layers of this person seeming

18   to not be giving the matter his or her full attention, being

19   overly distracted.

20        MR. EISENBERG:  I agree with that, Your Honor.

21   Question 24, the answer is a little bit vague, but he says:  I

22   am a physician as --

23        THE COURT:  And see patients on a regular basis.

24        MR. EISENBERG:  -- on a regular basis.  So, and he

25   checked yes to being a health care worker.  So I would rely on

1    the Court on this one.

2              MS. BROOK:  I think the concern with this is that it

3    kind of cuts both ways.  One, a need to protect a child, but

4    also a health care worker who is on a regular basis exposed to

5    COVID.  Our thought was on balance, based upon those two

6    factors, that the issue related to the care and custody of a

7    child with whom he shares joint custody, given the minimal

8    amount of time that this child will take will not be too much

9    of an intrusion that he can't rearrange that.  So our thought

10   was to not strike this individual for cause.

11             THE COURT:  I will give you another consideration into

12   that mix.  We're only going to be able to seat 24.  And so to

13   the extent that you've reviewed the questionnaires for the idea

14   of people wanting to find ways not to serve, that might be a

15   way to look at it as well because you don't get the luxury of

16   having, you know, 45, 43 people.

17             MS. BROOK:  Can I just ask just a quick follow-up

18   procedure on that?  My thought was we were going to be

19   questioning more than 24.

20             THE COURT:  We need 31, I am told.

21             MS. BROOK:  31.

22             THE COURT:  A minimum of 31.  All right.  So we'll, I

23   guess we can keep him in or her in, 1200.

24             MS. BROOK:  Thank you, Your Honor.

25             THE COURT:  The next is 1229.  Oh, we have already, I

1    think we -- 1229 is out.

2         1304, this is a question I have for my courtroom

3    deputy.  Here the concern was basically having to pay money out

4    of pocket first for the stay.  So I am told that the jury

5    office contracts with the hotel, so there is no out of pocket

6    for the hotel, so that removes the concern.  And so to the

7    extent that he has a financial hardship, they can find a hotel

8    that will accept the contract for payment.  So do we want to

9    keep 1304?

10        MS. BROOK:  The government's concern with this

11   individual was not a hardship strike, but a bias one.  That was

12   twofold.  The concern is that this individual on question

13   number two, let me read that:

14        Given this brief recitation of the facts, is there

15   anything about these circumstances that would cause you to

16   believe that you could not consider the evidence fairly and

17   impartially?

18        I have a very strong dislike of the liberal socialist

19   Democratic party and the way they govern.

20        Obviously we know that the victims in this case, while

21   the case is not political, the victims have a political

22   presentation in terms of their identity to the public.

23        Then additionally with question number, sorry, 18, if

24   there is anything that would make it difficult for you to sit

25   and be fair and impartial to both sides, briefly explain.  And

1    this individual goes on to say:  I have a lot of feelings that

2    revolve around the capability of a person threatening, et

3    cetera, and then talks about additionally other -- other issues

4    that may play into profiling of the victim.  So with that, that

5    was our concern.

6              THE COURT:  Mr. Eisenberg.

7              MR. EISENBERG:  Your Honor, those two questions and

8    the answers to them are what I was getting to earlier in the

9    sense that that's the kind of answer that the Court would

10   explore during voir dire.  This person doesn't deserve to be

11   struck on the basis of this response, nor are there ones who

12   are extremely pro this party, and there are some as well in

13   these answers.  I don't think that kind of question is

14   hardship, and it only becomes cause when the juror, while under

15   questioning by the Court, evidences an inability to be fair,

16   then they should be struck.

17             THE COURT:  Well, I think, I think I agree with

18   respect to the answer number two, but I certainly think that

19   there's a predetermination as to number 18.  A threat of bodily

20   harm, whether in person or on a phone, should be taken

21   seriously.  But there's a question about whether or not the

22   person is capable of doing the harm, and I think that's the --

23   that's what we're here for.  And so I am concerned about that,

24   and I am concerned that a person that has very strong opinions

25   may bring those strong opinions whether we try to control them

UNITED STATES DISTRICT COURT

1    one way or the other so as not to influence other panel

2    members.  So that's my concern.

