**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **3:21-CR-08043-DJH** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | February 25, 2022 |
| **Steven Martis,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SENTENCING


Official Court Reporter:
Hilda E. Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                          **A P P E A R A N C E S**

3

For the Plaintiff:
4        United States Attorney's Office
         By:  **Kristen Brooks,** Esq.
5             **Joseph Koehler, Esq.**
         40 North Central Avenue, Suite 1200
6        Phoenix, AZ 85004

7   For the Defendant:
         David Eisenberg, P.L.C.
8        By:  **David Eisenberg,** Esq.
         3550 N. Central Ave
9        Suite 1155
         Phoenix, Arizona 85012-2120
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **P R O C E E D I N G S**

3

4          THE COURT:  All right.  Please be seated.

5          COURTROOM DEPUTY:  This is case number CR 21-8043,

6    United States of America vs. Steven Arthur Martis, on for

7    sentencing.

8          MS. BROOK:  Good afternoon, Your Honor, Kristen Brook

9    and Joseph Koehler on behalf of the United States.

10         THE COURT:  Good afternoon.

11         MR. EISENBERG:  Good afternoon, Your Honor, David

12   Eisenberg on behalf of the Defendant, Steven Martis.  As Your

13   Honor can see, he's present but by VTC.

14         THE COURT:  And good afternoon, Mr. Eisenberg, and

15   good afternoon to you, Mr. Martis.

16         THE DEFENDANT:  Hello.

17         THE COURT:  Are you able to hear all of us?

18         THE DEFENDANT:  Pretty garbled.

19         THE COURT:  Mr. Eisenberg, my understanding was that

20   Mr. Martis was to have been brought in to the courtroom for the

21   purposes of this hearing.  Has he consented to appear through

22   the VTC?

23         MR. EISENBERG:  Yes, Your Honor.  When I spoke to him

24   last about sentencing, we discussed what it would mean to

25   travel here as opposed to being sentenced in through VTC.  We

1   discussed the hearing aspect of that, and I was confident not

2   only that he could hear but that his choice was to remain at

3   FCC, CIFCC for the purposes of the sentencing.

4           THE COURT:  Did you hear all of that, Mr. Martis?

5           THE DEFENDANT:  Yes.

6           THE COURT:  And do you agree you wish to have your

7   sentencing hearing even though you can't be physically present

8   here in the courtroom for it?

9           THE DEFENDANT:  Well, I told you I wanted to appeal

10  this.

11          THE COURT:  I did not quite understand that.  Can you

12  repeat that?

13          THE DEFENDANT:  I told the attorney I wanted an

14  appeal.

15          THE COURT:  All right.  Mr. Martis, do you agree that

16  you wish to have your sentencing hearing take place even though

17  it is through the video teleconferencing system?

18          THE DEFENDANT:  I would much rather have an appeal,

19  yes.

20          THE COURT:  We're having a bit of a communication

21  problem, Mr. Martis.  I don't -- you are within your rights to

22  want to appeal.  Listen to my question, and see if you can

23  answer it.  Do you wish to have this sentencing hearing today

24  even though you are in, appearing in court through this video

25  system?

1          THE DEFENDANT:  Okay.  Yes.

2          THE COURT:  All right.  Now, what that means is if

3     there's something that you cannot hear, will you please let me

4     know?

5          THE DEFENDANT:  Yes.

6          THE COURT:  All right.  And so Mr. Martis has agreed

7     to appear in this sentencing hearing through the video system,

8     and I do also note that he's also spent about 387 days in

9     custody, and so it is in the interest of justice to have his

10    hearing take place today without further delay.

11         And so Mr. Martis, this is now the time set for

12    entering judgement and sentencing on your case.  As you recall,

13    after a trial by a jury on November 18th of 2021, you were

14    found guilty by a jury of Count 6 of the superseding indictment

15    which charges you with threats through interstate commerce, in

16    violation of Title 18 United States Code Section 875(c).

17         Now, it is my obligation to impose a sentence as a

18    result of that conviction.  The probation office has provided

19    to me a presentence investigation report.  That report provides

20    me with background information about you.  It also provides an

21    overview of what the investigation revealed in your case, and

22    it makes sentencing recommendations.

23         Did you have an opportunity to read through that

24    report?