3         MR. EISENBERG:  Judge, this is somewhat like the voir

4    dire questions:  Do you have relatives who are in law

5    enforcement, would you more than likely give them the greater

6    due than the average person coming in?  And after voir dire

7    questions the question then becomes, if that person is simply

8    biased by expressing it here in front of the courts, they are

9    gone.  But if they say in response to the Court's questioning:

10   Yes, I will abide by Your Honor's statement with respect to the

11   nature of the offense and the elements in the case, then this

12   person, if they persist in saying the capabilities of the

13   person doing the threatening are something that I'm still going

14   to consider, then they have to be out because capability is not

15   part of the element of intent, and I acknowledge that.

16        But we don't really know how deeply this person holds

17   that opinion.  And we all have biases.  Every juror comes to

18   court, even though they may not inform the Court of that bias,

19   once they hear what the Court has to say with respect to the

20   law and so forth, I think many jurors take that to heart.  So

21   nonetheless, I couldn't tell on this basis whether this juror

22   really is so biased that he or she needs to be excluded.

23        MS. BROOK:  I will say lastly that these jurors fill

24   out these jury questionnaires under the penalty of perjury and

25   they do so in a position that they can, without the filter of

```
1    social feedback, tell us what they are really thinking, and I
2    think with answer number two as well as 18 we have a legal
3    issue as well as a political bias, bias issue, that would make
4    this juror somebody who should be struck for cause.
5              THE COURT:  And I do agree, Mr. Eisenberg, so I am
6    going to strike 1304.
7              1306, and I guess it depends on whether or not you are
8    dog owners.  This person feels that they aren't able to leave
9    their dogs alone.
10             MR. KOEHLER:  So Your Honor, somebody who has two dogs
11   and regularly goes out of town on occasion leaving the dogs
12   behind, we find people to care for them, and we still have one
13   child at home who cares for a neighbor's dog when they go out
14   of town.  I'm shocked that this juror is unable to find
15   somebody to take care of her dogs for a couple of nights.
16             THE COURT:  Mr. Eisenberg.
17             MR. EISENBERG:  I kind of agree with that, Your Honor.
18   This is going to be two to three days.  Like Mr. Koehler, we
19   have a dog and we do find a way.
20             THE COURT:  All right.  We will keep the dog owner in.
21             MR. KOEHLER:  What is the juror number on that one,
22   Your Honor?
23             MR. EISENBERG:  1306.
24             THE COURT:  1306.  I had -- I think there was a
25   question about 1322, but here I think given the duration of the
```

1    trial, this person was going to be on vacation, but I think we

2    are, given that the 20th is this following Saturday, that I

3    don't think it will interfere, so we will keep 1322 in.

4          Now, let me run through a couple of other matters.

5          MS. BROOK:  Your Honor, we had one.

6          THE COURT:  I have more.

7          MS. BROOK:  Okay.

8          THE COURT:  Those are ones that I primarily flagged

9    for hardship reasons whether financial or COVID related.  There

10   are others and you can certainly reserve this for later.

11         Juror No. 900, this person answered question 21 about

12   the duration of the trial:  Unsure if I can get someone to

13   watch over and help my mom.  She doesn't need 24/7 care, but

14   definitely needs assistance.

15         And then with regard to question 23, COVID and anyone

16   in the household being at risk:  My 79-year-old mother.

17         So if you, I don't know if you have a strong feeling

18   one way or the other with regard to 900.

19         MR. EISENBERG:  Your Honor, I guess this is a little

20   different than the person with the dogs.  This is a human being

21   that needs care, 79 years old, doesn't drive.  I would be

22   inclined to say no objection to her being removed.

23         Although, I am sorry, Your Honor, question 21 says:

24   Unsure I can get someone -- Your Honor just read this -- to

25   help mom.  I will be okay.  She doesn't need 24/7 care, but

1  definitely needs assistance.

2        Well, if that's the sole caretaker, then I would

3  excuse that person.