25         THE DEFENDANT:  Yes.

```
 1              THE COURT:  Were you able to go through the report and
 2    sentencing recommendations with Mr. Eisenberg?
 3              THE DEFENDANT:  Not after I received it.
 4              THE COURT:  Mr. Eisenberg.
 5              MR. EISENBERG:  Yes, Your Honor, after he received it
 6    he and I talked about it --
 7              THE DEFENDANT:  No, we didn't.
 8              MR. EISENBERG:  -- by telephone, and there's been more
 9    than one conversation concerning the presentence report.  The
10    report was also mailed to him with a cover letter in which I
11    discussed the report as well.
12              THE COURT:  Mr. Martis, do you agree with what
13    Mr. Eisenberg has just said?
14              THE DEFENDANT:  Basically, yeah.
15              THE COURT:  So you discussed the Report and
16    Recommendations over the telephone; is that correct?
17              THE DEFENDANT:  Show what?  There were lots of errors
18    in it.
19              THE COURT:  Did you bring those errors to the
20    attention of Mr. Eisenberg?
21              THE DEFENDANT:  I tried to, yes.
22              MR. EISENBERG:  Yes, Your Honor, that did happen, and
23    those that were in the nature of background, I conveyed to the
24    probation office, and a few of those were changed, but there
25    were no errors with respect to the guideline calculation, which
```

1   we went through, as well as the criminal history which we also

2   went through.

3          THE COURT:  All right.  Now, Mr. Martis, are you so

4   far satisfied with the services of your counsel?

5          THE DEFENDANT:  Not really happy, but, you know, what

6   can you do?  I don't have any money to pay for anything.

7          THE COURT:  Do you feel that Mr. Eisenberg has done a

8   good job for you?

9          THE DEFENDANT:  Not really.

10          THE COURT:  Well, I think given the circumstances, the

11   nature of your case and having presided over the trial, I think

12   Mr. Eisenberg has provided you with representation that is

13   professional and fair, and I understand that you are concerned

14   about the results of your trial, but I think overall my

15   observation has been that Mr. Eisenberg has been attentive to

16   your case, but I appreciate your input.

17          Now, I have no objections to the presentence

18   investigation report, Mr. Eisenberg; is that correct?

19          MR. EISENBERG:  That is correct, Your Honor.

20          THE COURT:  And I have no objections from the

21   government, is that also correct?

22          MS. BROOK:  That's correct, Your Honor.

23          THE COURT:  There being no objections, then I will

24   adopt the advisory sentencing guidelines that are calculated in

25   the report.

 1          Mr. Martis, your sentencing guidelines are calculated

 2   in the following way:  The base offense level number that is

 3   assigned to the crime of threats through interstate commerce is

 4   a base offense level number 12.  There are two additional

 5   levels that are added to that because this offense includes

 6   making more than two threats.  There are an additional three

 7   levels that are added because in this case you threatened a

 8   member of the United States Congress.  The adjusted offense

 9   level, therefore, is 17.  You are in a criminal history

10   category of I.  And although you do have a lengthy criminal

11   history, the majority of that is fairly old and so we don't

12   count it.  The only countable criminal history here is the

13   conviction that you obtained back in October of 2018 for

14   failure to appear in the Bullhead City Municipal Court.

15          Now, based on your offense level of 17 and your

16   criminal history category of I, that places you in a sentencing

17   guideline range of 27 to 33 months in custody.

18          Now, before the Court does impose a sentence, I will

19   tell you that I have received two additional documents, one of

20   them is the government Sentencing Memorandum.  The other is

21   Mr. Eisenberg's Sentencing Memorandum in which he asks the

22   Court to impose a time-served sentence and to consider reducing

23   your sentencing guideline range for acceptance of

24   responsibility, and I've read through all of that and before

25   the Court does impose a sentence, Mr. Martis, is there anything

1   that you wish to say on your own behalf before I pronounce

2   sentence?

3            THE DEFENDANT:  What can I say?

4            THE COURT:  That is entirely up to you, sir.

5            THE DEFENDANT:  I just responded the way I felt and it

6   is my opinion.  And if that's not good enough, that's just too

7   bad.  That's the way I feel.  I feel like I did nothing wrong.

8            THE COURT:  All right.  Is there anything more?

9            THE DEFENDANT:  Just like President Donald Trump, I am

10  a patriot and I love my country.  I cannot stand fools that

11  commit treason against it.

12           THE COURT:  All right.  Thank you, Mr. Martis.

13           Mr. Eisenberg.

14           MR. EISENBERG:  Your Honor, may it please the Court,

15  may I address the Court from up at the podium?

16           THE COURT:  Yes, you may.

17           MS. BROOK:  And Your Honor, perhaps for the sake of

18  ensuring that Mr. Martis can hear when we speak at the podium,

19  maybe we take our mask off?

20           THE COURT:  That's fine, Mr. Eisenberg.  If you wish

21  to remove your mask, you may do so.

22           MR. EISENBERG:  I do, Your Honor, thank you.  That was

23  a good suggestion, Ms. Brook.

24           THE COURT:  And bring the mic to you as close as you

25  can.  Thank you.

1          MR. EISENBERG:  Yes, ma'am.  Your Honor, we've asked

2    for the sentence of time served, and that is based upon the

3    overall concept that a time-served sentence, which in this case

4    is now greater than a year, as the Court has noted, is

5    sufficient but not greater than necessary to achieve several

6    sentencing factors which the Court would necessarily have to be

7    guided by in 3553.