4        MS. BROOK:  Your Honor, may I see Dave's, Mr.

5  Eisenberg's 900?  Ours isn't in here.

6        MR. EISENBERG:  Sure.

7        MS. BROOK:  One second.  We don't have any objection.

8        THE COURT:  All right.  So 900, yes, 900 will be

9  removed.  13 -- I might have this wrong.  Oh, I wanted to bring

10 to your attention with regard to number 1344, the answer to

11 number two, and this may be along the lines of having to flesh

12 out whether or not this individual will be able to follow jury

13 instructions, but what concerns me is the final, the final

14 sentence:  I will presume that Mr. Martis has court-appointed

15 defense attorney, and if he has a complete understanding of the

16 fact pattern and his actions that he should probably plea

17 bargain and accept incarceration time.  Just my opinion.

18       So if you want to keep the individual in, I am happy

19 to do that if you want to flesh that out further.

20       MR. EISENBERG:  I think to be consistent he should be

21 kept in.

22       THE COURT:  All right.  Then I want to call to your

23 attention with respect to 1359, and the answers to questions

24 number two and number 18, and the answer to question number two

25 is with regard to the circumstances:  I'm not sure.  I've been

1   stalked and harassed before in high school, and I had to get a

2   restraining order on the person.

3          And then again, with respect to 18, it's sort of a

4   reiteration of that same feeling and the uncomfortable feeling

5   that it caused the individual, so I bring that to your

6   attention as well.

7          MR. EISENBERG:  And my response would be the same as

8   before, Your Honor.

9          THE COURT:  All right.  And so what we will do with

10  the remaining individuals that are kept in is that we will seat

11  I believe up to 41, did you say?

12          COURTROOM DEPUTY:  43.

13          THE COURT:  43 individuals.  We will conduct voir dire

14  in the ceremonial courtroom, and so we'll have the ability to

15  seat more.  We need a minimum of 31, assuming all of these

16  individuals show up.  And as has happened in the past, we

17  sometimes get late questionnaires, and I will double-check to

18  see if we do have any that arrive by perhaps Friday and then

19  you may have to review more.

20          All right.  Any other questions with regard to that?

21          MS. BROOK:  Just one more juror for discussion and

22  deliberation regarding a Motion to Strike for Cause, and that's

23  217.  217 is an individual who on question number 18 evidenced

24  both a bias against the government Department of Justice as

25  well as the nature of the threats themselves and inability to

1    follow the law.  So let me read this:  Do you have any strong

2    feelings about the law that make communicating verbal threats

3    over the phone illegal?

4         The response from 217 was:  In today's world, when the

5    U.S. justice department is treating parents like terrorists

6    because they are concerned and frustrated and raise their

7    voices, yes, I have a problem with that.

8         Our concern would be bias that permeates against the

9    United States, the Department of Justice.  Specifically here in

10   this case bringing the prosecution.  And additionally, making

11   clear that they have strong feelings about criminalizing

12   threats made over the phone.

13        THE COURT:  Well, I see what your point is, but I

14   actually think the answer to -- the answer -- the way that the

15   person answered question 18 is nonresponsive.  And so it's, and

16   it relates to a whole different subject matter, and so that's

17   the way I view the answer, and I think once you get the person

18   in and they understand the context of the case, I think it

19   bears at least some fleshing out.

20        MS. BROOK:  Your Honor, do you permit the parties at

21   the end of voir dire to do some specific follow-ups?

22        THE COURT:  Only with regard to specific answers and

23   questions that have been asked, yes.

24        All right.  Anything then further in terms of who will

25   be seated or on the jury panel?

1          MS. BROOK:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Okay.  I think I covered just

3     about everything, and I will have my decision with respect to

4     the requested government's supplemental nonmodel instruction on

5     the First Amendment, I will have that to you if not by Friday

6     then before we start the trial definitely.

7          Is there anything else from the government?

8          MS. BROOK:  Your Honor, just in terms of how the trial

9     proceeds forward, because we anticipate this being such a quick

10    trial, I think it may be possible, even if we get to closing by

11    the end of the day on Tuesday if not first thing in the morning

12    on Wednesday, Mr. Koehler and I have tried numerous cases

13    together and in each of those we divide up close so that one

14    takes the first primary close and the other one does rebuttal.

15    Nobody has had an issue with that, but we wanted to make sure

16    this Court doesn't either.