8          One is the nature and the circumstances of the

9    offense.  A second is the defendant's history and its

10   characteristics.  A third is the guideline and how it's

11   calculated in his case.  And the fourth is the need for, in my

12   case or what I'm about to tell Your Honor, is the lack of a

13   need in his case for deterrence and public protection.

14         First I'm going to go to the nature and the

15   circumstances of the offense, and this is an offense that is

16   centered completely around telephone calls.  These calls had a

17   similarity, Your Honor, and the reason why I'm going into them

18   is to show a couple of things.  One is that they weren't quite

19   as devastating as they may appear when you listen to them; and

20   secondly, while I know it may not be an element of the offense

21   that Mr. Martis was not really able to carry them out by virtue

22   of the actual calls themselves, and here's what I mean.

23         First, the nature of the calls were to congressional

24   offices.  There were no calls to personal telephone numbers,

25   there was no stalking, there was no call by a cell phone in

1  front of somebody's house.  If he had gone to Washington, if he

2  could have.  All of the calls also were similar in that they

3  were voicemails.  Most of them, in fact, I think the entirety

4  of all the calls to Congresswoman Pelosi, Congressman Schiff

5  and Senator Schumer were done in the early morning Washington

6  time.  All were just a few seconds long.  So the diatribe, if

7  one would call it that, was extremely brief.

8          Almost no details were conveyed within the calls as to

9  when, how or in some cases where the actual threat would be

10 carried out, and I think that's important because the nature

11 and content of the calls could hardly be said to be of a major

12 type of call or letter that we have seen in other cases

13 involving threats conveyed through interstate commerce.

14         The calls started in January of 2019.  They were all

15 to a call made from one spot in Bullhead City.  The first call

16 that I have is September the 4th to Ms. Pelosi.  In effect,

17 he's saying:  We're out here in California, we stick by our

18 guns.  You want to take away our guns, we will take away your

19 life.

20         No mention was made by Mr. Martis of how that would

21 happen, when it would happen, or where it would happen.  I

22 understand the nature of the call, but the context and the

23 content of it are not indicative of someone who is going to

24 carry out a threat.

25         The second call is on the 18th of that month, also to

1    Congresswoman Pelosi:  I just killed three of these illegals.

2    We're coming for you too.

3            There is no evidence that he shot anybody, as he said

4    to the agents when he was interviewed, and there was no mention

5    in this case as well as to how he would carry out the threat,

6    when it would occur, and where it would occur.  Just coming for

7    you.

8            Count 3 is January the 20th, 2020.  This is one that I

9    believe stayed within the cases.  It went to the jury, and it's

10   one in which the jury hung.  This is a call to Congressman

11   Schiff:  In effect, your impeachment failed.  We're going to

12   wipe the streets of D.C. with you, ha-ha-ha, 'cause we're going

13   to put a bullet in your head.  You're dead.

14           Okay.  At least this one has the context of how it

15   would happen, but not when.

16           The next one, also that was hung on, this is Count 4,

17   this one is also to Ms. Pelosi, March 27th, 2020:  Nancy, we're

18   going to kill you, chop you up into little pieces.

19           Well, at least there is the chopping there, but the

20   when and the where is not disclosed.

21           And then another one to Congressman Schiff,

22   March 28th:  We're going to kill you.  You're dead.  Your

23   career, everything else is dead.  No mention there of when,

24   where and how that would occur.

25           January the 17th, this is Count 6, this is the one of

1    conviction.  Here is two calls made on the same day almost

2    within seconds of each other.  The context is:  I'm coming to

3    kill you, and you're dead.  No mention where and how that would

4    occur.

5           There were other calls that were made to all three of

6    these congresspersons.  I counted a total, based upon the

7    discovery, of 186 calls made to these three members of

8    Congress.  Of those seven or so made it into either the proof

9    or at least the investigation with respect to them being

10   allegedly calls of threat.  That leaves 179 calls to these

11   three Congress people.  I assume, Your Honor, from the lack of

12   evidence, and certainly from the lack of anything that was

13   produced by the government, that none of them were reported to

14   the United States Capitol Police and, therefore, they were not

15   threatening.  We kept that, Your Honor, I guess to the point

16   because we heard from two staffers who talked about the regimen

17   that they used in order to review the voicemail messages.

18          So what I'm saying, Your Honor, is that in effect

19   there were so few calls, excuse me, the other way around, so

20   many calls put to these three members of Congress that were not

21   indicative of threats, that it tells a story about Mr. Martis,

22   and the story is these calls were made earlier in the process.

23   It was only as time went on that he got angry with what he saw,

24   and now we have these charges.