17         THE COURT:  That's fine.

18         MS. BROOK:  Thank you.

19         THE COURT:  Anything from you, Mr. Eisenberg?

20         MR. EISENBERG:  Yes, Your Honor, this housekeeping

21    matter for me, Mr. Martis is under sequestration and he will

22    remain that way through the rest of this week and into next

23    week.  I understand the reason for that.  However, I cannot see

24    him face-to-face, at least the way it is presently as

25    structured, and I don't want to have him feeling like he cannot

1    actually converse with his attorney.  Can be done over the

2    phone, and Ms. Rothsmeyer at CAFCC has been helpful in trying

3    to set up phone calls, but they don't always work and a lot of

4    times that has to be done in the evening, which is okay, but

5    it's not ideal.  I would ask the Court to consider, and I will

6    be happy to submit a motion to this effect, to allow me to

7    visit him at least once on a face-to-face basis.  One of the

8    reasons for that is there are a lot of tape-recorded

9    conversations here, sorry, not conversations, but voicemails.

10   He cannot hear them if I play them in my office through my

11   telephone into his phone receptacle at CCA.

12            THE COURT:  Place in your motion specifically what it

13   is that you're asking.  You want at least one visit with him

14   before the trial, during the trial?

15            MR. EISENBERG:  No, during the trial is not a problem.

16   Before the trial.

17            THE COURT:  And when you say you want one visit with

18   him before the trial, are you talking about at CCA while he is

19   sequestered or here in the courthouse?

20            MR. EISENBERG:  At CCA, Your Honor.

21            THE COURT:  And I think we can try to accommodate

22   that.  I'm not sure if we have to go through the U.S. Marshals

23   Services for that because he's under their custody so to speak.

24            MR. EISENBERG:  Right.

25            THE COURT:  So we will find out how that gets

1    directed, but I certainly will.  I understand the necessity of

2    that and so we'll see what we can do to accommodate it.

3          MR. EISENBERG:  Thank you, Your Honor, and along with

4    that is my request that he be afforded the usual hygienic

5    preparation that includes a shower and haircut and so forth.

6    It's been a little difficult to have that set up.  I am not

7    sure why there is a disconnect there.  I am not sure I need to

8    put that into a motion, but I think he should be as presentable

9    as possible when Tuesday comes, and those are two of the

10   concerns that I have.  He should have a haircut and his beard

11   should be trimmed, and he should have -- we will get him the

12   clothing, so that's not an issue.  He also should be able to

13   take a shower.  That hasn't been -- that hasn't been all that

14   common since he's been in sequestration.

15         The issue is he doesn't have hot water there.  I don't

16   think we're going to be able to make up for that.  That's just

17   the way it is, but I do think he ought to be able to have those

18   events take place and they should take place Sunday or Monday.

19         THE COURT:  Well, I will see what I can do in terms of

20   that order.  I don't necessarily know what the constrictions

21   are, but it seems to me not to be an unreasonable request.

22         MR. EISENBERG:  No, they are not your -- I think that

23   a lot of times he's not there when they come by to offer him

24   these services.  Sometimes they don't come by to offer these

25   services.  I understand what the protocol is in terms of how

1    frequently that should happen.  Same thing with the change of

2    clothing, that's been difficult to coordinate, but I am just

3    concerned about him coming to court looking properly.

4            THE COURT:  All right.  We will see what we can do.  I

5    will wait for that motion, and then we can modify it as need be

6    once I confer with the U.S. Marshals Service.

7            MR. EISENBERG:  Thank you.

8            THE COURT:  All right.  There being nothing further,

9    then I will see you 9:00 a.m. -- why don't we do this:  I'll

10   ask counsel to be present in the ceremonial courtroom at 8:30

11   a.m.  That way I can give you, if I haven't already given you

12   my ruling with respect to the requested jury instruction, and

13   then we can go over any final questions that you may have

14   before the panel comes in.

15           All right.  We are adjourned.

16           (Hearing concluded at 3:16 p.m.)

17

18

19

20

21

22

23

24

25

1

2

3                       **C E R T I F I C A T E**

4

5

6          I, HILDA E. LOPEZ, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 15th day of May,

15  2022.

16

17

18                              s/Hilda E. Lopez_____
19                              HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25