25          I'll leave away from this particular matter in terms

1    of the number of calls, but I do want to note there were 24

2    other calls made to what I recognize, and I think the general

3    population would recognize as democratic senators or members of

4    Congress, Kyrsten Sinema, Mark Kelly, Maxine Waters, 24 calls.

5    None contained reported threats.

6          So again, where is the intent to actually carry out

7    this, and the severity, I should say, with respect to what

8    Mr. Martis was trying to do?  A lot of this is found within the

9    FBI's search in the interview of my client.

10         Basically what you come away with, what I have come

11   away with, Your Honor, is that these calls were designed to

12   express political views rather than actually carry out any

13   threats, and also what you can understand from the search and

14   seizure is he had no ability to do what he was saying he would

15   do on the phone.  And in fact, they also show that he had no

16   intent to do any of it.

17         First, with respect to the search, this goes to his

18   ability to carry out any threat.  No firearms were found,

19   nothing else that I would describe as a workable weapon.  There

20   were no knives found, no spear-like weapons, no chains, and no

21   sophisticated equipment that might be used in order to help or

22   participate with others in terms of the threats that were

23   carried out here.  Much like perhaps what we saw January 6th of

24   last year on Capitol Hill.  The interview itself lasted

25   27 minutes.  The defendant consented to the interview.  At no

1   time did he ask it to stop.  At no time did he ask for an

2   attorney.  Both sides engaged in a pleasant tone of voice, but

3   at the end of the day the defendant held firm to his

4   convictions that he was distressed about what was going on in

5   Washington.  Before the calls were played, he acknowledged

6   making calls, but he couldn't remember what was said.  It's not

7   surprising given the amount of calls here, but he did

8   acknowledge that it was he on the phone when calls were played.

9           Before the agents started to play the calls, one of

10  them, Agent Ferreira, said:  You threatened to put a bullet in

11  their head.  And I think he may have been referring to more

12  than one.  The defendant answered:  Huh-uh, no way.  Let me

13  hear the conversation then.

14          So in his mind at that time before the conversations

15  are being played, he could not recall having made a threat, and

16  one cannot say that he was lying or misstating what he believed

17  to be correct at that point in time because as that interview

18  went on he acknowledged that was his voice and he made those

19  calls.  So there are two calls that I want to stress.

20          One was the one to Congresswoman Pelosi on January the

21  26th of 2019.  The call was played.  Mr. Martis answered during

22  the interview:  Yeah, I remember the damn border problem.  But

23  as far as telling her I'm going to kill her, huh-uh, kill her,

24  what you call it, her career, maybe.  And the reason for the

25  call, he said, was to change what they were doing.  Stick up

1    for this country.  Stop being such idiots.  Regardless of one's

2    political persuasion, that's how he feels, and the sincerity of

3    the defendant is important.  Maybe not the way he carried it

4    out, but the sincerity is 'cause it does go to intent.

5           The other call I want to remark about is on September

6    the 4th, also to Ms. Pelosi.  And the agent there said:  If you

7    want to take away our guns, we will take away your life, what

8    did you mean by that?

9           Mr. Martis answered:  Political life.

10          The agent said:  You aren't trying to go over there

11   and necessarily kill her?

12          No, no, hell no, said Mr. Martis.  Tell them to do

13   something about the border problems.  Do the right thing.

14          And then finally, Your Honor, towards the end of the

15   interview when the agents were talking to him about what was

16   going to happen next, he talked about his ability to carry out

17   these threats.  He says:  I can't get to Washington.  I cannot

18   even make it to Kingman.  And then what I certainly appreciate

19   is the candor with which agent, the case agent, informed the

20   probation officer about his view of Mr. Martis' intent when, as

21   reported in the probation officer's report, he said:  Mr.

22   Martis did not appear to have the means or intent to carry out

23   his criminal threats.

24          I won't dwell on Mr. Martis' testimony at trial except

25   to say that it was consistent with everything he told the FBI.

1    He made the calls, he did not intend to harm anybody, but he

2    was angry.  When he started making these calls to the

3    politicians, he wasn't really doing anything other than

4    criticizing their actions, but when things didn't change,

5    that's when he got angry and that's when he made the statements

6    that he made.  That was his testimony.

7          Now, I do write in my memo, Your Honor, that while I

8    understand the nature of acceptance of responsibility as it

9    impacts sentencing guideline calculation, I decided not to file

10   an objection because I think as a matter of law in the way the

11   guidelines have been interpreted, probation office was right

12   not to give it to him.  But nonetheless, I think we have to

13   focus on going back to his testimony at trial.  He didn't deny

14   the facts.  He didn't deny the calls.  He didn't deny what he

15   said.  He didn't say the recordings were wrong, but what he did

16   say is basically I didn't have the intent to commit the crime.

17         Now, I suppose I could have made the argument that

18   that says that he's entitled to contest the element of intent,

19   and in some cases say that defendant may preserve the right to

20   get acceptance of responsibility if he's arguing over something

21   such as jurisdiction.  Nonetheless, it's important to note

22   that's what his testimony was.

23         And then, Your Honor, as far as history and

24   background, his concern, again, he doesn't qualify for a

25   lengthy sentence, and I think it does support my request that

1   he get time served.  High school graduate, service in the

2   military for four years, Vietnam service, he has at least three

3   awards for meritorious service or good conduct.  He was

4   privately employed for several years.  He was married.  No

5   children.  His sole means of support is Social Security.

6   Again, that would show, and as I will sum up later on, he

7   doesn't have the means to carry out any threats.

8          Your Honor, his age and health also speak of a

9   sentence of time served.  He has back injuries, herniated

10  discs, he has glaucoma, and he's confined to a wheelchair.  And

11  the guidelines with respect to the health characteristic do

12  provide for a substantive of confinement through such as home

13  confinement rather than prison for persons of advanced age and

14  those who have poor health.

15         The probation office makes a recommendation of greater

16  sentence than time served because it says it finds that he's a

17  risk to re-offend, which I disagree with, but he's not a

18  danger, and I think the probation office recognizes that.  He

19  is wheelchair-bound, as I said, he is arthritic, and he's in

20  generally poor health.

21         So Your Honor, I would sum up and say there's no

22  victim statement in this case which I do find interesting.

23  None of the Congress people came to testify.  I understand that

24  they are busy, but they didn't even bother to write a letter,

25  but what Your Honor is left with is the testimony of their

1    staffers.  That's the total extent of how the people felt about

2    what was going on.

3           I also will repeat and then I'll leave off, Your

4    Honor, he has an incapacity to carry out anything.  The vast

5    majority of the calls he made were benign, and certainly he was

6    heartfelt in what he said.  This was wrong, but at no time did

7    he ever mean to injure or harm anyone.

8           So Your Honor, I think that there is a good record to

9    be made.  In fact, an outstanding record on his behalf to be

10   made is that a time-served sentence is appropriate.  Thank you,

11   Your Honor.

12          THE COURT:  Thank you.  Let me double-check that my

13   guideline chart is the same.  To my knowledge, the sentencing

14   guideline chart has not changed from the 2018, and I indicated,

15   as it does in the presentence investigation report, just on

16   looking at it right now, I looked at it earlier, but I somehow

17   overlooked it, an offense level 17 with a criminal history

18   category of I places him in a 24 to 30-month range, and here

19   it's noted and I repeated 27 to 33 months.

20          MS. BROOK:  That's a good catch.

21          MR. EISENBERG:  Your Honor, I wonder whether he may

22   have been on probation from that underlying offense, the

23   misdemeanor, and if Your Honor looks at paragraph 87, I can

24   understand the confusion.  I'm on document, let me get to the

25   right one, I think it's 86 is the final.

1          THE COURT:  Well, here in paragraph 87 it says that he

2    is in a criminal history category of II, and if that is the

3    case then 27 to 33 months is accurate.  And I did also note, I

4    think there was his last conviction that he was on probation

5    three years of unsupervised probation, and that his probation

6    was to expire October 25th of 2021.  And so then I think

7    there's a typographical error then in the Document 86, and it

8    should be criminal history category II.

9          MR. EISENBERG:  Your Honor, I'm looking at Document 86

10   and paragraph 87 says based on a total offense level of 17 and

11   a criminal history category of II.

12         THE COURT:  That's what I just said.

13         MR. EISENBERG:  I am sorry.  Okay.

14         THE COURT:  That's precisely what I just said.

15   Because he was still on a probationary term when he committed

16   the offense he's actually in a criminal history category of II,

17   which then makes the guideline range 27 to 33 months.  So we

18   will amend Document 86 on page 20 to read:  Criminal history

19   category of II.

20         MS. BROOK:  That's correct, Your Honor.

21         MR. EISENBERG:  I agree.

22         THE COURT:  Thank you.  Anything more, Mr. Eisenberg?

23         MR. EISENBERG:  No, Your Honor.

24         THE COURT:  All right.  Ms. Brook.

25         MS. BROOK:  Thank you, Your Honor.

1              THE COURT:  Just one second.

2              All right.  Ms. Brook.

3              MS. BROOK:  Thank you, Your Honor.  Your Honor, the

4    government requests that the Court impose a strong sentence, a

5    sentence that is consistent with the guideline calculation in

6    this particular case followed by three years of supervised

7    release.  To hit home the point for the defendant of specific

8    deterrence, to provide for the community a message of general

9    deterrence that this crime is in fact a serious crime, to

10   promote respect for the law.  To start off, Your Honor, the

11   biggest concern that the government has standing here today is

12   that Mr. Eisenberg addressed the Court and said that the

13   defendant understands what he did was wrong.  But as he said

14   just a few moments ago sitting here in court:  What can I say,

15   I did nothing wrong.

16              It is that that he has maintained, that perspective,

17   that outlook, that for over two years had him engaging in

18   multiple calls where he was calling not only Speaker of the

19   House Pelosi, but other members of Congress, and threatening

20   them.  The seriousness of the offense in this particular case,

21   despite what defense counsel says, defense counsel stood here

22   and said:  Well, these are telephone calls and they are not as

23   devastating as they may be.  What the defendant did was

24   intentionally knowingly picked up the phone, he intentionally

25   made these calls, and he transmitted messages to individuals

1    trying to scare them, scare them with a threat of death,

2    specific harm, and we know that in fact it did just that.

3           We heard during trial from Heather Connelly, we heard

4    from Owen Beal.  Ms. Connelly teared up on the stand talking

5    about how these messages affected them, how difficult they were

6    to receive.

7           And defense counsel makes mention and talks about the

8    fact that this defendant should receive a less sentence, or

9    this crime is less significant than it could have been because

10   he had no intention to kill anybody.  The defendant is not

11   charged with that.  That's not the essence of this crime.

12   That's not what this criminal conduct is about.  And to

13   misconstrue those two different types of cases would do an

14   injustice to this crime.  The legislature has established that

15   in fact this is a serious crime.  That the defendant did not

16   need to provide specific details.  I am going to, as he said in

17   his last call, the one on, the two on January 17th that he

18   said:  I am coming to kill you; you are dead.  He doesn't have

19   to provide specifics about that.

20          The jury in this case found that what the defendant

21   did was issued a true threat.  It was not merely a joke, it was

22   not in an elegant expression of anger or political argument.

23   And the jury had for them instructions that made clear.  The

24   First Amendment is something that is protected in this country.

25   The First Amendment protects the right to free speech.

1    However, Martis crossed the line from expressing his political

2    beliefs and his disappointment towards others who don't share

3    his political views, to engaging in felonious criminal conduct

4    when he picked up the phone and repeatedly made these calls,

5    certainly the two on the 17th of January of 2021, which we are

6    here today to address.

7            It is not permissible that the defendant doesn't

8    understand the nature of this crime being a crime.  He was told

9    on February 4th of 2020 that in fact it was a crime.  You can't

10   call Congress folks and threaten to put a bullet in their head.

11   He was warned by the FBI.  He said he understood, but what did

12   he do?  He picked up the phone and again and again he called.

13           The history and characteristics of this particular

14   defendant are of note and they are concerning.  He has a

15   history of arrests and convictions for disorderly conduct.  He

16   has a history of arrests, also convictions for assault on a

17   police officer, multiple DUIs, failing to appear, a history

18   that has seemed to have escalated in terms of his ongoing

19   conduct with these calls, his inability to stop materializing

20   in this January 17th of 2021 call.

21           The Court may find in this particular case that some

22   degree of a downward departure or a variance may be appropriate

23   for his age or his infirmity, and to some extent maybe that is

24   appropriate, but it's important to note that, you know, when

25   you use the means of a phone to commit a crime, age and

1   infirmity aren't a barrier to the continued, continuing to

2   perpetrate this particular crime in the future, and it's

3   concerning as we sit here today that he has no insight on his

4   criminal conduct and engaging in this conduct in the future.

5        We ask that in terms of a supervised release tail on

6   this sentence that it implements the recommendations requested

7   by the Probation Department.  In particular, anger management.

8   Additionally, mental health counseling, if that may be

9   appropriate.  And there are additional recommendations for a

10  warrantless search, prohibiting the use of alcohol.

11       And I also want to make note, if the Court is inclined

12  to implement in this case a time-served sentence, in order for

13  the defendant to bridge to the facility that's near CoreCivic

14  that would be the halfway house where he could remain for

15  180 days, he doesn't have a support system, he doesn't have a

16  home to go home to, that that institution needs two weeks in

17  order to place him there.

18       At the end of the day, Your Honor, we ask for a strong

19  sentence.  We ask that the sentence imposed provide specific

20  deterrence for this particular defendant who still today it

21  appears sitting here does not have any insight into committing

22  this crime.  Thank you, Your Honor.

23       THE COURT:  Thank you.  Mr. Martis, the Court, as

24  Mr. Eisenberg has I am sure explained to you, and I am sure you

25  are now aware, has to consider a number of sentencing factors.

1    They are by statute passed by the Congress years ago, they

2    include the nature of the crime that you are now convicted of,

3    making threats through interstate commerce to members of the

4    United States Congress.  They include your background and

5    character, whether or not you're in need of a sentence to deter

6    you from future similar or criminal conduct, if you need a

7    sentence for purposes of rehabilitation, and I also would

8    consider your criminal history background.  All of these

9    sentencing factors have to be balanced and weighed and then we

10   look at your sentencing guideline range.

11        Well, here I need not repeat the conviction that

12   resulted from your trial by jury.  I need not repeat the two

13   threats that you conveyed over the telephone to Congresswoman

14   Pelosi's office.  I think it bears reminding that the

15   individuals, though it was not Congresswoman Pelosi who picked

16   up the phone, the individuals who for the first time heard your

17   voice making those threats, the individuals who testified at

18   trial were still clearly shaken by the language and the words

19   that they heard.

20        The -- there's a reason for the statute that makes

21   threats through interstate commerce against the law, and here I

22   think, Mr. Martis, it's important for you to consider, and if

23   one day maybe you will consider, that these threats that you

24   made were certainly designed, as the government's counsel has

25   just stated, to scare or to threaten these individuals into

1   taking some action or to stopping some action.  It crosses the

2   line from your ability to engage in First Amendment speech.

3   When you make the threat in the way that you did, which invokes

4   this idea that some physical harm will result as a result of an

5   action or inaction, that that person who is receiving that

6   threat, that is where it crosses the line.

7          I mean, imagine, Mr. Martis, if you will, I know you

8   were formerly married, imagine if your former wife had picked

9   up the phone to hear and receive a message such that you left,

10   frightening at best, but a threat, unlawful.

11          And as to the nature and circumstances of this case,

12   what makes this more difficult, and I think this is what I took

13   away from the jury verdict and after the trial, they convicted

14   you of the threat that you made, the two threats you made after

15   you had been contacted by the FBI about the prior 2019 calls

16   that you had placed to all of these other members of Congress.

17   I think they were possibly willing to overlook your

18   understanding of what you were doing at that time.  We can all

19   speculate about that, but you were told back in February 2020

20   that this was against the law, but yet you continued to do, to

21   make those calls well knowing that what you were doing was

22   illegal.

23          And I had for a moment, Mr. Martis, considered

24   Mr. Eisenberg's request regarding giving you some reduction for

25   acceptance of responsibility, but when you point-blank said to

1    me, "I did nothing wrong" today, it tells me that there is the

2    need for a deterrent sentence here.  Because even considering

3    your age, some of the health concerns you present with, which,

4    by the way, were there before you engaged in this activity,

5    I -- the only thing that I can think of to save you from

6    engaging in this kind of conduct again or to save the community

7    from receiving these types of threats is to impose a condition

8    that you not be allowed to use the telephone, and that is

9    simply outside of my authority.  And so I'd love to think

10   Mr. Eisenberg was right that you don't need a sentence to deter

11   you; that based on your health and your age and everything else

12   that you're not going to re-offend, but I'm not myself

13   convinced of that, Mr. Martis, based on what you just said and

14   what your testimony was.

15           And it does make it very difficult for me because I do

16   want to, Mr. Martis, give you some benefit because you have

17   honorably served this country, you have deep political views

18   and beliefs, you've received numerous certificates of

19   appreciation of service and honors for your service to the

20   country.  You've also been able to be gainfully employed

21   throughout the majority of your life.  I don't know, though,

22   how much of your conduct was influenced by your weekly use of

23   marijuana even up at the time that you were making these calls

24   or your daily drinking of alcohol.  I suspect it played some

25   role because you made some of these calls very late into the

1    night, but the years long continuation of the conduct is not

2    aberrant behavior.  It's not just happening once every year

3    when some major political event happens.  It's continuous, it's

4    repeated, it's routine even after you were told that it was

5    against the law.

6         I don't know, Mr. Martis, that I'm convinced that

7    anything that the Court will do will make an impact on your

8    future conduct.  You're an older gentleman.  You're set in your

9    ways, I am sure, and I think one concern I have is something

10   that Mr. Eisenberg raised, and that's the fact that the target

11   of the threat did not make her views known.  And one thing I

12   also contemplated was what types of sentences were actually

13   being handed out for the January 6th events that unfolded at

14   the capitol, and then I look at Mr. Martis.  Those were extreme

15   different acts that occurred.  Mr. Martis' weapon of choice

16   appears to be the telephone, and that is really something that

17   I don't think that I can control his access to, and so I have

18   had to balance and weigh all of these factors.

19        I do find that Mr. Martis is not a danger to others in

20   the traditional sense.  I don't think, and I know that although

21   there was evidence that some aspect or parts of a firearm were

22   found in his possession at the time he was making these calls,

23   it wasn't necessarily a firearm to begin with.  He is a

24   prohibited possessor.  But I do find that Mr. Martis is in need

25   of rehabilitation.  He has an alcohol daily consumption issue

1   as well as a twice weekly marijuana use issue.  I think that he

2   has not expressed sufficient remorse for his conduct.  I don't

3   think he appreciates the fact that it is illegal.

4          So what weighs in the factors that the Court may

5   impose for a variance?  I think it's his health.  And I

6   suspect, especially during this time of the pandemic, that his

7   time incarcerated has been hard on him as it has everyone else,

8   but with someone of his age, I have taken that into

9   consideration.

10          Mr. Martis, it would have done me and I think you a

11   world of good if you had shown even the slightest bit of

12   remorse or understanding for your conduct, but on my record I

13   don't find it.

14          And so I have considered all of the sentencing factors

15   in 3553(a).  Is there any legal cause as to why sentence shall

16   not now be imposed?

17          MS. BROOK:  No, Your Honor.  Thank you.

18          MR. EISENBERG:  No, Your Honor.

19          THE COURT:  Pursuant to the Sentencing Reform Act of

20   1984, it is the judgement of the Court that Steven Arthur

21   Martis is hereby committed to the Bureau of Prisons for a term

22   of 21 months.  I have imposed a downward variance for his

23   health-related factors, but I do find that this is sufficient

24   but not greater than necessary hopefully to keep him from

25   repeat conduct and to try to deter him from future conduct.

1           And you shall pay a special assessment of $100, which

2   is due immediately.  Your payment of criminal monetary

3   penalties is due during imprisonment at a rate of not less than

4   $25 per quarter, and payments shall be made through the Bureau

5   of Prisons' Inmate Financial Responsibility Program.

6           The Court hereby waives the imposition of interest and

7   penalties on any unpaid balance.

8           Now, on release from custody you shall be placed on

9   supervised release for 36 months.  And while on supervised

10   release you shall comply with the mandatory and standard

11   conditions of supervision as adopted by this court in General

12   Order 17-18.

13           And of particular importance, you shall not commit

14   another federal, state or local crime during the term of

15   supervision.

16           Within 72 hours of being released from custody of the

17   Bureau of Prisons, you shall report in person to the probation

18   office in the district in which you are released.

19           You shall comply with the following special

20   conditions:  You must cooperate in the selection of DNA as

21   directed by your probation officer.

22           You must not contact the victim that is named in the

23   indictment for which the conviction resulted, and the probation

24   officer will verify compliance.

25           You must reside at and participate in a Residential

1    Re-entry Center, a residential substance abuse treatment

2    program, a 12-step based halfway house, a sober living

3    environment, or any combination thereof as approved and

4    directed by the probation officer for up to 180 days unless you

5    are discharged earlier by the probation officer.

6           You must follow all rules and regulations, and you

7    must contribute to programming costs in an amount determined by

8    the probation officer.

9           You must participate in a mental health assessment and

10   participate in mental health treatment as determined to be

11   necessary by a medical or mental health professional, and

12   follow any treatment direction by the treatment provider.

13          You must take medicine as prescribed by a medical

14   professional providing mental health treatment unless you

15   object, in which event you must immediately notify your

16   probation officer.  You must contribute to the cost of

17   treatment in an amount to be determined by your probation

18   officer.

19          You must submit your person, property, house,

20   residence, vehicle, papers or office to a search conducted by a

21   probation officer.  Failure to submit to such a search may be

22   grounds for revoking your supervised release.  You must warn

23   any other occupant that the premises may be subject to search

24   under these conditions.

25          To the extent the probation officer determines you are

1  reasonably able to pay the cost of doing so, you must

2  participate in an approved program for anger management.

3          You must participate as instructed by your probation

4  officer in a program of substance abuse treatment, whether

5  that's outpatient or inpatient, which may include testing for

6  substance abuse.  You must contribute to the cost of treatment

7  in an amount to be determined by your probation officer, and

8  you must not use or possess alcohol or alcoholic beverages.

9          Now, Mr. Martis, because you went to trial and you

10  were convicted by a jury after that trial, you do retain all of

11  your rights of appeal, however, if you do intend to appeal your

12  conviction and the sentence that the Court just imposed, you

13  only have 14 days in which to file your Notice of Intent to do

14  so, and Mr. Eisenberg can advise you with regard to that.

15          Is there anything further from the government?

16          MS. BROOK:  No, Your Honor.  Thank you.

17          THE COURT:  Is there anything further from you,

18  Mr. Eisenberg?

19          MR. EISENBERG:  Yes, Your Honor, would the Court

20  recommend that he be placed in Arizona?

21          THE COURT:  I think I can go ahead and make the

22  recommendation to the Bureau of Prisons, but I think what they

23  will likely do is take into account his health and age status

24  first to determine where it is best to place him, and it might

25  not be in Arizona, but I will nevertheless make the

1   recommendation.

2          MR. EISENBERG:  Thank you, Your Honor.

3          THE COURT:  Is there anything further, Mr. Eisenberg?

4          MR. EISENBERG:  No, Your Honor.

5          THE COURT:  All right.  There being nothing further,

6   then we are adjourned.

7          MS. BROOK:  Thank you, Your Honor.

8          (Hearing concluded at 2:37 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      **<u>C E R T I F I C A T E</u>**

4

5          I, HILDA E. LOPEZ, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 15th day of May,

14   2022.

15

16

17                          s/Hilda E. Lopez_____

18                          HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25